No. 22-2034

## In the United States Court of Appeals for the Fourth Circuit

JOHN and JANE PARENTS 1
and JOHN PARENT 2,

Plaintiffs-Appellants,

v.

MONTGOMERY COUNTY BOARD OF
EDUCATION, *et al.,*

Defendants-Appellees.

On appeal from the United States District Court for the
District of Maryland, Southern Div., No. 8-20-cv-3552-PWG

APPELLANTS' OPENING BRIEF

Steven W. Fitschen                    Frederick W. Claybrook, Jr.
National legal Foundation                  (Counsel of Record)
524 Johnstown Road                    Claybrook LLC
Chesapeake, Va 23322                  700 Sixth St., NW, Ste. 430
(757) 463-6133                        Washington, D.C. 20001
sfitschen@nationallegalfoundation.org (202) 250-3833
                                      Rick@Claybrooklaw.com

Attorneys for Plaintiffs-Appellants

November 14, 2022

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. __22-2034__        Caption: __John and Jane Parents 1, et al. v. Montgomery Co. Bd. of Ed., et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__John and Jane Parents 1; John Parent 2__
(name of party/amicus)

_____

 who is _____Appellants_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO


2.    Does party/amicus have any parent corporations?                              ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                              ☐YES ☑NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct
financial interest in the outcome of the litigation?                    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)     ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected
substantially by the outcome of the proceeding or whose claims the trade association is
pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?                    ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?          ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational
victim of the criminal activity and (2) if an organizational victim is a corporation, the
parent corporation and any publicly held corporation that owns 10% or more of the stock
of victim, to the extent that information can be obtained through due diligence.

Signature: s/ Frederick W. Claybrook, Jr.                    Date:    November 14, 2022

Counsel for: Appellants

Table of Contents

Table of Authorities ................................................................. iii

Jurisdictional Statement ...........................................................1

Statement of the Issues.............................................................1

Statement of Facts ...................................................................3

Summary of Argument..............................................................4

Argument................................................................................7

   I.  The Parental Preclusion Policy Violates the Parent's Fundamental
       Rights to Care for Their Minor Children Including Abridging Their
       Right to Remove Their Children from Public Schools, by Hiding
       Important Information from Them .................................................7

      A. Parents, Not Public Schools, Are Principally Responsible for
         the Care of Their Children..........................................................8

      B. The Parental Rights to Remove Their Children from Public
         School Is Directly at Issue .......................................................12

  II.  The Parental Preclusion Policy Is Not Excused by the
       Curricular Exception.......................................................14

      A. The Parental Preclusion Policy Deals with Matters of Importance
         to the Parent-Child Relationship Not Handed over by Parents to
         the Public Schools ...................................................................15

      B. The Curricular Exception Does Not Sanction Hiding Information
         from Parents.............................................................................20

      C. The Curricular Exception Primarily Focuses on What Happens
         at School, While the Parental Preclusion Policy Primarily
         Focuses on What Happens at Home........................................21

III. The Interests on Which the District Court Relied to Uphold the Parental Preclusion Policy Are Also Inadequate as a Matter of Law ...........23

    A. Minors Have No Privacy Interest Vis-à-vis Their Parents.......................26

    B. MCBE Cannot Justify Its Parental Preclusion Policy by Assuming that All Parents Labeled as "Unsupportive" Are Negligent or Abusive.................................................................................31

    C. A Generalized Interest in Not Discriminating Against Transgender Individuals Is Irrelevant and Cannot Save the Challenged Provisions ..............................................................................38

IV. The Parental Preclusion Policy Is Neither Supported by a Legitimate Compelling Interest Nor Narrowly Tailored ...................................................40

    A. No Compelling Interest Supports the Parental Preclusion Policy............41

    B. The Parental Preclusion Policy Is Not Narrowly Tailored......................47

Conclusion ....................................................................................................50

Certificates ....................................................................................................52

Addendum .....................................................................................................54

Table of Authorities

Cases

*Adarand Constructors, Inc. v. Peña*, 515 U.S. 200 (1995)......................................24

*Alfonso v. Fernandez,* 195 A.D.2d 46, 606 N.Y.S.2d 259
    (N.Y. App. Div. 1993)................................................................20

*Anspach v. Phila. Dept. of Pub. Health*, 503 F.3d 256 (3d Cir. 2007)....................20

*Arnold v. Bd. of Educ.*, 880 F.2d 305 (11th Cir. 1989), *abrogated on
    other grounds in Leatherman v. Tarrant Cnty. Narcotics Intel. &
    Coord. Unit*, 507 U.S. 163 (1993)................................................. 19, 36

*Ballard v. United States*, 329 U.S. 187 (1946) .......................................44

*Bell v. Tavistock* [2020] EWHC 3274 (Admin), CO/60/2020,
    https://www. judiciary.uk/wp-content/uploads/2020/12/Bell-v-Tavistock-
    Judgment.pdf ......................................................................45

*BJ's Wholesale Club, Inc. v. Rosen*, 435 Md. 714, 80 A.3d 345 (2013)................28

*Brokaw v. Mercer Cnty.,* 235 F.3d 1000 (7th Cir. 2000)................................ 34, 41

*Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786 (2011)................ 41, 42, 46

*Burson* v. *Freeman,* 504 U. S. 191 (1992)..............................................48

*Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014) ............................. 24, 49

*C.N. v Ridgewood Bd. of Educ.*, 430 F.3d 159 (3d Cir. 2005) ...............................17

*Carson v. Makin,* 142 S. Ct. 1987 (2022) ..............................................14

*Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 US 520 (1993)......................48

*Croft v. Westmoreland Cnty. Children and Youth Servs.*,
    103 F.3d 1123 (3d Cir. 1997) ......................................................34

*Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022) .........................20

*Doe v. Heck,* 327 F.3d 492 (7th Cir. 2003).......................................................... 31, 41

*Doe v. Irwin*, 615 F.2d 1162 (6th Cir. 1980) ...........................................................20

*Fulton v. Phila.,* 141 S. Ct. 1868 (2021)...................................................................24

*Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal*,
    546 U.S. 418 (2006) ...........................................................................................23

*Gruenke v. Seip*, 225 F.3d 290 (3d Cir. 2000) ........................................... 18, 31, 37

*Grutter v. Bollinger*, 539 U.S. 306 (2003)...............................................................24

*H.L. v. Matheson*, 450 U.S. 398 (1981) ...................................................................11

*Herndon v. Chapel Hill-Carrboro Bd. of Educ.*,
    89 F.3d 174 (4th Cir. 1996)................................................................................18

*Hurley v. Irish-American Gay, Lesbian and Bisexual Grp. of
    Boston, Inc.*, 515 U.S. 557 (1995) .....................................................................26

*Jordan by Jordan v. Jackson*, 15 F.3d 333 (4th Cir. 1994) ....................... 10, 19, 33

*Leatherman v. Tarrant Cnty. Narcotics Intel. & Coord. Unit*,
    507 U.S. 163 (1993) ...........................................................................................19

*Littlejohn v. Sch. Bd. of Leon Cnty. Fla.*, No. 4:2021cv004-15
    (N.D. Fla., complaint filed Oct. 18, 2021) ........................................................36

*Matal v. Tam*, 137 S. Ct. 1744 (2017) .....................................................................25

*MedImmune, Inc. v. Genentech, Inc.,* 549 U.S. 118 (2007) ....................................39

*Meyer v. Nebraska*, 262 U.S. 390 (1923) ...................................................... 8, 9, 11

*Moore v. City of E. Cleveland,* 431 U.S. 494 (1977)...............................................10

*Papachristou v. Jacksonville,* 405 U.S. 156 (1972) ................................................35

*Parham v. J.R.*, 442 U.S. 584 (1979) ................................................ 10, 28, 31, 33

*Perez v. Broskie*, No. 3:22-cv-0083-TJC-JBT (M.D. Fla.,
   amended complaint filed Mar. 11, 2022) ............................................36

*Perry v. Sindermann*, 408 U.S. 593 (1972) ............................................14

*Pierce v. Soc'y of Sisters*, 268 U.S. 510, (1925) .............................. 9, 13, 22

*Prince v. Mass.,* 321 U.S. 158 (1944) ........................................... 9, 13, 22

*R.A.V. v. St. Paul*, 505 U.S. 377 (1992) ..............................................48

*Reardon v. Midland Cmty. Schs.*, 814 F. Supp. 2d 754 (E.D. Mich. 2011) ...........17

*Reno v. Flores*, 507 U.S. 292 (1993) .....................................................9

*Ricard v. USD 475 Geary Cnty., KS Sch. Bd.,*
   2022 WL 1471372 (May 9, 2022).............................. 11, 26, 29, 41, 49

*Santosky v. Kramer,* 455 U.S. 745 (1982) ...................................... 19, 33

*Sherbert v. Verner*, 374 U.S. 398 (1963) ..............................................24

*Stanley v. Ill.*, 405 U.S. 645 (1972).............................. 9, 22, 31, 33, 37

*Thornhill v. Ala.,* 310 U.S. 88 (1940) ...................................................35

*Troxel v. Granville*, 530 U.S. 57 (2000) .................... 9, 12, 19, 22, 28, 37

*United States v. Va.*, 518 U.S. 515 (1996) ...........................................44

*Venkatraman v. REI Sys., Inc.*, 417 F. 3d 418 (4th Cir. 2005) .................7

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
   455 U.S. 489 (1982) .....................................................................35

*Wash. v. Glucksberg*, 521 U.S. 702 (1997).......................... 9, 13, 14, 19

*Wis. v. Yoder*, 406 U.S. 205 (1972) ........................................................24

*Wyatt v. Fletcher*, 718 F.3d 496 (5th Cir. 2013)....................................27


Statutes

Md. Code, Family Law Art.
  §§ 5-701 *et seq* ...................................................................................34
  § 5-706(b)(2).......................................................................................34
  § 5-706.1(a), (b), (c) ..........................................................................34
  § 5-706.2(c)(2).....................................................................................34

Md. Code, Health-Gen'l Art.
  § 20-102 ..............................................................................................33
  § 20-103 ..............................................................................................33

20 U.S.C.
  § 1232g ................................................................................................28
  § 1232h ................................................................................................28

28 U.S.C.
  § 1291 ....................................................................................................1
  § 1441 ....................................................................................................1

42 U.S.C.
  § 1983 ....................................................................................................1


Other Authorities

Wm. Blackstone, *Commentaries on the Law of England*, Book the First, ch.
  XVI, https://oll.libertyfund.org/titles/blackstone-commentaries-on-the-
  laws-of-england-in-four-books-vol-1 ................................................8

"Every Cell Has a Sex," https://www.bostonglobe.com/opinion/2014/
  01/05/every-cell-has-sex/lgnbRyR1FvVqA9ccbKM5iI/story.html....................44

"Gender Ideology Run Amok, " *Imprimis,* https://imprimis.hillsdale.edu/
  gender-ideology-run-amok/ ................................................................46

Christopher Gillberg, https://acpeds.org/topics/sexuality-issues-of-youth/gender-confusion-and-transgender-identity/deconstructing-transgender-pediatrics.................................................................................45

https://doi.org/10.1080/ 26895269.2022.2100644 at S44, S57-58, S77-78 ...........43

https://segm.org/UK_shuts-down-worlds-biggest-gender-clinic-for-kids .............45

https://whyevolutionistrue.com/2022/08/04/new-paper-purports-to-refute-social-contagion-hypothesis-for-transgender-adolescents/ ..................................46

https://www.heritage.org/gender/commentary/sex-reassignment-doesnt-work-here-the-evidence .......................................................................................47

https://www.nytimes.com/2022/06/10/ science/transgender-teenagers-national-survey.html..................................................................................................46

https://www.washingtonpost.com/ education/2022/07/18/gender-transition-school-parent-notification/ ..................................................................40

https://www.wpath.org/media/cms/Documents/SOC%20v7/Standards%20of%20Care_V7%20Full%20Book_English.pdf (v.7, 2012) ................. 42-43

Mayer & McHugh, "Sexuality and Gender," 50 *The New Atlantis* 8 (Fall 2016), https://www.thenewatlantis.com/issues/no-50-fall-2016................47

Paul McHugh, *Wall Street Journal* https://www.wsj.com/articles/paul-mchugh-transgender-surgery-isnt-the-solution-1402615120. ....................45

"Muslims and Christians Should Work Together . . .," *Public Discourse,* https://www.thepublicdiscourse.com/2018/05/21436/..........................................46

Abigail Shrier, *Irreversible Damage: The Transgender Craze Seducing Our Daughters* (Regnery Pub'g 2021) ......................................................................46

Colin Wright, "The New Evolution Deniers," *Quillette*, Nov. 30, 2018, https://quillette.com/2018/11/30/the-new-evolution-deniers/ .............................44

N.T. Wright, https://www.oakleys.org.uk/blog/2017/08/bishop_nt_wright_on_transgenderism_in_the_times ...........................44

Jurisdictional Statement

Plaintiff Parents filed this action in the Maryland Circuit Court for Montgomery County, Maryland. Defendants Montgomery County Board of Education and its members (collectively, "MCBE") removed the action to federal district court pursuant to 28 U.S.C. § 1441, as the complaint contained a count alleging relief under the Fourteenth Amendment and 42 U.S.C. § 1983. (JA21-25.) The district court dismissed the action under Rule 12(b)(6) in a final order, with supporting opinion, on August 18, 2022. (JA81-121.) Plaintiff Parents timely filed a notice of appeal on September 14, 2022 (JA122), and this Court has jurisdiction pursuant to 28 U.S.C. § 1291.

Statement of the Issues

This case involves those parts of a MCBE "Guidelines" document that implement a policy that, when minor children—from kindergarten through high school—wish to exhibit as transgender at school but not inform their parents, or if the parents are not deemed potentially "supportive" enough by school personnel in consultation with the child, school personnel will actively hide from parents that their child is exhibiting as transgender at school, including by reverting to the child's legal name and birth pronouns when communicating with the parents. Plaintiff Parents bring the following issues to this Court concerning this "Parental Preclusion Policy":

1. Did the district court err in determining that the Plaintiff Parents' did not assert their fundamental right to determine whether to educate their children in the public school?

2. Did the district court err in holding that parents, by sending their children to public schools, waived their rights to control whether, when, and how their minor children should exhibit as transgender?

3. Did the district court err in finding that a child has a "secrecy" interest vis-à-vis the parents?

4. Did the district court err in finding that a school may restrict parental rights due to "safety" concerns without following the State's legislated process with constitutionally required procedures for parents alleged to be abusive or negligent?

5. Did the district court err in finding that the Parental Preclusion Policy satisfies strict scrutiny analysis?

Statement of Facts

The salient facts are few and easily summarized.  MCBE adopted the MCPS Guidelines.[1]  Those Guidelines are applicable to students from kindergarten through high school and expressly provide that school personnel are to hide from parents[2] that their minor child has gone "trans" at school unless the child consents. (JA69.)  The Guidelines instruct school personnel, when children request it, to use different names and pronouns than those provided to the school by their parents, without giving notice to the parents of the change.  (JA69-70.)  To conceal this change, the Guidelines further inform school personnel when communicating with parents to revert to using their child's birth-gender name and pronouns, unless the child has provided consent to the disclosure.  (JA70.)

To implement the Guidelines, MCPS adopted Form 560-80, basically an evaluation intake form for students desiring to be treated as transgender at school. Form 560-80 requires school personnel, in consultation with the minor, to rank

---

[1]  While Plaintiff Parents brought suit during the 2020-21 school term and attached to their Complaint that term's version of the Guidelines, the Guidelines have been republished each school year thereafter with no change in substance to the challenged provisions.  The 2022-23 version is found at https://www. montgomeryschoolsmd.org/uploadedFiles/students/rights/GenderIdentityGuidel inesForStudents.pdf.

[2]  Hereinafter, when "parents" are referenced, Plaintiff Parents intend to include guardians, unless the context indicates otherwise.

how "supportive" the parents will be on a scale from one to ten. Although the number which parents must achieve to be considered sufficiently "supportive" is not specified, if parents do not measure up, they will not be told. (JA74-75.) This secrecy is accomplished in part by putting the completed form in a special file to which parents will not have access. (JA75.) Plaintiff Parents denominate the challenged parts of the MCPS Guidelines and Form 560-80 that provide for non-disclosure to parents as the "Parental Preclusion Policy."

Plaintiff Parents filed this action challenging the Parental Preclusion Policy in Maryland state court, alleging both federal and state causes of action. MCBE removed the action and moved to dismiss. The district court granted that motion, and this appeal followed.[3]

## Summary of Argument

We are *not* asking this Court to wade into the merits of a medical and moral debate that roils our nation concerning the advisability of minors exhibiting as transgender. We *are* asking this Court to affirm that parents have a fundamental interest in counseling and supporting their child with regard to such a decision and that public school personnel may not hide and dissemble about the situation

---

[3] Plaintiff Parents do not appeal the rulings of the district court of the counts they brought under Maryland law, but that should not be construed as indicating that they agree with any of those rulings.

because they or the child believe the parents may not turn out to be "supportive" enough by their limited lights.

It is parents, not the schools, who are primarily responsible for the care and upbringing of their minor children. As the district court recognized, for a century it has been established that parents, as part of their liberty guaranteed by the Fourteenth Amendment, may remove their children from the public schools. That right is effectively foreclosed by the Parental Preclusion Policy for parents that school personnel deem potentially not "supportive" enough, targeting exactly the parents who most likely would want to exercise their right to remove their child from public school by not telling them that the school is fostering their child's gender transition.

This is not, as the district court would have it, a dispute about what is taught in the classroom to every child. Parents necessarily and voluntarily relinquish some level of control over what is taught when they send their child to public school with the children of many other parents. But parents transfer to the public schools only some of their responsibilities with regard to *educating* their children. They do not send them to public schools to supplant their primary right and responsibility to decide what is in the best interests of their children by allowing school personnel to decide whether and when their children should gender transition or how they should do so. Nor do they relinquish their right to provide

professional assistance to their children who do want to transition. Even in curricular contexts, parents are entitled to know what is being taught so as to be able to exercise their right to remove their child from the school should they so desire or to supplement their child's education on a particular subject. That right is being improperly foreclosed here.

The purported rationales justifying the Parental Preclusion Policy—privacy and safety of the child—are both invalid as a matter of law. Minor children have no enforceable privacy interest vis-à-vis their parents, as it assumes that the child knows its best interests better than do the parents, when the law presumes exactly the opposite due to the child's immaturity. Moreover, minors cannot generate a privacy interest by running their "secret" through school personnel, especially when they are freely telling third parties at school of their gender inclination, a fact which independently defeats any claim of confidentiality or secrecy. That federal and state statutes and regulations provide that parents have a right to notice of what transpires at school reinforces the same.

The safety of minors is, of course, a valid interest in the abstract. Here, however, what is challenged is the Parental Preclusion Policy's principal purpose of keeping minors "safe" from their parents *at home*, not from other kids at school. Not only does this obviously reach deep into familial relations where the school has no business being involved, but it ignores that the State has already set up a

system to redress neglectful or abusive parents, a system that provides due process protections required by the Fourteenth Amendment, including notice to parents. The Parental Preclusion Policy unconstitutionally circumvents those protections.

The Parental Preclusion Policy also fails strict scrutiny analysis. It is unsupported by any compelling interest and, even if it were, it is not narrowly tailored. It is based on "predictive judgments" and "ambiguous evidence" and is unnecessary to protect minor children when the State already has a statutory process in place to identify abusive or neglectful parents. Moreover, it is obviously overinclusive by eliminating parental rights of parents who would be "supportive."

<u>Argument</u>

This Court reviews a grant of a motion to dismiss *de novo*, indulging all reasonable factual inferences in the non-movant's favor. *Venkatraman v. REI Sys., Inc.*, 417 F. 3d 418, 420 (4th Cir. 2005).

I.    The Parental Preclusion Policy Violates the Parent's
      Fundamental Rights to Care for Their Minor Children,
      Including Abridging Their Right to Remove Their Children
      <u>from Public Schools, by Hiding Important Information from Them</u>

The U.S. Constitution protects parental interests as fundamental. While those interests are not absolute, the challenged Parental Preclusion Policy seriously entrenches on them. MCBE revealed in its motion—and the district court in its decision did so as well—that the actual (and obvious) purpose of the challenged

Parental Preclusion Policy is to reach beyond the schoolhouse and to keep students who wish to exhibit as transgender "safe" at home from parents who might be "unsupportive" (by the school's amorphous definition), effectively branding such parents as neglectful or abusive without any due process protections.  This is exactly the type of governmental overreach negating parental rights forbidden by the Fourteenth Amendment.

A.    Parents, Not Public Schools, Are Principally
      Responsible for the Care of Their Children

As MCBE and the district court concede, beginning with *Meyer v. Nebraska*, 262 U.S. 390 (1923), a case involving a state education policy for minor children contrary to the desire of their parents, the Supreme Court has consistently recognized the fundamental right of parents to direct the welfare, education, and upbringing of their children without undue interference by the state.  This liberty interest is protected by the Due Process Clause of the Fourteenth Amendment and was long established previously in the common law.[4]  The "Fourteenth Amendment 'forbids the government to infringe . . . "fundamental" liberty interests *at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest.'" *Wash. v. Glucksberg*, 521 U.S. 702,

---

[4]   *See generally* Wm. Blackstone, *Commentaries on the Law of England*, Book the First, ch. XVI, at *447, *450, https://oll.libertyfund.org/titles/blackstone-commentaries-on-the-laws-of-england-in-four-books-vol-1.

721 (1997) (quoting *Reno v. Flores*, 507 U.S. 292, 302 (1993) (emphasis in

original).

The plurality opinion in *Troxel v. Granville*, 530 U.S. 57 (2000),

summarized prior decisions of the Court as follows:

> The liberty interest at issue in this case—the interest of parents in the
> care, custody, and control of their children—is perhaps the oldest of
> the fundamental liberty interests recognized by this Court. More than
> 75 years ago, in *Meyer v. Nebraska,* 262 U.S. 390, 399, 401
> (1923), we held that the "liberty" protected by the Due Process Clause
> includes the right of parents "to establish a home and bring up
> children" and "to control the education of their own." Two years
> later, in *Pierce v. Society of Sisters,* 268 U.S. 510, 534-535 (1925), we
> again held that the "liberty of parents and guardians" includes the
> right "to direct the upbringing and education of children under their
> control." We explained in *Pierce* that "[t]he child is not the mere
> creature of the State; those who nurture him and direct his destiny
> have the right, coupled with the high duty, to recognize and prepare
> him for additional obligations." *Id.,* at 535. We returned to the
> subject in *Prince v. Massachusetts,* 321 U.S. 158 (1944), and again
> confirmed that there is a constitutional dimension to the right of
> parents to direct the upbringing of their children. "It is cardinal with
> us that the custody, care and nurture of the child reside first in the
> parents, whose primary function and freedom include preparation for
> obligations the state can neither supply nor hinder." *Id.,* at 166.
>
> In subsequent cases also, we have recognized the fundamental right of
> parents to make decisions concerning the care, custody, and control of
> their children. In light of this extensive precedent, it cannot now be
> doubted that the Due Process Clause of the Fourteenth Amendment
> protects the fundamental right of parents to make decisions
> concerning the care, custody, and control of their children.

*Id.* at 65-66 (some internal citations and quotations omitted); *see also Parham v.*

*J.R.*, 442 U.S. 584, 602-04 (1979); *Stanley v. Ill.*, 405 U.S. 645, 651 (1972)

(collecting cases); *May* v. *Anderson,* 345 U. S. 528, 533 (1953) (describing

parental rights as Parham v. J.R., 442 U.S. 584, 602-04 (1979) "far more precious .

. . than property rights").

The Supreme Court explained in *Parham* that fundamental parental rights

are critical due to the immaturity of minors in their care:

> The law's concept of the family rests on a presumption that parents
> possess what a child lacks in maturity, experience, and capacity for
> judgment required for making life's difficult decisions. More
> importantly, historically, it has recognized that natural bonds of
> affection lead parents to act in the best interests of their children.

442 U.S. at 602.  Following this precedent, this Court in *Jordan by Jordan v.*

*Jackson*, 15 F.3d 333 (4th Cir. 1994), expounded on the significance of parental

rights as follows:

> There are few rights more fundamental in and to our society than
> those of parents to retain custody over and care for their children, and
> to rear their children as they deem appropriate.  To say that "the
> institution of the family is deeply rooted in this Nation's history and
> tradition," *Moore v. City of East Cleveland,* 431 U.S. 494, 503
> (1977) (plurality), as the Supreme Court often has said, borders on
> understatement.  The unitary family is the foundation of society.
> Through the intimate relationships of the family, our children are
> nurtured, tutored in the values and beliefs of our society, and prepared
> for life.  Through these relationships, our children—indeed, we, as
> parents—are strengthened, fulfilled and sustained. The bonds between
> parent and child are, in a word, sacrosanct, and the relationship
> between parent and child inviolable except for the most compelling
> reasons.

*Id.* at 342-43 (citations omitted).

If the State may not prohibit the teaching of a foreign language in the school curriculum against the parents' desires, *see Meyer*, 262 U.S. at 401, it is obvious that it cannot go a large step farther and violate the parents' instructions about how to address their minor children and then deceive parents about their doing so. The importance of this override of the parents is dramatized by the Parental Preclusion Policy itself, which, by instructing school personnel to conceal information from parents about it, implicitly recognizes that parents have a substantial interest in their children's transgender behavior. *See H.L. v. Matheson*, 450 U.S. 398, 410 (1981) (holding that parents' rights include counseling their children on "important decisions").

Two recent cases have applied these principles in directly analogous situations. In the first, *Ricard v. USD 475 Geary County, KS School Board*, 2022 WL 1471372 (May 9, 2022), the court expressed amazement that a school would even believe it permissible to violate parental rights by having a policy preventing teachers from telling parents that the school was using names and genders other than those given by the parents for their children: "It is difficult to envision why a school would even claim—much less how a school could establish—a generalized interest in withholding or concealing from the parents of minor children[] information fundamental to a child's identity, personhood, and mental and

emotional well-being such as their preferred name and pronouns." *Id.* at *8 (footnote omitted).

In the second, the Wisconsin Supreme Court had before it a school transgender policy including provisions very much like that of MCPS in the Parental Preclusion Policy. While the majority of the court in *John Doe 1 v. Madison Metropolitan School District*, 2022 Wis. 65, did not reach the merits, the three justices who did wrote as follows:

> The constitutional presumption is that parents will act in the best interest of their child. *Troxel*, 530 U.S. at 69. Allowing a school to reassign a child's gender[] flips this constitutional presumption on its head by assuming that parents will not act in their child's best interest.

*Id.* ¶ 89 (Roggensack, J., dissenting). As these cases hold, fundamental parental rights are infringed by the Parental Preclusion Policy.

## B.    The Parental Rights to Remove Their Children from Public School Is Directly at Issue

The district court admitted that, as held by *Pierce*, one aspect of parents' constitutionally protected rights is the ability to decide whether or not to send their children to public schools. (JA93-94.) The district court tries to avoid this controlling precedent, however, by asserting that Plaintiff Parents did not raise the issue of "whether" to send their children to public schools. (JA110.)

The district court is decidedly wrong about that. Plaintiff Parents in their Opposition to the motion to dismiss cited *Pierce* (Docket No. 53 at 4) and argued

that MCBE and the other defendants "seem to think that, once parents have put
their child in public school, school personnel can freely withhold relevant
information to the very parents who may wish to withdraw their child due to the
school's 'philosophy' and its application to their own child." (Docket No. 53 at
5.)  Plaintiff Parents also noted that MCBE and its *Amici* below trumpeted, rather
than contested, that whether a minor will become transgender "is a matter of
significant importance to that child.  *A fortiori*, it is an issue of significant
importance to the parents of that child.  It is central to the fundamental and primary
interests of the parents to 'care and nurture' their children.  *Prince*, 321 U.S. at
166." (Docket No. 53 at 5.)

Not only was this interest raised and argued by Plaintiff Parents, but it is
dispositive here.  When the Parental Preclusion Policy instructs school personnel
surreptitiously to override parental direction as to the naming of their child and to
deny parents highly relevant information that would inform their fundamental
interest "to direct the education and upbringing of [their] children," *Glucksberg*,
521 U.S. at 720, it violates the right of parents to withdraw their children from
public schools.  *See Pierce*, 268 U.S. at 535.  Plaintiff Parents pled and argued that
the Parental Preclusion Policy abridges their right to remove their children from

the public schools.  (JA60.)  The district court ignored it, and, for this reason alone,

reversal is warranted.[5]

## II.     The Parental Preclusion Policy Is Not Excused by the Curricular Exception

The district court in positing that the parents' fundamental rights are to be

accorded somewhat less protection than other fundamental rights unduly inflated

an exception into the rule.  As the Supreme Court noted in *Glucksburg*,

abridgement of parental rights, like other fundamental rights protected by the

Fourteenth Amendment, are typically afforded heightened scrutiny.  521 U.S. at

720-22.  The one exception when parents voluntarily send their child to public

school is that, because many other parents will do the same, the school will be

primarily responsible to determine the curriculum and generally applicable

administrative rules.  Even then, parents are entitled to notice of the school's

---

[5]    The unconstitutional conditions doctrine supplies additional support here.  A
generally available public benefit (in this case, a public-school education)
cannot be conditioned on surrendering a constitutionally protected right (in this
case, the right of parents to raise their children as they see fit).  "For at least a
quarter-century, this Court has made clear that, even though a person has no
'right' to a valuable government benefit, . . . [the government] may not deny a
benefit to a person on a basis that infringes his constitutionally protected
interests . . . .  Such interference with constitutional rights is impermissible".
*Perry v. Sindermann*, 408 U.S. 593, 597 (1972); *see also Carson v. Makin,* 142
S. Ct. 1987 (2022) (holding that receipt of a generally applicable benefit cannot
be conditioned on a school not exercising its religion as it sees fit).

decisions in those regards, and they retain the right to remove their child from the school at any time.

The district court attempted to expand this curricular carve-out to cover the Parental Preclusion Policy. (JA95-20.) Its effort failed, for three major reasons. First, the curricular exception simply does not apply to this situation. Second, it does not involve keeping secrets from parents, the very purpose of the Parental Preclusion Policy. Third, the Parental Preclusion Policy targets what happens at home, while the curricular exception deals with group functions at school.

A.   The Parental Preclusion Policy Deals with Matters
     of Importance to the Parent-Child Relationship
     Not Handed over by Parents to the Public Schools

The multiple cases cited by the district court that discuss the curricular exception do not require individualized attention, as they are generically irrelevant. They deal solely with internal school choices that must be applied uniformly to allow a school to function, such as of the substance of classroom instruction and hours of operation. They are developed by the school itself; here, though, the child's birth gender and name was not a school creation, but the parents'. Moreover, Plaintiff Parents are not attempting to dictate a curriculum about transgenderism or to change the MCPS bullying guidelines. They are only insisting that they be informed of their own, individual children's behavior

when it deviates from their prior instruction about the naming and gender of their child—and not lied to about it by school personnel.

Transgenderism, like other medical or psychological conditions, although it may need to be addressed while the child is in school, is not part of the primary educational mission for which parents have entrusted their children to the public schools.  It is a core parental issue involved in the care, health, and welfare of their children.  Thus, the precedents on which the district court relied, all of which deal directly with matters involving the educational mission and administration of public schools and that must be applied uniformly for the school to function in a reasonable manner, are inapposite.

Of course, there is a limit to the curriculum exception, even as to the matters directly affecting education.  For example, grades are central to the educational function of the school, but a school certainly could not refuse to disclose an individual student's grades to the parents because the student was afraid of the parents' reaction or wanted to keep them secret.  Much less can a school withhold information from parents about their child's transgender behavior, which is not part of the school's delegated education function.

Nor can those cases recognizing that schools can go too far and infringe on parental rights, even when acting within the school setting, be brushed off as all dealing with "coercion," as the district court tries to do.  (JA98, 100.) For example,

- 16 -

in *C.N. v Ridgewood Board of Education*, 430 F.3d 159 (3d Cir. 2005), the Third

Circuit canvassed school-family dispute cases and found the key to a valid

assertion of parental rights to be, not coercion, but "actions that strike at the heart

of parental decision-making authority on matters of the greatest importance." *Id.*

at 184; *see also Reardon v. Midland Cmty. Schs.*, 814 F. Supp. 2d 754, 772 (E.D.

Mich. 2011) (stating that the Sixth Circuit does not require coercion but asks

whether there has been "affirmative interference" with parental rights and

responsibilities).  MCBE and the district court below certainly conceded that what

is involved here is of the greatest importance for minor children and their parents.

In *C.N.*, the Third Circuit found that the survey questions that school

officials used with minor children did not reach the level of a constitutional

violation, even though the school exposed the children to sensitive topics, because

(a) the fact that the survey given was not hidden from parents; (b) the parents

"remain[ed] free to discuss these matters and to place them in the family's moral or

religious context, or to supplement the information with more appropriate

materials"; and (c) the school "in no way indoctrinated the students in any

particular outlook on these sensitive topics . . . ." *Id.* at 185.  That draws a sharp

contrast to this case, in which (a) school personnel hide relevant information from

parents because (b) they do not want parents to have input on the topic with their

children and (c) MCBE has adopted a very definite position on this sensitive topic

- 17 -

of children, at any stage of their development, being supported to exhibit as

transgender.  This violation of parental rights rises to a constitutional level.

The words of the Third Circuit in an analogous case are apt here:

> School-sponsored counseling and psychological testing that pry into
> private family activities can overstep the boundaries of school
> authority and impermissibly usurp the fundamental rights of parents to
> bring up their children, as they are guaranteed by the Constitution.
> Public schools must not forget that *"in loco parentis"* does not mean
> "displace parents."

> It is not educators, but parents who have primary rights in the
> upbringing of children. School officials have only a secondary
> responsibility and must respect these rights. State deference to
> parental control over children is underscored by the [Supreme]
> Court's admonitions that the child is not the mere creature of the
> State, and that it is the parents' responsibility to inculcate moral
> standards, religious beliefs, and elements of good citizenship.

*Gruenke v. Seip*, 225 F.3d 290, 307 (3d Cir. 2000) (internal citations and

quotations omitted).  These principles apply to this situation.

*Herndon v. Chapel Hill-Carrboro Board of Education*, 89 F.3d 174 (4th Cir.

1996), on which the district court principally relied (JA94-96), does not support the

contrary conclusion.  Factually, *Herndon* dealt with a specific part of the

curriculum requiring community service for graduation that was applicable to all

students and was well known to parents, and so it fit comfortably within the

curriculum exception.  Legally, the portions of the opinion quoted by the district

court that queried whether, standing alone, parental rights should be described as

"fundamental" has been answered in the affirmative by the later Supreme Court

decisions in *Glucksburg,* 521 U.S. at 720-21, and *Troxel*, 530 U.S. at 65 (describing as "the oldest of the fundamental liberty interests recognized") (plurality); *id.* at 80 (Thomas, J., concurring) (describing as "fundamental" interest for which strict scrutiny applies for an infringement), not to mention other cases of that Court, *e.g., Santosky v. Kramer,* 455 U.S. 745, 753, 759 (1982), and of this Court, *e.g., Jordan,* 15 F.3d at 342-43.

Moreover, the district court did not successfully distinguish *Arnold v. Board of Education*, 880 F.2d 305, 311-12 (11th Cir. 1989), *abrogated on other grounds in Leatherman v. Tarrant Cnty. Narcotics Intel. & Coord. Unit*, 507 U.S. 163 (1993), which also stands for the proposition that school officials can go too far and impermissibly encroach on parental rights. In *Arnold*, school officials violated the rights of parents by encouraging and assisting their daughter to have an abortion without notifying them of the situation. The only distinctions of substance between the situation in *Arnold* and here make matters worse for MCBE: (a) The *Arnold* court found a violation even without contrary parental information on file, as there is here; (b) in *Arnold*, school personnel acted in one particular instance; here, MCBE cuts parents out of the action systemically if they are deemed unsupportive; and (c) in *Arnold*, the surgery on the child was not being

performed by school personnel or at the school,[6] while here MCPS personnel

actively hide from parents what is happening at school and what they are doing

with the parents' minor children, who may be as young as six.[7]

### B. The Curricular Exception Does Not Sanction Hiding Information from Parents

Second, Plaintiff Parents are not challenging all parts of the MCPS

Guidelines, but only those parts that require school personnel to disregard their

instructions, to hide information from them, and to dissemble to do so. The

curricular exception does not sanction such behavior. Parents are fully entitled to

know what and how their children are being instructed at school and what general

---

[6] The district court highlighted the *dicta* in *Arnold* that it was not holding that school counselors have a constitutional duty to inform parents that their child was considering abortion, even though it recommended that they do so. (JA98-99.) Whatever weight that *dicta* had in the context of abortion under *Roe* and its progeny has now been eliminated by *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2275-76 (2022) (overruling *Roe* and noting the distortions to other legal principles that *Roe* and its progeny worked in the abortion context).

[7] *Anspach v. Philadelphia Department of Public Health*, 503 F.3d 256 (3d Cir. 2007), and *Doe v. Irwin*, 615 F.2d 1162 (6th Cir. 1980), dealt with minors voluntarily visiting a public health clinic and there receiving contraceptives. Both decisions distinguished the school situation, where attendance is compulsory, and noted that there was only a "passive" failure by the clinics to inform the parents. *See Anspach*, 503 F.3d at 268-69; *Irwin*, 615 F.2d at 1168. Here, school personnel are far from passive in their helping minors make determinations not to inform their parents and dissembling to hide that fact. *See also Alfonso v. Fernandez,* 195 A.D.2d 46, 606 N.Y.S.2d 259 (N.Y. App. Div. 1993) (finding parental rights violated when condoms were distributed to students upon request by the school without parental notice).

administrative rules they must follow.  No case cited by the district court or known

by Plaintiff Parents that relies on or explains the curricular exception involves the

school hiding matters from parents.  That is the essence of the problem here, and

the curricular exception does not sanction it.  Parents have a right to *know* what

transpires in the classroom, even if they have ceded their right to the school to

determine general curricular affairs.  Without notice, parents cannot exercise their

right to remove their child from public school if they think it appropriate due to the

school's decisions and their own child's particular needs and circumstances.

C.    The Curricular Exception Primarily Focuses on What
      Happens at School, While the Parental Preclusion
      <u>Policy Primarily Focuses on What Happens at Home</u>

Third, the curricular carve-out deals with what happens at school and does

not involve direct regulation of what happens at home.  Here, the thrust of the

challenged Parental Preclusion Policy is to regulate what happens at home, keeping

"secrets" from the parents so that their children can stay "safe" there.  As will be

discussed further below, neither of these interests on which the Parental Preclusion

Policy rests is legitimate.

The curricular exception is not properly used to regulate parent-child

relationship in the home, either.  And there can be no doubt that the Parental

Preclusion Policy affects familial relationships.  Just by asking the questions, "Do

you want to tell your parents?" and "Are your parents supportive of you?," as the

Parental Preclusion Policy requires, school personnel encourage children to distrust their parents.  It is just as obvious that a child living a "double life," exhibiting as transgender at school and not at home, creates an emotional distance from the parents and threatens alienation from them after the parents discover that this behavior has been kept secret from them.  This is not just a "school matter," as the district court tried to cast it.  (JA110.)

Nor may the challenged Parental Preclusion Policy be swept into the curricular carve-out and trump fundamental parental rights by the circular argument of the district court that what happens at home may "compound" a student's problems associated with gender transformation when at school.  (JA103-04.)  That rationale would allow practically any violation of parental rights and fails as a matter of law because it reverses the priority of care of the child.  As the Supreme Court has iterated repeatedly, it is *parents* who have primary responsibility for the care and education of their children, not the public schools.  *See, e.g.*, *Troxel*, 530 U.S. at 65-66; *Stanley*, 405 U.S. at 651; *Prince*, 321 U.S. at 166; *Pierce*, 268 U.S. at 535.  The proper question, then, is not whether what happens at home affects the child at school, but whether this school policy affects the parent-child relationship at home.  The purpose of the Parental Preclusion Policy is exactly that—to intrude on what happens in the home.  That

manifestly exceeds the school's legitimate control and violates the parents' fundamental rights.  It is not excused by the curricular carve-out.

––––––––––––––––––––––––––––––

In the end, the district court's application of the curricular exception was tautological.  According to the district court, anything the school does is "educational," and anything "educational" fits under the exception.  Thus, the curricular exception, by the district court's reading, devours the rule that schools may not improperly entrench on fundamental parental rights.  But schools may, indeed, act improperly in this regard, in ways not protected by the curricular carve-out, and the Parental Preclusion Policy proves it.

III.    The Interests on Which the District Court Relied to Uphold
        the Parental Preclusion Policy Are Also Inadequate as a Matter of Law

The district court, echoing MCBE, justified the Parental Preclusion Policy of withholding information from parents about their children on three grounds: privacy, safety, and nondiscrimination.  It cannot be gainsaid that these interests, writ large, are important ones.  However, the district court committed the basic legal error of overgeneralizing the interest involved in order to justify the Parental Preclusion Policy.

The Supreme Court in *Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal*, 546 U.S. 418 (2006), interpreting the Religious Freedom Restoration Act

("RFRA") but explaining that Congress "expressly adopted the compelling interest test . . . [of] *Sherbert v. Verner*, 374 U.S. 398 (1963), and *Wisconsin v. Yoder*, 406 U.S. 205 (1972)" in RFRA, held that, in *Sherbert* and *Yoder*, "this Court looked beyond broadly formulated interests justifying the general applicability of government mandates and scrutinized the asserted harms of granting specific exemptions to particular religious claimants." *Id.* at 430-31 (citing *Yoder*, 406 U.S. at 213, 221, 236; *Sherbert*, 374 U.S. at 410). And the Court went on to point out that this rule requiring particularity applies broadly when any fundamental rights are involved: "Outside the Free Exercise area as well, the Court has noted that '[c]ontext matters' in applying the compelling interest test, . . . and has emphasized that 'strict scrutiny *does* take "'relevant difference'" into account"—indeed, that is its fundamental purpose,'" *id.* at 431-32 (quoting *Grutter v. Bollinger*, 539 U.S. 306, 327 (2003), and *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 228 (1995) (emphasis in original)). For instance, the Supreme Court in *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014), in considering whether there was a compelling interest supporting the challenged HHS regulation rejected HHS's very broad articulation of interests such as promoting "public health" and "gender equality," requiring instead a focus on the interests served by the particular application to the plaintiffs. *Id.* at 726; *accord Fulton v. Phila.,* 141 S. Ct. 1868, 1881 (2021) (applying to First Amendment violation).

Applying these principles here, it is not just "privacy" that is involved; it is, more particularly, an asserted right of children to keep information private *from their parents*. And it is not just "safety" that is involved; it is, more particularly, an asserted right by school personnel to decide unilaterally when parents may be abusive to their children. While the Parental Preclusion Policy's attack on the parents' fundamental rights must properly be justified under strict scrutiny, here MCBE cannot even satisfy rational basis review, because none of its asserted interests is properly focused or legally sufficient.

At its base, the "interests" asserted by MCBE and the district court are nothing more than a statement that the school might not agree with what the parents might say to or instruct their children. Thus, this situation is directly analogous to a governmental entity justifying a restriction on speech by arguing that it does not like the substance of what is being said. This, of course, is not a legitimate interest, but a repudiation of a fundamental right: "We have said time and again" that speech may not be prohibited "merely because the ideas are themselves offensive to some of their hearers." *Matal v. Tam*, 137 S. Ct. 1744, 1763 (2017) (citations omitted) (Alito, J.). Similarly, a school may not subvert parental rights merely because the school prognosticates that it may disagree with how parents will exercise their fundamental rights with their minor children.

Paraphrasing *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 579 (1995), a public school "is not free to interfere with [parental rights] for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government." The district court in *Ricard* applied this teaching directly in this context:

> Presumably, the [school] District may be concerned that some parents are unsupportive of their child's desire to be referred to by a name other than their legal name. Or the District may be concerned that some parents will be unsupportive, if not contest, the use of pronouns for their child that the parent views as discordant with a child's biological sex. But this merely proves the point that the District's claimed interest is an impermissible one because it is intended to interfere with the parents' exercise of a constitutional right to raise their children as they see fit. And whether the District likes it or not, that constitutional right includes the right of a parent to have an opinion and to have a say in what a minor child is called and by what pronouns they are referred.

2022 WL 1471372 at *8 (footnote omitted). Indeed, as discussed further below, MCBE's purported "interests" are illegitimate because they are simply attempted justifications for wanting to displace parents as the ones primarily responsible for the care and nurturing of the parents' children.

A.    Minors Have No Privacy Interest Vis-à-vis Their Parents

The first interest on which MCBE and the district court relied is to keep the "secret" of the minor child that he or she is exhibiting as transgender—this in the

- 26 -

context of a Parental Preclusion Policy that applies to children in kindergarten (typically, six-year-olds) through high school. (JA66-72.). As an initial matter, what is "secret"? The children are exhibiting as other than their birth gender to fellow students and school personnel. They are doing so publicly and openly. Whatever the children had been keeping secret in this regard is no longer private when they display their proclivities to third parties by their conduct. What happens at school is not suitable for application of "what happens in Las Vegas stays in Las Vegas."

Second, minor children have no right of privacy in relation to their parents, and they cannot manufacture any such "right" by disclosing matters first to school personnel. As the Fifth Circuit noted in a related context, it "has never held that a person has a constitutionally-protected privacy interest in her sexual orientation, and it certainly has never suggested that such a privacy interest precludes school authorities from discussing with parents matters that relate to the interests of their children." *Wyatt v. Fletcher*, 718 F.3d 496, 505 (5th Cir. 2013). The same applies to gender identity.

Third and more basically, the idea that minor children have a protectable right to keep secrets from their parents runs directly counter to the firmly established principles that minor children are not capable of making decisions in their own best interest due to their immaturity and that parents are entrusted and

presumed to act in their chidrens' best interests instead.  These principles were

well know to the common law.  *See Parham,* 442 U.S. at 602.  They are codified in

Maryland Family Law § 5-203(b), which provides that the parents of a minor "are

jointly and severally responsible for the child's support, care, nurture, welfare, and

education."  *See BJ's Wholesale Club, Inc. v. Rosen*, 435 Md. 714, 728, 80 A.3d

345, 353 (2013) (stating that § 5-203(b) "defines globally the role of a parent" and

that a parent is empowered to make all types of decisions for the minor child).

And it is a principle recognized repeatedly by the Supreme Court:

> The law's concept of the family rests on a presumption that parents
> possess what a child lacks in maturity, experience, and capacity for
> judgment required for making life's difficult decisions. More
> important, historically it has recognized that natural bonds of affection
> lead parents to act in the best interests of their children.

*Parham,* 442 U.S. at 602 (citing 1 W. Blackstone, Commentaries *447; 2 J. Kent,

Commentaries on American Law *190); *see also Troxel*, 530 U.S. at 68-69.

The principle that parents are primarily responsible for their children and

must have relevant information to perform their familial duties also motivated

Congress both in the Family Educational Rights and Privacy Act, 20 U.S.C. §

1232g ("FERPA"), which provides for loss of federal funding if States fail to

establish regulations requiring local school boards to provide parents with

documentary information generated by school personnel, and in the Protection of

Pupil Rights Amendment, *id.* § 1232h, which provides the same if States fail to

notify and gain consent of parents before conducting surveys of the type required

by the Parental Preclusion Policy.

The MCPS Guidelines themselves seem to rely on FERPA to justify keeping

information from the parents if their child does not consent. (JA69.) The school

district in *Ricard* tried to do the same and was rebuffed:

> The problem for the District is that FERPA does not prohibit the
> District from communicating with parents about their minor child's
> preferred name and pronouns. To the contrary, FERPA is a law that
> specifically <u>empowers</u> parents to receive information about their
> minor students; it mandates the District to make education
> records available to parents upon request—whether the child wants
> their parents to have the records or not. See 34 C.F.R. §
> 99.10(a) ("Except as limited under § 99.12, a <u>parent</u> or eligible
> student <u>must</u> be given the opportunity to inspect and review the
> student's education records" (emphasis added)). And FERPA does
> not exempt from its disclosure obligation education records that deal
> with preferred names and pronouns. Thus, the District's
> contemporaneous justification for adopting the policy is predicated on
> an erroneous understanding of the law. And the District's statement
> to parents that "FERPA guidelines" prevented the District from
> disclosing preferred name and pronoun information without a child's
> permission, was misleading. The District could not have a legitimate,
> compelling interest in withholding information based on FERPA
> when FERPA in fact required the District to disclose the very
> information at issue—at least to the extent the information was
> contained in an education record.

2022 WL 1471372 at *7 (emphasis in original; footnotes omitted). Indeed, the

district court here correctly noted that the Parental Preclusion Policy, by hiding

from parents intake Form 560-80, violates the Maryland regulations implementing

FERPA (but ruled Plaintiff Parents could not enforce the regulation in court) (JA117-19.)

Parents are principally responsible for their minor children, even when they send them to public schools, and the law presumes that parents will act in their children's best interests because minors are not yet fit to make decisions for themselves, eliminating any "privacy" between parents and their minor children. Instead of these legally required assumptions, the Parental Preclusion Policy makes other, contrary implied assumptions to support a personnel "privacy" interest, such as these:

1. Minor children always know what is best for themselves, at least when sexual matters are concerned.

2. Minor children always know when their parents will be "supportive" and when they will not be.

3. School personnel will never unduly influence minor children when helping a child to determine whether parents will be "supportive."

4. School personnel and minor children will always employ a uniform meaning of "supportive."

5. Parents who may counsel their child against transgenderism are, by definition, not "supportive."

None of these assumptions are reasonable, and, both individually and in

combination, they invalidate the Parental Preclusion Policy. Moreover, they are at

cross-purposes with the legal rule that the care and nurture of minor children lies

first and foremost with the parents—not with public schools, and not with the

minors themselves. *See Parham*, 442 U.S. at 602; *Stanley*, 405 U.S. at 651;

*Gruenke*, 225 F.3d at 307. These supporting assumptions, like the "privacy"

rationale, are nothing but bald presumptions that minors and school personnel

know better than parents what is best for their minor children. The law begs to

differ. As the Supreme Court instructed in *Parham*, the fact that "the decision of a

parent is not agreeable to a child or . . . involves risks" "does not diminish the

parents' authority to decide what is best for the child," nor does it "automatically

transfer the power to make that decision from the parents to some agency or officer

of the state." 442 U.S. at 603–04; *see also Doe v. Heck,* 327 F.3d 492, 521 (7th Cir.

2003) (finding a violation of parents' rights when State actors "not only failed to

presume that the plaintiff parents would act in the best interest of their children,

they assumed the exact opposite").

      B.     MCBE Cannot Justify Its Parental Preclusion Policy by Assuming
               <u>that All Parents Labeled as "Unsupportive" Are Negligent or Abusive</u>

The district court also validated the Parental Preclusion Policy on MCBE's

asserted interest that the MCPS Parental Preclusion Policy is necessary to protect

minor students from harm from parents at home.  It found that a transgender child's discomfort at school would be exacerbated if parents were not supportive. (JA103-05.)  Similarly, in its motion to dismiss, MCBE justified the Parental Preclusion Policy by arguing that disclosure to parents who are "not supportive . . . might expose the student to harm" (JA87) and that "gender nonconforming students face significant dangers of abuse *at home* from unsupportive families." (JA99, emphasis added.)  But this interest provides no legitimate defense.  Instead, it further shows how the Parental Preclusion Policy subverts the constitutional protections required by parents' fundamental interests to care for their minor children.

Even if there were evidence of abuse occurring in some parent-child situations, it does not permit a broad, prophylactic abridgement of other parents' constitutional rights by public school personnel.[8]  An individual's fundamental rights may not be foreclosed, without notice, based on a generalized suspicion of some of the members of the class to which the individual belongs.[9]

---

[8]  The *Amici* below reported the findings of one survey that 40% of TGNC youth said their "families" (not limited to parents) were "not supportive."  (JA90.) This demonstrates both that (a) the class of "parents" is not homogeneous in this regard and (b) the challenged parts of the Parental Preclusion Policy are likely to be applied often.

[9]  Although Plaintiff Parents briefed this point below, the district court did not address it in its decision.

The Supreme Court has repeatedly applied this principle in parental rights settings. For example, in *Santosky,* the Court held that the State must find that a parent is guilty of neglect by clear and convincing evidence, 455 U.S. at 747-48; and in *Stanley*, the Court held that due process requires a natural parent to be given a hearing prior to a determination of neglect. 405 U.S. at 656-58; *see also Jordan*, 15 F.3d at 343. The Supreme Court has summarized, "The statist notion that governmental power should supersede parental authority in *all* cases because *some* parents abuse and neglect children is repugnant to American tradition." *Parham*, 442 U.S. at 603 (emphasis in original); *see also In re Winship*, 397 U.S. 358, 365-66 (1970) (remarking that "labels and good intentions do not themselves obviate" due process safeguards). Notification and due process are required for deprivation of parents' fundamental liberty interest in the care of their children.[10] *See Jordan*, 15 F.3d at 343 ("where the state seeks to interfere with these 'essential' or 'fundamental' parental rights, its action must satisfy the procedural strictures of the Due Process Clause" (citations omitted)). Their liberty cannot be eliminated in secret.[11] As the court stated in *Ricard*, the only interest that would be compelling

---

[10] Maryland law provides for notice to parents before receiving sexually related medical treatment, including abortion, except in certain specified instances. *See* Md. Code, Health-Gen'l Art. §§ 20-102, 20-103. Neither transgenderism nor gender dysphoria is a specified exception.

[11] Consonant with these federal constitutional requirements, Maryland has specific, codified procedures for dealing with abusive and neglectful parents. If

enough to justify a school withholding information about their children is if there was a need to protect against particularized, illegal parental behavior "as the law defines it, and not simply as an administrator might subjectively perceive it." 2022 WL 1471372 at *8. And as the Third Circuit stated in *Croft v. Westmoreland County Children and Youth Services*, 103 F.3d 1123, 1126 (3d Cir. 1997), the government "has no interest in protecting children from their parents unless it has some reasonable and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse." *Accord Brokaw v. Mercer Cnty.,* 235 F.3d 1000, 1019 (7th Cir. 2000). The justices of the Wisconsin Supreme Court who reached the issue in *John Doe 1* agreed:

> Both the United States Constitution and the Wisconsin Constitution support the conclusion that MMSD's Policies cannot deprive parents of their constitutional rights without proof that parents are unfit, a hearing, a court order, and without according parents due process. Instead, under MMSD's explicit guidelines, parents are affirmatively excluded from decision-making unless their child consents.

2022 Wis. 65, ¶ 89 (Roggensack, J., dissenting).

All these concerns come sharply into play here when MCBE usurps the parental role. Without a discussion with his or her parents on this sensitive subject,

---

there is a particularized concern that parents may abuse their own child, those laws provide for procedural due process for the parents, process that includes full notification of any suspected abuse or neglect and the right to respond to qualified investigators and to a neutral judicial officer. *See* Md. Code, Family Law Art. §§ 5-701 *et seq.*; *see, e.g.*, *id.* §§ 5-706(b)(2); 5-706.1(a), (b), (c); 5-706.2(c)(2).

a child very likely will not know whether or not they are "supportive" (much less

which number to select on the one-to-ten scale of Form 560-80).  MCPS personnel,

out of imagined fear for the child's safety, may lead the child *not* to bring this

matter to the parents' attention, as long as there is any perceived ambivalence

about the parents' support.  And the term "supportive" in this context is undefined

and too vague to pass due process muster.  *See Village of Hoffman Estates v.*

*Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982) (holding that a "more

stringent vagueness test should apply" when the measure "threatens to inhibit the

exercise of constitutionally protected rights").  Such standardless discretion

provides a "convenient tool for harsh and discriminatory enforcement" by the

government decision makers "against particular groups deemed to merit their

displeasure."  *Papachristou v. Jacksonville,* 405 U.S. 156, 170 (1972) (finding

"suspicious" to be vague and quoting *Thornhill v. Ala.,* 310 U.S. 88, 97-98 (1940)).

What is also very clear is that the MCPS employee involved with surveying

the child and filling out Form 560-80 likely is not professionally qualified to

counsel on gender transformation.  Nor is MCBE going to pay for professional

assistance for the child, despite the fact that adolescents acting out gender

transformation roles are much more prone to suicide and that the vast majority of

children who experience gender dysphoria ultimately find comfort with their

biological sex as they mature.  (JA40-41.)  Does the school's supposed "right" to

decide what's best for minors go so far as to allow school personnel to hide from

parents that their child is contemplating or has attempted suicide? *See Perez v.*

*Broskie*, No. 3:22-cv-0083-TJC-JBT (M.D. Fla., amended complaint filed Mar. 11,

2022) (parents alleging school violated parental rights by assisting their child to

transition at school without informing them of such counseling or suicide

attempts).  This Parental Preclusion Policy raises the not insubstantial specter of

parents suing for wrongful death of their minor children because their parental

rights were violated and their children were deprived of counseling, both parental

and professional, that parents would have provided but for the MCPS Parental

Preclusion Policy of secrecy and dissembling.  *See, e.g.*, *id.; Littlejohn v. Sch. Bd.*

*of Leon Cnty. Fla.*, No. 4:2021cv004-15 (N.D. Fla., complaint filed Oct. 18, 2021)

(action by parents of minor child for secretly aiding their child to exhibit as

transgender in middle school); *Konen v. Caldiera*,

https://libertycenter.org/cases/konen/ (admin. claim filed against California public

school and its officials by parent and her minor child for secretly counseling and

assisting minor to exhibit as trans at middle school); *cf. Arnold*, 880 F.2d at 311-12

(finding school violated parental rights by keeping daughter's pregnancy secret

from them).

      The district court tries to soften the obvious violations of parental rights by

repeatedly citing to the Guidelines' statement that MCPS hopes that parents will be

"supportive" and, if some school official believes they are and that it is "safe" to do so, the school will inform and involve the parents in dealing with their child's transgender behavior.  (*E.g.,* JA88-91.)  This demonstrates that MCBE recognizes, as a general proposition, that parents should not be misinformed and kept in the dark about what their children are doing at school and how they are being treated.  But that does not give school personnel (who have undoubtedly in almost all cases spent much less time with the child than the parents have) the right to withhold that information, in their sole discretion and on remarkably insufficient information, based on their supposition about what the parental response might be.  It is *parents* that the law presumes know their own children best and are best positioned and motivated to protect and counsel them.  *See Parham*, 442 U.S. at 602.  It is *parents* who are given the primary right to care for their child—not school counselors, teachers, or principals.  *See Troxel,* 530 U.S. at 66 ("it cannot . . . be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children"); *Stanley*, 405 U.S. at 651; *Jordan*, 15 F.3d at 343.  Of course, there are instances in which parents, in exercising their rights, fall woefully short of their responsibilities to act in their child's best interest.  But parental rights, like other fundamental rights, may only be curtailed or withheld after notice and due process.  They may not be abridged utilizing amorphous

standards interpreted solely in a government official's discretion. School officials by the expedient of publishing their own "guidelines" cannot give themselves authority to bypass the due process protections set up to regulate parental neglect and abuse, implementing their own standards, in their own ways, on an unreviewable, "case-by-case basis." (JA68.)

C.    A Generalized Interest in Not Discriminating Against Transgender Individuals Is Irrelevant and Cannot Save the Challenged Provisions

The district court notes that the Supreme Court, this Court, and others have found federal statutes to protect transgender individuals from sex discrimination. (JA102-03.) That has no relevance here.

Plaintiff Parents do not want schools to allow discrimination, bullying, or harassment targeting their children, and they are not seeking to enjoin any parts of the MCPS Guidelines except those that require school personnel to disregard their instructions and to hide information from them. Indeed, parents when informed of their child's transgender desire can provide the support and comfort that the child needs to resist and recover from any such improper activity by fellow students. But parents cannot do that if they are kept in the dark. Providing a safe school environment does not, as MCBE contends, allow schools to dictate how *parents* treat or instruct their children, even if school personnel might happen to disagree. Much less does it allow schools to alter information and violate

instruction provided by parents to the school and then hide that they are doing so, preventing parents from providing additional assistance, tailored to their children, to minimize the difficulties and noted dangers of a child making a gender transition.

Similarly beside the point are the district court's repeated attempts to excuse the Parental Preclusion Policy by invocations of other parts of the Guidelines that recognize the importance of children communicating on gender issues with their parents. (*E.g.*, JA98, 100, 104.) Those are not the parts of the Guidelines that Plaintiff Parents challenge. They challenge the Parental Preclusion Policy that allows—nay, mandates—that school personnel do the opposite when the child, with their supervision and counsel, decides that the parents may not be "supportive" enough, by the school's subjective definition.[12]

The Parental Preclusion Policy cannot be upheld on the basis that some parents deemed sufficiently supportive are told about their children's transgender

---

[12] The district court unfairly criticized Plaintiff Parents for bringing this action *before* they are aware whether they suffer the harm that would be caused by the part of the Guidelines they challenge. They are not to be blamed for not waiting until the threatened harm has already been done to their relationship with their children—and perhaps harm done to their children as well. The Constitution does "not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat." *MedImmune, Inc. v. Genentech, Inc.,* 549 U.S. 118, 128-29 (2007).

conduct in school.  This suit challenges the policy's exclusion of parents the school deems of questionable attitude.[13]

<hr>

In sum, none of the interests relied upon by MCBE and the district court to uphold the challenged parts of the MCPS Guidelines that hide information from parents can withstand any form of scrutiny.  The assumptions underlying the Parental Preclusion Policy are irrational and contrary to established legal presumptions, there is no privacy interest of minors vis-à-vis their parents, and parents may not be secretly tarred by schools with an "unsupportive" label and, *Presto!,* lose their constitutional protections guarding their rights to care for and nurture their children.

## IV.    The Parental Preclusion Policy Is Neither Supported by a Legitimate Compelling Interest Nor Narrowly Tailored

As it abridges a fundamental right, the Parental Preclusion Policy must satisfy strict scrutiny analysis.  However, as discussed above, it is not justified by *any* legitimate interest, causing it to fail under both rational and strict scrutiny. Absent "'some definite and articulable evidence'" of a child being abused, "neither

<hr>

[13]  A spokesman for MCBE for a recent article stated that the schools currently has over 300 situations in which parents are not being told of their children exhibiting as transgender at school.  https://www.washingtonpost.com/ education/2022/07/18/gender-transition-school-parent-notification/ (last visited Sept. 28, 2022).

the state nor its officials have any interest whatsoever 'in protecting children from their parents,' and no further inquiry (i.e., balancing of interests) is necessary." *Heck,* 327 F. 3d at 521 (citing *Brokaw,* 235 F. 3d at 1019; *Croft,* 103 F. 3d at 1126); *accord Ricard,* 2022 WL 147,372 at * 8. But even if balancing were necessary, and even if the policy were justified by a particularized, compelling interest, it is not narrowly tailored.

A.    <u>No Compelling Interest Supports the Parental Preclusion Policy</u>

As discussed above, the interests advanced by MCBE and accepted by the district court are no more than embellishments of a determination by MCBE that it can better act in the best interests of a minor child than can the child's parents. That is unacceptable as a matter of law. MCBE's asserted interests are also deficient because predictive judgments of the type MCBE is making under the Parental Preclusion Policy are insufficient to qualify as a compelling interest when fundamental rights are infringed.

The Supreme Court in *Brown v. Entertainment Merchants Association*, 564 U.S. 786 (2011), dealt with a similar, but ironically largely reversed, situation, in that California prohibited minors from purchasing some video games due to their content. Because the free speech right of minors was being infringed, California had to justify its restriction by a compelling interest, and it responded that it was both protecting minors who might be harmed by the violent material of the games

- 41 -

and protecting parental rights to care for their children. The Supreme Court ruled that "predictive judgments" by the State are not sufficient to make a compelling interest and that there must be an actual problem substantiated by evidence; "ambiguous proof will not suffice." *Id.* at 799-800.

Here, MCBE only deals with predictive judgments and only relies on ambiguous proof. It starts the process with a prediction, based in many cases on close to zero evidence and only a child's hunch, about the likely reaction of the parents. It then prognosticates, without evidence, that, if parents are not "supportive" as defined by the particular MCBE employee filling out the intake form, that it might negatively affect the child. This is even scantier and more ambiguous "evidence" than the Supreme Court rejected in *Brown*, in which California presented expert testimony that watching violent video games might lead to violent behavior by minors. *Id.* In this case, as set out in the Complaint (JA40-41), the leading pro-transexual professional association in the world, the World Professional Association for Transgender Health ("WPATH"), in its Standards of Care Guidelines ("SOC") calls for mental health professionals to "provide family counseling," acknowledging that "[f]amilies play an important role in the psychological health and well-being of youth."

https://www.wpath.org/media/cms/Documents/SOC%20v7/Standards%20of%20C

are_V7%20Full%20Book_English.pdf (v.7, 2012) at 14-15.[14]  They recognize that parents face "difficult decisions" about how much and how soon to allow their children to act on transgender inclinations, including changing names and pronouns, and that there is not a one-size-fits-all solution.  *Id.* at 15-16.  In this connection, it bears repeating that the MCPS Parental Preclusion Policy applies to students of *all* ages, from elementary through high school.

Much other evidence shows that the issue of whether a particular minor should "go trans" is far from certain and hotly debated.  And, while the Parental Preclusion Policy robs all parents, whatever their views,[15] of the ability to care for their children if they are labeled insufficiently supportive, it is also certainly untrue that parents who disagree with the assumption that transgender behavior is normal and normative have no cause for concern or are, in any proper sense of the word, "unsupportive" because of their views.  For example, on a scientific basis, sex is, indeed, immutable.  It is set at conception, and all of a child's billions of cells are

---

[14]  In the complaint, Plaintiff Parents cited the then-current version of the SOC and continue to do so here.  WPATH recently published a new edition of its Standards of Care that continues its recognition of the importance of parental involvement in a minor's consideration of exhibiting as transgender.  *See, e.g.*, https://doi.org/10.1080/ 26895269.2022.2100644 at S44, S57-58, S77-78.

[15]  Despite the district court making assumptions of what Plaintiff Parents might believe in this regard, neither the Complaint nor other pleadings disclose how they would identify themselves on the "supportive" scale.

either male or female.  It never changes, even after pharmaceutical or surgical

interventions.[16]  *See United States v. Va.*, 518 U.S. 515, 533 (1996) (describing

sexual differences as "enduring"); *Ballard v. United States*, 329 U.S. 187, 193

(1946) (remarking that biological males and females are "not fungible").  On a

philosophical basis, the idea that one can alter one's sex or "was born in the wrong

body" is based on an assumption, rejected by many philosophers, that the person's

mind (or spirit) and the person's body can be separated and the non-bodily part is

the "real" part and has the ability to change or override the bodily part.[17]  On a

social science and medical basis, almost all teens experiencing gender dysphoria

"grow out" of it by adulthood,[18] and hormonal and surgical treatments to "convert"

---

[16]  "[W]hile there is evidence for the fluidity of sex in many organisms, this is
simply not the case in humans. . . .  [T]he reality [is] that sex in humans is
functionally binary. . . .  [T]he claim that classifying people's sex based on
anatomy and genetics 'has no basis in science' has itself no basis in reality, as
any method exhibiting a predictive accuracy of over 99.98 percent would place
it among the most precise methods in all the life sciences."  Colin Wright, "The
New Evolution Deniers," *Quillette*, Nov. 30, 2018, https://quillette.com/
2018/11/30/the-new-evolution-deniers/ (last visited Sept. 28, 2022); *see also*
"Every Cell Has a Sex," https://www.bostonglobe.com/opinion/2014/01/05
/every-cell-has-sex/ lgnbRyR1FvVqA9ccbKM5iI/story.html.

[17]  Dr. N.T. Wright, a noted Christian writer and teacher, summarized this view in
a succinct letter to the editor of *The Times* of London in 2017.  https://www.
oakleys.org.uk/blog/2017/08/bishop_nt_wright_on_transgenderism_in_the_tim
es (last visited Oct. 4, 2022).

[18]  Dr. Paul McHugh, former Psychiatrist-in-Chief, The Johns Hopkins Hospital
(1975-2001) and currently Johns Hopkins University Distinguished Service
Professor of Psychiatry, noted in an op-ed for the *Wall Street Journal* that

someone's gender have major downsides that are still being discovered.[19]  Many

medical practitioners consider such treatments on minors to be child abuse.[20]  On a

religious basis, Christianity, Judaism, and Islam all teach that there is a God who

---

"[w]hen children who reported transgender feelings were tracked without medical or surgical treatment at both Vanderbilt University and London's Portman Clinic, 70%-80% of them spontaneously lost those feelings.  Some 25% did have persisting feelings; what differentiates those individuals remains to be discerned."  (Originally published June 12, 2014, and updated on May 13, 2016, https://www.wsj.com/articles/paul-mchugh-transgender-surgery-isnt-the-solution-1402615120 (last visited Oct. 4, 2022).)

[19] A recent decision by the U.K.'s High Court of Justice summarized some of the serious concerns about the long-term effects of drugs used in gender-transforming procedures, noting, *inter alia,* a change made on the National Health Service website that backtracked a previous representation that puberty blocker treatments were "fully reversible" and substituted a disclaimer that began, "Little is known about the long-term side effects of hormone or puberty blockers in children with gender dysphoria." *Bell v. Tavistock* [2020] EWHC 3274 (Admin), CO/60/2020, [paragraph 67], https://www.judiciary.uk/wp-content/uploads/2020 /12/Bell-v-Tavistock-Judgment.pdf.  After an independent investigation, U.K.'s Tavistock Center is being shut down.  *See* https://segm.org/UK_shuts-down-worlds-biggest-gender-clinic-for-kids (last visited Nov. 1, 2022).

[20] "[M]any medical organizations around the world, including the Australian College of Physicians, the Royal College of General Practitioners in the United Kingdom, and the Swedish National Council for Medical Ethics have characterized these interventions in children as experimental and dangerous. World-renowned Swedish psychiatrist Dr. Christopher Gillberg has said that pediatric transition is 'possibly one of the greatest scandals in medical history' and called for 'an immediate moratorium on the use of puberty blocker drugs because of their unknown long-term effects.'" https://acpeds.org/topics /sexuality-issues-of-youth/gender-confusion-and-transgender-identity/ deconstructing-transgender-pediatrics (footnotes omitted).

created humans and that transgender conduct violates God's design for

humanity.[21]  And many have shown concern that the dramatic increase in

especially juvenile female assertions of transgenderism are heavily influenced by

peer pressure.[22]

This is all to say, the Parental Preclusion Policy is not supported by the type

of unambiguous evidence required to support a compelling interest, but instead by

predictive judgments of government officials, which do not suffice.  *See Brown*,

564 U.S. at 799-800.  Parents are being neither unloving nor naïve if they have

serious concerns about their children experimenting with transgender conduct or

about how fast they should do so.  They have a legitimate interest in knowing that

---

[21]  *See, e.g.,* "Muslims and Christians Should Work Together . . ." in *Public Discourse*, summarizing similarities in Islamic and Christian theology on family and moral issues. https://www.thepublicdiscourse.com/2018/05/21436/.

[22]  *See, e.g.,* Abigail Shrier, *Irreversible Damage: The Transgender Craze Seducing Our Daughters* (Regnery Pub'g 2021); "Gender Ideology Run Amok," *Imprimis,* June/July 2021, vol. 50, no. 6/7, found at https://imprimis .hillsdale.edu/gender-ideology-run-amok/ ("What is behind this social contagion—the spread of ideas, emotions, and behaviors through peer influence, one more instance of teenage girls sharing and spreading their pain.") (last visited Oct. 4, 2022); a *New York Times* report on the dramatic increase in transgender identification among young people, https://www.nytimes.com /2022/06/10/ science/transgender-teenagers-national-survey.html (last visited Oct 4, 2022); and a critique of a widely reported study that claims to debunk the notion of social contagion as an explanation of the surge in transgender identification among young people found at https://whyevolutionistrue.com /2022/08/04/new-paper-purports-to-refute-social-contagion-hypothesis-for-transgender-adolescents/ (last visited Oct 4, 2022).

a school is deviating from their instructions about how their child is to be

addressed and to be treated at school.  And, again, all parties recognize that minors

exhibiting as transgender are at much greater risk of self-destructive

behavior.  While the social science studies do *not* support the conclusion that the

sole cause is social disfavor, much less parental disfavor, to the exclusion of other

or contributing underlying causes,[23] the Parental Preclusion Policy prevents parents

who are suspected of being not "supportive" enough from being able to provide

professional assistance to their children to mitigate such a risk, even when such

assistance would affirm the child's transgender inclinations.

B.    The Parental Preclusion Policy Is Not Narrowly Tailored

The Parental Preclusion Policy also fails strict scrutiny because it is

seriously overinclusive and its goal of screening for abusive or neglectful parents

(by MCBE's lights) is already accommodated by State law in a much more

---

[23]  *See, e.g.,* Mayer & McHugh, "Sexuality and Gender," 50 *The New Atlantis* 8
(Fall 2016), https://www.thenewatlantis.com/issues/no-50-fall-2016, noting that
there is limited evidence that social stressors such as discrimination and stigma
contribute to the elevated risk of poor mental health outcomes for transgender
populations and calling for more high-quality, longitudinal studies to examine
the relationship between social stressors and poor mental health results for
transgendered individuals.  A thirty-year study in Sweden, a culture strongly
supportive of transgendered individuals, found that 10-15 years after "sex
change" surgery, the suicide rate of those who had the surgery was 20 times that
of comparable peers. https://www.heritage.org/gender/commentary/sex-
reassignment-doesnt-work-here-the-evidence.

targeted, less restrictive way.  It is unconstitutional for this reason as well.  "The absence of narrow tailoring suffices to establish the invalidity" of the challenged policy.  *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 US 520, 546 (1993).

The Supreme Court in *Brown* provided controlling guidance on narrow tailoring, too.  It found that a prohibition of sales of violent videos to all minors would sweep in many families in which the parents had no objection to their children buying the videos:  "While some of the legislation's effect may indeed be in support of what some parents of the restricted children actually want, its entire effect is only in support of what the State thinks parents *ought* to want."  564 U.S. at 804 (emphasis in original).  The Court noted that other processes were in place to assist parents who did object and relied on its decision in *R.A.V. v. St. Paul*, 505 U.S. 377 (1992), which struck down an ordinance, despite its stated purpose being to serve the compelling state interest of ensuring "the basic human rights of members of groups that have historically been subjected to discrimination," because it regulated expression due to hostility to its content and such regulation was not "*necessary* to serve the asserted [compelling] interest."  *Id.* at 395 (quoting *Burson* v. *Freeman,* 504 U. S. 191, 199 (1992) (plurality opinion) (emphasis added in original).

Here, the Parental Preclusion Policy obviously will sweep into the "not sufficiently supportive" class many parents who are, indeed, supportive of their

children, no matter what definition the involved MCBE decision maker will utilize in the particular instance. Like the statute struck down in *Brown*, the Parental Preclusion Policy's "entire effect is only in support of what the State thinks parents *ought* to want." 564 U.S. at 804. Moreover, a policy such as this to protect the children from the parents is obviously *un*necessary, as Maryland has a detailed statutory process, described above, to deal with parents who are abusive or neglectful.[24] *See id.* The Supreme Court in *Burwell* ruled that another program of the government meeting the asserted interest necessarily means that the challenged regulation fails the least restrictive means test. 573 U.S. at 730-31. Applying this rule, the district court in *Ricard* found that, even if a general policy instructing teachers not to disclose a student's preferred name and gender to parents served a compelling interest to protect them from their own parents, which it did not, it would be overinclusive and fail strict scrutiny. 2022 WL 1471372 at *8. The *statutory* process to disclose abusive parents truly is case-by-case, allowing opportunity for evidence to be presented and applying the constitutional prerequisites of clear and convincing evidence, legal representation, and notice before overriding the legal presumption that parents act in the best interests of their children and are the ones to make care and nurture decisions for their children.

---

[24] See note 11 *supra.*

<u>Conclusion</u>

MCBE by the Parental Preclusion Policy mandates that its employees hide from parents that their minor children are exhibiting transgenderism at school if the child, in consultation with school personnel, suspects the parents may not be "supportive" enough. This includes intentionally withholding related student records and keeping secret that school personnel are no longer abiding by the information and instruction provided by parents about the name and sex of their children. But there is a bar to the public schools taking over control of children from their parents in the name of current trends in "right thinking." It is a bar established by the Constitution, which protects from encroachment the fundamental right of parents to the primary right to control the care and nurture of their children, a right that cannot be circumvented by governmental deception instead of due process, no matter how righteous school personnel believe their cause to be.

The proffered justifications for the Parental Preclusion Policy are both logically and legally deficient. This Court should reverse and remand with instruction to act consistently with the decision of this Court.

Respectfully submitted,

/s/ Frederick W. Claybrook, Jr.
Frederick W. Claybrook, Jr.
  (Counsel of Record)
Claybrook LLC
700 Sixth St., NW, Ste. 430
Washington, D.C. 20001
(202) 250-3833
Rick@Claybrooklaw.com

Steven W. Fitschen
National Legal Foundation
524 Johnstown Road
Chesapeake, Va. 23322
(757) 463-6133
sfitschen@nationallegalfoundation.org

Attorneys for Appellants

November 14, 2022

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limitations of F.R.A.P. 32(a)7(B)(i) and F.R.A.P. 29(a)(5). Exclusive of the exempted portions, this brief contains 12,281 words, including footnotes, in 14-point Century Schoolbook font. This total was calculated with the Word Count function of Microsoft Office Word 365.

s/ Steven W. Fitschen
Steven W. Fitschen
The National Legal Foundation
524 Johnstown Road
Chesapeake, Va. 23322
(757) 650-9210
sfitschen@nationallegalfoundation.org

## CERTIFICATE OF SERVICE

I hereby certify that on November 14, 2022, I served the foregoing Brief of the Appellants on all Counsel through the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service on those participants will be accomplished by the CM/ECF system.

s/ Steven W. Fitschen
Steven W. Fitschen
The National Legal Foundation
524 Johnstown Road
Chesapeake, Va. 23322
(757) 650-9210
sfitschen@nationallegalfoundation.org

# ADDENDUM

Montgomery County, Maryland, Public Schools'

2020-2021 Guidelines for Student Gender Identity

and

2020-2021 Intake Form

English

# 2020–2021

## Guidelines for Student

# GENDER IDENTITY

## in Montgomery County Public Schools

www.montgomeryschoolsmd.org

Maryland's Largest School District

**MONTGOMERY COUNTY PUBLIC SCHOOLS**

USCA4 Appeal: 22-2034    Doc: 22    Filed: 11/14/2022    Pg: 65 of 74

Filed: 11/14/2022    Pg: 66 of 74

Doc: 22

USCA4 Appeal: 22-2034



**Board of Education**

## VISION
*We inspire learning by providing the greatest public education to each and every student.*

## MISSION
*Every student will have the academic, creative problem solving, and social emotional skills to be successful in college and career.*

## CORE PURPOSE
*Prepare all students to thrive in their future.*

## CORE VALUES
*Learning
Relationships
Respect
Excellence
Equity*

**Board of Education**

Mrs. Shebra L. Evans
*President*

Ms. Brenda Wolff
*Vice President*

Ms. Jeanette E. Dixon

Dr. Judith R. Docca

Mrs. Patricia B. O'Neill

Ms. Karla Silvestre

Mrs. Rebecca K. Smondrowski

Mr. Nicholas W. Asante
*Student Member*

**Montgomery County
Public Schools (MCPS)
Administration**

Jack R. Smith, Ph.D.
*Superintendent of Schools*

Monifa B. McKnight, Ed.D.
*Deputy Superintendent*

Henry R. Johnson, Jr., Ed.D.
*Chief of Staff*

Derek G. Turner
*Chief of Engagement, Innovation, and Operations*

Janet S. Wilson, Ph.D.
*Chief of Teaching, Learning, and Schools*

850 Hungerford Drive
Rockville, Maryland 20850
www.montgomeryschoolsmd.org

56

Montgomery County Public Schools (MCPS) is committed to a safe, welcoming school environment where students are engaged in learning and are active participants in the school community because they feel accepted and valued. To this end, all students should feel comfortable expressing their gender identity, including students who identify as transgender or gender nonconforming.[1] It is critical that all MCPS staff members recognize and respect matters of gender identity; make all reasonable accommodations in response to student requests regarding gender identity; and protect student privacy and confidentiality. To assist in these efforts, MCPS has developed the following guidelines for student gender identity that are aligned with the Montgomery County Board of Education's core values, guidance from the Maryland State Department of Education,[2] and the Montgomery County Board of Education Policy ACA, *Nondiscrimination, Equity, and Cultural Proficiency*, which prohibits discrimination, stigmatization, and bullying based on gender identity, as well as sex, gender, gender expression, and sexual orientation, among other personal characteristics. These guidelines cannot anticipate every situation which might occur. Consequently, the needs of each student must be assessed on a case-by-case basis.

## GOALS

- Support students so they may participate in school life consistent with their asserted gender identity;
- Respect the right of students to keep their gender identity or transgender status private and confidential;
- Reduce stigmatization and marginalization of transgender and gender nonconforming students;
- Foster social integration and cultural inclusiveness of transgender and gender nonconforming students; and
- Provide support for MCPS staff members to enable them to appropriately and consistently address matters of student gender identity and expression.

## DEFINITIONS

The definitions provided here are not intended to label students but rather to assist in understanding transgender and gender nonconforming students. Students might or might not use these terms to describe themselves.[3,4]

AGENDER   Without a gender (also "nongendered" or "genderless").

CISGENDER   A person whose gender identity and gender expression align with the person's sex assigned at birth; a person who is not transgender or gender nonconforming.

GENDER EXPRESSION   The manner with which a person represents or expresses gender to others, often through behavior, clothing, hairstyles, activities, voice, speech and word choices, or mannerisms.

GENDER FLUID   A person whose gender identity or gender expression is not fixed and shifts over time, depending on the situation.

GENDER IDENTITY   A person's deeply held internalized sense or psychological knowledge of the person's own gender. One's gender identity may be the same as or different from the sex assigned at birth. Most people have a gender identity that matches their sex assigned at birth. For some, however, their gender identity is different from their sex assigned at birth. All people have gender identity, not just persons who are transgender or gender nonconforming people. For the purposes of this guidance, a student's gender identity is that which is consistently asserted at school.

GENDER NONCONFORMING   A term for individuals whose gender expression differs from conventional or stereotypical expectations, such as "feminine" boys, "masculine" girls, and those whose gender expression may be androgynous. This includes people who identify outside traditional gender categories or identify as two or more genders. Other terms that can have similar meanings include "gender diverse" or "gender expansive."

INTERSEX   A range of conditions associated with the development of physical sex characteristics that do not fit the typical definition of male or female.

LGBTQ   An acronym for the Lesbian, Gay, Bisexual, Transgender, Queer, and Questioning community. This acronym often is written as LGBTQ+ in an effort to be more inclusive. It is also stated as LGBTA to include people who are asexual, or LGBTI, with the I representing intersex, or LGBTQIA to represent all of the above.

NON-BINARY   A person who transcends commonly held concepts of gender through their own expression and identity (e.g., gender expansive, gender creative, or gender queer). Some non-binary people are also transgender.

[1] Related Montgomery County Board of Education Policies and MCPS Regulations: ACA, ACF, JHF, JHF-RA, ACA-RA, ACF-RA, COA, COA-RA.
[2] For more information and lists of additional resources, see: *Maryland State Department of Education, Providing Safe Spaces for Transgender and Gender Non-Conforming Youth: Guidelines for Gender Identity Non-Discrimination* (October 2015), available at marylandpublicschools.org/about/Documents/DSPSS/SSSP/ProvidingSafeSpacesTransgenderGenderNonConformingYouth012016.pdf.
[3] Terminology used in these guidelines is intended to be as inclusive as possible; however, it is understood that terms and language are evolving and may become outdated quickly.
[4] Definitions were informed by the following sources: American Civil Liberties Union; American Psychological Association; Baltimore City Schools; California School Boards Association; Chicago Public Schools; District of Columbia Public Schools; Gay, Lesbian, and Straight Education Network; Howard County Public Schools; Human Rights Campaign; Lambda Legal; Maryland State Department of Education; Maryland Public Secondary Schools Athletic Association; Massachusetts Department of Elementary and Secondary Education; National Collegiate Athletic Association; National School Boards Association; New York City Department of Education; PFLAG; and Trevor Project.

USCA4 Appeal: 22-2034   Doc: 22   Filed: 11/14/2022   Pg: 67 of 74

USCA4 Appeal: 22-2034    Doc: 22    Filed: 11/14/2022    Pg: 68 of 74

SEX ASSIGNED AT BIRTH   The sex designation recorded on an infant's birth certificate, should such a record be provided at birth.

SEXUAL ORIENTATION   Describes a person's emotional, romantic, or sexual attraction to other people. Some examples of sexual orientation are gay, lesbian, bisexual, asexual or pansexual.

TRANSGENDER   An adjective describing a person whose gender identity or expression is different from that traditionally associated with the person's sex assigned at birth. Other terms that can have similar meanings are "transsexual" and "trans."

TRANSITION   The process by which a person decides to live as the gender with which the person identifies, rather than the gender assigned at birth. In order to openly express their gender identity to other people, transgender people may take a variety of steps (e.g., using a nickname or legally changing their names and/or their sex designation on legal documents; choosing clothes and hairstyles that reflect their gender identity; and generally living, and presenting themselves to others consistently with their gender identity). Some, but not all, transgender people take hormones or undergo surgical procedures to change their bodies to align with their gender identity. Although transitioning includes the public representation on one's gender expression, transitioning is a personal process and individuals transitioning have the right to privacy.

X MARKER   Gender marker option for a person who does not identify with the binary categories of "M" for male or "F"

## PROACTIVELY WORKING WITH TRANSGENDER AND GENDER NONCONFORMING STUDENTS

### GENDER SUPPORT PLAN

The principal (or designee), in collaboration with the student and the student's family (if the family is supportive of the student), should develop a plan to ensure that the student has equal access and equal opportunity to participate in all programs and activities at school and is otherwise protected from gender-based discrimination at school. The principal, designee, or school-based mental health professional (e.g., school psychologist or school counselor) should use MCPS Form 560-80, *Intake Form: Supporting Students, Gender Identity* to support this process and assist the student in participating in school. The completed form must be maintained in a secure location and may not be placed in the student's cumulative or confidential files. While the plan should be consistently implemented by all school staff, the form itself is not intended to be used or accessed by other school staff members.

- Each student's needs should be evaluated on a case-by-case basis, and all plans should be evaluated on an ongoing basis and revised as needed. As a part of the plan, schools should identify staff member(s) who will be the key contact(s) for the student. The plan should delineate how support will be provided and how and to whom information will be disseminated. In addition, each plan should address identified name; pronouns; athletics; extracurricular activities; locker rooms; bathrooms; safe spaces, safe zones, and other safety supports; and formal events such as graduation.

## COMMUNICATION WITH FAMILIES

Prior to contacting a student's parent/guardian, the principal or identified staff member should speak with the student to ascertain the level of support the student either receives or anticipates receiving from home. In some cases, transgender and gender nonconforming students may not openly express their gender identity at home because of safety concerns or lack of acceptance. Matters of gender identity can be complex and may involve familial conflict. If this is the case, and support is required, the Office of School Support and Improvement or the Office of Student and Family Support and Engagement (OSFSE) should be contacted. In such cases, staff will support the development of a student-led plan that works toward inclusion of the family, if possible, taking safety concerns into consideration, as well as student privacy, and recognizing that providing support for a student is critical, even when the family is nonsupportive.

## PRIVACY AND DISCLOSURE OF INFORMATION

- All students have a right to privacy. This includes the right to keep private one's transgender status or gender nonconforming presentation at school.

- Information about a student's transgender status, legal name, or sex assigned at birth may constitute confidential medical information. Disclosing this information to other students, their parents/guardians, or third parties may violate privacy laws, such as the federal *Family Educational Rights and Privacy Act* (FERPA).

- Schools will ensure that all medical information, including that relating to transgender students, is kept confidential in accordance with applicable state, local, and federal privacy laws.

- Please note that medical diagnosis, treatment, and/or other documentation are not required for a school to accommodate requests regarding gender presentation, identity, and diversity.

- Transgender and gender nonconforming students have the right to discuss and demonstrate their gender identity and expression openly and decide when, with whom, and how much to share private information. The fact that students choose to disclose their status to staff members or other students does not authorize school staff members to disclose a student's status to others, including parents/guardians and other school staff members, unless legally required to do so or unless students have authorized such disclosure. It is inappropriate to ask transgender or gender nonconforming students more questions than are necessary to support them at school.

## NAMES/PRONOUNS

- All students have the right to be referred to by their identified name and/or pronoun. School staff members should address students by the name and pronoun corresponding to the gender identity that is consistently asserted at school. Students are not required to obtain a court-ordered name

USCA4 Appeal: 22-2034    Doc: 22    Filed: 11/14/2022    Pg: 69 of 74

and/or sex designation change or to change their student records as a prerequisite to being addressed by the name and pronoun that corresponds to their identified name. To the extent possible, and consistent with these guidelines, school personnel will make efforts to maintain the confidentiality of the student's transgender status.

## STAFF COMMUNICATION

Whenever schools are not legally required to use a student's legal name or sex assigned at birth on school records and other documents, the school should use the name and gender identified by the student on documents such as classroom rosters, identification badges, announcements, certificates, newspapers, newsletters, and yearbooks. To avoid harmful misgendering or misnaming, schools should be especially mindful that all information shared with substitute teachers should be in alignment with the student's identified name and gender.

- Schools should seek to minimize the use of permission slips and other school-specific forms that require disclosure of a student's gender or use gendered terminology such as boys/girls (instead of students) or mother/father (instead of parent/guardian).

- Unless the student or parent/guardian has specified otherwise, when contacting the parent/guardian of a transgender student, MCPS school staff members should use the student's legal name and pronoun that correspond to the student's sex assigned at birth.

- Asking about a person's pronouns makes spaces more inclusive and welcoming of transgender, gender nonconforming, and non-binary people.

## OFFICIAL SCHOOL RECORDS

Schools are required to maintain a permanent student record for each student, which includes the legal name and gender of the student. In situations where schools are required to use the legal name and gender from a student's permanent record, such as for standardized tests or reports to the Maryland State Department of Education (MSDE), school staff members and administrators shall adopt practices to avoid the inadvertent disclosure of the student's legal name and gender when it differs from the student's identified name and gender.

- In accordance with guidance from the Maryland State Department of Education, a student's records may identify the student as male, female, or gender X.

- A student's permanent record will be changed to reflect a change in the student's legal name or gender upon receipt of documentation that such legal name and/or gender have been changed. Any of the following documents is evidence of a legal name and/or gender change:

  - Court order;
  - New birth certificate;
  - State- or federal-issue identification; or
  - Documentation from a licensed healthcare practitioner.

- If a student and/or the student's parent/guardian requests a change to the student's permanent record, absent such documentation, the school should contact OSFSE.

- The school must protect the student's previous identity once a change to a student's legal name and/or gender has occurred. Please refer to the Student Record Keeper Manual, Office of Shared Accountability (OSA), or OSFSE for additional information.

- When a name and/or gender change has been made to official school records, the school must notify OSA so that appropriate notice to MSDE can be made.

- When a name and/or gender change has been made to official school records, school administrators should advise families that they must provide updated copies of any records provided to the school that were generated by external sources (e.g., immunization records, doctor's orders, or other records from medical providers).

- Similarly, a former student's permanent record should be changed to reflect a change in the former student's legal name or gender, upon receipt of documentation that such legal name and/or gender have been changed pursuant to a court order, new birth certificate, state- or federal-issue identification, or with documentation from a licensed healthcare practitioner. These changes are processed by Central Records.

## DRESS CODE

- Transgender and gender nonconforming students have the right to dress in a manner consistent with their gender identity or gender expression, so long as it complies with the MCPS dress code. School staff members shall not enforce a school's dress code more strictly for transgender or gender nonconforming students than for other students.

- Schools should consider gender-neutral dress codes for class or yearbook photos, honor society ceremonies, graduation ceremonies, or dances. In addition, in circumstances where gendered clothing is worn (e.g., in shows and performances), students should be allowed to wear the garments associated with their gender identity.

## GENDER-BASED ACTIVITIES

- Schools should evaluate all gender-based policies, rules, and practices, and maintain only those that have a clear and sound pedagogical purpose. For example, if music and performance groups arrange students into sections, they should seek to group them by voice type/qualities, rather than by gender.

- Whenever students are separated by gender in school activities or are subject to an otherwise lawful gender-specific rule, policy, or practice, students must be permitted to participate consistent with their gender identity.

Filed: 11/14/2022     Pg: 70 of 74
Doc: 22     USCA4 Appeal: 22-2034

## GENDER-SEPARATED AREAS

- Where facilities are designated by gender, students **must** be provided access to gender-specific facilities (e.g., bathrooms, locker rooms, and changing rooms) in alignment with their consistently asserted gender identity.

- Any student who is uncomfortable using a shared facility because of safety, privacy, or any other reason, should, upon request, be provided with a safe and nonstigmatizing alternative arrangement such as a single bathroom or, with respect to locker rooms, a privacy partition or curtain in changing areas, use of a nearby private restroom or office, or a separate changing schedule. The student should be provided access in a manner that safeguards confidentiality.

- Students who are entitled to use a facility consistent with their gender identity cannot be required to use an alternative arrangement. Alternative arrangements should be used only at the request of a student and in a manner that keeps the student's transgender status confidential.

- Some students may feel uncomfortable with a transgender student using the same sex-specific facility. This discomfort is not a reason to deny access to the transgender student. School administrators and counseling staff members should work with students to address their discomfort to foster understanding of gender identity and to create a school culture that respects and values all students.

## NEW CONSTRUCTION/RENOVATION

- If existing facilities do not meet the requirements of school administration to provide a gender-neutral facility for students, schools should work with the Department of Facilities Management to develop facility plans that could include renovation of existing facilities.

- Bearing in mind student safety considerations, the Department of Facilities Management should work to design gender-neutral bathroom facilities that are for student/public use.

- To the extent feasible, MCPS should build at least one gender-neutral restroom on each floor and in high-traffic areas.

- To the extent feasible, MCPS should incorporate at least one gender-neutral changing facility into the design of new schools and school renovations, allowing for safety and confidentiality considerations in the design and location of the gender-neutral facility.

## PHYSICAL EDUCATION CLASSES AND INTRAMURAL SPORTS

- Whenever the school provides gender-segregated physical education classes and intramural sports, students must be allowed to participate in a manner consistent with their gender identity.

## INTERSCHOLASTIC ATHLETICS

- Transgender and gender nonconforming student participation in interscholastic athletics is determined in accordance with Maryland Public Secondary Schools Athletic Association (MPSSAA) policies and guidelines (available online at www. mpssaa.org/assets/1/6/MPSSAA_Transgender_Guidance_revised_8.16.pdf).

- Per MPSSAA guidance and to ensure competitive fairness, the integrity of women's sports, and equal opportunities to participate without discrimination, transgender and gender nonconforming students in MCPS shall be permitted to participate on the interscholastic athletics team of:
  - the student's sex assigned at birth; or
  - the gender to which the student has transitioned; or
  - the student's asserted gender identity.

- Schools should refer any appeals regarding eligibility to participate in interscholastic athletics to the MCPS Athletics Unit.

- Competition at other schools: Accommodations provided at the home school should be made available at other facilities with the consent of the student and as part of the student's plan. The coach or home school should notify the school to be visited about any necessary accommodations, keeping the identity of the student confidential.

## CLUBS

- Many MCPS middle and high schools have student-led clubs that connect and support the interests of LGBTQ+ and gender nonconforming students, such as Gender and Sexuality Alliance (GSA) clubs. These clubs should run like any other club with clearly defined purposes.

## OUTDOOR EDUCATION/OVERNIGHT FIELD TRIPS

- Students must be allowed to participate consistent with their asserted gender identity.

- Sleeping arrangements should be discussed with the student and family (if the family is supportive of the student). Upon request, the student should be provided with a safe and non-stigmatizing alternative arrangement, such as a private sleeping area, if practicable.

- Schools should try to accommodate any student who may desire greater privacy, if practicable, without isolating other students.

- A student's transgender status is confidential information and school staff members may not disclose or require disclosure of a student's transgender status to other students or their parents/guardians, as it relates to a field trip, without the consent of the student and/or the student's parent/guardian.

USCA4 Appeal: 22-2034      Doc: 22      Filed: 11/14/2022      Pg: 71 of 74

# BULLYING, HARASSMENT, OR INTIMIDATION AND THREAT ASSESSMENT

- LGBTQ+ students have a higher incidence of being bullied and harassed, as well as a higher rate of suicide contemplation, and are more than five times as likely as non-LGBTQ+ students to attempt suicide.

- Board Policy JHF, *Bullying, harassment, or Intimidation*, sets forth the Board's commitment to an environment that is free of bullying, harassment, or intimidation so that schools are a safe place in which to learn; and MCPS Regulation JHF-RA, *Student Bullying, Harassment, or Intimidation*, provides procedures that address the prohibition of bullying in schools. These are available on the MCPS website at *https://www.montgomeryschoolsmd.org/departments/policy/pdf/jhf.pdf* and *https://www.montgomeryschoolsmd.org/departments/policy/pdf/jhfra.pdf*.

- Board Policy COA, *Student Well-being and School Safety*, establishes and maintains a behavior threat assessment process, based on an appraisal of behaviors, and provides appropriate preventive or corrective measures to maintain safe and secure school environments and workplaces. All children deserve a safe and nurturing school environment that supports their physical, social, and psychological well-being. In alignment with Board Policy ACA, *Nondiscrimination, Equity, and Cultural Proficiency*, school safety measures should not reinforce biases against, or rely on the profiling of, students based on their actual or perceived personal characteristics. MCPS Regulation COA-RA, *Behavior Threat Assessment*, requires that staff responsible for implementing behavior threat assessment procedures at the school level are trained to understand implicit bias, promote diversity awareness, and consider the risk of self-harm or the presence of suicidal ideation. Board of Education Policy COA, *Student Well-being and School Safety*, and MCPS Regulation COA-RA, *Behavior Threat Assessment*, are available on the MCPS web at *www.montgomeryschoolsmd.org/departments/policy/pdf/coa.pdf* and *www.montgomeryschoolsmd.org/departments/policy/pdf/coara.pdf*

- Bullying and harassment include conduct that is directed at a student based on a student's actual or perceived gender identity or expression, and includes conduct that targets a student because of a characteristic of a friend, family member, or other person or group with whom a student associates.

- Complaints alleging discrimination or harassment directed at a student based on a student's actual or perceived gender identity or expression should be handled in the same manner as other discrimination or harassment complaints. Schools should be vigilant about bullying and harassment and address it promptly.

- School staff members should take all reasonable steps to ensure safety and access for transgender and gender nonconforming students at their school and support students' rights to assert their gender identity and expression.

- Students shall not be disciplined based on their actual or perceived gender identity or expression.

- Schools are encouraged to have age-appropriate student organizations develop and lead programs to address issues of bullying prevention for all students, with emphasis on LGBTQ+ students.

# SAFE SPACES

- **Hallway or "Flash" Pass:** If needed, schools will allow a transgender or gender nonconforming student to go to a safe space (e.g., main office, counselor's office) at any time the student encounters a situation that feels unsafe or uncomfortable.

- **Safe Zones:** Schools will designate certain teachers' classrooms, specific offices, or a location in a school that is deemed a safe zone where any student, for whatever reason, may go to be free from judgment and to feel comfortable and safe. Schools also should ensure that staff members who have safe zone stickers on their doors have received appropriate training regarding providing inclusive, affirming environments.

# STAFF SUPPORT

- Board of Education Policy ACA, *Nondiscrimination, Equity, and Cultural Proficiency* protects all MCPS employees from any form of discrimination, including actions that are motivated by an invidious intent to target individuals based on their actual or perceived personal characteristics as well as acts of hate, violence, insensitivity, disrespect, or retaliation—such as verbal abuse, harassment, bullying, slurs, threats, physical violence, vandalism, or destruction of property—that impede or affect the learning or work environment, and encompassing racism, sexism, issues of gender identity, and other forms of institutional prejudice in all their manifestations. Staff seeking guidance and supports involving issues of gender identity are encouraged to contact the coordinator in the Office of Employee Engagement and Labor Relations (OEELR) at 240-740-2888.

# CONTACTS

- For more information please contact the MCPS OSFSE at 240-314-4824, or the MCPS Office of the Chief of Staff, Student Welfare and Compliance, at 240-740-3215.

# MCPS NONDISCRIMINATION STATEMENT

Montgomery County Public Schools (MCPS) prohibits illegal discrimination based on race, ethnicity, color, ancestry, national origin, religion, immigration status, sex, gender, gender identity, gender expression, sexual orientation, family/parental status, marital status, age, physical or mental disability, poverty and socioeconomic status, language, or other legally or constitutionally protected attributes or affiliations. Discrimination undermines our community's long-standing efforts to create, foster, and promote equity, inclusion, and acceptance for all. Some examples of discrimination include acts of hate, violence, insensitivity, harassment, bullying, disrespect, or retaliation. For more information, please review Montgomery County Board of Education Policy ACA, *Nondiscrimination, Equity, and Cultural Proficiency*. This Policy affirms the Board's belief that each and every student matters, and in particular, that educational outcomes should never be predictable by any individual's actual or perceived personal characteristics. The Policy also recognizes that equity requires proactive steps to identify and redress implicit biases, practices that have an unjustified disparate impact, and structural and institutional barriers that impede equality of educational or employment opportunities.

| For inquiries or complaints about discrimination against MCPS staff * | For inquiries or complaints about discrimination against MCPS students * |
|---|---|
| Office of Employee Engagement and Labor Relations<br>Department of Compliance and Investigations<br>850 Hungerford Drive, Room 55, Rockville, MD 20850<br>240-740-2888<br>OEELR-EmployeeEngagement@mcpsmd.org | Office of the Chief of Staff<br>Student Welfare and Compliance<br>850 Hungerford Drive, Room 162, Rockville, MD 20850<br>240-740-3215<br>COS-StudentWelfare@mcpsmd.org |
| **For inquiries or complaints about sex discrimination under Title IX, including sexual harassment, against students or staff*** | |
| Title IX Coordinator<br>Office of the Chief of Staff<br>Student Welfare and Compliance<br>850 Hungerford Drive, Room 162, Rockville, MD 20850<br>240-740-3215<br>COS-TitleIX@mcpsmd.org | |

*Inquiries, complaints, or requests for accommodations for students with disabilities also may be directed to the supervisor of the Office of Special Education, Resolution and Compliance Unit, at 240-740-3230. Inquiries regarding accommodations or modifications for staff may be directed to the Office of Employee Engagement and Labor Relations, Department of Compliance and Investigations, at 240-740-2888. In addition, discrimination complaints may be filed with other agencies, such as: the U.S. Equal Employment Opportunity Commission, Baltimore Field Office, City Crescent Bldg., 10 S. Howard Street, Third Floor, Baltimore, MD 21201, 1-800-669-4000, 1-800-669-6820 (TTY); or U.S. Department of Education, Office for Civil Rights, Lyndon Baines Johnson Dept. of Education Bldg., 400 Maryland Avenue, SW, Washington, DC 20202-1100, 1-800-421-3481, 1-800-877-8339 (TDD), OCR@ed.gov, or www2.ed.gov/about/offices/list/ocr/complaintintro.html.*

This document is available, upon request, in languages other than English and in an alternate format under the *Americans with Disabilities Act*, by contacting the MCPS Office of Communications at 240-740-2837, 1-800-735-2258 (Maryland Relay), or PIO@mcpsmd.org. Individuals who need sign language interpretation or cued speech transliteration may contact the MCPS Office of Interpreting Services at 240-740-1800, 301-637-2958 (VP) or MCPSInterpretingServices@mcpsmd.org. MCPS also provides equal access to the Boy/Girl Scouts and other designated youth groups.

Maryland's Largest School District

## MONTGOMERY COUNTY PUBLIC SCHOOLS
Published by the Department of Materials Management for the
Office of Student and Family Support and Engagement

1237.20ct • Editorial, Graphics & Publishing Services • 7/20 

EXHIBIT 2
MCPS Form 560-80
June 2020
Page 1 of 2

Maryland's Largest School District

# MONTGOMERY COUNTY PUBLIC SCHOOLS

## Intake Form: Supporting Student Gender Identity

Office of Student and Family Support and Engagement
MONTGOMERY COUNTY PUBLIC SCHOOLS
Rockville, Maryland 20850
See MCPS *Guidelines for Student Gender Identity*

**Instructions:** The school administrator, counselor, or psychologist should complete this form with the student. Parents/guardians may be involved if the student states that they are aware of and supportive of the student's gender identity. This form should be kept in a secure, confidential location. See distribution information on Page 2. **This form is not to be kept in the student's cumulative or confidential folders.** All plans should be evaluated on an ongoing basis and revised as needed.

### STUDENT INFORMATION

Student Name in MCPS Student Information System (Last, First, MI): _____

School -- Choose One -- _____ Grade _____

What is your identified name?* _____ MCPS ID # _____

What is your identified gender?** ❑ Male  ❑ Female  ❑ X (unspecified/non-binary)  ❑ Other _____

What pronouns do you use to identify yourself in school? _____

### SUPPORT/SAFETY FOR STUDENT

Is parent/guardian aware of your gender identity? ❑ Yes  ❑ No

Support Level: (None) ❑ 1  ❑ 2  ❑ 3  ❑ 4  ❑ 5  ❑ 6  ❑ 7  ❑ 8  ❑ 9  ❑ 10 (High)

If support level is low, what considerations must be accounted for in implementing this plan?

### PRIVACY, CONFIDENTIALITY, AND DISCLOSURE

Plan for bathroom/locker use:

Plan for sports/extracurricular activities:

Other issues to be considered/addressed:

Who will be the student's "go to adult" on campus?

\* Consistent with *MCPS Guidelines for Student Gender Identity*, the school administrator/counselor/psychologist can request that the school record keeper add the identified name in the MCPS Student Information System.

\*\* Student's indication of identified gender on this form is for confidential notification to the school ONLY. If the student requests that their gender be changed on MCPS official records, the school must follow the procedures outlined in the *MCPS Student Record Keeper Manual*.

USCA4 Appeal: 22-2034     Doc: 22     Filed: 11/14/2022     Pg: 73 of 74

**MCPS Form 560-80**
**Page 2 of 2**

Filed: 11/14/2022      Pg: 74 of 74

Doc: 22

USCA4 Appeal: 22-2034

## PRIVACY, CONFIDENTIALITY, AND DISCLOSURE (continued)

If this person is not available, what should student do?

What, if any, will be the process for periodically checking in with the student and/or family?

What are expectations in the event the student is feeling unsafe and how will the student signal their need for help?

## OTHER SCHOOL ACTIVITIES

Are there lessons, units, content or other school activities during the school year to consider (health curriculum, swim unit, social justice units, name projects, dance instruction, Pride events, school dances, promotion/graduation ceremonies, etc.)?

## COMMUNICATION PLAN

Identify staff to whom this information may be disclosed:

How public or private will information about this student's gender be?

## SUPPORT PLAN REVIEW AND REVISION

How will this plan be monitored over time?

Form completed by (print name) _____ Date ____/____/_____

Distribution: Copy 1/School Confidential folder (in principal's office)
Copy 2/Student Welfare and Compliance Unit, via scan to COS-StudentWelfare@mcpsmd.org,
or via pony to CESC, Room 162, in a envelope marked confidential