No. 22-2034

# In the United States Court of Appeals
## FOR THE FOURTH CIRCUIT

———

JOHN and JANE PARENTS 1 and JOHN PARENT 2,
PLAINTIFFS-APPELLANTS,

*v.*

MONTGOMERY COUNTY BOARD OF EDUCATION, *et al.*,
DEFENDANTS-APPELLEES

———

On appeal from the United States District Court
for the District of Maryland
Case No. 8-20-cv-3552-PWG
The Honorable Paul W. Grimm, Judge

———

## AMICUS BRIEF OF DR. ERICA E. ANDERSON, PhD, SUPPORTING APPELLANTS AND REVERSAL

———

WISCONSIN INSTITUTE FOR
LAW & LIBERTY

LUKE N. BERG
Deputy Counsel
*Counsel of Record*

330 E. Kilbourn Ave., Suite 725
Milwaukee, WI 53202
luke@will-law.org
(414) 727-7367

## TABLE OF CONTENTS

INTEREST OF AMICUS .................................................................. 1

INTRODUCTION ............................................................................. 2

ARGUMENT ..................................................................................... 3

   I.   Whether a Minor Experiencing Gender Incongruence Should Transition Socially Is a Major and Potentially Life-Altering Decision That Requires Parental Involvement, for Many Reasons ................................................................................. 3

   II.  Parental Decision-Making Authority Over Their Minor Children Includes the Right to be Involved in How School Staff Refer to Their Child While at School ................................. 15

   III. Treating a Child or Adolescent as the Opposite Sex While at School, in Secret From Their Parents, Is Not a "Curriculum" Decision, Nor Is a Child's Request for Secrecy Sufficient to Exclude Parents ............................................................................. 26

CONCLUSION ................................................................................ 32

# TABLE OF AUTHORITIES

## Cases

*Arnold v. Board of Education of Excambia County, Alabama*,
  880 F.2d 305 (11th Cir. 1989) ...................................................24, 28

*C.N. v. Ridgewood Bd. of Educ.*,
  430 F.3d 159 (3d Cir. 2005)................................................17, 20, 27

*D.F. v. Harrisonburg Public Schs.*,
  No. CL22001304-00 (Rockingham Cnty., Va., Cir. Ct., filed
  June 1, 2022) ...................................................................................25

*Doe v. Madison Metro. Sch. Dist.*,
  No. 20-CV-454 (Dane Cnty., Wis., Cir. Ct., filed Feb. 18,
  2020)..................................................................................................25

*Doe v. Manchester Sch. Dist.*,
  No. 216-2022-CV-117 (N.H. Superior Ct., *filed* Mar. 3, 2022) ......25

*Foote v. Ludlow Sch. Comm.*,
  No. 3:22-CV-30041 (D. Mass., filed Apr. 12, 2022) ........................25

*Gruenke v. Seip*,
  225 F.3d 290 (3d Cir. 2000).................................................19, 20, 24

*H. L. v. Matheson*,
  450 U.S. 398 (1981) .........................................................................23

*Konen v. Caldeira*,
  No. 5:22-CV-5195 (N.D. Cal., filed June 27, 2022) ........................25

*Kosilek v. Spencer*,
  774 F.3d 63 (1st Cir. 2014).................................................................7

*Littlejohn v. Sch. Bd. of Leon Cnty, Fla.*,
  No. 4:21-CV-415 (N.D. Fla., filed Oct. 18, 2021)............................25

*May v. Anderson*,
  345 U.S. 528 (1953) .........................................................................15

*Meyer v. Nebraska*,
  262 U.S. 390 (1923) .........................................................................15

*Parents Defending Education v. Linn-Mar Comm. Sch. Dist.*,
  No. 1:22-CV-78 (N.D. Iowa, filed Aug. 2, 2022) .............................25

*Parents Protecting Our Children v. Eau Claire Area Sch. Dist.*,
No. 3:22-cv-508 (filed Sep. 7, 2022) ................................................25

*Parham v. J. R.*,
442 U.S. 584 (1979) ............................................................... passim

*Perez v. Broskie*,
No. 3:22-CV-83 (M.D. Fla., filed Jan. 24, 2022) ...........................25

*Ricard v. USD 475 Geary Cnty, Kan. Sch. Bd.*,
No. 5:22-CV-4015 (D. Kan., filed March 7, 2022) ........................25

*Santosky v. Kramer*,
455 U.S. 745 (1982) ................................................................15, 31

*Skinner v. Oklahoma*,
316 U.S. 535 (1942) .........................................................................15

*T.F., et al. v. Kettle Moraine School District*,
No. 21-CV-1650 (Waukesha Cnty. Wis., Cir. Ct., filed Nov.
17, 2021).............................................................................22, 25, 26

*Thomas v. Loudoun Cnty. Public Schs.*,
No. CL22003556-00 (Loudoun Cnty, Va., Cir. Ct., filed June
29, 2022)......................................................................................25

*Troxel v. Granville*,
530 U.S. 57 (2000) ...................................................15, 16, 19, 30

*Wisconsin v. Yoder*,
406 U.S. 205 (1972) ...................................................15, 16, 17

**Statutes**

20 U.S.C. § 1232g.............................................................................24

**Other Authorities**

Dr. Hilary Cass, *Independent review of gender identity services for
children and young people: Interim report* (February 2022) ...........7

Elie Vandenbussche, *Detransition-Related Needs and Support: A
Cross-Sectional Online Survey*, 69(9) Journal of
Homosexuality 1602–1620 (2022)....................................................13

Expert Affidavit of Dr. Stephen B. Levine, Dkt. 31, *Doe v. Madison
Metropolitan Sch. Dist.*,

No. 20-CV-454 (Dane County Wis. Cir. Ct., filed Feb. 19, 2020) .................................................................... 7

*Guidelines for Psychological Practice With Transgender and Gender Nonconforming People*, American Psychological Association, 70(9) APA 832–64 (2015) .......................................... 11

*Independent review into gender identity services for children and young people*, NHS England, https://www.england.nhs.uk/ commissioning/spec-services/npc-crg/gender-dysphoria-clinical-programme/gender-dysphoria/independent-review-into-gender-identity-services-for-children-and-young-people/ ........ 6

James M. Cantor, *Transgender and Gender Diverse Children and Adolescents: Fact-Checking of AAP Policy*, 46(4) Journal of Sex & Marital Therapy 307–313 (2019) .......................................... 4

James R. Rae, et al., *Predicting Early-Childhood Gender Transitions*, 30(5) Psychological Science 669–681 (2019) ........... 4, 8

Jesse Singal, *How the Fight Over Transgender Kids Got a Leading Sex Researcher Fired*, The Cut (Feb. 7, 2016) ................................. 6

Kenneth J. Zucker, *The myth of persistence: Response to "A critical commentary on follow-up studies and 'desistance' theories about transgender and gender non-conforming children" by Temple Newhook et al.*, 19(2) International Journal of Transgenderism 231–245 (2018) ...................................................... 6

Kristina R. Olson, et al., *Gender Identity 5 Years After Social Transition*, 150(2) Pediatrics (Aug. 2022) ....................................... 5

Ryan Mills, *A Mom's Fight to Save Her Daughter from Trans Orthodoxy at School*, National Review (Apr. 5, 2022) ................... 23

*Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, WPATH, 23 International J. Trans. Health 2022 S1–S258 (2022) ...................................... passim

*Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People,* The World Professional Association for Transgender Health (Version 7, 2012) ......... 4, 9, 11

T. D. Steensma, et al., *Factors Associated with Desistence and Persistence of Childhood Gender Dysphoria: A Quantitative*

*Follow-Up Study*, 52(6) Journal of the American Academy of Child & Adolescent Psychiatry 582–590 (2013) ........................... 5, 8

*What is Gender Dysphoria?* American Psychiatric Association, https://www.psychiatry.org/patients-families/gender-dysphoria/what-is-gender-dysphoria ........................................... 13

Wylie C. Hembree, et al., *Endocrine Treatment of Gender-Dyshporic/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline,* Endocrine Society 102(11) J Clin. Endocrinol. Metab. 3869–3903 (2017) ................... 8

## INTEREST OF AMICUS[1]

Dr. Erica E. Anderson, PhD, is a clinical psychologist practicing in Berkeley, California, with over 40 years of experience, and is transgender herself. Between 2019 and 2021, Dr. Anderson served as a board member for the World Professional Association for Transgender Health (WPATH) and as the President of USPATH (the United States arm of WPATH). Since 2016, Dr. Anderson's work has focused primarily on children and adolescents dealing with gender-identity-related issues, at the Child and Adolescent Gender Clinic at Benioff Children's Hospital at the University of California, San Francisco (2016 to 2021), and at her private consulting and clinical psychology practice (2016 to present). She has seen hundreds of children and adolescents for gender-identity-related issues in that time, many of whom transition, with her guidance and support.

As a practitioner serving children and adolescents experiencing gender incongruence, Dr. Anderson has a strong interest in ensuring that such children receive the best possible support and assistance (whether

---

[1] No party's counsel authored this brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting this brief. No person—other than the amicus curiae, its members, or its counsel—contributed money that was intended to fund preparing or submitting this brief.

or not they ultimately transition), which, in her view, requires involving their parents. All parties have consented to the filing of this amicus brief.

## INTRODUCTION

The Montgomery County, Maryland, School District, like some other school districts around the country, has adopted a policy allowing children of *any age* to secretly adopt a new gender identity at school, requiring all staff to treat them as though they were the opposite sex, without parental notice or consent, and even directing staff to conceal this from parents in various ways. Many mental-health professionals believe that a gender-identity transition during childhood is a profound and difficult decision, and that parental involvement is necessary to properly assess the underlying sources of the child's feelings, to evaluate the risks and benefits of a transition, to identify and address any coexisting issues, to provide ongoing support, and ultimately, to decide whether a transition will be in their child's best interests. Yet the District Court held that this critical decision is merely a "curriculum" decision that school districts may not only exclude parents from, but also hide from them. It is the first federal court in the country to hold—on a motion

to dismiss, no less—that such a policy does not violate parents' constitutional rights. This Court should reverse.

## ARGUMENT

I. **Whether a Minor Experiencing Gender Incongruence Should Transition Socially Is a Major and Potentially Life-Altering Decision That Requires Parental Involvement, for Many Reasons**

When children and adolescents express a desire to socially transition to a different gender identity (to change their name and pronouns to ones at odds with their natal sex), there is a major fork in the road, a decision to be made about whether a transition will be in the youth's best interests. Parents must be involved in this decision, for many reasons.

First, there is an ongoing debate in the mental health community about how quickly and under what conditions children and adolescents who experience gender incongruence (a mismatch between their natal sex and perceived or desired gender identity) should transition socially. Childhood social transitions were "[r]elatively unheard-of 10 years ago,"

but have become far more frequent in recent years.[2] Before the recent trend, in some circles, to immediately "affirm," without question, every child's and adolescent's expression of a desire for an alternate gender identity, a robust body of research—multiple studies across different locations and times—had found that, for the vast majority of children (roughly 80-90%), gender incongruence does not persist.[3] As one researcher summarized, "*every* follow-up study of GD [gender diverse] children, without exception, found the same thing: Over puberty, the majority of GD children cease to want to transition."[4]

These studies were conducted before the recent trend to quickly transition, whereas some newer studies of youth who *have* socially transitioned show much higher rates of persistence. A study in 2013

---

[2] Rae, James R., et al., *Predicting Early-Childhood Gender Transitions*, 30(5) Psychological Science 669–681, at 669–70 (2019), https://doi.org/10.1177/0956797619830649.

[3] *See*, *e.g.*, The World Professional Association for Transgender Health, *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People* ("WPATH SOC7") at 11 (Version 7, 2012), *available at* https://www.wpath.org/media/cms/Documents/SOC%20v7/SOC%20V7_English.pdf.

[4] Cantor, James M., *Transgender and Gender Diverse Children and Adolescents: Fact-Checking of AAP Policy*, 46(4) Journal of Sex & Marital Therapy 307–313 (2019), https://doi.org/10.1080/0092623X.2019.1698481.

found that "[c]hildhood social transitions were important predictors of persistence, especially among natal boys."[5] Another recent study of 317 transgender youth found that 94% continued to identify as transgender 5 years after transitioning.[6]

In light of the vastly different rates of persistence between youth who transition and those who do not, many experts in the field are concerned that a social transition may causally affect the likelihood that a child's or adolescent's experience of gender incongruence will persist. Dr. Kenneth Zucker, who for decades led "one of the most well-known clinics in the world for children and adolescents with gender dysphoria," has argued publicly that a social transition can "become[ ] self-reinforcing," because "messages from family, peers, and society do a huge amount of the work of helping form, reinforce, and solidify gender

---

[5] Steensma, T. D., et al., *Factors Associated with Desistence and Persistence of Childhood Gender Dysphoria: A Quantitative Follow-Up Study*, 52(6) Journal of the American Academy of Child & Adolescent Psychiatry 582–590, at 588 (2013), https://doi.org/10.1016/j.jaac.2013.03.016.

[6] Olson, Kristina R., et al., *Gender Identity 5 Years After Social Transition*, 150(2) Pediatrics (Aug. 2022), https://doi.org/10.1542/peds.2021-056082.

identities."[7] Dr. Zucker elsewhere has written that, in his view, "parents who support, implement, or encourage a gender social transition (and clinicians who recommend one) are implementing a psychosocial treatment that will increase the odds of long-term persistence."[8]

The U.K.'s NHS is currently reconsidering its model of transgender care,[9] and the doctor in charge of the review, Dr. Hilary Cass, wrote in her interim report: "[I]t is important to view [social transition] as an active intervention because it may have significant effects on the child or young person in terms of their psychological functioning. There are different views on the benefits versus the harms of early social transition.

---

[7] Singal, Jesse, *How the Fight Over Transgender Kids Got a Leading Sex Researcher Fired*, The Cut (Feb. 7, 2016), https://www.thecut.com/2016/02/fight-over-trans-kids-got-a-researcher-fired.html.

[8] Zucker, K., *The myth of persistence: Response to "A critical commentary on follow-up studies and 'desistance' theories about transgender and gender non-conforming children" by Temple Newhook et al.*, 19(2) International Journal of Transgenderism 231–245 (2018), available at https://www.researchgate.net/publication/325443416.

[9] *See Independent review into gender identity services for children and young people*, NHS England, https://www.england.nhs.uk/commissioning/spec-services/npc-crg/gender-dysphoria-clinical-programme/gender-dysphoria/independent-review-into-gender-identity-services-for-children-and-young-people/.

Whatever position one takes, it is important to acknowledge that it is not a neutral act, and better information is needed about outcomes."[10]

Dr. Stephen Levine, another well-known practitioner in the field,[11] in an expert report for a related case, writes that "therapy for young children that encourages transition cannot be considered to be neutral, but instead is an experimental procedure that has a high likelihood of changing the life path of the child, with highly unpredictable effects on mental and physical health, suicidality, and life expectancy."[12]

The authors of the 2013 study mentioned above expressed concern that "the hypothesized link between social transitioning and the cognitive representation of the self" may "influence the future rates of persistence," while noting that this "possible impact of the social transition itself on cognitive representation of gender identity or

---

[10] Cass, H., *Independent review of gender identity services for children and young people: Interim report* (February 2022), https://cass.independent-review.uk/publications/interim-report/.

[11] Dr. Levine was the court-appointed expert in the first major case to reach a federal court of appeals about surgery for transgender prisoners. *Kosilek v. Spencer*, 774 F.3d 63, 77 (1st Cir. 2014).

[12] Expert Affidavit of Dr. Stephen B. Levine, Dkt. 31, *Doe v. Madison Metropolitan Sch. Dist.*, No. 20-CV-454 (Dane County Wis. Cir. Ct., filed Feb. 19, 2020), available at https://will-law.org/wp-content/uploads/2021/02/affidavit-stephen-levine-with-exhibit.pdf.

persistence" had "never been independently studied," Steensma (2013), *supra* n. 5, at 588–89.

Another group of researchers recently wrote that "early childhood social transitions are a contentious issue within the clinical, scientific, and broader public communities. [citations omitted]. Despite the increasing occurrence of such transitions, we know little about who does and does not transition, the predictors of social transitions, and whether *transitions impact children's views of their own gender*." Rae (2019), *supra* n. 2, at 669–70 (emphasis added).

The Endocrine Society's guidelines similarly recognize that "[s]ocial transition is associated with the persistence of GD/gender incongruence as a child progresses into adolescence. It may be that the presence of GD/gender incongruence in prepubertal children is the earliest sign that a child is destined to be transgender as an adolescent/adult (20). However, social transition (in addition to GD/gender incongruence) has been found to contribute to the likelihood of persistence."[13]

---

[13] Hembree, Wylie C., et al., *Endocrine Treatment of Gender-Dyshporic / Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, Endocrine Society, 102(11) J Clin. Endocrinol. Metab. 3869–3903, at 3879 (2017), https://doi.org/10.1210/jc.2017-01658.

The World Professional Association for Transgender Health (WPATH), which takes a decidedly pro-transitioning stance, has acknowledged that "[s]ocial transitions in early childhood" are "controversial," that "health professionals" have "divergent views," that "[f]amilies vary in the extent to which they *allow* their young children to make a social transition to another gender role," and that there is insufficient evidence "to predict the long-term outcomes of completing a gender role transition during early childhood." WPATH SOC7, *supra* n. 3, at 17.[14] WPATH encourages health professionals to *defer to parents* "as they work through the options and implications," *even* "[i]f parents do not allow their young child to make a gender role transition." *Id*.

In short, when a child or adolescent expresses a desire to change name and pronouns to an alternate gender identity, mental health professionals do not universally agree that the best decision, for *every*

---

[14] The latest version of WPATH's standards of care guidelines (version 8), which was released just two months ago, continues to acknowledge that "there is a dearth of empirical literature regarding best practices related to the social transition process." *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, WPATH, 23 International J. Trans. Health 2022 S1–S258, at S76 (2022), *available at* https://www.tandfonline.com/doi/pdf/10.1080/26895269. 2022.2100644

*such* child or adolescent, is to immediately "affirm" their desire and begin treating that child or adolescent as the opposite sex. And whether transitioning will be helpful or harmful likely depends on the individual child or adolescent. As WPATH emphasizes, "an individualized approach to clinical care is considered both ethical and necessary." WPATH SOC8, *supra* n. 14, at S45.

While the mental-health community continues to debate whether socially transitioning is generally beneficial or not, it is beyond dispute that there is currently little solid evidence about who is right, given how recent of a trend this is.

Even setting aside the debate about socially transitioning, there is near universal agreement that, when a child or adolescent exhibits signs of gender incongruence (and a request to change name/pronouns would certainly qualify), each should be considered separately and individually and can benefit from the assistance of a mental-health professional, for multiple reasons.

Every major professional association recommends a thorough professional evaluation to assess, among other things, the underlying causes of the child's or adolescent's feelings and consider whether a

transition will be beneficial. The American Psychological Association, for example, recommends a "comprehensive evaluation" and consultation with the parents and youth to discuss, among other things, "the advantages and disadvantages of social transition during childhood and adolescence."[15] The Endocrine Society likewise recommends "a complete psychodiagnostic assessment." *Supra* n. 13, at 3877. WPATH, too, recommends a comprehensive "psychodiagnostic and psychiatric assessment," covering "areas of emotional functioning, peer and other social relationships, and intellectual functioning/school achievement," "an evaluation of the strengths and weaknesses of family functioning," any "emotional or behavioral problems," and any "unresolved issues in a child's or youth's environment." WPATH SOC7, *supra* n. 3, at 15.[16] WPATH also recommends that mental health professionals "discuss the

---

[15] American Psychological Association, *Guidelines for Psychological Practice With Transgender and Gender Nonconforming People*, 70(9) APA 832–64, at 843 (2015), https://www.apa.org/practice/guidelines/transgender.pdf.

[16] WPATH SOC8, *supra* n. 14, at S45, likewise states that "a comprehensive clinical approach is important and necessary," "[s]ince it is impossible to definitively delineate the contribution of various factors contributing to gender identity development for any given young person."

potential benefits and risks of a social transition with families who are considering it." WPATH SOC8, *supra* n. 14, at S69.

A professional assessment is especially important given the "sharp increase in the number of adolescents requesting gender care" recently, particularly among adolescent girls ("2.5-7.1 times" adolescent boys). WPATH SOC8, *supra* n. 14, at S43. As WPATH acknowledges, an increasing number of "adolescents [are] seeking care who have not seemingly experienced, expressed (or experienced and expressed) gender diversity during their childhood years," indicating that "social factors also play a role," including "susceptibility to social influence." *Id.* at S44–S45.

There is also growing awareness of adolescents who come to "regret gender-affirming decisions made during adolescence" and later "detransition," which many find to be a "difficult[ ]" and "isolating experience." *Id.* at S47. In one recent survey of 237 detransitioners (over 90% of which were natal females), 70% said they realized their "gender

dysphoria was related to other issues," and half reported that transitioning did not help.[17]

Another reason for professional involvement is to assess whether the child or adolescent needs mental-health support. Many transgender youth experience dysphoria—psychological distress—associated with the mismatch between their natal sex and perceived or desired gender identity. Indeed, the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders' (DSM-V) official diagnosis for "gender dysphoria" is *defined by* "clinically significant distress" associated with the mismatch. *See What Is Gender Dysphoria?*, American Psychiatric Association.[18]

Gender incongruence is also frequently associated with other mental-health issues. WPATH's SOC8 surveys studies showing that transgender youth have higher rates of depression, anxiety, self-harm, suicide attempts, eating disorders, autism spectrum disorders, and other

---

[17] Vandenbussche, E., *Detransition-Related Needs and Support: A Cross-Sectional Online Survey*, 69(9) Journal of Homosexuality 1602–1620, at 1606 (2022), https://doi.org/10.1080/00918369.2021.1919479.

[18] American Psychiatric Association, *What is Gender Dysphoria?* https://www.psychiatry.org/patients-families/gender-dysphoria/what-is-gender-dysphoria.

emotional and behavioral problems than the general population. *Supra* n. 14, at S62–63. All major professional organizations recommend screening for these coexisting issues and treating them, if needed. *Id.*; APA Guidelines, *supra* n. 15, at 845; Endocrine Society Guidelines, *supra* n. 13, at 3876.

Finally, professional support can be vital *during* any transition. A transition can "test [a young] person's resolve, the capacity to function in the affirmed gender, and the adequacy of social, economic, and psychological supports," and "[d]uring social transitioning, the person's feelings about the social transformation (including coping with the responses of others) is a major focus of [ ] counseling." Endocrine Society Guidelines, *supra* n. 13, at 3877.

It should go without saying, but parents cannot obtain a professional evaluation, screen for dysphoria and other coexisting issues, or provide professional mental-health support for their children, if their school hides from them what is happening at school.

To summarize, no professional association recommends that teachers and school officials, who have no expertise whatsoever in these issues, should facilitate a social transition while at school, treating

minors as if they are really the opposite sex, in secret from their parents, solely because they are concerned that their parents might not be "supportive" of a transition.

## II. Parental Decision-Making Authority Over Their Minor Children Includes the Right to be Involved in How School Staff Refer to Their Child While at School

A long line of cases from the United States Supreme Court establishes that parents have a constitutional right "to direct the upbringing and education of children under their control." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality op.) (quoting *Pierce v. Society of Sisters*, 268 U.S. 510, 534–35 (1925)). This is "perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court." *Troxel*, 530 U.S. at 65 (plurality op.). Over the years, the Supreme Court has described this right as "essential," *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923), "commanding," *Santosky v. Kramer*, 455 U.S. 745, 759 (1982), a "basic civil right[ ] of man," *Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942), "far more precious … than property rights," *May v. Anderson*, 345 U.S. 528, 533 (1953), and "established beyond debate as an enduring American tradition," *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972).

This line of cases establishes four important principles with respect to parents' rights that are relevant to the case at hand.

*First,* parents are the primary decision-makers with respect to their minor children—not their school, or even the children themselves. *Parham v. J. R.*, 442 U.S. 584, 602 (1979) ("Our jurisprudence historically has reflected … broad parental authority over minor children."); *Troxel*, 530 U.S. at 66 (plurality op.) ("[W]e have recognized the fundamental right of parents to *make decisions* concerning the care, custody, and control of their children.") (emphasis added); *Yoder*, 406 U.S. at 232 (emphasizing the "primary role of the parents in the upbringing of their children"). Parental decision-making authority rests on two core presumptions: "that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions," *Parham*, 442 U.S. at 602, and that "natural bonds of affection lead parents to act in the best interests of their children," far more than anyone else. *Parham*, 442 U.S. at 602; *Yoder*, 406 U.S. at 232 ("The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children.")

*Second*, parental rights reach their peak, and thus receive the greatest constitutional protection, on "matters of the greatest importance." *See C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 184 (3d Cir. 2005) (calling this "the heart of parental decision-making authority"); *Yoder*, 406 U.S. at 233–34. One such area traditionally reserved for parents is medical and health-related decisions, as the United States Supreme Court recognized long ago: "Most children, even in adolescence, simply are not able to make sound judgments concerning many decisions, including their need for medical care or treatment. Parents can and must make those judgments." *Parham*, 442 U.S. at 603.

*Third*, a child's disagreement with a parent's decision "does not diminish the parents' authority to decide what is best for the child." *Parham*, 442 U.S. at 603–04. *Parham* illustrates how far this principle goes. That case involved a Georgia statute that allowed parents to voluntarily commit their minor children to a mental hospital (subject to review by medical professionals). *Id.* at 591–92. A committed minor argued that the statute violated his due process rights by failing to provide him with an adversarial hearing, instead giving his parents substantial authority over the commitment decision. *Id.* at 587. The

Court rejected the minor's argument, confirming that parents "retain a substantial, if not the dominant, role in the [commitment] decision." *Id.* at 603–04. "The fact that a child may balk at hospitalization or complain about a parental refusal to provide cosmetic surgery does not diminish the parents' authority." *Id.* at 604.

*Fourth*, the fact that "the decision of a parent is not agreeable to a child or … involves risks does not automatically transfer the power to make that decision from the parents to some agency or officer of the state." *Parham,* 442 U.S. at 603. Likewise, the unfortunate reality that some parents "act[ ] against the interests of their children" does not justify "discard[ing] wholesale those pages of human experience that teach that parents generally do act in the child's best interests." *Id.* at 602–03. The "notion that governmental power should supersede parental authority in *all* cases because *some* parents abuse and neglect children" is "statist" and "repugnant to American tradition." *Id.* at 603 (emphasis in original). Thus, as long as a parent is fit, "there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions

concerning the rearing of that parent's children." *Troxel*, 530 U.S. at 68–69 (plurality op.).

In accordance with these principles, courts have recognized that a school violates parents' constitutional rights if it attempts to usurp their role in significant decisions. In *Gruenke v. Seip*, 225 F.3d 290 (3d Cir. 2000), for example, a high school swim coach suspected that a team member was pregnant, and, rather than notifying her parents, discussed the matter with other coaches, guidance counselors, and teammates, and eventually pressured her into taking a pregnancy test. *Id*. at 295–97, 306. The mother sued the coach for a violation of parental rights, explaining that, had she been notified, she would have "quietly withdrawn [her daughter] from school" and sent her to live with her sister until the baby was born. *Id*. at 306. "[M]anagement of this teenage pregnancy was a family crisis," she argued, and the coach's "failure to notify her" "obstruct[ed] the parental right to choose the proper method of resolution." *Id*. at 306. The court found that the mother had "sufficiently alleged a constitutional violation" against the coach and condemned his "arrogation of the parental role": "It is not educators, but parents who have primary rights in the upbringing of children. School officials have

- 19 -

only a secondary responsibility and must respect these rights." *Id.* at 306–07. The court also suggested that the guidance counselors may have violated the mother's parental rights, even though she had not sued them: "We need not consider the potential liability of school counselors here, although we have considerable doubt about their right to withhold information of this nature from the parents." *Id.* at 307.

The Montgomery County School District's Policy violates parents' decision-making authority over their minor children in at least three different ways.

First, the Policy violates parents' constitutional right to make the decision about whether a social transition is in their child's best interest. When children or adolescents experience gender dysphoria, the decision whether they should socially transition is a significant and impactful healthcare-related decision that falls squarely within "the heart of parental decision-making authority," *C.N.*, 430 F.3d at 184; *Parham*, 442 U.S. at 603. As described in more detail above, there is an ongoing debate among mental health professionals over how to respond when a child experiences gender incongruence, and, in particular, whether and when

children should socially transition by being addressed as though they were the opposite sex.

The District's Policy takes this life-altering decision out of parents' hands and places it with educators and young children, who lack the "maturity, experience, and capacity for judgment required for making life's difficult decisions." *Parham*, 442 U.S. at 602. By enabling children to transition at school, in secret from parents, without parental involvement, the District is effectively making a treatment decision without the legal authority to do so and without informed consent from the parents. Given the significance of changing gender identity, especially at a young age, parents "can and must" make this decision. *Parham*, 442 U.S. at 603.

A child's fear that his or her parents might not "support" a transition is not sufficient to override their decision-making authority. Parents' role is sometimes to say "no" to protect their children from decisions against their long-term interests.

The recent experience of some parents in Wisconsin illustrates the point.[19] During COVID, their 12-year-old daughter began to have a serious mental health crisis, and, for a time, believed she was transgender and expressed a desire to adopt a male name and pronouns while at school.[20] Everyone around her rushed to "affirm" her new identity, but her parents decided that an immediate transition was not in her best interest, at least not until she met with a professional to understand what she was feeling and to "educat[e] herself about what gender transitioning really entails." *Supra* n. 20. The mother told her daughter, "I'm not telling you that you can't be transgender. … I'm telling you that you can't change your name and your gender *right now*. You have a lot of underlying issues that need to be addressed before you make the decision that you were born in the wrong body. I understand that all

---

[19] Undersigned counsel represents these parents; their story is described in the complaint, and in the article cited in footnote 20 below. *T.F., et al. v. Kettle Moraine School District*, No. 21-CV-1650 (Waukesha Cnty. Wis., Cir. Ct., filed Nov. 17, 2021), *complaint available at* https://will-law.org/wp-content/uploads/2021/11/Kettle-Moraine-Complaint-Redacted.pdf.

[20] Mills, Ryan, *A Mom's Fight to Save Her Daughter from Trans Orthodoxy at School*, National Review (Apr. 5, 2022), https://www.nationalreview.com/news/a-moms-fight-to-save-her-daughter-from-trans-orthodoxy-at-school/.

these people around you are appeasing you and giving you want you want, and I'm not doing that, and that makes you angry. But I am your best friend. I am looking out for your best interest." *Id*. They communicated their decision to the school, but the school responded that they would call their daughter whatever she wanted at school, regardless of the parents' decision, forcing them to immediately withdraw her from the District. *Id*. Just a few weeks later, after being removed from those "affirming" that she was really a boy, their daughter realized that her parents were right, and told her mother that "affirmative care really messed me up." *Id*. This story powerfully illustrates that immediately transitioning is not *always* the best option for *every* child, that parents know and love their children better than anyone else, and that school districts must defer to parents about what is best for their children.

Second, the District's Policy also violates parental rights by concealing a serious mental-health issue from parents, circumventing their involvement altogether on this sensitive issue. *See H. L. v. Matheson*, 450 U.S. 398, 410 (1981) (parents' rights "presumptively include[ ] counseling [their children] on important decisions"); *Arnold v. Board of Education of Excambia County, Alabama*, 880 F.2d 305, 313

(11th Cir. 1989). Parents cannot guide their children through difficult decisions without knowing what their children are facing. That is why federal and state laws give parents complete access to all of their children's education records. *E.g.*, 20 U.S.C. § 1232g(a)(1)(A). By prohibiting staff from communicating with parents about this one issue, the District's Policy effectively substitutes school staff for parents as the primary source of input for children navigating difficult decisions, with long-term implications. *See Gruenke*, 225 F.3d at 306–07.

Third, the Policy interferes with parents' ability to provide professional assistance their children may urgently need. As explained above, gender dysphoria can be a serious psychological issue that requires support from mental health professionals. And gender incongruent children often present other psychiatric co-morbidities, including depression, anxiety, suicidal ideation and attempts, and self-harm. Teachers and staff do not have the training and experience necessary to properly diagnose children with gender dysphoria or to opine and advise on the treatment options. They cannot provide professional assistance for children dealing with these issues, and parents cannot obtain it either for their child if they are kept in the dark. Thus, parents

must be notified and involved not only to make the decision about whether a social transition is in their child's best interest, but also to obtain professional support for their child.

This case is one of over a dozen cases around the country challenging policies like the District's here,[21] and, as Appellants note, multiple jurists around the country have already begun to recognize that these policies violate parents' constitutional rights. In addition to those decisions mentioned in Appellants' brief, the Waukesha County Circuit

---

[21] *Doe v. Madison Metro. Sch. Dist.*, No. 20-CV-454 (Dane Cnty., Wis., Cir. Ct., filed Feb. 18, 2020) (motion to dismiss denied, awaiting decision on preliminary injunction motion); *Littlejohn v. Sch. Bd. of Leon Cnty, Fla.*, No. 4:21-CV-415 (N.D. Fla., filed Oct. 18, 2021) (awaiting decision on motion to dismiss); *T.F. v. Kettle Moraine Sch. Dist.*, No. 21-CV-1650 (Waukesha Cnty., Wis., Cir. Ct., filed Nov. 17, 2021) (motion to dismiss denied, briefing summary judgment); *Perez v. Broskie*, No. 3:22-CV-83 (M.D. Fla., filed Jan. 24, 2022) (awaiting decision on motion to dismiss); *Foote v. Ludlow Sch. Comm.*, No. 3:22-CV-30041 (D. Mass., filed Apr. 12, 2022) (same); *Doe v. Manchester Sch. Dist.*, No. 216-2022-CV-117 (N.H. Superior Ct., *filed* Mar. 3, 2022) (motion to dismiss granted, on appeal); *Ricard v. USD 475 Geary Cnty, Kan. Sch. Bd.*, No. 5:22-CV-4015 (D. Kan., filed March 7, 2022) (preliminary injunction granted, case settled); *D.F. v. Harrisonburg Public Schs.*, No. CL22001304-00 (Rockingham Cnty., Va., Cir. Ct., filed June 1, 2022) (awaiting decision on preliminary injunction motion); *Konen v. Caldeira*, No. 5:22-CV-5195 (N.D. Cal., filed June 27, 2022) (removed, early scheduling stages); *Thomas v. Loudoun Cnty. Public Schs.*, No. CL22003556-00 (Loudoun Cnty, Va., Cir. Ct., filed June 29, 2022) (briefing motion to dismiss); *Parents Defending Education v. Linn-Mar Comm. Sch. Dist.*, No. 1:22-CV-78 (N.D. Iowa, filed Aug. 2, 2022) (preliminary injunction denied, mostly based on standing, on appeal to 8th Cir.); *Parents Protecting Our Children v. Eau Claire Area Sch. Dist.*, No. 3:22-cv-508 (filed Sep. 7, 2022) (briefing motion to dismiss).

Court in Wisconsin denied a motion to dismiss in the case discussed above, *supra* p. 22–23 and n. 19, recognizing that school officials refusing to "honor the parent's request not to refer to their daughter by a male name or pronouns … demonstrates a potential violation of their rights as parents to direct the upbringing of their child." *See* Appendix, *infra*. The court also denied the District's motion to dismiss as to other parents who challenged the policy preemptively to prevent a threat of harm to their children and their constitutional rights as parents. *Id* at 4–5.

As far as amici and undersigned counsel are aware, the District Court's decision in this case is the only federal court decision in the country thus far to hold, on the merits, that a school district policy to facilitate social transitions at school, in secret from parents, solely at the child's request, *does not* violate parents' constitutional rights to raise their own children.[22]

### III. Treating a Child or Adolescent as the Opposite Sex While at School, in Secret From Their Parents, Is Not a "Curriculum" Decision, Nor Is a Child's Request for Secrecy Sufficient to Exclude Parents

The District Court made three errors in its analysis.

_____

[22] As noted in footnote 22, *supra*, there is one similar state court decision.

First, the District Court reframed the Policy to allow and facilitate secret gender identity transitions at school as a matter of "curriculum." *E.g.*, JA96 ("the *Meyer-Pierce* line of cases do not establish a 'fundamental right' for parents to dictate the nature of their children's education"); JA101 ("[I]t is clear in the case law that parents do not have a constitutional right to dictate a public school's curriculum."); JA110 ("This case involves 'how' the MCPS teaches its students").

The portion of the policy challenged by Appellants has nothing at all to do with curriculum. Parents of course cannot "dictate" what a school district teaches during the day, but they do have authority over their minor children, and when a major decision-point arises—like whether staff will treat their child as the opposite sex—schools must defer to parents, even if the issue surfaces at school. Indeed, one of the cases cited by the District Court draws this exact distinction: in *C.N.*, 430 F.3d at 184, the Third Circuit emphasized that exposing children to an objectionable survey is not "of comparable gravity" to "depriv[ing] [parents] of their right to make decisions concerning their child." That is exactly what is at stake here.

Relatedly, the District Court held that *Arnold*, 880 F.2d 305, is "clearly distinguishable," because in that case school officials "coerced [a minor] to refrain from discussing with the parent an intimate decision such as whether to obtain an abortion." JA98. But the Court's rationale for *why* that violated parents' rights is that it "deprive[d] the parents of the opportunity to counter influences on the child the parents find inimical to their religious beliefs or the values they wish instilled in their children." *Arnold*, 880 F.2d at 313. In the same way, the District's policy prohibits teachers (i.e. coerces them) from discussing with parents their child's transition at school, without the child's consent, as the District Court acknowledged. JA104–JA105 ("[The Policy] advis[es] that school personnel [must] keep a transgender or gender nonconforming student's gender identity confidential unless and until that student consents to disclosure"); JA92 ("the Guidelines instruct MCPS staff to keep a student's gender identity confidential until the student consents to the disclosure"). By coercing teachers to refrain from openly communicating with parents about their child's request to transition to a different gender identity at school, the Policy prevents parents from advising their

children—and providing professional guidance and support—at the critical moment when their child is considering whether to transition.

Second, the District Court heavily emphasized that the District will not *always* hide a social transition at school from parents, but only if the student requests secrecy from their parents. JA89–JA92. That is beside the point. School districts *may never* hide this major decision from parents solely because the minor student wants to keep a secret from their parents. As Appellants' note, the District effectively treats school like Las Vegas. If minor students—of any age, no less—want to hide a gender identity transition at school from their parents, the District will happily oblige, no questions asked. "What happens at school stays at school." To ensure secrecy, the District directs teachers to hide records of the transition (violating education records laws, as the District Court recognized), JA117–JA118, and to engage in deception by using different names/pronouns around parents than at school, JA70 ("[W]hen contacting the parent/guardian of a transgender student, MCPS school staff members should use the student's legal name and pronoun that correspond to the student's sex assigned at birth"). And the District prohibits teachers from communicating with parents about their own

children. JA69 (staff shall not "disclose a student's status to others, *including parents/guardians* … unless legally required to do so or unless students have authorized such disclosure."). The District's Policy effectively communicates to its minor students that deceiving and hiding things from their parents is ok.

Unsurprisingly, the District Court did not identify any case holding that schools may conspire with minor students to hide a major life decision from their parents. Never mind case law, it also did not identify *any comparable situation or example* in which schools help their students hide things from their parents when everyone at school is aware. As any parent can testify, schools regularly send home parental consent forms, for even the most minor of things. Yet the District and others have carved out this one, major life decision, and decided that parents not only do not get to be involved in the decision, they *do not even get to know* what is happening.

Finally, the District Court held that the District's Policy is substantially justified and appropriately tailored to protect children *from their own parents*. JA102–JA105. This holding flies directly in the face of the "traditional *presumption*"—constitutionally mandated, by the way—

that parents act in their children's best interests. *Troxel*, 530 U.S. at 69 ("The decisional framework employed by the Superior Court directly contravened the traditional presumption that a fit parent will act in the best interest of his or her child."); *Doe v. Heck*, 327 F.3d 492, 521 (7th Cir. 2003) (finding a violation of parents' rights where state actors "not only failed to presume that the plaintiff parents would act in the best interest of their children, they assumed the exact opposite."). It is never constitutionally permissible to usurp parental authority solely at the say-so of a minor, without requiring any evidence or allegation of harm, or providing any process or opportunity for the parents to respond or defend themselves. *See Santosky v. Kramer*, 455 U.S. 745 (1982). School districts do not have power to act as ad hoc family courts, litigating family law issues or deciding on their own, independent of any court process, which parents have authority over which decisions.

* * * * *

At bottom, the District simply disagrees with parents who might say "no" to an immediate transition. That is not sufficient to override their parental role. Schools cannot and should not exclude parents from decisions involving their own children, solely based on their assessment

of how "supportive" they are. The District's Policy, and others like it around the country, are a stunning deviation from what parents expect when they send their minor children to school. If this Court affirms the District Court's ruling, parents in this circuit will have no choice but to preemptively withdraw their children from public school to preserve their parental role. Parents should not have to cede their decision-making authority merely by sending their children to public school.

## CONCLUSION

This Court should reverse the judgment of the District Court.

Dated: November 21, 2022

<div style="margin-left: 50%;">

Respectfully Submitted,

WISCONSIN INSTITUTE FOR
LAW & LIBERTY

/s/ Luke N. Berg
LUKE N. BERG
Deputy Counsel
*Counsel of Record for Amicus*

330 E. Kilbourn Ave., Suite 725
Milwaukee, WI 53202
luke@will-law.org
(414) 727-7367

</div>

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(G), I certify the following:

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because this brief contains 6,199 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and Circuit Rule 32(b), and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6), because this brief has been prepared in a proportionately spaced typeface using the 2013 version of Microsoft Word in 14-point Century Schoolbook font.

Dated: November 21, 2022

/s/ Luke N. Berg
LUKE N. BERG

## CERTIFICATE OF SERVICE

I hereby certify that on November 21, 2022, I filed the foregoing

Amicus Brief with the Clerk of the Court using the CM/ECF System,

which will send notice of such filing to all registered CM/ECF users.

Dated: November 21, 2022

/s/ Luke N. Berg

LUKE N. BERG

# APPENDIX

**FILED**
**06-01-2022**
**Clerk of Circuit Court**
**Waukesha County**
**2021CV001650**

BY THE COURT:

DATE SIGNED: June 1, 2022

Electronically signed by Michael P. Maxwell
Circuit Court Judge

STATE OF WISCONSIN        CIRCUIT COURT- BRANCH 8        WAUKESHA COUNTY

T.F., et. al.,

                              Plaintiffs,

  vs.

                                                      Case:  2021CV1650

KETTLE MORAINE SCHOOL DISTRICT,

                              Defendant.

## DECISION AND ORDER

        The Complaint alleges that the Kettle Moraine School District (hereinafter "Kettle Moraine") violated parental rights by adopting a policy to allow, facilitate, and affirm a minor student's request to transition to a different gender identity at school without parental consent and even over the parents' objection. *(See Doc. #2, ¶1)* Kettle Moraine responds that there is no justiciable controversy as one set of plaintiffs (T.F. and B.F.) are no longer in the district and the other set of plaintiffs (P.W. and S.W.) do not currently have a child for which the policy would have a current application and therefore they do not have standing or a claim which is ripe for determination. *(See Doc. #19, p. 3)*

## **RELEVANT BACKGROUND**

        In December of 2020, T.F. and B.F.'s daughter, then twelve years old, began questioning her gender identity. Her parents temporarily pulled her from school to get her professional counseling. After some counseling, she expressed to her parents and District staff that she wanted to adopt a new male name and male pronouns when she returned to school. *(See Doc. #2, ¶¶ 28–32)* Her parents determined that an immediate transition would not be in her best interest. They wanted her to take more time to explore and process the cause of these feelings before taking such a profound and fraught step. *(See id. ¶ 32)* Shortly before their daughter returned to school, T.F. and B.F. informed the Kettle Moraine of their decision that school officials should refer to their daughter by her legal name and female pronouns. *(See id. ¶ 33)* Kettle Moraine

1

responded, however, that pursuant to District policy, the school would not follow their decision, but would instead refer to their daughter using whatever name and pronouns she wanted. *(See id. ¶¶ 34–35)* In light of this decision, and to avoid the potential damage that being addressed by teachers and staff with a male name and pronouns could do to their daughter, B.F. and T.F. withdrew her from school and sought a different therapist that would help their daughter process her feelings. *(See id. ¶¶ 36–37)* After just two weeks of this different environment, their daughter changed her mind about her identity, telling her parents that "affirmative care really messed [her] up" and that the rush to affirm that she was really a boy added to her confusion. *(See id. ¶¶ 38–40)* Although they would have stayed in Kettle Moraine, but for the policy, B.F. and T.F. then enrolled their daughter in another district. *(See id. ¶¶ 41–42)* Plaintiffs, P.W. and S.W., have two children currently enrolled in Kettle Moraine and their children are subject to the policy. *(See id. ¶¶ 45–46)*

## LEGAL STANDARD

Wisconsin's current pleading standard requires that all pleadings contain both: "a short and plain statement of the claim, identifying the transaction or occurrence or series of transactions or occurrences out of which the claim arises and showing that the pleader is entitled to relief," and "a demand for judgment for relief the pleader seeks." *Wis. Stat. §* 802.02 (1) (2019-20); *See also* Fed. R. Civ. P. 8 (a).

"A motion to dismiss tests the legal sufficiency of the complaint." *Ladd v. Uecker*, 2010 WI App 28, ¶ 7, 323 Wis. 2d 798, 780 N.W.2d 216. In reviewing a motion to dismiss, the Court accepts as true "all facts well-pleaded in the complaint and the reasonable inferences therefrom." *Data Key Partners v. Permira Advisers LLC*, 2014 WI 86, ¶ 19, 356 Wis. 2d 665, 849 N.W.2d 693. The Court also liberally construes the complaint in favor of the plaintiff and in favor of stating a claim. *Jenkins v. Sabourin*, 104 Wis. 2d 309, 313, 311 N.W.2d 600 (1981). However, the Court may not consider facts outside the complaint "in the process of liberally construing the complaint." *Doe 67C v. Archdiocese of Milwaukee*, 2005 WI 123, ¶19, 284 Wis. 2d 307, 700 N.W.2d 180. And legal conclusions are insufficient to survive a motion to dismiss. *Data Key*, 2014 WI 86, ¶ 19. Ultimately, a motion to dismiss should not be granted, unless "it appears to a certainty that no relief can be granted under any set of facts that plaintiff can prove in support of his allegations." *Morgan v. Pa. Gen. Ins. Co.*, 87 Wis. 2d 723, 732, 275 N.W.2d 660 (1979).

The Wisconsin Supreme Court in *Data Key* adopted the heightened plausibility pleadings standard, where a plaintiff must "allege facts that, if true, plausibly suggest a violation of applicable law." *Data Key*, 2014 WI 86, ¶ 21. Further, the sufficiency of the complaint depends on the underlying law of the claims, which also determines what facts must be pled. *Data Key*, 2014 WI 86, ¶ 31 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). The facts must be "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Data Key*, 2014 WI 86, ¶ 25 (citing *Twombly*, 550 U.S. 544, 555). Factual assertions describe the "who, what, where, when, why, and how" of the claim. *Data Key*, 2014 WI 86, ¶ 173 n.9 (citing *State v. Allen*, 2004 WI 106, ¶ 23, 274 Wis. 2d 568, 682 N.W.2d 433). For example, in *Voters with Facts v. City of Eau Claire*, the Wisconsin Supreme Court held that when the complaint only establishes the possibility of entitlement to relief and lacking any further evidence, the complaint fails to meet the plausibility

required to survive a motion to dismiss. 2018 WI 63, ¶ 55, 382 Wis. 2d 1, 913 N.W.2d 131.
Whether a complaint raises a justiciable controversy is appropriately determined on a motion to
dismiss. *See In re Delavan Lake Sanitary Dist.*, 160 Wis. 2d 403, 410, 466 N.W.2d 227, 230 (Ct.
App. 1991)

## DISCUSSION

Kettle Moraine argues that there exists no justiciable controversy between the parties as
the Plaintiffs lack standing to bring their claims, their claims are not ripe for determination, and
the claims are moot.

In order bring an equitable claim for declaratory or injunctive relief in Wisconsin
pursuant to *Wis. Stat. §§* 806.04 and 813.01, there must exist a justiciable controversy. That is,
the plaintiff must demonstrate:

> (1) A controversy in which a claim of right is asserted against one who has an interest in
> contesting it.
> (2) The controversy must be between persons whose interests are adverse.
> (3) The party seeking declaratory relief must have a legal interest in the controversy-that
> is to say, a legally protectible interest.
> (4) The issue involved in the controversy must be ripe for judicial determination.

*Vill. of Slinger v. City of Hartford*, 2002 WI App 187, ¶ 9, 256 Wis. 2d 859, 865-66, 650 N.W.2d
81, 83-84. These requirements are statutory. *See Milwaukee Dist. Council 48 v. Milwaukee Cty.*,
2001 WI 65, ¶ 35, 244 Wis. 2d 333, 627 N.W.2d 866. "Failure to fulfill any of these
prerequisites is fatal to a claim for declaratory relief." *Sipl v. Sentry Indem. Co.*, 146 Wis. 2d
459, 465, 431 N.W.2d 685 (Ct. App. 1988).

*I.     T.F. and B.F. have standing to pursue their claim*

It is clear in Wisconsin that this Court is construe standing "liberally," not "narrowly or
restrictively, e.g., *Foley-Ciccantelli v. Bishop's Grove Condo. Ass'n, Inc.*, 2011 WI 36, ¶38, 333
Wis. 2d 402, 797 N.W.2d 789, and that even a "trifling interest" can suffice. *McConkey v. Van
Hollen*, 2010 WI 57, ¶15, 326 Wis. 2d 1, 783 N.W.2d 855. The purpose of the standing inquiry is
simply to ensure that the "the issues and arguments presented will be carefully developed and
zealously argued." *Id.* at ¶16. There are only two basic requirements for standing—"plaintiffs
must show [1] that they suffered or were threatened with an injury [2] to an interest that is legally
protectable." *Marx v. Morris*, 2019 WI 34, ¶35, 386 Wis. 2d 122, 925 N.W.2d 112.

For purposes of a motion to dismiss, T.F. and B.F.'s allegations are that they were forced
to withdraw their daughter from Kettle Moraine to protect her and preserve their parental role
when Kettle Moraine refused to honor their decision about what was best for their daughter. *(See
Doc. #2, ¶¶ 32-40)* Wisconsin courts recognize that parents have a right to make "decisions
regarding the education and upbringing of their children," "free from government intervention."
*City of Milwaukee v. K.F.*, 145 Wis. 2d 24, 43, 426 N.W.2d 329 (1988); *Jackson v. Benson*, 218
Wis. 2d 835, 879, 578 N.W.2d 602 (1998); *Barstad v. Frazier*, 118 Wis. 2d 549, 567, 348

N.W.2d 479 (1984); *Matter of Visitation of A. A.L.*, 2019 WI 57, ¶ 15, 387 Wis. 2d 1, 927 N.W.2d 486.  T.F. and B.F. allege that Kettle Moraine violated their right to make decisions regarding the upbringing of their daughter when they were told by Kettle Moraine that the school would not honor the parent's request to not refer to their daughter by a male name or pronouns.

This allegation, viewed in the light most favorable to T.F. and B.F., demonstrates a potential violation of their rights as parents to direct the upbringing of their child and is sufficient to survive a motion to dismiss on the issue of standing.

II.     *T.F. and B.F.'s claims are not moot.*

Kettle Moraine argues that T.F. and B.F.'s claims are moot due to the fact that their daughter no longer attends the district.  The heart of T.F. and B.F.'s claims are a declaratory judgment that their constitutional rights as parents were violated when Kettle Moraine refused to honor T.F. and B.F.'s judgment for their daughter due to the school's policy.  Now that their daughter is no longer enrolled in Kettle Moraine, T.F. and B.F. do not face continuing potential harm from Kettle Moraine's policy, but it does not change that T.F. and B.F. allege that they have already suffered a harm.  T.F. and B.F. need only show nominal damages to sustain a claim. ". . .[N]ominal damages suffice for the vindication of a legal title or right." *Dahlman v. City of Milwaukee*, 131 Wis. 427, 111 N.W. 675, 677 (1907).  *See also, Uzuegbunam v. Preczewski*, 141 S. Ct. 792 (2021).

When viewed in the light most favorable to T.F. and B.F., the claim of at least nominal damages for a potential violation of their rights as parents to direct the upbringing of their child and is sufficient to survive a motion to dismiss on the issue of mootness.

III.     *P.W. and S.W., like any other parent, may petition for declaratory relief.*

Plaintiffs, P.W. and S.W., have two children currently enrolled in Kettle Moraine and their children are subject to the policy. *(See Doc. #2. ¶¶ 45–46)*  Unlike T.F. and B.F., P.W. and S.W. do not allege that they have a child grappling with gender dysphoria or that they have already suffered harm from the current Kettle Moraine policy.  P.W. and S.W. simply allege that by virtue of the fact that they have children at Kettle Moraine, they may challenge a policy of the district that they believe interferes with their parental rights.

Kettle Moraine argues that to have standing a party must have a personal stake in the outcome of a case and must be directly affected by the issues in controversy. *Vill. of Slinger*, 2002 WI App 187, ¶ 9.  They further argue that a plaintiff's complaint "must establish that he has a 'personal stake' in the alleged dispute, and that the alleged injury suffered is particularized as to him." *Raines v. Byrd*, 521 U.S. 811, 819, 117 S. Ct. 2312, 2317, 138 L.Ed.2d 849, 858 (1997). Kettle Moraine argues that "[m]erely being a parent in a school district and disagreeing with an alleged policy is insufficient to confer standing as a matter of law." *See Lake Country Racquet & Athletic Club, Inc. v. Vill. of Hartland*,  2002 WI App 301, ¶23, 259 Wis.2d 107.  Generally, Kettle Moraine's view is correct – a party must have a personal stake in the outcome of a case, but what Kettle Moraine confuses is that injury is necessary to claim a personal stake.

P.W. and S.W. seek declaratory relief that Kettle Moraine's policy infringes on their parental rights. "A plaintiff seeking declaratory judgment need not actually suffer an injury before seeking relief." *Putnam v. Time Warner Cable of SE Wisconsin, Ltd. P'ship*, 2002 WI 108, ¶ 44. The Declaratory Judgment Act's stated purpose is "to settle and to afford relief from uncertainty and insecurity with respect to rights, status and other legal relations." *Wis. Stat. §* 806.04(12). The Act "is primarily anticipatory or preventative in nature." *Lister v. Bd. of Regents of Univ. Wisconsin Sys.*, 72 Wis. 2d 282, 307 (1976). It is expressly designed to "allow courts to … resolve identifiable, certain disputes between adverse parties … prior to the time that a wrong has been threatened or committed." *Putnam*, 2002 WI 108, ¶ 43. The Act itself says it "is to be liberally construed and administered," *Wis. Stat. §* 806.04(12), such that declaratory relief is appropriate "wherever it will serve a useful purpose." *Olson v. Town of Cottage Grove*, 2008 WI 51, ¶ 42.

The Wisconsin Supreme Court has provided guidance on how to analyze standing and ripeness in declaratory judgment actions. *See Milwaukee District Council 48 v. Milwaukee County*, 2001 WI 65, 244 Wis. 2d 333, 627 N.W.2d 866. In that case, a union preemptively challenged Milwaukee County's process for denying vested pension benefits to employees who were terminated for cause. *Id.*, ¶¶ 2–3. The Court held that the union had standing and that its claim was ripe, emphasizing that the same would be true for "the vast majority of individual employees," even though "[v]ery few individuals [were] in a position to assert that their termination for 'cause' [was] imminent and that their loss of pension [was] imminent." *Id.*, ¶¶ 45–46. "Waiting until both events actually occur," the Court explained, "would defeat the purpose of the declaratory judgment statute." *Id.*, ¶ 46. The union's goal was to establish "the decision-making process in which an employee is discharged," and both "judicial economy and common sense dictate[d]" that the union could seek a declaration preemptively to avoid the "potential denial of [its members'] pensions," *Id.*, ¶¶ 44–45, 47 (emphasis added).

Like the individual employees in *Milwaukee District Council 48*, P.W. and S.W. need not wait for potential harm from Kettle Moraine's policy to occur for their children before they are entitled to seek declaratory relief on whether the policy violates their parental rights. This is different than the conclusion drawn in *Lake Country Racquet & Athletic Club, Inc.* In that case, the Court concluded Lake Country failed "to bring forth any facts demonstrating any pecuniary loss <u>or</u> the risk of any substantial injury to its interests." *Lake Country Racquet & Athletic Club, Inc.*, 2002 WI App 301, ¶17. [emphasis added] P.W. and S.W. allegation of an infringement on their fundamental right to parent their children is a risk of substantial injury to their interests and is sufficient to survive a motion to dismiss.

**IT IS HEREBY ORDERED,**

1)      Kettle Moraine's motion to dismiss is DENIED.
2)      Kettle Moraine shall have 20 days from the date of this Order to file an Answer to the Complaint.
3)      The Court shall set this matter for a scheduling conference.