No. 22-2034

# In the United States Court of Appeals for the Fourth Circuit

JOHN AND JANE PARENTS 1 AND JOHN PARENT 2,

*Plaintiffs-Appellants*,

v.

MONTGOMERY COUNTY BOARD OF EDUCATION, ET AL.,

*Defendants-Appellees*.

On Appeal from the U.S. District Court for the District of Maryland,
No. 8-20-cv-3552-PWG

## BRIEF OF *AMICI CURIAE* JEWISH COALITION FOR RELIGIOUS LIBERTY, COALITION FOR JEWISH VALUES, AMERICAN HINDU COALITION, AND ISLAM AND RELIGIOUS FREEDOM ACTION TEAM IN SUPPORT OF APPELLANTS AND REVERSAL

Sue Ghosh Stricklett
American Hindu Coalition
42618 Trade West Drive
Sterling, VA 20166
(301) 785-1041
sueghosh@stricklettgroup.com

*Counsel for American Hindu Coalition*

Jeffrey C. Mateer
Keisha T. Russell*
First Liberty Institute
2001 West Plano Parkway, Ste 1600
Plano, TX 75075
(972) 941-4444
krussell@firstliberty.org

Kayla A. Toney
  *Counsel of Record*
First Liberty Institute
227 Pennsylvania Ave. SE
Washington, DC 20003
(202) 921-4105
ktoney@firstliberty.org

November 21, 2022

*Counsel for Amici Curiae*
*Fourth Circuit admission pending*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No.  22-2034      Caption:  John and Jane Parents 1, et al. v. Montgomery Co. Bd. of Ed., et al

Pursuant to FRAP 26.1 and Local Rule 26.1,

Jewish Coalition for Religious Liberty, American Hindu Coalition, Coalition for Jewish Values, and
(name of party/amicus)

Islam and Religious Freedom Action Team

 who is _____amicus_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO


2.  Does party/amicus have any parent corporations?  ☐YES ☑NO
    If yes, identify all parent corporations, including all generations of parent corporations:




3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
    If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)  ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?  ☐ YES ☑ NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.      Is this a criminal case in which there was an organizational victim?  ☐ YES ☑ NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: __Kayla A. Toney_____          Date: ___November 21, 2022___

Counsel for: __Amici_____

Print to PDF for Filing

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... ii

INTERESTS OF *AMICI CURIAE* ........................................................1

INTRODUCTION .................................................................................3

ARGUMENT ........................................................................................5

I.    The Free Exercise Clause protects parents' freedom to direct their children's education and their ability to impart their sincere religious beliefs without government interference ........................................5

II.    The Parental Preclusion Policy substantially burdens the sincerely held religious beliefs of many different faith groups, including Jewish Americans, Hindu Americans, and Muslim Americans ..............................11

    A.    Traditional Jewish Beliefs about Sex and Gender .............................13

    B.    Hindu Beliefs about Sex and Gender ................................................16

    C.    Muslim Beliefs about Sex and Gender ...............................................17

III.    The Parental Preclusion Policy will disproportionately impact families from minority faith backgrounds ................................................21

    A.    Minority faiths are most likely to be misunderstood and targeted by hostile government officials ...............................21

    B.    Families from minority faith backgrounds often lack educational alternatives ..............................................25

CONCLUSION .....................................................................................26

CERTIFICATE OF COMPLIANCE....................................................28

CERTIFICATE OF SERVICE ..............................................................29

# TABLE OF AUTHORITIES

**Cases**

*A.A. ex rel. Betenbaugh v. Needville Indep. Sch. Dist.*,
    611 F.3d 248 (5th Cir. 2010) ................................................. 21

*Agudath Israel of Am. v. Cuomo*,
    983 F.3d 620 (2d Cir. 2020) .................................................. 22

*Arnold v. Bd. of Educ. of Escambia Cnty., Ala.*,
    880 F.2d 305 (11th Cir. 1989) ............................................ 8, 9

*Ben-Levi v. Brown*,
    136 S. Ct. 930 (2016) ............................................................ 23

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
    457 U.S. 853 (1982) ................................................................ 8

*C.N. v. Ridgewood Bd. of Educ.*,
    430 F.3d 159 (3d Cir. 2005) ................................................. 10

*Doe 1 v. Madison Metropolitan Sch. Dist.*,
    976 N.W.2d (Wis. 2022) ......................................................... 4

*Espinoza v. Montana Dep't of Revenue*,
    140 S. Ct. 2246 (2020) ....................................................... 5, 6

*Figliola v. Harrisonburg City Public School Board*,
    No. CL22-1304 (Va. Cir. Ct. filed June 1, 2022) ..................... 4

*Gonzales v. Mathis Indep. Sch. Dist.*,
    No. 2:18-cv-43, 2018 WL 6804595 (S.D. Tex. Dec. 27, 2018) ......... 21

*Gruenke v. Seip*,
    225 F.3d 290 (3d Cir. 2000) ......................................... 8, 9, 11

*Holt v. Hobbs*,
    574 U.S. 352 (2015) ......................................................... 23, 24

*Islamic Soc'y of Basking Ridge v. Township of Bernards*,
  226 F. Supp. 3d 320 (D.N.J. 2016) ...................................................................... 21

*Kennedy v. Bremerton School District*,
  142 S. Ct. 2407 (2022) .................................................................................................. 3

*Mahanoy Area Sch. Dist. v. B. L. by & through Levy*,
  141 S. Ct. 2038 (2021) ................................................................................................ 26

*Morse v. Frederick*,
  551 U.S. 393 (2007) ..................................................................................................... 25

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
  140 S. Ct. 2049 (2020) ............................................................................................ 6, 7

*Parents Defending Education v. Linn-Marr Community Sch. Dist.*,
  No. 22-cv-78 CJW-MAR, 2022 WL 4356109 (N.D. Iowa Sept. 20, 2022) ......... 4

*Parents for Educational & Religious Liberty in Schools v. Lester Young Jr.*,
  Index No. 907655-22 (N.Y. Sup. Ct. filed Oct. 9, 2022) ..................................... 26

*Ricard v. USD 475 Geary Cnty.*,
  No. 5:22-cv-04015, 2022 WL 1471372 (D. Kan. May 9, 2022)........................... 4

*Tatel v. Mt. Lebanon School District*,
  No. CV 22-837, 2022 WL 15523185 (W.D. Pa. Oct. 27, 2022)................. *passim*

*Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*,
  309 F.3d 144 (3d Cir. 2002).................................................................................... 22

*Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*,
  450 U.S. 707 (1981) ............................................................................................. 13, 24

*West Virginia Bd. of Educ. v. Barnette*,
  319 U.S. 624 (1943) ....................................................................................................... 8

*Wisconsin v. Yoder*,
  406 U.S. 205 (1972) ...................................................................................... *passim*

## Other Authorities

Asma Afsaruddin, *Muslim Views on Education: Parameters, Purview, and Possibilities*, 44 J. Cath. Legal Studies 143 (2005) ........................................... 7

Marwan Ibrahim Al-Kaysi, Morals and Manners in Islam: A Guide to Islamic Adab (1986)........................................................................................ 19

*Aum School*, Aum Educational Society of America (2022) ................................... 26

Baptist Faith and Message (2000) ........................................................................... 7

Catholic Catechism, No. 2333 ............................................................................... 12

Catholic Catechism, No. 2361 ............................................................................... 13

*Deuteronomy* 6:7 ..................................................................................................... 6

*Dharma Sastra*, Vol. 6 Manu Sanskrit ................................................................. 16

Dr. Sikiru Gbena Eniola, *An Islamic Perspective of Sex and Sexuality: A Lesson for Contemporary Muslims*, 12 IOSR Journal of Humanities and Social Science 2 (May-Jun. 2013) ................................................................................ 13

Fatwa No. 88708, "Sisters object to barrier between them and men in the mosque," *Islamweb.net* (Sept. 29, 2004)............................................................ 19

First Liberty Institute, *Public Comment on Section 1557 NPRM* (Oct. 3, 2022) ... 12

"Gender and Sexuality," *Religion Library: Hinduism*, Patheos.......................... 16

*Genesis* 1:27 ..................................................................................................... 12, 13

*Issues in Jewish Ethics: Homosexuality*, Jewish Virtual Library ..................... 13

Maimonides, Mishne Torah, Hilkhot Talmud Torah. ............................................. 6

*Male, Female, or Other: Ruling of a Transgender Post Sex Change Procedures*, American Fiqh Academy (May 2, 2017) ........................................................ 20

iv

*Marriage in Islam*, Why Islam? Facts About Islam (March 5, 2015) .............. 13, 18

Orthodox Church of America, *"In the Beginning…" Healing our Misconceptions* ......................................................................................................... 12

*Raising Children as Good Hindus*, Hinduism Today (Apr. 1, 2021) ................... 17

Chaim Rapoport, *Judaism and Homosexuality: An Alternate Rabbinic View*, 13 Hakirah, the Flatbush Journal of Jewish Law and Thought 29 ........ 14

Yehuda Shurpin, *Why Are Women Exempt From Certain Mitzvahs?*, Chabad.org ................................................................................................. 15

*Surah Al-Hujurat* 49:13 ........................................................................ 18

*Surah An-Nisa* 4:1 .............................................................................. 18

*Surah Nur* 24:31 ................................................................................. 19

The Church of Jesus Christ of Latter-Day Saints, *Chastity, Chaste*...................... 13

Asma Uddin, When Islam Is Not A Religion: Inside America's Fight For Religious Freedom (2019)................................................................. 21

*Women and Mitzvot*, Aish (May 23, 2013) ..................................................... 14, 15

*Women are the Twin Halves of Men*, Observer News Service, (March 9, 2017) ......................................................................................................... 13, 19

Christopher Yuan, *Gender Identity and Sexual Orientation,* The Gospel Coalition ................................................................................................. 11

Rabbi Avi Zakutinsky, *Dancing at a Wedding*..................................................... 14

Ani Amelia Zainuddin, et al, *The Islamic Perspectives of Gender-Related Issues in the Management of Patients with Disorders of Sex Development*, National Library of Medicine (April 21, 2016)................................................. 18, 19, 20

# INTERESTS OF *AMICI CURIAE*[1]

***The Jewish Coalition for Religious Liberty*** is a cross-denominational organization of Jewish rabbis, lawyers, and professionals who are committed to defending religious liberty. As members of a minority faith that adheres to practices that many in the majority may not know or understand, the Jewish Coalition for Religious Liberty has an interest in ensuring that government actors are prohibited from evaluating the validity of religious objectors' sincerely held beliefs. The Jewish Coalition for Religious Liberty is also interested in ensuring that parents' and students' First Amendment free exercise rights are protected.

***The American Hindu Coalition (AHC)*** is an apolitical national advocacy organization representing Hindus, Buddhists, Jains, Sikhs, and related members of minority religions that frequently face discrimination and misunderstanding in the public school system, as their religious practices and beliefs are unfamiliar to mainstream America. The AHC membership, comprised of parent activists, have advocated for a parent-partnered public school education in various local and state-

---

[1] All parties have consented to the filing of this brief pursuant to Fed. R. App. 29(a)(2). Pursuant to Fed. R. App. P. 29(a)(4)(E), no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person—other than *Amici* or their counsel—contributed money that was intended to fund preparing or submitting the brief.

wide school boards, including Fairfax County, Virginia, New York City, and San Francisco, California.

AHC joins this brief in support of Plaintiff Parents, in defense of religious parents and children against discriminatory practices in public school education that are prohibited by the Fourteenth Amendment, as construed by the Supreme Court. AHC further endeavors to protect students' and parents' First Amendment rights to freely exercise their religion and their fundamental rights not to be compelled to act contrary to their sincerely held religious beliefs.

*The Coalition for Jewish Values (CJV*) is the largest Rabbinic Public Policy organization in the United States. CJV articulates and advances public policy positions based upon traditional Jewish thought, through education, mobilization, and advocacy, including *amicus curiae* briefs in defense of equality and freedom for religious institutions and individuals. Representing over 2,000 traditional Orthodox rabbis, CJV has an interest in protecting religious liberty and practice, including the ability of parents to raise their children according to their sincerely held beliefs.

*The Islam and Religious Freedom Action Team (IRF)* of the Religious Freedom Institute amplifies Muslim voices on religious freedom, seeks a deeper understanding of the support for religious freedom inside the teachings of Islam, and protects the religious freedom of Muslims. To this end, the IRF engages in research, education, and advocacy on core issues including freedom from coercion in religion

and equal citizenship for people of diverse faiths. The IRF explores and supports religious freedom by translating resources by Muslims about religious freedom, by fostering inclusion of Muslims in religious freedom work both where Muslims are a majority and where they are a minority, and by partnering with the Institute's other teams in advocacy. The IRF has an interest in protecting the ability of parents to raise their children according to their sincerely held religious beliefs.

## INTRODUCTION

As the Supreme Court recently recognized in *Kennedy v. Bremerton School District*, suppressing religious expression in public schools "would undermine a long constitutional tradition under which learning how to tolerate diverse expressive activities has always been 'part of learning how to live in a pluralistic society.'" 142 S. Ct. 2407, 2431 (2022). Yet the Montgomery County Board of Education's Parental Preclusion Policy does just that.

A Muslim student who wears a hijab and follows the Quran's teachings on gender will be singled out by school staff if she objects to sharing a restroom with a biological male in violation of her religious beliefs. Jewish parents who are fulfilling their religious obligation to teach their children Torah values will be left in the dark as their children are forced to choose between following the beliefs they learned at home or succumbing to pressure from school officials and classmates to support gender transitions. And Hindu parents, who have no viable choice but to send their

children to public school, will be the last to learn that their child has secretly transitioned at school at the encouragement of administrators. For the Plaintiff Parents, other families in Montgomery County, and parents in districts around the country adopting similar policies,[2] such concerns are neither speculative nor hypothetical. But the courts can protect these parents' concerns by vigorously enforcing their First Amendment rights.

The First Amendment provides robust protection for religious exercise, which includes parents' ability to bring up their children in accordance with their sincere religious beliefs. *Amici* urge this Court to uphold free exercise rights and consider the impact of such policies on religious families nationwide, particularly families from minority faith backgrounds.

---

[2] *See, e.g., Parents Defending Education v. Linn-Marr Community Sch. Dist.*, No. 22-cv-78 CJW-MAR, 2022 WL 4356109 (N.D. Iowa Sept. 20, 2022), *appeal docketed*, No. 22-2927 (8th Cir. Sept. 13, 2022); *Tatel v. Mt. Lebanon School District*, No. CV 22-837, 2022 WL 15523185 (W.D. Pa. Oct. 27, 2022); *Doe 1 v. Madison Metropolitan Sch. Dist.*, 976 N.W.2d (Wis. 2022); *Ricard v. USD 475 Geary Cnty.*, No. 5:22-cv-04015, 2022 WL 1471372 (D. Kan. May 9, 2022); *Figliola v. Harrisonburg City Public School Board*, No. CL22-1304 (Va. Cir. Ct. filed June 1, 2022).

# ARGUMENT

## I. The Free Exercise Clause protects parents' freedom to direct their children's education and their ability to impart their sincere religious beliefs without government interference.

Plaintiff Parents argue that the Fourteenth Amendment protects the fundamental rights of parents to direct their children's upbringing. Op. Br. at 7–14. *Amici* believe that Plaintiff Parents have an additional claim under the Free Exercise Clause, because it provides robust protection for the religious liberty of families seeking to raise their children in accordance with their sincere religious beliefs. *See Wisconsin v. Yoder*, 406 U.S. 205, 214 (1972) (parental rights regarding religious upbringing are "specifically protected by the Free Exercise Clause," "[l]ong before . . . universal formal education"). As the district court correctly acknowledged, *Yoder* reaffirmed that "when [parental] rights combine with First Amendment free exercise concerns . . . they are fundamental." JA095 (internal citation omitted).[3]

Parental rights are closely linked with free exercise rights and are especially strong for religious families seeking to teach their faith to the next generation. For nearly 100 years, the Supreme Court has reaffirmed the "enduring American tradition" of "the rights of parents to direct 'the religious upbringing' of their children." *Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246, 2261 (2020)

---

[3] Although Plaintiff Parents did not raise a Free Exercise claim here, the Policy has a disproportionately harmful impact on religious parents' free exercise rights which this Court must consider in its parental rights analysis.

(quoting *Yoder*, 406 U.S. at 213–214); *see also Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2065–66 (2020) (describing how many religious traditions entrust parents with primary responsibility for imparting their faith to their children without government interference). Not only does the First Amendment protect parents' freedom to teach their faith to their children, but for many this is a religious obligation at the core of the parents' own religious exercise.

For example, Jews believe they are under a biblical obligation to teach their children God's commandments. *See Deuteronomy* 6:7 ("And you shall teach them to your sons and speak of them when you sit in your house, and when you walk on the way, and when you lie down and when you rise up."). This is an obligation of the highest order, for "the world exists only by virtue of the breath coming from the mouths of children who study Torah."[4]

For Hindus, child-rearing is a parent's highest righteous (*Dharmic*) duty. Hindu legal texts (*Dharmaśāstras*) dating back to 200 B.C. provide detailed instructions regarding the rights and responsibilities of both parents in child-rearing and the importance of child welfare in society. Moreover, the Hindu medical text, *Āyurveda* (dating back to 200–100 B.C.) describes a mother's vital role in her child's

---

[4]   Maimonides, Mishne Torah, Hilkhot Talmud Torah 1:2; 2:1, 3, https://www.sefaria.org/Mishneh_Torah%2C_Torah_Study.2?lang=bi.

physical and psychological development. Thus, parental instructions on a *Dharmic* life are essential to a child's education.

For Muslim Americans, "the acquisition of at least rudimentary knowledge of religion and its duties [is] mandatory for the Muslim individual."[5] This obligation, which applies to parents as they raise children, comes from the Prophet Muhammad, who proclaimed that "'[t]he pursuit of knowledge is incumbent on every Muslim.'"[6] And for millions of Christians, "[p]arents are to teach their children spiritual and moral values and to lead them, through consistent lifestyle example and loving discipline to make choices based on biblical truth."[7]

Any infringement of these First Amendment rights is subject to strict scrutiny. *See Yoder*, 406 U.S. at 215 ("[O]nly those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion."). While the Court in *Yoder* did not face a situation where minor children disagreed with their Amish parents' decision to forgo the later years of public education, the Court observed that "such an intrusion by a State into family decisions

---

[5] *Our Lady of Guadalupe*, 140 S. Ct. at 2065 (citing Asma Afsaruddin, *Muslim Views on Education: Parameters, Purview, and Possibilities*, 44 J. CATH. LEGAL STUDIES 143, 143–44 (2005)).

[6] *Id.*

[7] Baptist Faith and Message (2000), https://bfm.sbc.net/bfm2000/#xviii.

in the area of religious training would give rise to grave questions of religious freedom comparable to those raised here." *Id.* at 231–32.

Courts have consistently recognized the link between parental rights and free exercise rights in the context of public-school policies, especially regarding religious families. The Supreme Court has recognized that "the discretion of the States and local school boards in matters of education must be exercised in a manner that comports with the transcendent imperatives of the First Amendment." *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 864 (1982); *see also West Virginia Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943) ("Boards of Education . . . have, of course, important, delicate, and highly discretionary functions, but none that they may not perform within the limits of the Bill of Rights. That they are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual[.]").

Especially in cases involving gender identity or pregnancy—where "the situation raises profound moral and religious concerns"—public schools may not "depriv[e] parents of the opportunity to counter influences on the child the parents find inimical to their religious beliefs or the values they wish instilled in their children." *Arnold v. Bd. of Educ. of Escambia Cnty., Ala.*, 880 F.2d 305, 313–14 (11th Cir. 1989) (holding that school officials violated the Constitution when they coerced minor into abortion without parents' knowledge); *see also Gruenke v. Seip*,

225 F.3d 290, 307 (3d Cir. 2000) (when swim coach revealed student's pregnancy against family's wishes, court recognized that "[i]t is not educators, but parents who have primary rights in the upbringing of children"). While the district court attempted to distinguish these cases based on minor factual differences, JA098-100, the principles are directly applicable here: public schools may not interfere with the foundational relationship between parents and children, especially in areas such as sexuality where religious beliefs are at stake. The mere fact that policies like Montgomery County's are new and unprecedented in their dramatic scope does not give courts a free pass to explain away or ignore constitutional law that has protected parental rights for nearly a century. And the district court even acknowledged that under the Policy, "interference by school personnel might rise to the level described in *Arnold* or *Gruenke*." JA100. The court may be willing to take that chance, but *amici* are not, because the Policy *requires* parental exclusion unless the staff and student decide that parents will be "supportive" enough.

In *Tatel v. Mt. Lebanon School District*, a federal court recently vindicated parents' Free Exercise claims based on their "sincerely held religious beliefs about sexual or gender identity and the desire to inculcate those beliefs in their children." No. CV 22-837, 2022 WL 15523185, at *26 (W.D. Pa. Oct. 27, 2022). There, a first-grade teacher advocated her own agenda and beliefs about gender identity despite parents' objections, telling her six-year-old students to keep the conversations secret,

9

and the school district refused to provide notice and opt-out rights as it did for other non-religious topics. Contrasting the parents' religious teachings that "humans are created beings who must accept their place in a larger reality" with the transgender movement's assertion that "human beings are autonomous, self-defining entities who can impose their internal beliefs about themselves on the exterior world," the court recognized the "contradictions between . . . worldviews." *Id.* at *18. The court emphasized that "parents, not schools, have the primary responsibility to inculcate moral standards, religious beliefs, and elements of good citizenship," especially "[w]ith respect to important matters that strike at the heart of parenting (such as inculcation of religious beliefs or teachings contrary to the parents' religious beliefs)." *Tatel*, 2022 WL 15523185, at *20 (citing *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 185 (3d Cir. 2005)).

The Montgomery County Board of Education's Policy at issue here violates the Free Exercise Clause by interfering with religious parents' historically rooted and constitutionally protected ability to raise their children in accordance with their sincere beliefs. The Board might wish to be "empowered, as parens patriae, to 'save' a child from himself or his [religious] parents" so that "the State will in large measure influence, if not determine, the religious future of the child." *Yoder*, 406 U.S. at 232. But that is a power the Constitution does not permit it to wield. The Board's Policy sets students and parents at odds by *requiring* parental exclusion and allowing the

staff and student total control over sensitive decisions about gender identity. JA069. Like the teacher's actions in *Tatel*, the Board's Policy sends the message that students can define their own gender and reality, apart from their parents' knowledge or guidance, making no accommodation for students who believe in biological sex. JA069-071. These actions violate the Supreme Court's holding that that it is the parents' responsibility to inculcate "moral standards, religious beliefs, and elements of good citizenship." *Yoder*, 406 U.S. at 233. As the Third Circuit held in *Gruenke*, "when such collisions [between parental rights and public school policies] occur, the primacy of the parents' authority must be recognized and should yield only where the school's action is tied to a compelling interest." 225 F.3d at 305. Here, the Board's Policy triggers strict scrutiny, and it cannot hope to pass muster because its parental exclusion policy is maximally restrictive of parents' First Amendment rights. Thus, the Policy violates the Free Exercise Clause.

## II. The Parental Preclusion Policy substantially burdens the sincerely held religious beliefs of many different faith groups, including Jewish Americans, Hindu Americans, and Muslim Americans.

Religions from diverse cultures and geographic regions assert—as they have for millennia—that sex is an objective, binary category that cannot be changed by self-perception or medical intervention.[8] Millions of Christians hold to this belief.

---

[8] *See, e.g.,* Christopher Yuan, *Gender Identity and Sexual Orientation,* THE GOSPEL COALITION, https://www.thegospelcoalition.org/essay/gender-identity-and-sexual-orientation/.

Catholic teaching makes clear that "[e]veryone, man and woman, should acknowledge and accept his sexual identity" and that "[p]hysical, moral, and spiritual difference and complementarity are oriented toward the goods of marriage and the flourishing of family life."[9] The Orthodox Church of America teaches that "our sexuality begins with our creation," and "[t]he Bible says 'Male and female He created them' (Gen. 1:27)."[10] Within the Protestant tradition, most denominations believe the Bible's teaching that God created humans male and female in His image, and that this reality cannot be changed based on perceived gender identity, including but not limited to the Anglican Church, Assemblies of God, the Church of God in Christ, the Lutheran Church, the Presbyterian Church in America, and Southern Baptists.[11]

But this religious belief is not just the province of traditional trinitarian Christianity. Sacred texts that define beliefs on marriage, sexuality, chastity, and sex

---

[9] Catholic Catechism, No. 2333, https://www.usccb.org/sites/default/files/flipbooks/catechism/562/#zoom=z.

[10] Orthodox Church of America, *"In the Beginning…" Healing our Misconceptions*, https://www.oca.org/the-hub/two-become-one/session-2-in-the-beginning-.-.-.-healing-our-misconceptions (quoting *Genesis* 1:27).

[11] For a complete list of sources, *see* First Liberty Institute, *Public Comment on Section 1557 NPRM* (Oct. 3, 2022), at 4-9, https://perma.cc/97NU-VCMZ (detailing religious beliefs of 20 faith groups on sex and gender).

as binary (male and female) include not only the Catholic Catechism[12] and the Bible, but also the Quran,[13] Hadith,[14] the Torah,[15] and the Book of Mormon.[16] The First Amendment provides robust protection for religious believers who adhere to these faiths, as well as for individuals who do not participate in a specific religious tradition but who hold sincere religious beliefs about the body, sexuality, marriage, and gender.[17]

### A. Traditional Jewish Beliefs about Sex and Gender

For millions of Jewish Americans who follow traditional *halachic* teaching that is rooted in Jewish law dating back three millennia, the Torah is very clear about the divine creation of human beings as distinctly male and female.[18] "[W]e have to

---

[12] Catholic Catechism, No. 2361, https://www.usccb.org/sites/default/files/flipbooks/catechism/569/#zoom=z.

[13] *Marriage in Islam*, Why Islam? Facts About Islam (March 5, 2015), https://www.whyislam.org/social-issues/marriage-in-islam/; *Women are the Twin Halves of Men*, Observer News Service, (March 9, 2017), https://kashmirobserver.net/2017/03/09/women-are-the-twin-halves-of-men/.

[14] Dr. Sikiru Gbena Eniola, *An Islamic Perspective of Sex and Sexuality: A Lesson for Contemporary Muslims*, 12 IOSR JOURNAL OF HUMANITIES AND SOCIAL SCIENCE 2 (May-Jun. 2013), at 2028, https://www.iosrjournals.org/iosr-jhss/papers/Vol12-issue2/C01222028.pdf

[15] *Issues in Jewish Ethics: Homosexuality*, JEWISH VIRTUAL LIBRARY, https://www.jewishvirtuallibrary.org/homosexuality-in-judaism.

[16] The Church of Jesus Christ of Latter-Day Saints, *Chastity, Chaste,* https://www.churchofjesuschrist.org/study/scriptures/tg/chastity?lang=eng.

[17] *See Thomas* v. *Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 714 (1981).

[18] *Genesis* 1:27.

strive to 'maintain sexual purity' on a universal level and it is 'our obligation . . . to incorporate the Holiness Code into our everyday civic and communal life.'"[19] Observant Jews are careful to follow the timeless prescriptions of the Torah and Talmud and to respect their specific commands regarding sexual purity and holiness.

Differences between the biological sexes, in accordance with divine creation, also are fundamental to the structure and pattern of Jewish religious worship. For example, traditional Jewish synagogues provide a physical and visual separation between men and women during prayers, and mixed dancing is prohibited.[20] Many extend these practices to weddings and other occasions.[21] Also, while men and women are equally obligated to obey the negative commandments (such as do not murder and do not steal), women are exempt from many positive time-bound commandments.[22] This is based on the belief that God created men and women with different biological roles and abilities, and that "[a]s the primary creators and nurturers of human life, women more closely resemble God than men do."[23] Thus,

---

[19] Chaim Rapoport, *Judaism and Homosexuality: An Alternate Rabbinic View*, 13 HAKIRAH, THE FLATBUSH JOURNAL OF JEWISH LAW AND THOUGHT 29, 30 (citing Sanhedrin 58a (expounding on *Genesis* 2:24) and Maimonides, Mishneh Torah, Hilkhot Melakhim 9:5), https://hakirah.org/Vol13Rapoport.pdf, at 32.

[20] Rabbi Avi Zakutinsky, *Dancing at a Wedding*, https://outorah.org/p/27278/.

[21] *Id.*

[22] *Women and Mitzvot*, AISH (May 23, 2013), https://aish.com/women-mitzvot/.

[23] *Id.*

only men are obligated to pray at specific times each day, to blow the shofar on Rosh Hashanah, and to live in the ceremonial booth on Sukkot.[24] Women are allowed, but not required, to complete these practices. One potential explanation for this difference is that women are not required to observe such commandments because doing so might interfere with family responsibilities, and "raising children is considered one of the most elevated forms of service to God, crucial to the continuation of His nation and His Torah."[25] Only men may wear the ceremonial garments of *tzitzit* and *tefillin*.[26] All morning prayer services contain specific blessings for men and women.[27]

All of these practices are based on biological, chromosomal sex; the Torah does not recognize the possibility of changing the sex or gender with which a person was created. "This distinction between women and men is also reflected in the role parents have in determining the identity of their child. The essence of Jewishness is determined by the mother, whereas the particulars of Jewishness, such as tribal identity, are determined by the father."[28]

---

[24] *Women and Mitzvot*, *supra* note 22.

[25] Yehuda Shurpin, *Why Are Women Exempt From Certain Mitzvahs?*, Chabad.org, https://www.chabad.org/library/article_cdo/aid/4407982/jewish/Why-Are-Women-Exempt-From-Certain-Mitzvahs.htm.

[26] *Women and Mitzvot*, *supra* note 22.

[27] *Id.*

[28] Shurpin, *supra* note 25.

The distinctions between men and women also factor into eligibility to perform communal roles such as counting for a prayer quorum or leading prayers. If members of the Jewish community could change their sex or gender at will, this would not only disrupt their own religious practice, as the core obligations for men and women are not subject to change, but it would also disrupt the religious life of the community.

### B. Hindu Beliefs about Sex and Gender

Hindu scripture, culture, and values emphasize marriage and child-rearing as essential to *Dharma* (religious or moral duties). Both the marriage vow and the institution of marriage, which is heterosexual only, are defined and sanctioned by divine authority.[29] Hindu teaching makes clear that men and women have distinct identities and roles, and that sexual activity belongs within the confines of heterosexual marriage. It is only within marriage that sexual behavior aligns with *dharma* or righteous living.[30]

---

[29] *See, e.g., Dharma Sastra*, Vol. 6 Manu Sanskrit, Chapter III, pp. 80-93, https://archive.org/details/dharmasastra-with-english-translation-mn-dutt-6-vols-20-smritis/Dharma%20Sastra%20Vol%206%20Manu%20Sanskrit/page/80/mode/2up.

[30] "Gender and Sexuality," *Religion Library: Hinduism*, PATHEOS, https://www.patheos.com/library/hinduism/ethics-morality-community/gender-and-sexuality.

Producing offspring and rearing children are considered sacred duties essential to marriage, with distinct roles for the mother and the father. For example, the Hindu medical text, *Āyurveda*, describes a mother's vital role in her child's development, both physical and psychological. As such, Hindus believe that a parent's rights and responsibilities in child-rearing are sacred and must be protected against government infringement. For Hindus, child-rearing is a parent's highest righteous (*Dharmic*) duty. "Parents are indeed the first guru . . . [t]he child's deepest impressions come from what the parents do and say."[31] Hindu legal texts (*Dharmaśāstras*) dating back two millennia provide detailed instructions regarding the rights and responsibilities of both parents in child-rearing and the importance of child welfare in society. Thus, parental instructions on a *Dharmic* life, without government interference, are essential to a child's education.

### C. Muslim Beliefs about Sex and Gender

In the Muslim faith, both sacred writings and specific teachings make clear that men and women are two distinct biological sexes with important differences and relationships toward one another. The Quran makes this clear: "O Mankind! We created you all from a male and a female, and made you into nations and tribes so that you may know one another. Verily the noblest of you in the sight of God is the

---

[31] *Raising Children as Good Hindus*, Hinduism Today (Apr. 1, 2021), https://www.hinduismtoday.com/magazine/apr-may-jun-2021/raising-children-as-good-hindus/.

most God-fearing of you."[32] The Quran also teaches that "all human beings, whether male or female, are descended from Adam and Eve."[33] Both Shi'ah and Sunni Muslims hold to the words of the Prophet Mohammad (pbuh) who has stated that "men and women are twin halves of each other' (Bukhari)."[34] Muslims' belief that sex is binary, fixed, and immutable is closely linked to the creation narrative and "brings home the fact that men and women are created from a single source. Furthermore, by using the analogy of twin half, the Prophet (pbuh) has underlined the reciprocal and interdependent nature of men and women's relationships."[35]

Because the identities of biological men and women are unique and divinely created, this belief has important implications for religious worship, marriage, and discussions about gender identity. "Men and women in Islam have different roles, responsibilities, and accountabilities, as they differ in anatomy, physiology, and psychology."[36] As a matter of religious obedience, Muslims must observe decency (*ihtisham*), which prevents a Muslim female from sharing a restroom with the

---

[32] *Surah Al-Hujurat* 49:13.

[33] *Surah An-Nisa* 4:1; *see also* Ani Amelia Zainuddin, et al, *The Islamic Perspectives of Gender-Related Issues in the Management of Patients with Disorders of Sex Development*, NATIONAL LIBRARY OF MEDICINE (April 21, 2016), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5272885/.

[34] *Marriage in Islam*, *supra* note 13.

[35] *Id.*

[36] Zainuddin, *supra* note 33.

opposite biological sex, modesty (*hijab*), which includes behavior as well as dress, and seclusion (*khalwa*), which means a man and woman who are unrelated and unmarried cannot be alone together in an enclosed space.[37] In religious worship, men and women sit in separate areas of the mosque to reduce distractions and to protect modesty; this is a "way of preventing men and women from seeing each other and a way of increasing attention to prayer."[38] The obligation to go to Friday prayers applies to men but not women, and traditionally the prayer of a woman is more rewarded if she prays at home rather than at the mosque.[39] This belief does not demean women but instead recognizes the traditional complementary spheres of keeping a home and making a living in a more public way.[40] Thus, Muslims' belief in the distinct biological sexes is not only rooted in their sacred teachings but goes to the very core of their religious exercise.

Islamic teaching does recognize the rare occurrence of "*khuntha*" or "intersex" biology, when a child is born with sexual ambiguity because of opposite

---

[37] *See, e.g.*, *Surah Nur* 24:31 (describing concept of *hijab*); MARWAN IBRAHIM AL-KAYSI, MORALS AND MANNERS IN ISLAM: A GUIDE TO ISLAMIC ADAB 60-61 (1986) (describing restroom obligations).

[38] Fatwa No. 88708, "Sisters object to barrier between them and men in the mosque," *Islamweb.net* (Sept. 29, 2004), https://www.islamweb.net/en/fatwa/88708/sisters-object-to-barrier-between-them-and-men-in-the-mosque.

[39] Zainuddin, *supra* note 33.

[40] *Women are the Twin Halves of Men*, OBSERVER NEWS SERVICE, (March 9, 2017), https://kashmirobserver.net/2017/03/09/women-are-the-twin-halves-of-men/.

sex organs. Surgery is typically only allowed for *khuntha* individuals when medical doctors determine that it would allow the person to be designated as a certain sex, in order to be able to perform his or her duties as a Muslim.[41] For example, "[t]here are fatwas from different Islamic countries which give rulings regarding sex change surgery or gender reconstruction surgery . . . [t]hese fatwas generally agree that gender reconstruction surgery for the [*khuntha*] is permissible in Islam" but "totally prohibited" in other cases.[42] Islamic teaching does not recognize alternate gender identities, because even when someone changes his or her outer appearance or receives hormones or surgery, there is no fundamental change in biology at the cellular level and thus "the rulings of that [biological] sex continue to apply."[43]

Thus, the Parental Preclusion Policy interferes with the religious exercise of a wide variety of faith traditions who hold sincere beliefs about sex and gender, by interfering with the instruction that religious parents seek to provide to their children and by allowing and encouraging students to undergo gender transitions without their parents' knowledge or consent.

---

[41] Zainuddin, *supra* note 33.

[42] *Id.*

[43] *Male, Female, or Other: Ruling of a Transgender Post Sex Change Procedures*, AMERICAN FIQH ACADEMY (May 2, 2017), http://fiqhacademy.com/res03/.

## III.  The Parental Preclusion Policy will disproportionately impact families from minority faith backgrounds.

### A. Minority faiths are most likely to be misunderstood and targeted by hostile government officials.

Government officials are more likely to misunderstand minority faiths because their beliefs and practices are unfamiliar, and public-school administrators are no exception. *See, e.g., A.A. ex rel. Betenbaugh v. Needville Indep. Sch. Dist.*, 611 F.3d 248, 260–61 (5th Cir. 2010) (school officials questioned Native American student's belief in "keep[ing his] hair long and in braids as a tenet of [his] sincere religious beliefs"); *Gonzales v. Mathis Indep. Sch. Dist.*, No. 2:18-cv-43, 2018 WL 6804595, at *4 (S.D. Tex. Dec. 27, 2018) (school officials argued that students' traditional religious promesa (promise) was not "religious" or "an established tenet of their Catholic faith").

As an unwelcome minority in many American communities, Muslims are especially likely to face hostility from government officials who do not afford them the same presumption of good faith that other religious groups may enjoy. *See, e.g.,* ASMA UDDIN, WHEN ISLAM IS NOT A RELIGION: INSIDE AMERICA'S FIGHT FOR RELIGIOUS FREEDOM 116–17 (2019); *see also Islamic Soc'y of Basking Ridge v. Township of Bernards*, 226 F. Supp. 3d 320, 327–28 (D.N.J. 2016) (documenting destruction of property, government hostility, and false accusations regarding Islamic beliefs and practices following proposal to build local Mosque).

Anti-Semitism continues to run rampant, especially toward Orthodox Jews who adhere to traditional Torah values and practices. *See, e.g., Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 627 (2d Cir. 2020) (striking down governor's order targeting "a predominately ultra-orthodox cluster" based on his claim that the State was "having issues in the Orthodox Jewish community in New York, where because of their religious practices . . . we're seeing a spread of [COVID-19]"); *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 153 (3d Cir. 2002) (striking down ordinance enacted out of "fear" that "Orthodox Jews [would] move to Tenafly" and "take over").

Given these realities, children growing up in minority religious traditions face the greatest pressure to conform to the values and beliefs endorsed by school administrators. A Muslim student wearing a hijab or a Jewish student wearing a yarmulke would experience additional pressure because their very appearance demonstrates sincere religious beliefs that school administrators will assume conflict with the Policy. And the Policy focuses exclusively on making safe spaces for LGBTQ students without any consideration of religious students with a conscientious objection to sharing a restroom or locker room with the opposite biological sex. JA071. Instead, the Policy labels and dismisses any such concerns: "[t]his discomfort is not a reason to deny access to the transgender student." JA071. School staff are required to single out any students who express "discomfort" and

22

work with them to "foster understanding of gender identity." JA071. For Christian, Muslim, Jewish, Hindu, and many other religious students, such pressure from school staff will cause confusion and conflict with the religious beliefs they are learning at home. For a Muslim student living according to the Quran, her inability to share intimate spaces with biological males has nothing to do with "discomfort" and everything to do with her sincere religious beliefs which she cannot violate in good conscience. Surely reasonable compromises can be made where all students—including religious students—feel safe and accepted. But the Policy does no such thing.

Furthermore, the Board's Parental Preclusion Policy allowing government officials to decide (along with impressionable minors) whether parents will be "supportive" of a child's perceived gender identity creates a very clear danger of making false or unfair assumptions based on the family's religious beliefs. *See, e.g., Holt v. Hobbs*, 574 U.S. 352, 362 (2015) (government officials must not question the merits of an individual's sincerely held religious beliefs); *Ben-Levi v. Brown*, 136 S. Ct. 930, 934 (2016) (Alito, J., dissenting from cert. denial) ("[T]he government cannot define the scope of personal religious beliefs."). The Policy requires staff to rank a parent's perceived "support level" using an undefined, subjective scale of 1 to 10, based solely on conjecture. JA074. This all-important decision of whether to involve—or even notify—the parents that their child is

23

seeking a gender transition must be made without the staff ever having spoken with the parents about this issue, and without the student having told his or her parents about the situation. The Policy not only invites but *requires* government officials to evaluate parents' moral and religious beliefs without ever having spoken with them. That violates the First Amendment under *Holt* and *Thomas v. Review Board of Indiana Employment Security Division*, 450 U.S. 707, 716 (1981) (government actors must not second-guess or "undertake to dissent" sincere religious beliefs, because they "are not arbiters of scriptural interpretation"). Furthermore, if the student wears religious garb or discloses his or her family's religious tradition, school officials are very likely to assume that the parents will not be "supportive" because of their religious beliefs. This ignores the fundamental relationship between children and their parents, which the Supreme Court has protected for nearly 100 years. *Yoder*, 406 U.S. at 213–14. And it ignores the fact that most religious parents are uniquely equipped to provide helpful guidance and support for their child because they know their child best and can address influences such as peer pressure and mental health challenges that may be involved. Indeed, parents cannot "provide the support and comfort that the child needs," especially when encountering bullying or harassment at school, "if they are kept in the dark." Op. Br. at 38. For all these reasons, the Policy violates the Free Exercise Clause in a way that will disproportionately harm families from minority faith backgrounds.

### B. Families from minority faith backgrounds often lack educational alternatives.

As many courts have recognized, parental rights do not evaporate when parents send their children to public school. *Morse v. Frederick*, 551 U.S. 393, 424 (2007) (Alito, J., concurring) ("It is a dangerous fiction to pretend that parents simply delegate their authority—including their authority to determine what their children may say and hear—to public school authorities.") Indeed, such an approach would "be fundamentally unfair to parents who in reality do not have that choice." *Tatel*, 2022 WL 15523185, at *21. As Justice Alito observed, "[m]ost parents, realistically, have no choice but to send their children to a public school and little ability to influence what occurs in the school." *Morse*, 551 U.S. at 424. And "[c]onstitutional rights should not be analyzed in a way that benefits only socially and economically advantaged persons," that is, parents who can afford private school or homeschooling on a single income. *Tatel*, 2022 WL 15523185, at *21.

Even for the fraction of parents who could afford private school, members of minority faiths have very few options that would not cause confusion or conflict with their beliefs. A Muslim family may choose Catholic school over public school in order to avoid parental exclusion policies like Montgomery County's, but that would cause a different conflict as the student would learn one faith at home and another faith at school. Many Jewish parents, especially the most Orthodox, do choose to send their children to religious schools, but large geographical areas lack Jewish day

25

schools altogether, or the schools are under attack by hostile governments for allegedly not complying with local regulations.[44] And "[a]lthough the Hindu-American community has developed numerous institutions over the past decades, an absence of educational institutions still persists."[45]

As the Supreme Court recently observed in *Mahanoy Area School District v. B. L. by & through Levy,* 141 S. Ct. 2038, 2046 (2021), "America's public schools are the nurseries of democracy," which "only works if we protect the 'marketplace of ideas.'" Especially for members of minority faiths who are often misunderstood, "[t]hat protection must include the protection of unpopular ideas." *Id.* Here, parents from a wide variety of religious, cultural, and political backgrounds are coming together to express deeply concerned opposition to the Parental Preclusion Policy. This Court should heed their concerns and take action to protect the constitutional rights of parents and families.

## CONCLUSION

For all these reasons, the Court should reverse the district court's ruling.

---

[44] *See, e.g., Parents for Educational & Religious Liberty in Schools v. Lester Young Jr.*, Index No. 907655-22 (N.Y. Sup. Ct. filed Oct. 9, 2022).

[45] *Aum School*, Aum Educational Society of America (2022), https://aum.school/.

November 21, 2022

Respectfully submitted,

Sue Ghosh Stricklett
American Hindu Coalition
42618 Trade West Drive
Sterling, VA 20166
(301) 785-1041
sueghosh@stricklettgroup.com

s/ Kayla A. Toney
Kayla A. Toney
  *Counsel of Record*
First Liberty Institute
227 Pennsylvania Ave. SE
Washington, DC 20003
(202) 921-4105
ktoney@firstliberty.org

*Counsel for American Hindu Coalition*

Jeffrey C. Mateer
Keisha T. Russell*
First Liberty Institute
2001 West Plano Parkway, Ste 1600
Plano, TX 75075
(972) 941-4444
krussell@firstliberty.org

*Counsel for Amici Curiae*

*\*Fourth Circuit admission pending*

## CERTIFICATE OF COMPLIANCE

I, Kayla A. Toney, hereby certify that:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because it contains 5894 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f);

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, size 14.


November 21, 2022

/s/ *Kayla A. Toney*

Kayla A. Toney
*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on November 21, 2022, this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

November 21, 2022

/s/ *Kayla A. Toney*

Kayla A. Toney
*Counsel for Amici Curiae*