No. 22-2034

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

JOHN and JANE PARENTS 1;
and JOHN PARENT 2,

*Plaintiffs-Appellants*,

v.

MONTGOMERY COUNTY
BOARD OF EDUCATION, *et al.*,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Maryland (Southern Division)
The Honorable Paul W. Grimm
Case No. 8:20-cv-3552-PWG

**BRIEF OF ALLIANCE DEFENDING FREEDOM AS
*AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS-
APPELLANTS AND REVERSAL**

Katherine L. Anderson
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
kanderson@ADFlegal.org

Christopher P. Schandevel
John J. Bursch
Tyson C. Langhofer
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, VA 20176
(571) 707-4655
cschandevel@ADFlegal.org
jbursch@ADFlegal.org
tlanghofer@ADFlegal.org

*Counsel for Amicus Curiae*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. 22-2304        Caption: John and Jane Parents 1 et al v. Montgomery County Board of Educ.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Alliance Defending Freedom
(name of party/amicus)


who is _____ Amicus _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1. Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2. Does party/amicus have any parent corporations?  ☐YES ☑NO
   If yes, identify all parent corporations, including all generations of parent corporations:



3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
   If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: s/ Christopher P. Schandevel     Date: 11/21/2022

Counsel for: Amicus Curiae

- 2 -

Print to PDF for Filing

## CORPORATE DISCLOSURE STATEMENT

*Amicus curiae* Alliance Defending Freedom (ADF) is a nonprofit organization, does not have a parent corporation, and does not issue stock. ADF is not aware of any publicly owned corporation, not a party to the appeal, with a financial interest in the outcome of this case.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................i

TABLE OF AUTHORITIES ................................................... iii

INTEREST OF AMICUS CURIAE ............................................1

ARGUMENT ............................................................4

I.    After *Glucksberg* and *Troxel*, the fundamental status of the
      parental right identified in earlier cases—and thus the
      applicability of strict scrutiny—is no longer in doubt....................4

      A.    Unenumerated fundamental rights protected by the
            Due Process Clause trigger strict scrutiny.............................4

      B.    In *Glucksberg* and *Troxel*, the Supreme Court made
            clear that the parental rights protected by the Due
            Process Clause qualify as fundamental.................................7

II.   Interests falling outside the scope of the fundamental rights
      protected by the Due Process Clause trigger only rational-
      basis review. .......................................................10

III.  At a bare minimum, parents have a fundamental right to
      receive notification that their child's school has decided to
      counsel and treat their child for gender dysphoria. ....................13

CONCLUSION ........................................................19

CERTIFICATE OF COMPLIANCE.......................................20

CERTIFICATE OF SERVICE...........................................21

# TABLE OF AUTHORITIES

## **Cases**

*Alfonso v. Fernandez,*
  606 N.Y.S.2d 259 (N.Y. App. Div. 1993) ...................................... 17, 18

*Blau v. Fort Thomas Public School District,*
  401 F.3d 381 (6th Cir. 2005) .................................................. 10, 11, 12

*Blixt v. Blixt,*
  774 N.E.2d 1052 (Mass. 2002) ............................................................ 9

*Doe v. Settle,*
  24 F.4th 932 (4th Cir. 2022) ............................................................... 9

*Fields v. Palmdale School District,*
  427 F.3d 1197 (9th Cir. 2005) ................................................. 10, 11, 12

*Hawkins v. Freeman,*
  195 F.3d 732 (4th Cir. 1999) ........................................... 4, 7, 9, 10

*Herndon v. Chapel Hill-Carrboro City Board of Education,*
  89 F.3d 174 (4th Cir. 1996) ...................................................... 3, 5, 6, 9

*Hiller v. Fausey,*
  904 A.2d 875 (Pa. 2006) ..................................................................... 9

*Hodgson v. Minnesota,*
  497 U.S. 417 (1990) ........................................................................... 17

*Jones v. Jones,*
  359 P.3d 603 (Utah 2015) .................................................................... 9

*Leebaert v. Harrington,*
  332 F.3d 134 (2d Cir. 2003) .................................................. 10, 11, 12

*Littlefield v. Forney Independent School District,*
  268 F.3d 275 (5th Cir.2001) ............................................................. 11

*Matter of Visitation of A. A. L.,*
  927 N.W.2d 486 (Wis. 2019) ............................................................. 9

*Meriwether v. Hartop,*
   992 F.3d 492 (6th Cir. 2021) ................................................................. 2

*Parham v. J. R.,*
   442 U.S. 584 (1979) ..................................................................... 13, 14

*Ricard v. USD 475 Geary County, KS School Board,*
   2022 WL 1471372 (D. Kan. May 9, 2022) ...................................... 1, 2

*Runyon v. McCrary,*
   427 U.S. 160 (1976) ............................................................................ 6

*Troxel v. Granville,*
   530 U.S. 57 (2000) ................................................................... 7, 8, 9

*Washington v. Glucksberg,*
   521 U.S. 702 (1997) ................................................................. passim

*Wisconsin v. Yoder,*
   406 U.S. 205 (1972) ............................................................................ 5

## Statutes

20 U.S.C. § 1681 ................................................................................... 2

ALA. CODE § 22-8-4 ............................................................................ 14

CAL. FAM. CODE § 6922 ....................................................................... 14

DEL. CODE ANN. TITLE 13, § 707 ........................................................ 14

ME. REV. STAT. ANN. TITLE 22, § 1503 ............................................... 14

N.Y. PUB. HEALTH LAW § 2504 ........................................................... 14

## Other Authorities

Kenneth J. Zucker, *Debate: Different Strokes for Different Folks*, 25
   CHILD AND ADOLESCENT MENTAL HEALTH (2020) ........................ 15, 16

Russell B. Toomey et al., *Transgender Adolescent Behavior*, 142
   PEDIATRICS (2018) ............................................................................ 15

## INTEREST OF AMICUS CURIAE[1]

Alliance Defending Freedom is a non-profit, public interest legal organization that provides strategic planning, training, funding, and litigation services to protect Americans' constitutional rights—including the fundamental right of parents to direct the education and upbringing of their children. For example, ADF is currently litigating *D.F. v. School Board of the City of Harrisonburg*, Case No. CL22-1304, in Virginia state court. In that case, plaintiff parents and teachers challenge a school policy requiring teachers to deceive parents about the new name and pronouns their child is using at school unless the child grants permission for school officials to disclose that information to their parents. *See* Complaint at perma.cc/VG2V-D8FH; Memorandum in Support of Motion for Temporary Injunction at perma.cc/R8VP-G7P8.

ADF also recently litigated *Ricard v. USD 475 Geary Cnty., KS Sch. Bd.*, 2022 WL 1471372 (D. Kan. May 9, 2022), on behalf of a teacher whose school forced her to deceive parents about their child's gender identity and expression at school. ADF secured a preliminary injunction, in part based on the district court's holding that the policy was "intended to interfere with the parents' exercise of a constitutional right to raise their children as they see fit," including the right to "have a say" in what their minor children were called at school. *Id.* at *8.

---

[1] No counsel for a party authored this brief in whole or in part, no one, other than *amicus* and its counsel, made a monetary contribution for its preparation or submission, and all parties have consented to its filing.

ADF also regularly represents teachers and professors challenging similar policies that force them to use pronouns in violation of their core beliefs. ADF secured a victory for Shawnee State University professor Nicholas Meriwether in the Sixth Circuit Court of Appeals after he was disciplined for respectfully declining to use biologically incorrect pronouns. *Meriwether v. Hartop*, 992 F.3d 492, 511–12 (6th Cir. 2021) (holding university had "violated Meriwether's free-speech rights" by rejecting his proposed "win-win" solution of using the student's last name in place of pronouns). And undersigned counsel recently argued *Vlaming v. West Point School Board*, Record No. 211061, in the Virginia Supreme Court on behalf of a high-school French teacher who was fired after school officials rejected his request for a similar accommodation, which would have allowed him to refer to a student using the student's new chosen name while avoiding the use of pronouns altogether.

In these cases, ADF takes the position that finding a solution to the challenges posed by competing views of sex and gender identity that respects the rights of parents, students, and teachers is both possible and constitutionally required. At a minimum, parents have a right "to have a say in what a minor child is called and by what pronouns they are referred." *Ricard*, 2022 WL 1471372, at *8. Students have a right to an education free from discrimination and harassment. *See* Title IX, 20 U.S.C. § 1681, et seq. And teachers have a right not to speak messages that violate their core beliefs. *See Meriwether*, 992 F.3d at 511–12.

Stated differently, schools cannot force teachers to use pronouns in violation of their core beliefs when reasonable alternatives are available. Schools cannot allow teachers to create a hostile learning environment for students. And schools cannot cut parents out of the conversation entirely by hiding information about the school's efforts to facilitate their child's transition to a new gender identity at school.

But when schools adopt policies like the Montgomery County School Board's staff communication policy challenged in this case, such compromises become impossible. Accordingly, ADF has an important interest in making sure that schools and courts alike respect parents' fundamental right to direct the education and upbringing of their children. In this appeal, that means asking this Court to correct the district court's misplaced reliance on the outdated reasoning in *Herndon v. Chapel Hill-Carrboro City Bd. of Educ.*, 89 F.3d 174 (4th Cir. 1996).

The right of parents to "direct the education and upbringing of [their] children" is no less fundamental than any other unenumerated right. *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (listing the right alongside other "fundamental rights and liberty interests"). As a result, the policy challenged here is subject to strict scrutiny—which it cannot survive—and the district court erred in concluding otherwise. JA92–102. This Court should reverse the judgment below.

## ARGUMENT

**I.    After *Glucksberg* and *Troxel*, the fundamental status of the parental right identified in earlier cases—and thus the applicability of strict scrutiny—is no longer in doubt.**

### A.    Unenumerated fundamental rights protected by the Due Process Clause trigger strict scrutiny.

For claimed violations of substantive-due-process rights under the Fourteenth Amendment to the United States Constitution, this Court has long applied the traditional "two-step process" for deciding whether a violation has occurred. *Hawkins v. Freeman*, 195 F.3d 732, 739 (4th Cir. 1999) (en banc). "The first step in this process is to determine whether the claimed violation involves one of 'those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition,' and 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if they were sacrificed.'" *Id.* (quoting *Glucksberg*, 521 U.S. at 720–21) (cleaned up).

"The next step depends for its nature upon the result of the first." *Id.* "If the asserted interest has been determined to be 'fundamental,' it is entitled in the second step to the protection of strict scrutiny judicial review of the challenged legislation," meaning the law or policy must be "narrowly tailored to serve a compelling state interest.'" *Id.* (quoting *Glucksberg*, 521 U.S. at 721). "If the interest is determined *not* to be 'fundamental,' it is entitled only to the protection of rational-basis judicial review." *Id.* (emphasis added).

One year *before* the Supreme Court's decision in *Glucksberg*, this Court applied the same test in a parental-rights case challenging a school's requirement that "high school students perform fifty hours of community service" as a condition of graduation. *Herndon*, 89 F.3d at 176. In *Herndon*, this Court explained that the test for substantive-due-process claims requires "subjecting infringements on liberties deemed constitutionally 'fundamental' to a heightened or 'strict' level of judicial scrutiny," while "examining encroachments on lesser rights under the traditional standard of review, which requires only that the challenged state action be shown to bear some rational relationship to legitimate state purposes." *Id.* at 177 (cleaned up).

The difficulty in *Herndon*, though, was determining whether the long-recognized right of parents "to direct their children's education" qualified as "'fundamental' in the constitutional sense." *Id.* at 177–78. Based on *Wisconsin v. Yoder*, 406 U.S. 205 (1972), this Court concluded that, at least when parental rights "combine with First Amendment free exercise concerns, . . . they are fundamental." *Herndon*, 89 F.3d at 178. But because "religious concerns were central to the *Yoder* petitioners' position," this Court did not think *Yoder* had decided whether "parental rights standing alone, in nonreligious contexts, are 'fundamental' in the constitutional sense, or whether heightened scrutiny applies." *Id.*

Ultimately, this Court read "instructive dicta" in *Yoder* and *Runyon v. McCrary*, 427 U.S. 160 (1976), to support the conclusion that, while "parents have a liberty interest, protected by the Fourteenth Amendment, in directing their children's schooling," outside the religious context the Supreme Court had held "*reasonable* regulation by the state is permissible even if it conflicts with that interest." *Herndon*, 89 F.3d at 179.[2] "That is the language of rational basis scrutiny." *Id.* And the plaintiffs had conceded their interest was not religious. *Id.* So this Court applied rational-basis review and held that the school's community-service requirement did "not infringe unconstitutionally on [the plaintiffs'] right to control their children's education." *Id.*

The district court below relied heavily on *Herndon*'s "conclu[sion] that the Supreme Court had never expressly determined the appropriate standard of constitutional review for claims involving parental rights in the educational context." JA94. Indeed, the district court cited *Herndon* as "controlling authority" justifying its decision to apply rational-basis review, a standard the challenged policy "easily meets" in the court's view. JA97, 102. That reliance was misplaced.

---

[2] In *Herndon*, this Court also reasoned that older parental-rights cases offered "no dispositive guidance on which standard applies" because they all were decided "before the [Supreme] Court developed the current tiered framework" of levels of scrutiny. 89 F.3d at 178. "Strict scrutiny of infringements on fundamental rights was first suggested in 1961," and "it was not expressly embraced by a majority of the Court until 1971," *id.*, several decades after those older cases had been decided.

### B. In *Glucksberg* and *Troxel*, the Supreme Court made clear that the parental rights protected by the Due Process Clause qualify as fundamental.

The problem with the district court's reliance on *Herndon* is that the fundamental nature of the right to "direct the education and upbringing of one's children" is no longer in doubt. *Glucksberg*, 521 U.S. at 720. In *Glucksberg*, decided one year after *Herndon*, the Supreme Court reaffirmed that the Due Process Clause "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Id.* Most relevant here, the Court specifically *included* the right to "direct the education and upbringing of one's children" on its list of unenumerated fundamental rights. *Id.*[3] So the government may not infringe that right "*at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Id.* at 721 (cleaned up). And nothing *Herndon* said to the contrary can still be considered "controlling." JA97.

Three years after *Glucksberg*, the Supreme Court reaffirmed that parents have a "fundamental liberty interest[]" in the "care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (four-justice plurality). *Accord id.* at 80 (Thomas, J., concurring) (agreeing with "plurality that [the] Court's recognition of a fundamental right of parents to direct the upbringing of their children resolves this case").

---

[3] *Accord Hawkins*, 195 F.3d at 747 (recognizing "fundamental quality" of the right "to direct one's children's upbringing") (cleaned up).

That liberty interest "is perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court." *Id.* (plurality). And as the plurality expressly acknowledged, the Due Process Clause "provides heightened protection against government interference with [such] fundamental rights and liberty interests." *Id.* (plurality). *Accord id.* at 80 (Thomas, J., concurring) (endorsing "strict scrutiny" as the correct test for infringements on the "fundamental right of parents to direct the upbringing of their children").

Despite *Glucksberg* and *Troxel*'s controlling language, the district court barely even mentioned *Glucksberg*, citing it one time in a quoting parenthetical, JA88, and ignoring *Glucksberg*'s inclusion of the right to "direct the education and upbringing of one's children" on its list of fundamental rights triggering strict scrutiny, 521 U.S. at 720–21. Meanwhile, the district court dispensed with *Troxel* in a single footnote, limiting it to its facts while adding that the justices in the plurality "did not identify the level of constitutional scrutiny they applied." JA93–94 n.6. While it's true the plurality did not expressly identify strict scrutiny as the governing test, the plurality did state that the Due Process Clause "provides *heightened protection* against government interference with certain fundamental rights and liberty interests" right before the Court identified "the interest of parents in the care, custody, and control of their children" as one such "fundamental liberty interest[]." 530 U.S. at 65 (plurality) (emphasis added).

8

Taken together, *Glucksberg* and *Troxel* support one conclusion: whether described as the right to "direct the education and upbringing of one's children," *Glucksberg*, 521 U.S. at 720, or the liberty "interest of parents in the care, custody, and control of their children," *Troxel*, 530 U.S. at 65 (plurality), the rights of parents protected by the Due Process Clause easily qualify as "fundamental rights and liberty interests" for purposes of determining the appropriate level of review, *Glucksberg*, 521 U.S. at 720; *accord Troxel*, 530 U.S. at 65 (plurality).

Once the fundamental nature of the right is established, the standard of review clicks into place: "If the asserted interest has been determined to be 'fundamental,' it is entitled . . . to the protection of strict scrutiny judicial review." *Hawkins*, 195 F.3d at 739.[4] That was true in *Herndon*. 89 F.3d at 177 ("infringements on liberties deemed constitutionally 'fundamental' [subjected] to a heightened or 'strict' level of judicial scrutiny"). And it remains true today. *Doe v. Settle*, 24 F.4th 932, 953 (4th Cir. 2022) ("A substantive due process challenge is considered under rational-basis review *unless some fundamental right is implicated*.") (emphasis added) (citing *Herndon*, 89 F.3d at 177).

---

[4] *Accord Blixt v. Blixt*, 774 N.E.2d 1052, 1059 (Mass. 2002) (applying *Troxel* and concluding that, "[w]hen a fundamental right is at stake, the so-called 'strict scrutiny' formula . . . comes into play"); *Matter of Visitation of A. A. L.*, 927 N.W.2d 486, 494 (Wis. 2019) (collecting cases showing "the majority of courts" applying *Troxel* have applied strict scrutiny); *Jones v. Jones*, 359 P.3d 603, 611 n.10 (Utah 2015) (same); *Hiller v. Fausey*, 904 A.2d 875, 885, 885 n.18 (Pa. 2006) (same).

## II.  Interests falling outside the scope of the fundamental rights protected by the Due Process Clause trigger only rational-basis review.

Of course, the fundamental nature of a parent's right to direct the education and upbringing of her children doesn't mean any invocation of the right automatically triggers strict scrutiny. The "first step" in the analysis requires a "careful description" of the "asserted liberty right or interest" to avoid "overgeneralization." *Hawkins*, 195 F.3d at 747 (quoting *Glucksberg*, 521 U.S. at 721). Once carefully described, if the interest does not "implicate a fundamental right," then the government does not need to show anything "more than a reasonable relation to a legitimate state interest." *Glucksberg*, 521 U.S. at 722. In other words, if the asserted interest falls outside the scope of the fundamental right, then the government need only satisfy rational-basis review.

That basic structure of the analysis explains the result in each of the three out-of-circuit cases the district court relied on most heavily in its opinion below. JA96–97, 101 (citing *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381 (6th Cir. 2005); *Leebaert v. Harrington*, 332 F.3d 134 (2d Cir. 2003); *Fields v. Palmdale Sch. Dist.*, 427 F.3d 1197 (9th Cir. 2005)). The court claimed that the courts in those cases had "likewise concluded that the *Meyer-Pierce* line of cases do not establish a 'fundamental right' for parents to dictate the nature of their children's education in public schools that requires the application of strict scrutiny." JA96. But that's only partially right.

10

Unlike the district court here, the Sixth, Second, and Ninth Circuits did *not* deny that the Supreme Court has classified certain parental rights as fundamental, triggering strict scrutiny. JA96. Quite the opposite, the Sixth Circuit in *Blau* stated that "[g]overnmental actions that infringe a fundamental right receive strict scrutiny," and the "right to direct the educational upbringing of one's child" *is* one of the "fundamental rights that the [Supreme] Court *has* recognized." 401 F.3d at 393–94; *accord id.* at 395 (this right has been recognized "for considerably longer than most individual constitutional rights have existed"). So, too, for the Ninth Circuit in *Fields*, 427 F.3d at 1208 ("Governmental actions that infringe upon a fundamental right receive strict scrutiny."); *id.* at 1204 ("[T]he right of parents to make decisions concerning the care, custody, and control of their children is a fundamental liberty interest protected by the Due Process Clause.").

The Second Circuit in *Leebaert* was less direct, but it still quoted without disputing the Fifth Circuit's statement that "[o]ne of the fundamental liberty interests recognized by the [Supreme] Court is the interest of parents in the care, custody, and control of their children." *Leebaert*, 332 F.3d at 142 n.3 (quoting *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 288 (5th Cir.2001)) (cleaned up). And just like the Sixth and the Ninth, the Second Circuit acknowledged that, "[w]here the right infringed is fundamental, strict scrutiny is applied to the challenged governmental regulation." *Leebaert*, 332 F.3d at 140.

11

So what explains the result in each of those cases? The answer is simple: in each one, the court of appeals determined that the specific interests being asserted did *not* fall within the scope of the fundamental parental rights and liberty interests protected by the Constitution.

In *Blau*, the Sixth Circuit held that a parent's rights do not include a "right to exempt his child from the school dress code." 401 F.3d at 396. In *Fields*, the Ninth Circuit held "there is no fundamental right of parents to be the *exclusive* provider of information regarding sexual matters to their children, either independent of their right to direct the upbringing and education of their children or encompassed by it." 427 F.3d at 1200. And in *Leebaert*, the Second Circuit noted *Troxel* had "left the scope of [the] right undefined," before ultimately holding that—whatever its scope—it does not "include[] the right to tell public schools what to teach or what not to teach." *Leebaert*, 332 F.3d at 142.[5]

So the question here is *not* whether the Constitution protects the fundamental right of parents to direct the education and upbringing of their children, thus triggering strict scrutiny. The Supreme Court has said that it does. Instead, the question is whether the specific interests Plaintiffs assert fall within the scope of that right. And for the reasons explained below, the answer to that question is a resounding "Yes."

---

[5] *Accord Leebaert*, 332 F.3d at 140–41 (citing two cases that, "[i]n defining the scope of the parental right to direct the upbringing and education of children," had both "held that it does not include a right to exempt one's child from public school requirements").

**III. At a bare minimum, parents have a fundamental right to receive notification that their child's school has decided to counsel and treat their child for gender dysphoria.**

Carefully described, this case asks whether parents' fundamental right to direct the education and upbringing of their child includes the right to receive notification from their child's school that school officials have decided to counsel and treat the child for gender dysphoria even if the child claims his or her parents might not support the school's counseling and treatment decisions. JA40–47, 54–55, 60–61.[6]

As Plaintiffs explain, the dual principles that 1) minor children are not capable of making certain decisions without a parent's consent, and 2) parents are "entrusted and presumed" to act in their children's best interest, are "well know[n] to the common law," deeply embedded in statutory law, and have been "recognized repeatedly by the Supreme Court." Opening Br. at 27–28. "Our jurisprudence historically has reflected Western civilization concepts of the family as a unit with broad parental authority over minor children." *Parham v. J. R.*, 442 U.S. 584, 602 (1979). "The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions." *Id.*

---

[6] In contrast, the district court mischaracterized the Plaintiff parents' asserted interest as the mere right to be "promptly informed of their child's gender identity." JA92. The Plaintiffs' complaint is about much more than that—it is about their right to be notified that school officials are actively counseling and facilitating their child's social transition to a gender identity that differs from their child's biological sex.

That explains why even today most minors cannot unilaterally consent to most forms of medical and mental-health care. *See, e.g.*, ALA. CODE § 22-8-4; CAL. FAM. CODE § 6922; DEL. CODE ANN. TITLE 13, § 707; ME. REV. STAT. ANN. TITLE 22, § 1503; N.Y. PUB. HEALTH LAW § 2504. Included within parents' fundamental right and duty to prepare their children for life's challenges and obligations is the duty "to recognize symptoms of illness and to seek and follow medical advice." *Parham*, 442 U.S. at 602. For centuries, our laws have operated based on the assumption "that natural bonds of affection lead parents to act in the best interests of their children." *Id.* (citing Blackstone and Kent).

Importantly, that has remained true despite the unfortunate reality that *some* parents may at times act against the best interests of their children. *Id.* "The statist notion that governmental power should supersede parental authority in *all* cases because *some* parents abuse and neglect children is repugnant to American tradition." *Id.* at 603. And "[s]imply because the decision of a parent is not agreeable to a child or because it involves risks does not automatically transfer the power to make that decision from the parents to some agency or officer of the state." *Id.* "Most children, even in adolescence, simply are not able to make sound judgments concerning many decisions, including their need for medical care or treatment." *Id.* "Parents can and must make those judgments." *Id.* And "[n]either state officials nor federal courts are equipped to review such parental decisions." *Id.* at 604.

All of that applies with equal force here. The World Professional Association for Transgender Health (WPATH), a "transgender advocacy organization" that has produced "guidelines for transgender care," defines "gender dysphoria" as the "psychological distress often associated with the mismatch between a person's biological sex and his or her perceived gender identity." JA40. "A gender social transition in prepubertal children," like the School Defendants' use of new chosen names and pronouns for students who identify as transgender, is a "form of psychosocial treatment that aims to reduce gender dysphoria" in children. Kenneth J. Zucker, *Debate: Different Strokes for Different Folks*, 25 CHILD AND ADOLESCENT MENTAL HEALTH (2020).

Treated by means *other than* social transition, "[m]ultiple studies have found that the vast majority of children (roughly 80–90%) who experience gender dysphoria ultimately find comfort with their biological sex" as they mature, "*assuming they do not transition*." JA41 (emphasis added). At the same time, children who *have* transitioned report "significantly higher rates of suicide ideation, suicide attempts, and suicide." JA40 (citing 2018 study).[7]

---

[7] In that study, a heartbreaking 50.8% of adolescents who identified as "female to male transgender" reported having attempted suicide. JA40. By comparison, 27.9% of all respondents who were "not sure" about their gender identity reported having attempted suicide, and 17.6% of female respondents who did not identify as transgender or questioning reported the same. Russell B. Toomey et al., *Transgender Adolescent Behavior*, 142 PEDIATRICS 1, 1–3 (2018), perma.cc/3Q5B-CCKG.

*Amicus curiae* ADF has seen equally troubling research findings in its own cases. For example, in Virginia state court, ADF proffered an expert report from Dr. Stephen B. Levine, former WPATH committee chairman, detailing the findings of one "cohort study by authors from Harvard and Boston Children's Hospital" finding that youth and young adults who self-identified as transgender "had an elevated risk of depression (50.6% vs. 20.6%) and anxiety (26.7% vs. 10.0%)," and a "higher risk of suicidal ideation (31.1% vs. 11.1%), suicide attempts (17.2% vs. 6.1%), and self-harm without lethal intent (16.7% vs. 4.4%) relative to the matched controls." Expert Report of Stephen B. Levine, MD, at 45, *D.F. v. School Board of the City of Harrisonburg*, Case No. CL22-1304, dated August 26, 2022, available at perma.cc/7DJ9-3BM4.

Summarizing the results of numerous studies, Dr. Levine warned that, "as we look ahead to the patient's life as a young adult and adult, the prognosis for the physical health, mental health, and social well-being of the child or adolescent who transitions to live in a transgender identity is not good." *Id.* at 47. "Meanwhile, *no studies* show that affirmation of pre-pubescent children or adolescents leads to more positive outcomes" later in life compared to other forms of ordinary therapy. *Id.* at 47 (emphasis added). Not surprisingly then, parents often "hold different philosophical views on what is the best way to help reduce [their child's] gender dysphoria," and those views "require both respect and understanding." Zucker, *Different Strokes*.

16

Against this backdrop, the School Defendants' policy of counseling and treating students for gender dysphoria *without ever notifying* their parents infringes parents' fundamental right to "direct the education and upbringing of [their] children." *Glucksberg*, 521 U.S. at 720. As shown above, "[t]he common law historically has given recognition to the right of parents, not merely to be notified of their children's actions, but to speak and act on their behalf." *Hodgson v. Minnesota*, 497 U.S. 417, 483 (1990) (Kennedy, J., concurring and dissenting).

By denying parents their right even to be notified about their child's transition—and the school's efforts to facilitate it—the policy here closely resembles the policy at issue in *Alfonso v. Fernandez*, 606 N.Y.S.2d 259 (N.Y. App. Div. 1993). In that case, the reviewing court held that a "plan to dispense condoms" to minor students "without the consent of their parents or guardians, or an opt-out provision," violated parents' fundamental rights. *Alfonso*, 606 N.Y.S.2d at 261.

"Through its public schools," New York had "made a judgment that minors should have unrestricted access to contraceptives, a decision which is clearly within the purview of the petitioners' constitutionally protected right to rear their children, and then [had] forced that judgment on them." *Id.* at 266. As a result, after finding the plan failed strict scrutiny, the reviewing court correctly held that it "violate[d] the petitioners' constitutional due process rights to direct the upbringing of their children." *Id.* at 267.

17

As the court explained, "[a]t common law it was for parents to consent or withhold their consent to the rendition of health services to their children." *Id.* at 262. And distributing condoms was not "an aspect of education in disease prevention." *Id.* at 263. It was a "means" of disease prevention. *Id.* As a result, *Alfonso* was not about parents complaining that their children were being exposed to ideas they found offensive. *Id.* at 266. It was about parents "being forced to surrender a parenting right," namely the right to "influence and guide the sexual activity of their children without State interference." *Id.* Thus, "[n]o matter how laudable its purpose," excluding parents "impermissibly trespass[ed]" on their fundamental rights. *Id.* at 265.

So too here. Plaintiff parents do not merely object to their children being taught ideas they disagree with about sex and gender identity. The parts of the policy they oppose are not merely "an aspect of education." *Id.* at 263. Instead, they object to the "means" the School Defendants have chosen to socially transition their children to a different gender identity without the parents' knowledge or consent. *Id.*

As in *Alfonso*, the solution here is simple: the school's policy "can go forward without interfering with the [plaintiffs'] rights simply by allowing parents who are interested in providing appropriate guidance and discipline to their children to 'opt out' by instructing the school not to [socially transition] their children without their consent." *Id.* at 267. The Constitution demands nothing less.

## CONCLUSION

This Court should hold that the challenged aspects of the School Defendants' policy infringe parents' fundamental right to direct the education and upbring of their children, apply strict scrutiny to those aspects of the policy, hold they cannot survive strict scrutiny, and reverse the decision below.

Dated: November 21, 2022

Katherine L. Anderson
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
kanderson@ADFlegal.org

By: */s/ Christopher P. Schandevel*
Christopher P. Schandevel
John J. Bursch
Tyson C. Langhofer
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, VA 20176
(571) 707-4655
cschandevel@ADFlegal.org
jbursch@ADFlegal.org
tlanghofer@ADFlegal.org

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

This amicus brief complies with the page limitation of Fed. R. App. P. 29(a)(5) and Circuit R. 29 because it consists of 4,533 words and does not exceed 6,500 words.

This amicus brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Century Schoolbook font.

*/s/ Christopher P. Schandevel*
Christopher P. Schandevel
*Counsel for Amicus Curiae*

Dated: November 21, 2022

**CERTIFICATE OF SERVICE**

I hereby certify that on November 21, 2022, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit using the CM/ECF system, which will accomplish service on counsel for all parties through the Court's electronic filing system.

*/s/ Christopher P. Schandevel*
Christopher P. Schandevel
*Counsel for Amicus Curiae*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
## APPEARANCE OF COUNSEL FORM

**BAR ADMISSION & ECF REGISTRATION:** If you have not been admitted to practice before the Fourth Circuit, you must complete and return an Application for Admission before filing this form. If you were admitted to practice under a different name than you are now using, you must include your former name when completing this form so that we can locate you on the attorney roll. Electronic filing by counsel is required in all Fourth Circuit cases. If you have not registered as a Fourth Circuit ECF Filer, please complete the required steps at Register for eFiling.

**THE CLERK WILL ENTER MY APPEARANCE IN APPEAL NO.** 22-2304 _____ as

☑ Retained   ☐ Court-appointed(CJA)   ☐ CJA associate   ☐ Court-assigned(non-CJA)   ☐ Federal Defender

☐ Pro Bono   ☐ Government

COUNSEL FOR: Alliance Defending Freedom _____

_____ as the
(party name)

☐ appellant(s) ☐ appellee(s) ☐ petitioner(s) ☐ respondent(s) ☑ amicus curiae ☐ intervenor(s) ☐ movant(s)

s/ Christopher P. Schandevel _____
(signature)

**Please compare your information below with your information on PACER. Any updates or changes must be made through PACER's Manage My Account.**

| | |
|---|---|
| Christopher P. Schandevel | 571-707-4655 |
| Name (printed or typed) | Voice Phone |
| Alliance Defending Freedom | 571-707-4656 |
| Firm Name (if applicable) | Fax Number |
| 44180 Riverside Parkway | |
| Lansdowne, VA 20176 | cschandevel@adflegal.org |
| Address | E-mail address (print or type) |

**CERTIFICATE OF SERVICE** *(required for parties served outside CM/ECF)*: I certify that this document was served on _____ by ☐ personal delivery; ☐ mail; ☐ third-party commercial carrier; or ☐ email (with written consent) on the following persons at the addresses or email addresses shown:

| | |
|---|---|
| | |

_____         _____
Signature                                    Date

1/28/2020  SCC