No. 22-2034

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

JOHN AND JANE PARENTS 1 AND JOHN PARENT 2,

*Plaintiffs-Appellants*,

*v.*

MONTGOMERY COUNTY BOARD OF EDUCATION, ET AL.,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Maryland, No. 8:20-cv-03552-PWG
Before the Honorable Judge Paul W. Grimm

## BRIEF FOR DEFENDANTS-APPELLEES

BRUCE M. BERMAN
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006

SIMON B. KRESS
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA 02109

ALAN SCHOENFELD
THOMAS K. BREDAR
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
alan.schoenfeld@wilmerhale.com

December 28, 2022

**CORPORATE DISCLOSURE STATEMENT**

None of the appellees is a nongovernmental corporation.

## TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ......................................................i

TABLE OF AUTHORITIES ...........................................................................v

INTRODUCTION .......................................................................................1

JURISDICTION.........................................................................................3

ISSUES PRESENTED.................................................................................4

STATEMENT ...........................................................................................4

    A.    The Guidelines ........................................................................4

    B.    Proceedings Below ...................................................................9

SUMMARY OF ARGUMENT .....................................................................14

STANDARD OF REVIEW ..........................................................................15

ARGUMENT ..........................................................................................16

I.    PLAINTIFFS LACK STANDING TO BRING THE ONLY CLAIM THEY
PRESS ON APPEAL ...........................................................................16

II.    PLAINTIFFS FAIL TO PLAUSIBLY ALLEGE THAT
THE GUIDELINES INFRINGE ANY FUNDAMENTAL RIGHT ...............................18

    A.    Parents Have No Fundamental Right To Be Informed By
Public Schools Of Their Child's Gender Identity ..............................19

        1.    Longstanding substantive-due-process precedent
rejects the right Plaintiffs assert.................................................19

        2.    Plaintiffs' attempts to evade established precedent
lack merit.............................................................................23

a.     Supporting the educational needs of transgender and gender-nonconforming students is part of a school's educational mission .................................................................24

b.     The Guidelines do not usurp Plaintiffs' constitutionally protected parental decision-making ....................................................................29

c.     Plaintiffs do not have a constitutionally protected right to have their transgender or gender-nonconforming children outed by school personnel .............................................34

d.     The Guidelines do not reach inside the family home and do not restrict what parents may discuss with their children ......................37

B.     The Guidelines Satisfy Rational-Basis Review ..................................39

III.   THE GUIDELINES ARE NARROWLY TAILORED TO SERVE SCHOOLS' COMPELLING INTEREST IN PROVIDING FOR STUDENTS' EDUCATIONAL NEEDS AND RIGHTS ..................................................................43

A.     Plaintiffs' Contention That No State Interest May Justify A Burden On Parental Rights Is Wrong................................................43

B.     Schools Have A Compelling Interest In Ensuring A Safe And Welcoming Learning Environment For Students ......................46

C.     Schools Have A Compelling Interest In Not Discriminating Against Transgender And Gender-Nonconforming Students....................................................51

D.     Schools Have A Compelling Interest In Protecting Student Privacy....................................................................53

E.     The Guidelines Are Narrowly Tailored To Advance All Three Compelling State Interests ........................................55

CONCLUSION ..................................................................................56

- iii -

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Alfonso v. Fernandez*, 606 N.Y.S.2d 259 (App. Div. 1993)....................................33

*Anspach ex rel. Anspach v. City of Philadelphia, Department of Public Health*, 503 F.3d 256 (3d Cir. 2007)......................................31, 36, 53

*Arnold v. Board of Education of Escambia County*, 880 F.2d 305 (11th Cir. 1989) ...............................................................................31

*Arroyo Gonzalez v. Rossello Nevares*, 305 F.Supp.3d 327 (D.P.R. 2018) .................................................................54

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..................................................................15

*Bailey v. Virginia High School League*, 488 F.App'x 714 (4th Cir. 2012)...................................................................19

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)...........................................15

*Bennett v. Spear*, 520 U.S. 154 (1997) ...................................................................16

*Blau v. Fort Thomas Public School District*, 401 F.3d 381 (6th Cir. 2005) ..............................................................25, 26

*Board of Education, Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853 (1982) .........................................................................24

*Bostock v. Clayton County*, 140 S.Ct. 1731 (2020) .................................................51

*Brokaw v. Mercer County*, 235 F.3d 1000 (7th Cir. 2000)......................................49

*Brown v. Board of Education*, 347 U.S. 483 (1954)...............................................46

*Brown v. Entertainment Merchants Association*, 564 U.S. 786 (2011) .................51

*Brown v. Hot, Sexy & Safer Products, Inc.*, 68 F.3d 525 (1st Cir. 1995)...........................................................21, 26, 36

*C.N. v. Ridgewood Board of Education*, 430 F.3d 159 (3d Cir. 2005) .... 20, 30, 32, 33, 53

*California Parents for the Equalization of Education Materials v. Torlakson*, 973 F.3d 1010 (9th Cir. 2020)......................................................27

*Canady v. Bossier Parish School Board*, 240 F.3d 437 (5th Cir. 2001) ................25

*City of Dallas v. Stanglin*, 490 U.S. 19 (1989) .........................................................22

*Clapper v. Amnesty International USA*, 568 U.S. 398 (2013)..................................16

*Croft v. Westmoreland County Children & Youth Services*, 103 F.3d 1123 (3d Cir. 1997) .........................................................................49

*Curtis v. School Committee of Falmouth*, 652 N.E.2d 580 (Mass. 1995).....................................................................27, 33

*Davison v. Randall*, 912 F.3d 666 (4th Cir. 2019) .....................................15, 16, 17

*DiCocco v. Garland*, 52 F.4th 588 (4th Cir. 2022)..................................................16

*Dobbs v. Jackson Women's Health Organization*, 142 S.Ct. 2228 (2022).........................................................................................22

*Doe 1 v. Madison Metropolitan School District*, 976 N.W.2d 584 (Wis. 2022) .................................................................44, 45

*Doe v. Irwin*, 615 F.2d 1162 (6th Cir. 1980) .............................................27, 35, 36

*Doe ex rel. Doe v. Boyertown Area School District*, 276 F.Supp.3d 324 (E.D. Pa. 2017).............................................................51

*Evancho v. Pine–Richland School District*, 237 F.Supp.3d 267 (W.D. Pa. 2017) .........................................................52

*Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462 (4th Cir. 1991) .......................................................................5

*Fields v. Palmdale School District*, 427 F.3d 1197 (9th Cir. 2005).......................26

*Giarratano v. Johnson*, 521 F.3d 298 (4th Cir. 2008)............................................16

*Goines v. Valley Community Services Board*, 822 F.3d 159 (4th Cir. 2016) .........................................................................5

*Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal*,
    546 U.S. 418 (2006) ................................................................. 45

*Grimm v. Gloucester County School Board*,
    400 F.Supp.3d 444 (E.D. Va. 2019) ....................................... 52

*Grimm v. Gloucester County School Board*, 972 F.3d 586
    (4th Cir. 2020), *as amended* (Aug. 28, 2020) ................... 26, 48, 52

*Gruenke v. Seip*, 225 F.3d 290 (3d Cir. 2000) ........................... 31

*Hall v. Tawney*, 621 F.2d 607 (4th Cir. 1980) ........................... 25

*Herndon ex rel. Herndon v. Chapel Hill-Carrboro Board of
    Education*, 89 F.3d 174 (4th Cir. 1996) ..................... 12, 21, 22, 23, 25, 40

*Hodge v. Jones*, 31 F.3d 157 (4th Cir. 1994) ............................. 30

*Immediato v. Rye Neck School Board*, 73 F.3d 454 (2d Cir. 1996) ....... 40

*LaVine v. Blaine School District*, 257 F.3d 981 (9th Cir. 2001) ........... 47

*Lee v. York County School Division*, 484 F.3d 687 (4th Cir. 2007) ....... 25

*Leebaert v. Harrington*, 332 F.3d 134 (2d Cir. 2003) ................... 21, 25

*Littlefield v. Forney Independent School Board*,
    268 F.3d 275 (5th Cir. 2001) ................................................. 41

*Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199 (4th Cir. 2020) ....... 16

*Matal v. Tam*, 137 S.Ct. 1744 (2017) ...................................... 46

*Meyer v. Nebraska*, 262 U.S. 390 (1923) ................................. 12, 20

*New York v. Ferber*, 458 U.S. 747 (1982) ................................. 47

*Ohio Valley Environmental Coalition, Inc. v. Pruitt*,
    893 F.3d 225 (4th Cir. 2018) ................................................. 15

*Parham v. J.R.*, 442 U.S. 584 (1979) ....................................... 49

*Parker v. Hurley*, 514 F.3d 87 (1st Cir. 2008) ....................... 21, 23, 48, 49

*Pierce v. Society of Sisters of Holy Names of Jesus & Mary*,
  268 U.S. 510 (1925)..................................................................12, 20, 37, 48

*Planned Parenthood of Central Missouri v. Danforth*,
  428 U.S. 52 (1976)......................................................................................53

*Reardon v. Midland Community School*,
  814 F.Supp.2d 754 (E.D. Mich. 2011) ........................................................31

*Renn ex rel. Renn v. Garrison*, 100 F.3d 344 (4th Cir. 1996) ................................30

*Ricard v. USD 475 Geary County, Kansas School Board*,
  2022 WL 1471372 (D. Kan. May 9, 2022) ...........................................44, 54

*Runyon v. McCrary*, 427 U.S. 160 (1976) .............................................................20

*Santosky v. Kramer*, 455 U.S. 745 (1982) .......................................................30, 49

*South Carolina v. United States*, 912 F.3d 720 (4th Cir. 2019) ............................16

*Stanley v. Illinois*, 405 U.S. 645 (1972).................................................................49

*Sterling v. Borough of Minersville*, 232 F.3d 190 (3d Cir. 2000) ..........................54

*Students v. United States Department of Education*,
  2016 WL 6134121 (N.D. Ill. Oct. 18, 2016) ................................................47

*Thomas v. Evansville-Vanderburgh School Corp.*,
  258 F.App'x 50 (7th Cir. 2007).....................................................................35

*Troxel v. Granville*, 530 U.S. 57 (2000) ................................................19, 20, 40, 41

*Village of Belle Terre v. Boraas*, 416 U.S. 1 (1974) ..............................................22

*Washington v. Glucksberg*, 521 U.S. 702 (1997) ..............................................22, 41

*Weidman v. Exxon Mobil Corp.*, 776 F.3d 214 (4th Cir. 2015) .............................15

*Whitaker ex rel. Whitaker v. Kenosha Unified School District No. 1
  Board of Education*, 858 F.3d 1034 (7th Cir. 2017) ....................................52

*Williams v. Kincaid*, 45 F.4th 759 (4th Cir. 2022) ................................................26

*Wisconsin v. Yoder*, 406 U.S. 205 (1972)........................................................37, 46

- viii -

*Wood v. Strickland*, 420 U.S. 308 (1975) ................................................47

## STATUTES AND REGULATIONS

28 U.S.C.
§ 1291 ....................................................................................3
§ 1331 ....................................................................................3
§ 1367 ....................................................................................3

42 U.S.C. § 1983 ...................................................................................10

Md. Code, Educ. § 7-401 ......................................................................27

Maryland Safe to Learn Act, Md. Code, Educ. §§ 7-1501 – 7-1512 .....................42

COMAR 13A.01.04.03 ...........................................................................42

## OTHER AUTHORITIES

Maryland State Department of Education, *Providing Safe Spaces for Transgender and Gender Non-Conforming Youth: Guidelines for Gender Identity Non-Discrimination* (2015), https://marylandpublicschools.org/about/Documents/DSFSS/SSSP/ProvidingSafeSpacesTransgendergenderNonConformingYouth012016.pdf ................................................................29

Montgomery County Board of Education, *Guidelines for the Continuing Education of Pregnant and Parenting Students* (2022), https://ww2.montgomeryschoolsmd.org/departments/policy/pdf/ioera.pdf................................................29

Montgomery County Board of Education, *Reporting and Investigating Child Abuse and Neglect* (2019), https://ww2.montgomeryschoolsmd.org/departments/policy/pdf/jhcra.pdf.........................................28

United States Department of Education, *Guidance on Schools' Obligations to Protect Students from Student-on-Student Harassment on the Basis of Sex; Race, Color and National Origin; and Disability, "Dear Colleague" Letter* (Oct. 26, 2010), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.pdf .........................................42

**INTRODUCTION**

Recognizing that transgender and gender-nonconforming students often face discrimination, stigmatization, bullying, and sometimes even violence, the Montgomery County, Maryland Board of Education ("the Board" or "MCBE") adopted guidelines for school faculty and staff that address a range of best practices to support the full participation of those students in school life. These *Guidelines for Student Gender Identity in Montgomery County Public Schools* ("Guidelines") (JA66-73) fulfill Montgomery County Public Schools' compelling interests in addressing discrimination on the basis of gender identity, protecting the privacy of students, and fostering a safe and respectful school environment.

Plaintiffs—three parents who do not claim to have a transgender or gender-nonconforming child in Montgomery County Public Schools ("MCPS")—take issue with the Guidelines. In particular, they object to provisions that ensure student safety and allow students some autonomy over the dissemination of information about their gender identity. Because the schools "cannot anticipate every situation which might occur," the Guidelines instruct that "the needs of each student must be assessed on a case-by-case basis"; they stress that "providing support for a student is critical" and recommend development of a "gender support plan" for transgender and gender-nonconforming students "in collaboration with [each] student and the student's family (if the family is supportive of the student)."

- 1 -

JA68-69.  The Guidelines likewise provide that dissemination of information about a student's gender identity should be guided by the student and that such information should be maintained as confidential by the student's school unless the student chooses otherwise.

Plaintiffs challenged the Guidelines under state and federal law, asserting as the basis for their standing certain statutory and regulatory rights to access information concerning their children.  The district court dismissed the complaint, and Plaintiffs now appeal the dismissal of only one of their seven claims: Count VI, which alleges a violation of Plaintiffs' substantive rights under the Due Process Clause to "direct the care, custody, education, and control of their minor children."  JA60.

The appeal should be dismissed for lack of standing or the district court's judgment should be affirmed.  As noted, Plaintiffs do not claim to have transgender or gender-nonconforming children.  Nor do they claim that their children have devised a support plan that excludes the parents, contend that any information about their children's gender transition is being withheld from them, or assert that they would remove their children from public school if they received such information.  Put simply, the Guidelines do not affect Plaintiffs at all, much less infringe on the constitutional right they invoke.  Plaintiffs therefore lack standing.

If this Court finds otherwise, it should affirm the district court's dismissal of Plaintiffs' due process claim.  The Due Process Clause does not encompass "a fundamental right to be promptly informed of their child's gender identity, when it differs from that usually associated with their sex assigned at birth, regardless of their child's wishes or any concerns regarding the detrimental effect the disclosure may have on that child."  JA92.  On the contrary, settled case law recognizes significant limits on parents' right to interfere with schools' judgments about what is necessary to preserve a safe and supportive learning environment for children.  The Guidelines are accordingly subject to rational-basis review, which they easily satisfy.  The Guidelines would also satisfy strict scrutiny because they are narrowly tailored to serve schools' compelling interests in ensuring student safety, rooting out discrimination against transgender and gender-nonconforming students, and protecting student privacy.

## JURISDICTION

Plaintiffs lack standing to pursue their due process claim, so this Court lacks subject-matter jurisdiction over this appeal.  If Plaintiffs have standing, then the district court had jurisdiction under 28 U.S.C. §§ 1331 and 1367 and this Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

1.      Whether Plaintiffs, who do not claim to have transgender or gender-nonconforming children, lack standing to bring their claim under the Due Process Clause of the Fourteenth Amendment, where they contend that the speculative possibility that confidential student records may be generated and withheld from them infringes their constitutional right to "direct the care, custody, education, and control of their minor children."

2.      Whether the district court correctly determined that Plaintiffs do not allege a violation of their fundamental parental rights, and that the Guidelines are accordingly subject to rational-basis review, which they satisfy.

3.      Whether, if heightened scrutiny applies, the Guidelines are narrowly tailored to serve a compelling government interest in protecting student safety and privacy and creating a suitable educational environment for vulnerable students.

## STATEMENT

### A.    The Guidelines

The Board developed the Guidelines in accordance with MCPS's longstanding commitment to fostering "a safe, welcoming school environment." JA68.  The Guidelines are part of a suite of Board actions to ensure that schools are broadly free from discrimination and provide safe educational environments for all students.  As the Guidelines state, they are "aligned with the Montgomery County

Board of Education's core values, guidance from the Maryland State Department

of Education, and the Montgomery County Board of Education Policy … which

prohibits discrimination, stigmatization, and bullying based on gender identity, as

well as sex, gender, gender expression, and sexual orientation, among other

personal characteristics." JA68. The Guidelines are intended to:

> support students so they may participate in school life consistent with
> their asserted gender identity; respect the right of students to keep
> their gender identity or transgender status private and confidential;
> reduce stigmatization and marginalization of transgender and gender
> nonconforming students; foster social integration and cultural
> inclusiveness of transgender and gender nonconforming students; and
> provide support for MCPS staff members to enable them to
> appropriately and consistently address matters of student gender
> identity and expression.

JA68. (capitalization altered). To that end, the Guidelines include guidance

concerning bullying, harassment, and intimidation, student dress codes, gender-

based activities and interscholastic athletics, gender-separated areas (such as

bathrooms and locker rooms), and other matters of concern to transgender and

gender-nonconforming students. JA70-72.[1]

---

[1] Plaintiffs attached the Guidelines to their complaint (JA66-75), so the Guidelines were properly considered by the district court in ruling on the motion to dismiss and can be considered by this Court on appeal. *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-166 (4th Cir. 2016). Where Plaintiffs' allegations conflict with the attached Guidelines, "the exhibit prevails." *Fayetteville Invs. v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991).

Of particular relevance to this appeal are the Guidelines' provisions concerning development of a "gender support plan" for transgender and gender-nonconforming students. Such a plan, the Guidelines explain, is meant "to ensure that the student has equal access and equal opportunity to participate in all programs and activities at school and is otherwise protected from gender-based discrimination at school." JA69. The Guidelines further explain that each plan should be developed "in collaboration with the student and the student's family (if the family is supportive of the student)." JA69. As the district court recognized, "the language of the Guidelines makes clear that they are not intended to be inflexibly applied to every transgender and gender nonconforming student." JA89. Rather, the Guidelines note that they "cannot anticipate every situation which might occur" and therefore instruct that "the needs of each student must be assessed on a case-by-case basis." JA68.

The Guidelines contemplate both situations where parents are supportive of the child's gender identity and situations where they are not, and they supply guidance for each. In particular, the Guidelines include a section on "communication with families," which provides:

> Prior to contacting a student's parent/guardian [regarding a student's gender identity], the principal or identified staff member should speak with the student to ascertain the level of support the student either receives or anticipates receiving from home. In some cases, transgender and gender nonconforming students may not openly express their gender identity at home because of safety concerns or

lack of acceptance.  Matters of gender identity can be complex and
may involve familial conflict.  If this is the case, and support is
required, the Office of School Support and Improvement or the Office
of Student and Family Support and Engagement (OSFSE) should be
contacted.  In such cases, staff will support the development of a
student-led plan that works toward inclusion of the family, if possible,
taking safety concerns into consideration, as well as student privacy,
and recognizing that providing support for a student is critical, even
when the family is nonsupportive.

JA69.

In accordance with their goals of supporting and respecting students, and

preventing stigmatization and marginalization, the Guidelines also address

"privacy and disclosure of information" and "staff communication":

PRIVACY AND DISCLOSURE OF INFORMATION

All students have a right to privacy.  This includes the right to keep
private one's transgender status or gender nonconforming presentation
at school.

Information about a student's transgender status, legal name, or sex
assigned at birth may constitute confidential medical information.
Disclosing this information to other students, their parents/guardians,
or third parties may violate privacy laws, such as the federal *Family
Educational Rights and Privacy Act* (FERPA).

Schools will ensure that all medical information, including that
relating to transgender students, is kept confidential in accordance
with applicable state, local, and federal privacy laws.

Please note that medical diagnosis, treatment, and/or other
documentation are not required for a school to accommodate requests
regarding gender presentation, identity, and diversity.

Transgender and gender nonconforming students have the right to
discuss and demonstrate their gender identity and expression openly
and decide when, with whom, and how much to share private

information. The fact that students choose to disclose their status to staff members or other students does not authorize school staff members to disclose a student's status to others, including parents/guardians and other school staff members, unless legally required to do so or unless students have authorized such disclosure. It is inappropriate to ask transgender or gender nonconforming students more questions than are necessary to support them at school.

…

STAFF COMMUNICATION

…

Unless the student or parent/guardian has specified otherwise, when contacting the parent/guardian of a transgender student, MCPS school staff members should use the student's legal name and pronoun that correspond to the student's sex assigned at birth.

JA69-70.

The Guidelines further provide that the "principal, designee, or school-based mental health professional … should use MCPS Form 560-80, *Intake Form: Supporting Students, Gender Identity*, to support this process and assist the student in participating in school." JA69. That form (which Plaintiffs also attached to their complaint) provides that "[p]arents/guardians may be involved [in completing the form] if the student states that they are aware of and supportive of the student's gender identity." JA74. The form includes a section entitled "Support/Safety for Student," which asks whether a student's parents are aware of the student's gender identity, solicits a "Support Level" rating from one to ten, and inquires: "If support level is low, what considerations must be accounted for in implementing this plan?" JA74.

Through these provisions, the Guidelines seek to ensure a "safe, welcoming school environment where students are engaged in learning and are active participants in the school community because they feel accepted and valued." JA68.  The Guidelines recognize that parental involvement is critical whenever possible and repeatedly suggest that schools work towards sharing information with parents to the extent it is safe to do so.  JA69.  The Guidelines also acknowledge the reality that "[i]n some cases, transgender and gender-nonconforming students may not openly express their gender identity at home because of safety concerns or lack of acceptance," JA69, and, in light of that reality, indicate that student support and safety is an overarching goal.  JA68-70.

## B.     Proceedings Below

Plaintiffs sued in the Circuit Court for Montgomery County, Maryland, asserting seven causes of action: (I) violation of Maryland Family Law; (II) violation of the Maryland Code of Regulations; (III) violation of the Maryland Constitution; (IV) violation of the federal Family Educational Rights and Privacy Act ("FERPA"), as purportedly incorporated by Maryland law; (V) violation of the federal Protection of Pupil Rights Amendment ("PPRA"), as purportedly incorporated by Maryland Law; (VI) violation of the U.S. Constitution; and

- 9 -

(VII) violation of 42 U.S.C. § 1983.  JA48-62.  MCBE removed the case to federal court (JA13) and moved to dismiss (JA17).

The district court dismissed Plaintiffs' complaint in its entirety for failure to state a claim.  JA81-82.  It first took care to correct Plaintiffs' tendentious reading of the Guidelines.  As the court explained, Plaintiffs "argue that the Guidelines require school personnel to 'hide relevant information from parents because [] they do not want parents to have input on the topic [of gender identity] with their children' and that, in so doing, 'MCBE has adopted a very definite position on this sensitive topic.'"  JA89 (alteration in original).  That reading, the court concluded, is "unsupported by the Guidelines' plain language" for three main reasons.

First, "the language of the Guidelines makes clear that they are not intended to be inflexibly applied to every transgender and gender nonconforming student."  JA89.  Rather, the Guidelines explicitly state that they must be applied on a "case-by-case basis" because schools "cannot anticipate every situation which might occur."  JA89.  As the court concluded, the Guidelines are designed to apply "flexibly in varied and evolving circumstances"; "[f]ar from commanding the alleged interference with the parental rights that the Plaintiffs describe, the Guidelines carefully balance the interests of both the parents and students, encouraging parental input when the student consents, but avoiding it when the

student expresses concern that parents would not be supportive, or that disclosing their gender identity to their parents may put them in harm's way." JA90.

Second, "the Guidelines cannot fairly be read to adopt a policy of excluding parents, inasmuch as they actively encourage familial involvement in the development and implementation of a transgender or gender nonconforming student's 'Gender Support Plan' whenever possible." JA90. As the district court acknowledged, it is "clear that familial involvement is preferred and encouraged," and even in cases where students may not openly express their gender identity at home because of safety concerns or lack of acceptance, the Guidelines provide that "staff will support the development of a student-led plan that *works toward inclusion of the family*." JA90-91.

Third, "the language that the Plaintiff Parents find objectionable must be read in the context of the Guidelines as a whole," which "were developed in furtherance of MCPS's commitment 'to a safe and welcoming school environment where students are engaged in learning and are active participants in the school community because they feel accepted and valued.'" JA91. Ultimately, the Guidelines' purpose of maintaining the "safety of transgender and gender nonconforming students must inform how they are read and how they can reasonably be expected to be implemented." JA91.

As relevant to the sole count on appeal, the court concluded that the

Guidelines "are subject to rational basis review, which they satisfy."  JA92.  The

court reasoned that this Court in *Herndon ex rel. Herndon v. Chapel Hill-Carrboro*

*Board of Education*, 89 F.3d 174 (4th Cir. 1996), "recognized the limitations on

parental rights established in *Meyer* and *Pierce*" and "rejected the application of

strict scrutiny to claims regarding a parent's right to direct a child's education that

do not include a religious element."  JA94 (citing *Meyer v. Nebraska*, 262 U.S. 390

(1923), and *Pierce v. Society of Sisters of Holy Names of Jesus & Mary*, 268 U.S.

510 (1925)).  More specifically, the district court explained, *Herndon*

acknowledged that "the Supreme Court has stated consistently that parents have a

liberty interest, protected by the Fourteenth Amendment, in directing their

children's schooling," but, "[e]xcept when the parents' interest includes a religious

element, … the Court has declared with equal consistency that reasonable

regulation by the state is permissible even if it conflicts with that interest."  JA96

(quoting *Herndon*, 89 F.3d at 179).  As *Herndon* concluded and the district court

underscored, this is "'the language of rational basis scrutiny.'"  JA96 (quoting

*Herndon*, 89 F.3d at 179; emphasis omitted).

Under rational basis review, the district court explained, "the Guidelines

need only 'bear some rational relationship to a legitimate state interest' to pass

constitutional muster."  JA102.  The Guidelines, the court determined, "easily

- 12 -

meet[] that standard" because "MCBE certainly has a legitimate interest in

providing a safe and supportive environment for all MCPS students, including

those who are transgender and gender nonconforming," and "the Guidelines are

certainly rationally related to achieving that result." JA102. The Guidelines also

satisfy strict scrutiny, as the court explained: "Even assuming momentarily that the

Guidelines *were* subject to strict scrutiny (they are not), I would conclude that they

satisfy that standard as well." JA102. The court reasoned that "the Guidelines

further a compelling state interest" and are "narrowly tailored in furtherance of that

interest" because:

> The Guidelines do not aim to exclude parents, but rather anticipate
> and encourage family involvement in establishing a gender support
> plan. Even where family support is lacking, the inclusion of family is
> identified as an eventual goal. The Guidelines, on their face, are
> noncoercive, and serve primarily as a means of creating a support
> system and providing counseling to ensure that transgender children
> feel safe and well at school. And, importantly, they apply to each
> student on a case by case basis.

JA103-104 (citations omitted).

The court further concluded that the Plaintiffs failed to plead an as-applied

challenge because their complaint and opposition "are devoid of any specific

factual allegations" and contain only "insufficient" and "generalized" averments.

JA106. In so doing, the court noted that Plaintiffs "were afforded but declined the

opportunity to amend their complaint to address its alleged deficiencies before

MCBE filed its Motion to Dismiss," and "they did not indicate either in their

- 13 -

complaint or their Opposition to MCBE's Motion to Dismiss that obtaining the

evidentiary support for their allegations related to the application of the Guidelines

would require further investigation or discovery." JA107.

Finally, the district court dismissed all of Plaintiffs' claims brought under

Maryland law, *see* JA108-119, which Plaintiffs do not appeal, *see* Br. 4.

## SUMMARY OF ARGUMENT

I.      Plaintiffs appeal the district court's dismissal of their claim alleging a

violation of their substantive rights under the Due Process Clause to "direct the

care, custody, education, and control of their minor children." Yet Plaintiffs have

failed to establish that they have Article III standing to assert this claim. They

assert that the possibility of student records being withheld from them infringes

their constitutional right, but nothing suggests that Plaintiffs are in remotely

imminent apprehension of such infringement. Specifically, Plaintiffs nowhere

allege that they have actually been (or are likely to be) harmed in any way by the

Guidelines, nor do they explain how any cognizable injury to them would be

redressed by a favorable decision. This claim relies on a highly attenuated chain of

possibilities that is far too speculative to establish standing.

II.     Plaintiffs have failed to plausibly allege a violation of their

fundamental parental rights. No case recognizes the right Plaintiffs invoke as

fundamental; indeed, the case law consistently rejects the notion that parents have

a constitutional right to dictate the operations of a public school. Because there is no such fundamental right, Plaintiffs' claim is subject to rational-basis review, which the Guidelines easily satisfy.

III.    If the Guidelines were subject to strict scrutiny, that standard would be satisfied because the Guidelines are narrowly tailored to serve MCPS's compelling interest in providing for students' educational needs and rights.

## STANDARD OF REVIEW

This Court reviews standing de novo. *Ohio Valley Env't Coal., Inc. v. Pruitt*, 893 F.3d 225, 229 (4th Cir. 2018). "[S]tanding to sue is a jurisdictional issue of constitutional dimensions, and it may be raised and addressed for the first time on appeal." *Davison v. Randall*, 912 F.3d 666, 677 (4th Cir. 2019).

This Court reviews de novo the grant of a motion to dismiss for failure to state a claim. *Weidman v. Exxon Mobil Corp.*, 776 F.3d 214, 219 (4th Cir. 2015). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court must "take the [alleged] facts in the light most favorable to the plaintiff," but it "'need not accept the legal conclusions drawn from the facts,'" and it "'need not accept as true unwarranted

inferences, unreasonable conclusions, or arguments.'" *Giarratano v. Johnson*, 521

F.3d 298, 302 (4th Cir. 2008).

## ARGUMENT

### I.    PLAINTIFFS LACK STANDING TO BRING THE ONLY CLAIM THEY PRESS ON APPEAL

A federal court cannot adjudicate a claim unless at least one plaintiff has

standing to press that claim. *Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199,

209 (4th Cir. 2020). "To establish Article III standing, a plaintiff must prove that:

'1) he or she suffered an 'injury in fact' that is concrete and particularized, and is

actual or imminent; 2) the injury is fairly traceable to the challenged action of the

defendant; and 3) the injury likely will be redressed by a favorable decision.'"

*Davison*, 912 F.3d at 677. "The Supreme Court has repeatedly held that an alleged

harm is too 'speculative' to support Article III standing when the harm lies at the

end of a 'highly attenuated chain of possibilities.'" *South Carolina v. United

States*, 912 F.3d 720, 727 (4th Cir. 2019) (quoting *Clapper v. Amnesty Int'l USA*,

568 U.S. 398, 410 (2013)).[2]

That is the case here, and Plaintiffs' appeal should be dismissed for lack of

standing. While MCPS did not argue standing in the district court, Plaintiffs'

---

[2] Although the standing burden is more modest at the pleading stage, it still exists. *See DiCocco v. Garland*, 52 F.4th 588, 592 (4th Cir. 2022) (citing *Bennett v. Spear*, 520 U.S. 154, 171 (1997)).

litigation decisions on appeal raise this issue and, of course, because standing to sue is jurisdictional, "it may be raised and addressed for the first time on appeal." *Davison*, 912 F.3d at 677.

In the district court, Plaintiffs asserted standing to vindicate a right to plenary access to their children's school records, including under FERPA, PPRA, and Maryland statutory and regulatory law. *See, e.g.*, JA36 ¶ 1 (describing action "to enforce their rights to access certain information generated and retained about their minor children by the defendants and their agents"), JA37-38 ¶¶ 3-4 (describing Plaintiffs and their statutory rights as parents of minor children under the Family Article of the Code of Maryland, the Code of Maryland Regulations, FERPA, and PPRA)). While Plaintiffs plausibly alleged constitutional standing below to vindicate these statutory rights and whatever constitutional protection might arguably have been associated with them, they have now abandoned these claims. Instead, Plaintiffs appeal only the dismissal of their federal due process claim, which they say entails "a fundamental right to remove their children from public schools"—a right they claim is infringed when public schools "hid[e] important information from [parents]." Br. 7. But Plaintiffs have not asserted that any information has been "hidden" from them, nor have they alleged anything respecting any supposed desire to remove their children from public schools that has been compromised or impeded by the Guidelines.

- 17 -

Plaintiffs likewise do not allege that they have a transgender or gender-nonconforming child enrolled in MCPS, or that their children have gender-support plans. As Plaintiffs acknowledge, the district court "criticized Plaintiff Parents for bringing this action *before* they are aware whether they suffer the harm that would be caused by the part of the Guidelines they challenge." Br. 39 n.12. Put simply, Plaintiffs have failed to explain how they have suffered an injury in fact that is concrete and particularized. For Plaintiffs to have been injured in the form of a violation of their right to control the upbringing of their children, they would need to have a transgender or questioning child, there would need to be a plan developed, and that plan would need to be developed in a way that excludes Plaintiffs or keeps information from them. None of those things is pled, much less with the requisite imminence or certainty required to invoke this Court's jurisdiction. Nor, as noted, have Plaintiffs alleged how a favorable decision in this case would redress any cognizable injury they have suffered. Under *Clapper*, what Plaintiffs do allege—that their right to remove their children from public schools is infringed by the Guidelines—is too attenuated and contingent to give Plaintiffs standing. The appeal should be dismissed for that reason.

## II. PLAINTIFFS FAIL TO PLAUSIBLY ALLEGE THAT THE GUIDELINES INFRINGE ANY FUNDAMENTAL RIGHT

As the district court correctly recognized, parents have a fundamental due-process right to make decisions concerning the care, custody, and control of their

children.  *See* JA92.  But no court has recognized the supposed right Plaintiffs

assert here, which the district court aptly described as "a fundamental right to be

promptly informed of their child's gender identity, when it differs from that usually

associated with their sex assigned at birth, regardless of their child's wishes or any

concerns regarding the detrimental effect the disclosure may have on that child."

JA92.  On the contrary, courts have consistently refused to recognize such a

sweeping expansion of parental rights in the context of public education.  The

district court rightly refused to do so here.  And because the Guidelines do not

implicate a fundamental right protected by the Due Process Clause, the district

court correctly subjected them to rational-basis review, which they easily satisfy.

### A.    Parents Have No Fundamental Right To Be Informed By Public Schools Of Their Child's Gender Identity

#### 1.    Longstanding substantive-due-process precedent rejects the right Plaintiffs assert

The Due Process Clause protects the right of parents and guardians to make

decisions concerning the care, custody, and control of their children.  *Troxel v.*

*Granville*, 530 U.S. 57, 66 (2000) (plurality op.).  But, as this Court (like numerous

others) has explained, "[a]lthough 'the Supreme Court has never been called upon

to define the precise boundaries of a parent's right to control a child's upbringing

and education,' it is clear that the right is neither absolute nor unqualified."  *Bailey*

*v. Virginia High Sch. League, Inc.*, 488 F.App'x 714, 716 (4th Cir. 2012) (per

curiam) (quoting *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 182 (3d Cir. 2005)).

In urging that the parental right includes the right to be informed of their child's gender identity, Plaintiffs rely principally on *Meyer v. Nebraska*, 262 U.S. 390 (1923), which held unconstitutional a law that prohibited teaching in any language other than English, and *Pierce v. Society of Sisters of Holy Names of Jesus & Mary*, 268 U.S. 510 (1925), which held unconstitutional a law requiring parents to send their children to public schools. That reliance is misplaced. While these cases have been taken to stand for the general proposition that parents have a right to control the upbringing and education of their children, *see Troxel*, 530 U.S. at 65 (plurality op.), the Supreme Court has stressed that this right does *not* mean that parents have a right to dictate the operation of public schools. In particular, the Court has stated that "*Pierce* … len[ds] no support to the contention that parents may replace state educational requirements with their own idiosyncratic views of what knowledge a child needs to be a productive and happy member of society." *Runyon v. McCrary*, 427 U.S. 160, 177 (1976) (quotation marks omitted).

Hewing to this limited view of *Meyer* and *Pierce*, courts of appeals have consistently recognized that public schools have the authority to make many kinds of judgments about how students are educated, and that parents do not have any

right to override, or claim exemptions from, those considered judgments.  As the First Circuit explained in *Parker v. Hurley*, 514 F.3d 87 (1st Cir. 2008), the schooling cases "evince the principle that the state cannot *prevent* parents from choosing a specific educational program."  *Id.* at 101-102 (collecting authority).  In other words, a State may not "completely foreclos[e] the opportunity of individuals and groups to choose a different path of education."  *Brown v. Hot, Sexy & Safer Prods., Inc.*, 68 F.3d 525, 533 (1st Cir. 1995)).  But "*Meyer*, *Pierce*, and their progeny do not begin to suggest the existence of a fundamental right of every parent to tell a public school what his or her child will and will not be taught." *Leebaert v. Harrington*, 332 F.3d 134, 141 (2d Cir. 2003).  Recognition of such a right would cause a sea change in the law and have drastic negative consequences—"mak[ing] it difficult or impossible for any public school authority to administer school curricula responsive to the overall educational needs of the community and its children."  *Id*.  This Court has likewise recognized these limitations and accordingly refused to recognize as fundamental a parent's right to direct a child's public-school education.  *Herndon ex rel. Herndon v. Chapel Hill Carrboro City Bd. of Educ.*, 89 F.3d 174, 179 (4th Cir. 1996).  All these cases foreclose Plaintiffs' claim that the Due Process Clause protects, a "fundamental right [of parents] to be promptly informed of their child's gender identity, when it differs from that usually associated with their sex assigned at birth, regardless of

- 21 -

their child's wishes or any concerns regarding the detrimental effect the disclosure may have on that child."  JA92.

Supreme Court precedent regarding substantive due process more generally forecloses that claim as well.  The Court has made clear that substantive due process protects only those liberties that are "carefully refined by concrete examples … found to be deeply rooted in our legal tradition."  *Washington v. Glucksberg*, 521 U.S. 702, 722 (1997); *see also Village of Belle Terre v. Boraas*, 416 U.S. 1, 7-8 (1974); *City of Dallas v. Stanglin*, 490 U.S. 19, 22-25 (1989).  The Court has also required particular care and precision in articulating the liberty interest at stake, lest recognition of too broad or general a right intrude on policymaking domains reserved to other branches of government.  *Glucksberg*, 521 U.S. at 720 (courts must "'exercise the utmost care whenever [they] are asked to break new ground in this field,' … lest the liberty protected by the Due Process Clause be subtly transformed into [their] policy preferences."); *see also Dobbs v. Jackson Women's Health Org.*, 142 S.Ct. 2228, 2247 (2022); *Herndon*, 89 F.3d at 179.

In short, courts require a "'careful description' of the asserted fundamental liberty interest" before recognizing it as one immunized from reasonable governmental regulation.  *Glucksberg*, 521 U.S. at 721; *see also id*. at 722-723 (illustrating the requisite specificity by rejecting the imprecise formulation "right

- 22 -

to die" for the more "carefully formulat[ed] … 'constitutionally protected right to refuse lifesaving hydration and nutrition.'"). Plaintiffs' claim falls well short of this exacting principle of substantive due process analysis. Br. 8.

Again, the right Plaintiffs seek to vindicate here is the supposed right to "be promptly informed of their child's gender identity, when it differs from that usually associated with their sex assigned at birth, regardless of their child's wishes or any concerns regarding the detrimental effect the disclosure may have on that child." JA92. Plaintiffs cite no case that recognizes such a right, and there is none. On the contrary, courts—including this one—have firmly checked such attempts to expand parental rights into a general right to superintend schools or claim exemptions from reasonable school policies and practices. *See Herndon*, 89 F.3d at 179 ("reasonable regulation by the state is permissible even if it conflicts" with parents' interest in directing children's schooling); *see also Parker*, 514 F.3d at 102 (collecting authority). Much less has any court suggested that such a right would be violated by reasonable school guidelines that further important educational and safety goals, like the Guidelines at issue here.

## 2.    Plaintiffs' attempts to evade established precedent lack merit

In an effort to situate their asserted right in a recognized constitutional tradition, Plaintiffs offer multiple ways of viewing the Guidelines. First, Plaintiffs contend that the Guidelines do not "deal directly with matters involving the

- 23 -

educational mission and administration of public schools," and so fall outside the

scope of public schools' constitutionally respected prerogative to make decisions

affecting students at school.  Br. 15-16.  Second, Plaintiffs claim that the

Guidelines usurp their "decision-making authority on matters of the greatest

importance."  Br. 16-20.  Third, Plaintiffs argue that the Guidelines "involve[] the

school hiding matters from parents," and, as a consequence, "abridge[] their right

to remove their children from the public schools."  Br. 12-14, 20-21.  And fourth,

Plaintiffs assert that the Guidelines "involve direct regulation of what happens at

home."  Br. 21-22.  All these arguments fail.

> ### a.  *Supporting the educational needs of transgender and gender-nonconforming students is part of a school's educational mission*

While acknowledging that the educational needs of transgender and gender-

nonconforming students "may need to be addressed while the child is in school,"

Plaintiffs maintain that addressing such needs is "not part of the primary

educational mission" of schools, and so the Guidelines fall outside the settled case

law recognizing schools' prerogative to address educational matters in school.

Br. 16.  This cramped view of public schools' educational mission is incorrect.

Courts have "long recognized that local school boards have broad discretion

in the management of school affairs."  *Board of Educ., Island Trees Union Free

Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 863 (1982).  Courts have thus consistently

declined to decide what is and is not part of a school's primary educational

mission. *See, e.g.*, *Canady v. Bossier Par. Sch. Bd.*, 240 F.3d 437, 444 (5th Cir.

2001) ("[I]t is not the job of federal courts to determine the most effective way to

educate our nation's youth."). As this Court put it, "[a]lthough schoolteachers

provide more than academic knowledge to their students, it is not a court's

obligation to determine which messages of social or moral values are appropriate

in a classroom. Instead, it is the school board, whose responsibility includes the

well-being of the students, that must make such determinations." *Lee v. York Cnty.*

*Sch. Div.*, 484 F.3d 687, 700 (4th Cir. 2007). Courts thus afford schools

reasonable discretion to define their own educational mission. For example, as the

Sixth Circuit explained in a case involving a school dress code:

> [Parents] do not have a fundamental right generally to direct *how* a
> public school teaches their child. Whether it is the school curriculum,
> the hours of the school day, school discipline, the timing and content
> of examinations, the individuals hired to teach at the school, the
> extracurricular activities offered at the school or, as here, a dress code,
> these issues of public education are generally "committed to the
> control of state and local authorities."

*Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 395-396 (6th Cir. 2005).

Applying this deference, courts have upheld numerous school regulations,

including mandatory community service, *see Herndon*, 89 F.3d 174, school

discipline, *see Hall v. Tawney*, 621 F.2d 607, 610 (4th Cir. 1980), mandatory

health curriculum, *see Leebaert v. Harrington*, 332 F.3d 134 (2d Cir. 2003), sex

education programs, *see Fields v. Palmdale Sch. Dist.*, 427 F.3d 1197 (9th Cir. 2005), compulsory sex education assembly, *see Brown*, 68 F.3d at 534, and school dress codes, *see Blau*, 401 F.3d 381.

While Plaintiffs blithely dismiss these cases as "generically irrelevant" (Br. 15), the same deference underlying them requires upholding MCBE's decision to adopt the Guidelines. Certainly, Plaintiffs cite no authority for exempting school guidance pertaining to the educational needs of transgender and gender-nonconforming students from the usual deference given to public schools in defining their educational missions. Plaintiffs do assert, without explanation, that "[t]ransgenderism [is] like other medical or psychological conditions" (Br. 16) and therefore is categorically and exclusively consigned to parental decision-making. This is unfounded. As an initial matter, being transgender or gender-nonconforming is *not* a medical condition; it does not in itself signal problems with a student's health or well-being. This Court has recognized that, explaining that "[b]eing transgender is … not a psychiatric condition, and implies no impairment in judgment, stability, reliability, or general social or vocational capabilities." *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 594 (4th Cir. 2020), *as amended* (Aug. 28, 2020) (quotation marks omitted); *accord Williams v. Kincaid*, 45 F.4th 759, 767-768 (4th Cir. 2022). Regardless, public schools must ensure a safe and supportive educational environment for students with a vast range of

health, behavioral, and medical needs, including pregnancy, learning differences, physical disabilities, substance-abuse disorders, mental illness, and more. *See* Md. Code, Educ. § 7-401(a) ("[E]ach county board shall provide [a] healthful school environment."). It defies common sense to suggest that schools have no discretion to make judgments about how to ensure a safe and supportive educational environment for transgender and gender-nonconforming students, even where parents may disagree with those judgments. As the Ninth Circuit has explained, "with respect to education, parents have the right to choose the educational forum, but not what takes place inside the school." *California Parents for the Equalization of Educ. Materials v. Torlakson*, 973 F.3d 1010, 1020 (9th Cir. 2020); *cf. Doe v. Irwin*, 615 F.2d 1162, 1167 (6th Cir. 1980) (rejecting contention that in-school condom-distribution program violated constitutional parental rights); *Curtis v. School Comm. of Falmouth*, 652 N.E.2d 580, 589 (Mass. 1995) (same, stressing that "[p]arents have no right to tailor public school programs to meet their individual religious or moral preferences").

The Guidelines further MCPS's educational mission, reflecting MCPS's commitment to providing "a safe, welcoming school environment where students are engaged in learning and are active participants in the school community because they feel accepted and valued." JA68. Plaintiffs assert that the Guidelines are intended to reach into students' homes and to "effectively brand[]

[unsupportive] parents as neglectful or abusive without any due process protections."  Br. 8.  The Guidelines neither express nor reflect any such intent; their stated goals are to protect the school environment for transgender and non-conforming students and to ensure those students' full participation in the school community.  To be sure, the Guidelines do not counsel ignorance of the student's home environment, but their purpose is to provide guidance and resources for staff to support the educational needs of transgender and gender-nonconforming students.  JA68.

The Guidelines are no outlier in this regard.  Schools routinely handle sensitive information disclosed to them by students, and school boards regularly provide school personnel with guidance on how to handle such information.  These policies often give discretion to school officials to determine whether disclosure is appropriate in light of concerns about a student's safety and well-being.  For example, a Montgomery County policy provides that "MCPS is not responsible for notifying parents/guardians of students involved in an alleged abuse or neglect situation in … cases where, in the judgment of the principal and CPS, APS (for vulnerable adults), and/or the Special Victims Investigations Division of the MCPD, notification of parents/guardians could create a threat to the well-being of the student."  Montgomery Cnty. Bd. of Educ., *Reporting and Investigating Child Abuse and Neglect* 13 (2019).  Similarly, another County policy provides that "any

- 28 -

contact with parents/guardians should be made by, or in consultation with, the

school counselor and/or the principal, who shall strive to ensure that such

information remains confidential and is not shared with other students."

Montgomery Cnty. Bd. of Educ., *Guidelines for the Continuing Education of*

*Pregnant and Parenting Students* 2 (2022).  Indeed, the Guidelines track years-old

Maryland State Department of Education guidelines on disclosure to parents of

student information related to gender identity.  Those guidelines remind school

personnel that they should "[a]lways act in the best interest of the child" when

considering disclosure of student information related to gender identity, counsel

personnel to "[p]ermit transgender and gender non-conforming students to …

decide when, with whom, and how much private information may be shared," and

remind them that such information "need not be disclosed without the student's

consent."  Maryland State Dep't of Educ., *Providing Safe Spaces for Transgender*

*and Gender Non-Conforming Youth: Guidelines for Gender Identity Non-*

*Discrimination* 11 (2015).  The Guidelines at issue here are simply another

example of this longstanding and commonsense recognition that schools have

significant responsibility for their students' well-being.

### b.     The Guidelines do not usurp Plaintiffs' constitutionally protected parental decision-making

Plaintiffs attempt to distance their claim from the settled case law against

them by drawing on cases that implicate parental decision-making authority.  In

particular, Plaintiffs suggest that the proper standard for assessing parental-rights claims in schools is whether the offending conduct "strike[s] at the heart of parental decision-making authority on matters of the greatest importance."  Br. 17 (citing *Ridgewood*, 430 F.3d at 184).  Where such consequential decision-making is at issue, Plaintiffs imply, schools bear a duty to disclose information that would facilitate such decision-making—regardless of the student's wishes or whether such disclosure might jeopardize the student's safety and well-being.  That is not the law, and it lacks any basis even in the case law on which Plaintiffs principally rely.

Although courts recognize a family's right to "independence in making certain kinds of important decisions," *Hodge v. Jones*, 31 F.3d 157, 163 (4th Cir. 1994) (quotation marks omitted), that right is "neither absolute nor unqualified," *id*. at 163-164.  Rather, the right "may be outweighed by a legitimate governmental interest."  *Id*.; *see also id.* at 164 (state has a "*parens patriae* interest in preserving and promoting the welfare of the child" (quoting *Santosky v. Kramer*, 455 U.S. 745, 766 (1982))).  And this Court has explained that reasoned efforts to protect children's welfare do not "intrude[] so vigorously into the … family as to infringe their family privacy right."  *Renn ex rel. Renn v. Garrison*, 100 F.3d 344, 349 (4th Cir. 1996).

The few instances where courts have held that schools violated parents'
decision-making authority turned on the presence of two factors: (1) coercive
pressure on the child to undertake a controversial or intimate act and
(2) concealment of that fact from the parents. *See Reardon v. Midland Cmty. Sch.*,
814 F.Supp.2d 754, 771 (E.D. Mich. 2011). For example, in *Arnold v. Board of
Education of Escambia County*, 880 F.2d 305, 311-312 (11th Cir. 1989), *overruled
on other grounds by Leatherman v. Tarrant County Narcotics Intelligence &
Coordination Unit*, 507 U.S. 163 (1993), the court concluded that school officials
violated the plaintiffs' family-privacy rights by coercing a minor into having an
abortion (including requiring her to perform menial tasks at the school to finance
the abortion) and concealing the decision from her parents. Similarly, in *Gruenke
v. Seip*, 225 F.3d 290, 308-309 (3d Cir. 2000) (including Roth J., concurring op.),
the court recognized the familial-privacy rights of a mother whose daughter was
forced by to take a pregnancy test her swim-team coach, who then spread rumors
of the teen's pregnancy at the school without informing her parents. But where, as
here, plaintiffs make no allegations of coercion, courts find no constitutional
violation of familial privacy. *See, e.g.*, *Reardon*, 814 F.Supp.2d at 771-772 (no
violation of familial privacy where school personnel provided advice, financial
assistance, counseling, and an offer to act as foster parents); *Anspach ex rel.
Anspach v. City of Phila., Dep't of Pub. Health*, 503 F.3d 256, 264-267 (3d Cir.

2007) (no violation of familial privacy where city health department provided minor with emergency contraception without notifying her parents or encouraging her to consult with them).  Here, the Guidelines, far from coercing students into making any important decision potentially touching on familial privacy, direct school personnel to "work[] toward [the] inclusion of the family."  JA69.[3]

Plaintiffs counter with a single case—*C.N. v Ridgewood Board of Education*—that they claim supports their right to be informed of their child's gender identity.  It does not.  In *Ridgewood*, the court considered whether a survey probing students on sensitive topics violated parental privacy rights.  After noting a factual dispute about whether the survey was voluntary, the court held that "even if the survey was involuntary, the conduct at issue does not rise to the level of a constitutional violation."  430 F.3d at 184.  Contrary to Plaintiffs' characterization

---

[3] More specifically, the Guidelines provide:

Prior to contacting a student's parent/guardian, the [school official] should speak with the student to ascertain the level of support the student either receives or anticipates receiving from home.  In some cases, transgender and gender nonconforming students may not openly express their gender identity at home because of safety concerns or lack of acceptance.  Matters of gender identity can be complex and may involve familial conflict. … In such cases, staff will support the development of a student-led plan that works toward inclusion of the family, if possible, taking safety concerns into consideration, as well as student privacy, and recognizing that providing support for a student is critical, even when the family is nonsupportive.

JA69.

(Br. 17), the court did not reject coercion as a criterion in determining whether a school policy contravened parental rights, but rather ruled that certain matters are not significant enough even to trigger an *inquiry* into coercion. *See Ridgewood*, 430 F.3d at 185 ("[O]ur review of [the parental rights] cases prompts us to conclude that the decision whether to permit a middle or high school student to participate in a survey of this type is not a matter of comparable gravity.").

*Ridgewood* and the other cases discussed above at most stand for the proposition that schools may unconstitutionally interfere with parental decision-making when they (1) coerce students to take action on a matter of great importance and (2) conceal that action from the parents. Neither concern is implicated here. Transgender and gender-nonconforming students are not coerced in any way by the Guidelines; the Guidelines are intended to support students' own choices. Perhaps recognizing this, Plaintiffs cite *Alfonso v. Fernandez*, 606 N.Y.S.2d 259 (App. Div. 1993), a 3-2 decision from New York's intermediate appellate court, in suggesting that compulsory attendance at public schools renders *any* affirmative action taken by schools with respect to certain important matters inherently coercive. Br. 20. No other court has adopted this reasoning—and in fact the Massachusetts Supreme Judicial Court, considering a nearly identical condom-distribution program to the one at issue in *Alfonso*, expressly rejected it. *Curtis*, 652 N.E.2d at 586-587.

Plaintiffs also observe (Br. 18) that the cases discussed above favor communication between students and their parents. But the Guidelines do just that, so long as such communication is possible without imperiling student safety. In particular, the Guidelines say that "staff will support the development of a student-led plan that works toward inclusion of the family, if possible, taking safety concerns into consideration, as well as student privacy, and recognizing that providing support for a student is critical, even when the family is nonsupportive." JA69. That is a reasonable exercise of educational judgment that does not strike at the heart of the parent-child relationship.

### c.    *Plaintiffs do not have a constitutionally protected right to have their transgender or gender-nonconforming children outed by school personnel*

Plaintiffs argue that by "requir[ing] school personnel to disregard their instructions, to hide information from them, and to dissemble to do so," the Guidelines violate their "right to *know* what transpires in the classroom, even if they have ceded their right to the school to determine general curricular affairs." Br. 20-21. That argument begins from a mistaken premise: The Guidelines do not "require" or even counsel hiding information from parents, instead actively working toward family inclusion. Specifically, as the district court recognized, the Guidelines "neither mandate nor encourage the exclusion or distrust of parents, but aim to include parents and other family in the support network they are intended to

- 34 -

create." JA91. Moreover, Plaintiffs cite no case supporting or defining this supposed "right to know," nor do they articulate any reasonable limits to its seemingly vast scope. It plainly cannot be that Plaintiffs have an absolute "right to know what transpires in the classroom." *See, e.g.*, *Thomas v. Evansville-Vanderburgh Sch. Corp.*, 258 F.App'x 50, 54 (7th Cir. 2007) (constitutional protections of parental rights do "not imply a parent's right to control every aspect of her child's education at a public school"); *cf. Irwin*, 615 F.2d at 1169 (parents lacked a constitutional right to be notified by a public facility that distributed contraceptives to unemancipated minors). Besides being administratively impractical, if not impossible, such a right would undermine the careful balance courts have struck between protecting the rights of parents and students and deferring to the reasoned judgments of educators on how to provide a safe and supportive learning environment.

Nor is there any merit to a narrower version of Plaintiffs' argument in which teachers and other school personnel have a duty to inform parents if their child expresses a wish to be referred to at school by a name or gender identity other than that assigned at birth. Plaintiffs identify no statute, constitutional provision, or other law that establishes such a duty, i.e., a duty to "out" students' gender identity to their parents. That is unsurprising, as the absence of any such duty is consistent with the established fact that school personnel have no duty to inform parents that

a student may be suffering from depression, anxiety, or other mental-health conditions (except, of course, when there is an imminent threat of harm, which is not alleged to be an issue here). Establishing such a disclosure requirement is the prerogative of legislatures and school boards—not courts.

Plaintiffs' implication that the Constitution imposes an affirmative duty of disclosure on schools—so that parents may better exercise their right of removal— is wrong. In the related context of minors seeking reproductive health services, courts have emphatically rejected a right to parental notification. *See Anspach*, 503 F.3d at 271 ("While parental notification has been permitted in limited circumstances in the context of abortion …, it has never been affirmatively required, nor extended to include other reproductive health services such as access to contraception" (citation omitted)); *Irwin*, 615 F.2d at 1169 (finding no constitutional right to notification rooted in parental rights jurisprudence where county health clinic distributed contraceptive devices and medication to unemancipated minors without notice to their parents).

Nor do the Guidelines, insofar as they decline to compel disclosure of a student's gender identity, foreclose Plaintiffs' ability to remove their children from Montgomery County Public Schools. Br. 20-21. Nothing in the Guidelines prohibits Plaintiffs from "choos[ing] a different path of education" for their children. *Brown*, 68 F.3d at 533. Plaintiffs are thus free to remove their children

from MCPS and either select a private institution, *Pierce*, 268 U.S. at 534-535, or

educate their children at home, *Wisconsin v. Yoder*, 406 U.S. 205, 234 (1972), in

order to more completely oversee their children's expression of gender identity.

Given that Plaintiffs are on notice of the Guidelines—which have not

prompted Plaintiffs to remove their children from MCPS—Plaintiffs appear to be

arguing a strange counterfactual: They *would* remove their children if they knew

their children had expressed a wish to be referred to at school by a name or gender

identity other than that assigned at birth. But again, while the desire of parents to

know their child's wishes with respect to gender identity is understandable, no law

imposes a duty on teachers or other school personnel to disclose, regardless of the

student's wishes or safety concerns, any and all information a student shares with

school personnel about the student's gender identity. Such a sweeping right and

such an intrusion on school policy and practice simply has no grounding in

case law.

> **d.    *The Guidelines do not reach inside the family home
> and do not restrict what parents may discuss with
> their children***

Finally, Plaintiffs assert that the Guidelines violate their parental rights

insofar as they "involve direct regulation of what happens at home." Br. 21-22.

The Guidelines do no such thing: They do not reach inside the family home or

otherwise purport to restrict what parents discuss with their children (regarding

gender identity or expression or any other topic). Plaintiffs are thus not constrained in any way by the Guidelines from talking to their children about gender identity and expression; observing their children's behavior, moods, and activities; requiring them to receive medical care and counseling; monitoring their communications; or deciding what their children may do in their free time (including whom the children may socialize with). What the Guidelines do concern is how, in order to protect student safety and to facilitate their education, issues of gender identity should be handled *while children are under school supervision*, when parents' rights are necessarily more limited. That is not "direct regulation of what happens at home." Br. 21.

Nor is it the law—Plaintiffs cite nothing suggesting it is—that "the proper question" with respect to a claim like Plaintiffs' "is not whether what happens at home affects the child at school, but whether this school policy affects the parent-child relationship at home." Br. 22. This extraordinarily broad formulation carries Plaintiffs' argument well beyond the facts of this case. The Guidelines' express goals, as noted, are to ensure a safe school environment for transgender and gender-nonconforming students and also ensure their full participation in the school community. JA68. Contrary to Plaintiffs' suggestion (Br. 22), mere inquiry into the home environment of transgender and gender-nonconforming students does not impermissibly interfere with parental rights; such inquiry, as

explained below, is narrowly tailored to serve MCPS's compelling interest in protecting students' safety and ensuring a "safe, welcoming school environment where students … feel accepted and valued."  JA68.

*    *    *

In short, though parents have a right to make decisions concerning the care, custody, and control of their children, no court has recognized the right Plaintiffs assert here.  Rather, substantive-due-process precedent clearly indicates that parents do not have a "fundamental right to be promptly informed of their child's gender identity, when it differs from that usually associated with their sex assigned at birth, regardless of their child's wishes or any concerns regarding the detrimental effect the disclosure may have on that child."  JA92.  Plaintiffs do not, and cannot, deny that supporting the educational needs of students is part of a school's educational mission; the Guidelines do not usurp Plaintiffs' decision-making authority; and they do not reach inside the family home or restrict what parents may discuss with their children.  Courts have consistently refused to recognize sweeping expansions of parental rights in the context of public education, and the district court properly refused to do so here.

### B.    The Guidelines Satisfy Rational-Basis Review

Because Plaintiffs' claimed right to be informed of their children's gender identity is not fundamental, rational-basis review—not strict scrutiny (*see* Br. 25-

- 39 -

49)—applies. In *Herndon ex rel. Herndon v. Chapel Hill-Carrboro City Board of Education*, 89 F.3d 174 (4th Cir. 1996), this Court considered what level of scrutiny to apply where a school board's mandatory community-service program allegedly violated plaintiffs' parental rights to control the upbringing and education of their children, explaining that:

> From *Meyer* to *Runyon*, the Supreme Court has stated consistently that parents have a liberty interest, protected by the Fourteenth Amendment, in directing their children's schooling. Except when the parents' interest includes a religious element, however, the Court has declared with equal consistency that *reasonable* regulation by the state is permissible even if it conflicts with that interest. That is the language of rational basis scrutiny.

*Id*. at 179; *see also Immediato v. Rye Neck Sch. Dist.*, 73 F.3d 454, 461 (2d Cir. 1996) (similar).

Plaintiffs argue (Br. 18-19) that *Herndon* was effectively overruled by *Glucksberg* and *Troxel*. Plaintiffs are mistaken. As explained, *Herndon* held that rational-basis review applies where parents challenge state educational requirements for secular reasons based on their right to direct their children's schooling. 89 F.3d at 179. Neither *Troxel* nor *Glucksberg* disturbs that holding.

*Troxel* involved a grandparent's visitation rights under a "breathtakingly broad" Washington statute that "effectively permits any third party seeking visitation to subject any decision by a parent concerning visitation of the parent's children to state-court review" based on the "the best interest of the child." 530

- 40 -

U.S. at 67 (plurality op.).  A plurality of the Supreme Court upheld the Washington

Supreme Court's invalidation of the statute on the ground that it gave judges

"unlimited power," *id*. at 73, to usurp parents' "due process right to make decisions

concerning the care, custody, and control" of their children, *id*. at 75.  Eight

justices declined to disturb existing substantive-due-process case law or opine on

the level of scrutiny that should apply to infringements on "parental due process

rights in the visitation context."  *Id*. at 73; *accord id.* at 78 (Souter, J., concurring);

*id*. at 85-91 (Stevens, J., dissenting); *id*. at 91-93 (Scalia, J., dissenting); *id*. at 96-

97 (Kennedy, J., dissenting).  *But see id*. at 80 (Thomas, J., concurring) (noting that

while Washington "lacks even a legitimate governmental interest," he would apply

strict scrutiny in a similar case if given the opportunity).  Another court of appeals

has thus recognized that *Troxel* is inapposite in schooling cases, opting "instead

[to] follow almost eighty years of precedent analyzing parental rights in the context

of public education under a rational-basis standard."  *Littlefield v. Forney Indep.

Sch. Dist.*, 268 F.3d 275, 289 (5th Cir. 2001).  *Glucksberg* is likewise inapposite.

There, considering a substantive-due-process challenge to Washington's ban on

assisted suicide, the Court took pains to stress the critical importance of judicial

care and restraint in adjudicating substantive due process claims.  521 U.S. at 721-

722.  Plaintiffs' imprecision in citing *Troxel* and *Glucksberg* is at odds with the

very care those cases model.  Neither case invalidates this Court's decision in

*Herndon*.

The district court correctly held that the rational-basis test is readily satisfied here.  JA102.  The Guidelines rationally relate to MCPS's legitimate interest in protecting students' safety and ensuring a "safe, welcoming school environment where students … feel accepted and valued."  JA68.  That interest is rooted in state and federal laws that obligate MCPS to take meaningful steps to make its schools safe environments for learning.  For example, under Maryland law, "[a]ll students in Maryland's public schools, without exception and regardless of race, ethnicity, region, religion, gender, sexual orientation, language, socioeconomic status, age, or disability, have the right to educational environments that are: A. Safe; B. Appropriate for academic achievement; and C. Free from any form of harassment." COMAR 13A.01.04.03.  Similarly, the recently enacted Maryland Safe to Learn Act, Md. Code, Educ. §§ 7-1501 – 7-1512, mandates that schools undergo safety evaluations, employ school-safety coordinators, and employ mental-health coordinators.  And U.S. Department of Education guidance notes that under Title IX, schools have a legal obligation to eliminate hostile environments and provide support to affected students.  *See* U.S. Dep't of Educ., *Guidance on Schools' Obligations to Protect Students from Student-on-Student Harassment on the Basis of Sex; Race, Color and National Origin; and Disability, "Dear Colleague" Letter*

(Oct. 26, 2010).  Assisting students in creating support plans that provide a modicum of confidentiality and autonomy in appropriate circumstances is rationally related to these interests.

### III. THE GUIDELINES ARE NARROWLY TAILORED TO SERVE SCHOOLS' COMPELLING INTEREST IN PROVIDING FOR STUDENTS' EDUCATIONAL NEEDS AND RIGHTS

Even if strict scrutiny applied to the Guidelines, it would be satisfied here. JA102.  MCBE asserts three compelling interests to which the Guidelines are narrowly tailored: ensuring student safety, not discriminating against transgender and gender-nonconforming students, and protecting student privacy.  Rather than squarely challenge these asserted interests, Plaintiffs contend that no asserted state interest can justify an alleged burden on one's parental rights.  This is not the law. As the district court found, MCPS's interests here are compelling, indeed urgent, and narrowly tailored to further those interests.  JA102-105.

#### A. Plaintiffs' Contention That No State Interest May Justify A Burden On Parental Rights Is Wrong

Plaintiffs claim without evidence that MCPS's interests are "illegitimate because they are simply attempted justifications for wanting to displace parents as the ones primarily responsible for the care and nurturing of the parents' children." Br. 26.  This merely restates Plaintiffs' fundamental-rights argument and ignores the relevant question, which is whether MCPS's interests are compelling.  It also

baselessly presumes that no asserted state interest can justify an alleged burden on a plaintiff's parental rights.  This is not the law.

Plaintiffs cite (Br. 11-12) two recent cases in which judges have questioned, in dicta, the validity of school guidance concerning the treatment of transgender students.  Those cases not only disregard controlling substantive-due-process law, but also lack any holding relevant to this case.

In the first, *Ricard v. USD 475 Geary County, KS School Board*, 2022 WL 1471372 (D. Kan. May 9, 2022), a teacher obtained a preliminary injunction of portions of a school's policy that she claimed violated her free-exercise rights.  Acknowledging that the teacher had no standing to vindicate parental-rights claims, the court nevertheless proceeded to comment on the parental-rights dimension of the policy's "prohibit[ion]" on disclosure to parents.  *Id.* at *8.  But these comments (which are what Plaintiffs rely on, *see* Br. 11-12, 26, 29, 33-34, 41, 49) are dicta in a preliminary procedural decision regarding a different constitutional right than the one raised here.  Moreover, the policy challenged in *Ricard* presumptively prohibited disclosure to a student's parents of the student's in-school transition.  2022 WL 1471372, at *2.  That is not the case here.

In the second, *Doe 1 v. Madison Metropolitan School District*, 976 N.W.2d 584 (Wis. 2022), the court upheld a trial-court order requiring the plaintiffs (parents of students in the district) to disclose their identities to opposing counsel

while allowing them to keep their names sealed and confidential as to the public and the district, *id.* at 587-588. The three dissenters opined on the merits of the case (and it is the dissent on which Plaintiffs here rely (Br. 12, 34)), but the court did not. Plaintiffs are therefore wrong in asserting (Br. 12) that Doe 1 "hold[s that] fundamental parental rights are infringed by the" challenged policy. Again, the court declined to "opine on the merits of the parents' request for temporary injunctive relief" against the policy. 976 N.W.2d at 588.

Plaintiffs offer two additional arguments for why the Court should categorically reject MCBE's asserted interests: that they are overgeneralized and that the Guidelines amount to viewpoint discrimination. Neither argument is persuasive. First, while conceding the importance of MCBE's interests, Plaintiffs argue (Br. 23) that the district court and MCBE "overgeneraliz[ed]" the interests "in order to justify" the Guidelines. To support that vague claim, Plaintiffs cite *Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal*, 546 U.S. 418 (2006), for the proposition that under strict scrutiny, compelling interests must be formulated with particularity, taking into account "relevant differences" and testing whether the asserted interest would be "'adversely affected'" by granting an exception to the party whose constitutional right has been burdened. *Id*. at 431-432. Leaving aside whether this standard applies to substantive-due-process claims—none of Plaintiffs' cited case law involved such a claim—MCBE here

- 45 -

meets this standard.  Second, Plaintiffs suggest—without support—that the
Guidelines provisions relating to communications with families implicate
viewpoint discrimination.  Br. 25 (citing *Matal v. Tam*, 137 S.Ct. 1744, 1763
(2017)); *see also* Br. 26.  But Plaintiffs neither raised this argument in the district
court, nor do they cite here any alleged facts supporting a claim of
viewpoint discrimination.

### B.    Schools Have A Compelling Interest In Ensuring A Safe And Welcoming Learning Environment For Students

The district court correctly found that MCPS has a compelling interest in
protecting its students' safety and ensuring a "safe, welcoming school environment
where students … feel accepted and valued."  JA102.  As the Supreme Court has
recognized, the State's interest in educating its citizens "is perhaps the most
important function of state and local governments."  *Brown v. Board of Educ.*, 347
U.S. 483, 493 (1954).  Indeed, the Court has stated expressly that states have a
"compelling" interest in educating their youth, to prepare children both "to
participate effectively and intelligently in our open political system," and "to be
self-reliant and self-sufficient participants in society."  *Yoder*, 406 U.S. at 221.
This compelling interest necessarily includes an interest in ensuring the safety of
students under a school's supervision.  In fact, the Supreme Court has deemed it
"evident beyond the need for elaboration that a State's interest in 'safeguarding the
physical and psychological well-being of a minor' is 'compelling.'"  *New York v.*

- 46 -

*Ferber*, 458 U.S. 747, 756-757 (1982).  And, not surprisingly, courts have also

held that they must "review, … with deference, schools' decisions in connection

with the safety of their students," *LaVine v. Blaine Sch. Dist.*, 257 F.3d 981, 992

(9th Cir. 2001), recognizing "the need to preserve the discretion of schools to craft

individualized approaches to difficult issues that are appropriate for their

respective communities," *Students v. U.S. Department of Education*, 2016 WL

6134121, at *24 (N.D. Ill. Oct. 18, 2016), *report and recommendation adopted*,

2017 WL 6629520 (N.D. Ill. Dec. 29, 2017) (citing *Wood v. Strickland*, 420 U.S.

308, 326 (1975)).

MCPS's interest in the safety of its transgender and gender-nonconforming

students is particularly urgent.  As Plaintiffs' complaint shows, the challenges

facing those students are real.  They experience heightened rates of both suicidal

ideation and actual attempted suicide.  Specifically, whereas "[n]early 14% of all

adolescents reported a previous suicide attempt, 50.8% of female to male

transgender adolescents did so, 41.8% of adolescents who identified as not

exclusively male or female did so, and 29.9% of male to female transgender

adolescents did so."  JA40.  Transgender and gender-nonconforming students are

also more likely to be bullied and harassed.  JA72.  Indeed, this Court recently

noted that "[i]n the largest nationwide study of transgender discrimination," a

shocking "77% of respondents who were known or perceived as transgender in

their K-12 schools reported harassment by students, teachers, or staff." *Grimm*,

972 F.3d at 597. Transgender and gender-nonconforming students likewise face

significant dangers of abuse at home from unsupportive families. JA69. Weighing

these safety concerns against the interest of parents in the upbringing of their

children, the Guidelines appropriately express a preference for parental

involvement while responding to the need to support students even when family

support is lacking.

Plaintiffs misconstrue MCPS's interest in providing a safe and supportive

learning environment as a pretextual justification to "usurp[] the parental role."

Br. 34. But Plaintiffs have alleged no facts that would support such a conclusion.

Moreover, Plaintiffs' usurpation theory presupposes that parental prerogative at

home and schools' reasonable exercise of their policy-making functions during the

school day are incompatible, a proposition courts have rejected. For example, the

Court in *Pierce* noted that while "[t]he child is not the mere creature of the state,"

the State nevertheless retains its role and responsibility "reasonably to regulate all

schools." 268 U.S. at 534-535. Similarly, the First Circuit has stressed that

"[p]ublic schools often walk a tightrope between the many competing

constitutional demands made by parents, students, teachers, and the schools' other

constituents." *Parker*, 514 F.3d at 107.

In challenging MCPS's compelling interest in providing a safe environment for students while at school, Plaintiffs cite cases concerning the custody of children. *See* Br. 33-34 (citing *Santosky v. Kramer*, 455 U.S. 745 (1982); *Stanley v. Illinois*, 405 U.S. 645 (1972); *Parham v. J.R.*, 442 U.S. 584 (1979); *Croft v. Westmoreland Cnty. Children & Youth Servs.*, 103 F.3d 1123 (3d Cir. 1997); and *Brokaw v. Mercer Cnty.*, 235 F.3d 1000 (7th Cir. 2000)). This reliance is misplaced. As the First Circuit has explained, there are two separate lines of cases regarding parents' constitutional rights: one concerning the *custody* of children, and another concerning the fundamental control of children's *schooling*. *Parker*, 514 F.3d at 101. Despite mentioning certain concepts from the custody cases, *see, e.g.*, Br. 5-6, 10, 12, 27-28, 30-31, 37, 41, 49 (referring to "best interests" of the child), Plaintiffs' claim plainly invokes the schooling cases. But none of those cases adopts the "best interests of the child" standard (used in custodial cases) to determine the scope of parental rights with respect to school operations. For good reason: Parents retain their custodial control while sending their children to school for several hours a day—even if, for those hours, parents necessarily cede some of their control to the discretion of the public school.

As the district court found, JA104-105, far from systematically excluding parents or sowing division at home, the Guidelines encourage parents' involvement—to the extent the student indicates it is safe to do so—in developing

and implementing a plan to support their child's full participation in school life "consistent with their asserted gender identity," JA68.  For example, the Guidelines advise that school personnel should work "*in collaboration with the student and the student's family (if the family is supportive of the student)*, [to] develop a plan to ensure that the student has equal access and equal opportunity to participate in all programs and activities at school and is otherwise protected from gender discrimination at school." JA69 (emphasis added).  Even where a student indicates that they "may not openly express their gender identity at home because of safety concerns or lack of acceptance," the Guidelines provide that "staff will support the development of a student-led plan that *works toward inclusion of the family, if possible*, taking safety concerns into consideration, as well as student privacy, and recognizing that providing support for a student is critical, even when the family is nonsupportive." JA69 (emphasis added).  Moreover, recognizing how complicated and sensitive these issues can be, the Guidelines direct school personnel to contact the Office of Student and Family Support and Engagement for additional support.  JA69.  This is not a policy designed to exclude parents.

Imposing on schools a duty to disclose sensitive student information, as Plaintiffs would have this Court require, would deter the students most in need from seeking school support.  Some transgender and gender-nonconforming students do face perilous situations at home.  *See* Dist. Dkt. 46 at 10-11 (PFLAG

Metro DC Amici Br.). It requires no speculation to recognize that, if transgender and gender-nonconforming students know that their gender identity or expression at school will be reported to their parents even over their objection, those students will decline to seek the support of the school and may well suffer adverse mental-health and educational outcomes as a result. MCPS's interest in ensuring a safe and welcoming learning environment for students is compelling.[4]

### C. Schools Have A Compelling Interest In Not Discriminating Against Transgender And Gender-Nonconforming Students

MCPS has a separate compelling interest in not discriminating against transgender and gender-nonconforming students. *See Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 276 F.Supp.3d 324, 390 (E.D. Pa. 2017), *aff'd*, 897 F.3d 518 (3d Cir. 2018). Even before the Supreme Court's decision in *Bostock v. Clayton County*, 140 S.Ct. 1731 (2020), which held that Title VII's prohibition on discrimination "because of … sex" covers discrimination on the basis of gender

---

[4] Citing *Brown v. Entertainment Merchants Association*, 564 U.S. 786 (2011), Plaintiffs contend that the Guidelines turn on "'predictive judgments' by the State [that] are not sufficient to make a compelling interest," Br. 41-42. *Brown*, a First Amendment case that dealt with a California law prohibiting the sale or rental of "violent video games" to minors, is inapposite. The Court rejected California's argument that the legislature's "predictive judgment" that a causal link existed between violent video games and harm to minors was sufficient in itself to state a narrowly drawn compelling interest. 564 U.S. at 799. Despite Plaintiffs' contrary representations, *Brown* did not announce a far-reaching principle on "predictive judgments." In any case, no similar categorical prohibition is at issue here, nor is the harm to transgender and gender-nonconforming students here predictive, speculative, or ambiguously stated.

identity and sexual orientation, multiple courts had determined that school

districts' discrimination against transgender students violates the Equal Protection

Clause and Title IX.  *See Grimm v. Gloucester Cnty. Sch. Bd.*, 400 F.Supp.3d 444,

458-462 (E.D. Va. 2019) (Title IX and Equal Protection Clause), *aff'd*, 972 F.3d

586 (4th Cir. 2020); *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1

Bd. of Educ.*, 858 F.3d 1034, 1050 (7th Cir. 2017) (Title IX); *Evancho v. Pine–

Richland School District*, 237 F.Supp.3d 267, 293 (W.D. Pa. 2017) (Equal

Protection Clause).  And since *Bostock*, this Court has confirmed that

discrimination against transgender students violates both the Equal Protection

Clause and Title IX.  *Grimm*, 972 F.3d at 616, 619.  The Guidelines work to

prevent such discrimination, ensuring that transgender and gender-nonconforming

students have "equal access and equal opportunity to participate in all programs

and activities at school and [are] otherwise protected from gender-based

discrimination at school."  JA69.

Plaintiffs' assertion (Br. 38) that MCPS's interest in not discriminating

against transgender and gender-nonconforming students "has no relevance" is

unavailing.  Plaintiffs argue that parents, too, have an interest in ensuring that their

children are not subject to discrimination.  *Id*.  That is surely true, but it does not

follow that the Guidelines bear no relation to avoiding discrimination on the basis

of gender identity.  If students are discouraged from seeking the support of their

schools because they fear their gender identity or expression will be disclosed to their parents, schools will be substantially hobbled in their ability to protect those students from discrimination and harassment. Schools cannot act on information that they do not have.

### D.     Schools Have A Compelling Interest In Protecting Student Privacy

Finally, MCPS has a compelling interest in protecting student privacy. The relief Plaintiffs seek would force MCPS to violate the privacy of students who confide in school personnel that they wish to be referred to at school by a name or gender identity other than that assigned at birth. As courts have recognized in cases weighing the privacy rights of families, students retain "the right not to have intimate facts concerning one's life disclosed without one's consent." *Ridgewood*, 430 F.3d at 179; *see also Anspach*, 503 F.3d at 271 ("[M]inors … enjoy constitutional rights of privacy under substantive due process."); *Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52, 74 (1976) ("Constitutional rights do not mature and come into being magically only when one attains the state-defined age of majority.").

Plaintiffs fail to reconcile their demand for nonconsensual disclosure with MCPS's compelling interest in protecting student privacy. Plaintiffs contend (Br. 26-31) that minor children have no legally protected privacy rights vis-à-vis their parents that *preclude* schools from disclosing sensitive information. But that is not

the relevant question.  Rather, the issue is whether schools may, in the exercise of

reasonable educational judgment, *choose* to protect students' privacy in their

gender identity or expression, even if the Constitution does not require it.  The

answer is yes: Schools may reasonably conclude that information about gender

identity is inherently sensitive and private, certainly where the student does not

wish that information to be disclosed.  *See Arroyo Gonzalez v. Rossello Nevares*,

305 F.Supp.3d 327, 333 (D.P.R. 2018) ("[T]here are few areas which [sic] more

closely intimate facts of a personal nature than one's transgender status."

(quotation marks omitted)); *cf. Sterling v. Borough of Minersville*, 232 F.3d 190,

196 n.4 (3d Cir. 2000) (collecting authority recognizing that sexual orientation is

"intrinsically private").  The Guidelines merely acknowledge that certain students,

lacking parental support, may not wish that sensitive and private information be

revealed, and respect those students' wishes.[5]  Plaintiffs' approach, requiring

---

[5] Plaintiffs' citation (Br. 29) to *Ricard*'s analysis of FERPA does not compel
a different conclusion.  There, the court took issue with the district's position that
FERPA *required* that, absent student consent, school personnel must withhold a
student's gender identity from the student's parents.  2022 WL 1471372, at *7.
Neither the Board nor the Guidelines evince such a view of FERPA.  *See* JA42
(noting that disclosure "may violate privacy laws, such as … FERPA").  In any
case, Plaintiffs offer no basis to conclude that FERPA's provisions "empower[ing]
parents to receive information about their minor students" licenses an unqualified
right of access for parents to any and all student records.  Br. 29.  Indeed,
Congress's decision not to provide a private right of action under FERPA suggests
a reasoned judgment that a parents' access to records should not be unlimited.

- 54 -

disclosure in all circumstances, would deny schools' ability to respect those privacy concerns.

### E. The Guidelines Are Narrowly Tailored To Advance All Three Compelling State Interests

As the district court concluded, the Guidelines are narrowly tailored to advance all three of the compelling interests just discussed. JA104-105. The Guidelines do not broadly exclude parents from decision-making concerning their children; on the contrary, they welcome and encourage parental participation whenever possible. At most, they provide children with a zone of protection and privacy when disclosure of their gender expression while at school could lead to serious conflict, and even harm, at home. In addition, (1) they do not coerce students into disclosing "issues relating to gender transformation" or into making decisions relating to gender identity expression; (2) they provide counseling services and other support to protect the safety and well-being of students; and (3) they evaluate students' needs and the family situation on a case-by-case basis. JA68-73.

In short, the Guidelines are the least burdensome means of advancing the schools' compelling interests. Plaintiffs' preferred alternative—that parents be informed of their children's gender identity or expression while at school under all circumstances, even when doing so could expose a student to harm—would fatally undermine those interests. Accordingly, whether the proper standard of review is

rational basis or strict scrutiny (or something in between), the district court

correctly held that Plaintiffs' constitutional claim fails as a matter of law.

## CONCLUSION

The appeal should be dismissed for lack of standing, or, in the alternative,

the district court's order should be affirmed.

Respectfully submitted.

/s/ Alan Schoenfeld

| | |
|---|---|
| BRUCE M. BERMAN | ALAN SCHOENFELD |
| WILMER CUTLER PICKERING | THOMAS K. BREDAR |
| HALE AND DORR LLP | WILMER CUTLER PICKERING |
| 1875 Pennsylvania Avenue NW | HALE AND DORR LLP |
| Washington, DC 20006 | 7 World Trade Center |
| | 250 Greenwich Street |
| SIMON B. KRESS | New York, NY 10007 |
| WILMER CUTLER PICKERING | (212) 230-8800 |
| HALE AND DORR LLP | alan.schoenfeld@wilmerhale.com |
| 60 State Street | |
| Boston, MA 02109 | |

December 28, 2022

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(ii).

1.    Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(f), the brief contains 12,860 words.

2.    The brief has been prepared in proportionally spaced typeface using Microsoft Word for Office 365 in 14 point Times New Roman font.  As permitted by Fed. R. App. P. 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

/s/ Alan Schoenfeld
ALAN SCHOENFELD

December 28, 2022

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of December, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit using the appellate CM/ECF system.  Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ Alan Schoenfeld
ALAN SCHOENFELD