**No. 22-2034**

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

JOHN & JANE PARENTS 1 AND JOHN PARENT 2,

*Plaintiffs-Appellants*,

v.

MONTGOMERY COUNTY BOARD OF EDUCATION ET AL.,

*Defendants-Appellees*.

———————————

On Appeal from a Final Order of the U.S. District for the District of Maryland,
Case No. 8:20-cv-3552-PWG

---

**BRIEF OF THE AMERICAN CIVIL LIBERTIES UNION AS AMICUS
CURIAE IN SUPPORT OF APPELLEES AND AFFIRMANCE**

---

Jon W. Davidson (admitted only in California)
Harper S. Seldin (admitted only in Pennsylvania)
Chase B. Strangio
AMERICAN CIVIL LIBERTIES
  UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(323) 536-9880
jondavidson@aclu.org

*Counsel for Amicus Curiae*

January 4, 2023

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the American Civil

Liberties Union states that it does not have a parent corporation and that no publicly

held corporation owns 10% or more of its stock.

Dated: January 4, 2023          By: */s/ Jon W. Davidson*          .
                                         Jon W. Davidson

                                         *Counsel for Amicus Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................... iii

STATEMENT OF INTEREST ........................................................................1

INTRODUCTION ...........................................................................................2

ARGUMENT ..................................................................................................4

I.     There Is No Fundamental Right for Parents To Be Promptly Notified of a Student's Gender Identity Regardless of the Student's Consent or Potential Negative Outcomes. ...................................................................................5

     A.    Parental Rights Are Broad, but Not Absolute.....................................5

     B.    The Right Proposed by Plaintiffs-Appellants Would Extend Parental Control Over the School Day Beyond the Scope of Constitutional Protections. ..........................................................................................7

     C.    The Guidelines Do Not Provide for Medical Treatment. ...................9

II.    Schools Have a Compelling Interest in Fostering an Environment Conducive to Learning, Which Requires Preventing Discrimination...........11

     A.    An Environment Conducive to Learning Requires Affirming Transgender Students' Gender Identity. ............................................12

     B.    Respecting Transgender Students' Privacy Is Essential to Their Safety and Personal Autonomy...........................................................14

     C.    Inclusivity Benefits Schools at Large. ...............................................16

III.   The Guidelines Are Narrowly Tailored To Further Compelling State Interests. ....................................................................................................17

CONCLUSION .............................................................................................21

CERTIFICATE OF COMPLIANCE .............................................................22

CERTIFICATE OF SERVICE.......................................................................22

# TABLE OF AUTHORITIES

## Cases

*Anspach ex rel. Anspach v. City of Phila., Dep't of Pub. Health*,
  503 F.3d 256 (3d Cir. 2007) ...................................................................9

*Arroyo Gonzalez v. Rossello Nevares*,
  305 F. Supp. 3d 327 (D.P.R. 2018) ....................................................15

*Bailey v. Va. High Sch. League, Inc.*,
  488 F. App'x 714 (4th Cir. 2012) .........................................................7

*Blau v. Fort Thomas Pub. Sch. Dist.*,
  401 F.3d 381 (6th Cir. 2005) .................................................................7

*Bostock v. Clayton County*,
  140 S. Ct. 1731 (2020) .........................................................................16

*Brown v. Bd. of Educ.*,
  347 U.S. 483 (1954) ........................................................................12, 17

*Brown v. Hot, Sexy & Safer Prods., Inc.*,
  68 F.3d 525 (1st Cir. 1995) ....................................................................7

*C.N. v. Ridgewood Bd. of Educ.*,
  430 F.3d 159 (3d Cir. 2005) .............................................................6, 15

*Cal. Parents for the Equalization of Educ. Materials v. Torlakson*,
  973 F.3d 1010 (9th Cir. 2020) ...............................................................6

*Doe by & through Doe v. Boyertown Area Sch. Dist.*,
  276 F. Supp. 3d 324 (E.D. Pa. 2017) ..................................................17

*Doe by & through Doe v. Boyertown Area Sch. Dist.*,
  897 F.3d 518 (3d Cir. 2018)..........................................................passim

*Doe v. Irwin*,
  615 F.2d 1162 (6th Cir. 1980) ...............................................................8

*Doe v. Town of Plymouth*,
  825 F. Supp. 1102 (D. Mass. 1993) .....................................................15

*Evancho v. Pine-Richland Sch. Dist.*,
  237 F. Supp. 3d 267 (W.D. Pa. 2017) ...........................................14, 17

*Fleischfresser v. Dirs. of Sch. Dist. 200*,
15 F.3d 680 (7th Cir. 1994)......................................................................7

*Foote v. Town of Ludlow*,
No. 3:22-cv-30041-MGM (D. Mass. Dec. 14, 2022)......................................9, 10

*Grimm v. Gloucester Cnty. Sch. Bd.*,
400 F. Supp. 3d 444 (E.D. Va. 2019)..................................................17

*Grimm v. Gloucester Cnty. Sch. Bd.*,
972 F.3d 586 (4th Cir. 2020)................................................................passim

*H.B. Rowe Co., Inc. v. Tippett*,
615 F.3d 233 (4th Cir. 2010).................................................................18

*Hodge v. Jones*,
31 F.3d 157 (4th Cir. 1994)....................................................................5

*Kowalski v. Berkeley Cnty. Schs.*,
652 F.3d 565 (4th Cir. 2011)..................................................................12

*Lee v. York Cnty. Sch. Div.*,
484 F.3d 687 (4th Cir. 2007)..................................................................12

*Leebaert v. Harrington*,
332 F.3d 134 (2d Cir. 2003)....................................................................6

*Martinez v. Cui*,
608 F.3d 54 (1st Cir. 2010) ....................................................................7

*New York v. Ferber*,
458 U.S. 747 (1982) ..............................................................................11

*Parents for Privacy v. Barr*,
949 F.3d 1210 (9th Cir. 2020)..................................................1, 5, 6, 8

*Parents United for Better Sch., Inc. v. Sch. Dist. of Phila. Bd. of Educ.*,
148 F.3d 260 (3d Cir. 1998)....................................................................7

*Planned Parenthood of Cent. Mo. v. Danforth*,
428 U.S. 52 (1976) ..................................................................................9

*Shanks v. Blue Cross & Blue Shield United of Wis.*,
979 F.2d 1232 (7th Cir. 1992)..................................................................10

*Soule by Stanescu v. Conn. Ass'n of Schs., Inc.*,
No. 3:20-CV-00201 (RNC), 2021 WL 1617206 (D. Conn. Apr. 25, 2021) ........16

*Sterling v. Borough of Minersville*,
   232 F.3d 190 (3d Cir. 2000) ...................................................................15

*Thomas v. Evansville-Vanderburgh Sch. Corp.*,
   258 F. App'x 50 (7th Cir. 2007) ..........................................................6, 7, 8

*Troxel v. Granville*,
   530 U.S. 57 (2000) ...................................................................................5

*Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
   858 F.3d 1034 (7th Cir. 2017) .............................................................16

**Other Authorities**

Brenda Alvarez, *Why Pronouns Matter*, neaToday (Oct. 5, 2022) ........................11

## STATEMENT OF INTEREST[1]

The American Civil Liberties Union ("ACLU") is a nationwide, non-profit, non-partisan organization with nearly two million members and supporters dedicated to the principles of liberty and equality embodied in the Constitution. As an organization that advocates for lesbian, gay, bisexual, and transgender people to live openly without discrimination and enjoy equal rights, personal autonomy, and freedom of expression and association, the ACLU and its members have a strong interest in preventing discrimination against transgender and gender nonconforming students in public schools. The ACLU has appeared as counsel-of-record and as amicus curiae in many cases nationwide to ensure that transgender students can participate fully in public schools, including as counsel-of-record in *Grimm v. Gloucester County School Board*, 972 F.3d 586 (4th Cir. 2020, *as amended* Aug. 28, 2020), *cert. denied*, 141 S. Ct. 2878 (2021); *Parents for Privacy v. Barr*, 949 F.3d 1210, 1217 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 894 (2020); and *Doe by & through Doe v. Boyertown Area School District*, 897 F.3d 518 (3d Cir. 2018), *cert. denied*, 139 S. Ct. 2636 (2019).

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(2), the ACLU certifies that no person or entity, other than the ACLU, its members, or its counsel, made a monetary contribution to the preparation or submission of this brief or authored the brief in whole or in part. The parties have consented to the filing of amicus briefs.

## INTRODUCTION

Schools cannot provide an environment conducive to learning unless students feel safe, supported, and welcomed. When students face discrimination at school and when their identity and sense of self are undermined, their ability to learn is compromised. Transgender and gender nonconforming students cannot fully participate in school when they are not referred to by the name and pronouns that reflect who they are and how they best understand themselves. The Montgomery County Public School's 2020-2021 Guidelines for Student Gender Identity (the "Guidelines") (JA66-73) seek to affirm transgender and gender nonconforming students' gender identities in school while also keeping them safe and respecting their privacy.

Plaintiffs-Appellants claim the Constitution mandates that public schools must inform a student's parents about what name and pronouns the student asks to be referred to during the school day regardless of the harmful and discriminatory impact on the student's educational opportunities and well-being. Not so. However broad parental rights may be, they do not include a right to require a public school to notify a student's parents about the student's gender identity or transgender status without the student's consent or consideration of potential negative outcomes. Although parents might want to be informed about their child's gender identity, there is no constitutional right for parents to be informed of such information without their

child's consent or without the consideration of potential negative outcomes. Once parents enroll their child in public school, they do not have the right to control every aspect of what transpires during the school day or how their child is taught. A school's decision to refer to students by the names and pronouns that reflect who they are is not medical treatment: being transgender is not a psychiatric condition and calling people (including children and adolescents) by the names and pronouns that reflect how they identify is the floor of respect in civil society. School staff do not become medical providers by simply respecting all students and ensuring that they are safe and welcome at school.

But even if the Guidelines implicated parents' fundamental rights—which the district court correctly decided they do not—the Guidelines are narrowly tailored to further compelling state interests. Public schools have a compelling interest in providing a safe and supportive learning environment for all students, particularly including transgender and gender nonconforming students, who "face unique challenges in the school setting."[2] But those challenges are not insurmountable: transgender and gender nonconforming students thrive when they can participate in school life consistent with their gender identity. Calling students by the name and pronouns that are in accord with their identity is, in this context, part of preventing discrimination and fostering an environment conducive to learning. Schools also

---

[2] *Grimm*, 972 F.3d at 597.

have a compelling interest in respecting students' control over what name and pronouns are used for them and when they want that information shared with others, especially given the risk of familial rejection and homelessness for transgender individuals. Students should not have to sacrifice their privacy or safety as a condition of attending public school.

The Guidelines are narrowly tailored toward furthering these interests and maximizing opportunities for transgender and gender nonconforming students to learn because no student can learn in an environment where they are persistently addressed in a manner that undermines their sense of self or where asking to be addressed by the name and pronouns that reflect who they are risks their privacy and safety.

## ARGUMENT

The Due Process Clause of the Fourteenth Amendment does not encompass a fundamental right for parents "to be promptly informed of their child's gender identity, when it differs from that usually associated with their sex assigned at birth, regardless of their child's wishes or any concerns regarding the detrimental effect the disclosure may have on that child." (JA92.) Given that no fundamental right is implicated, the Guidelines need only have a rational basis. But even if the Guidelines infringed upon a fundamental constitutional right and were subject to strict scrutiny—which the district court correctly determined they were not—they are

narrowly tailored to advance the state's compelling interest in "the safety and well-being of transgender and gender nonconforming students." (JA103.)

## I. There Is No Fundamental Right for Parents To Be Promptly Notified of a Student's Gender Identity Regardless of the Student's Consent or Potential Negative Outcomes.

Even if the Guidelines infringed upon a parent's substantive due process rights, the Plaintiffs-Appellants' challenge fails because they survive strict scrutiny. But as the district court properly held, the Court need not reach that stricter test because the Guidelines do not implicate a fundamental right in the first instance. Though parents possess broad rights over the care of their minor children, those rights are not absolute and do not extend to control over the type of school decision-making at issue here.

### A. Parental Rights Are Broad, but Not Absolute.

Parents do not have an absolute or unqualified right to make decisions concerning their children. Parents have a fundamental right "to make decisions concerning the care, custody, and control of their children," *Troxel v. Granville*, 530 U.S. 57, 66 (2000) (plurality opinion), but that liberty interest "does not reside there exclusively," nor is it beyond regulation "in the public interest." *Barr*, 949 F.3d at 1231. *See also Hodge v. Jones*, 31 F.3d 157, 163-64 (4th Cir. 1994) ("The maxim of familial privacy is neither absolute nor unqualified, and may be outweighed by a legitimate governmental interest."). Parents possess "the right to choose the

5

educational forum, but not what takes place inside the school." *Cal. Parents for the Equalization of Educ. Materials v. Torlakson*, 973 F.3d 1010, 1020 (9th Cir. 2020), *cert. denied sub nom.*, 141 S. Ct. 2583 (2021). Parents "do not have a due process right to interfere with the curriculum, discipline, hours of instruction, or the nature of any other curricular or extracurricular activities," and parental rights are "substantially diminished" once they elect to send their children to public school. *Id.* Parents who disagree with school policies "have the right to remove their children from" public schools, but their right does not extend to requiring particular policies. *Barr*, 949 F.3d at 1230 n.16.

Courts have consistently applied this long-standing principle in a broad range of contexts. *See, e.g.*, *id.* at 1231-33 (no fundamental right to object to school policy allowing transgender students to use single-sex facilities consistent with their gender identity); *Thomas v. Evansville-Vanderburgh Sch. Corp.*, 258 F. App'x 50, 54 (7th Cir. 2007) (private conversation between school counselor and student regarding school performance did not violate parent's right to direct child's upbringing); *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 185 (3d Cir. 2005) (parental rights not violated by child's participation in survey seeking information about drug and alcohol use, sexual activity, physical violence, and suicide attempts); *Leebaert v. Harrington*, 332 F.3d 134, 141 (2d Cir. 2003) (upholding school's mandatory health classes against father's claim of violation of fundamental rights); *Parents United for*

*Better Sch., Inc. v. Sch. Dist. of Phila. Bd. of Educ.*, 148 F.3d 260, 277 (3d Cir. 1998) (upholding school's consensual condom distribution program); *Brown v. Hot, Sexy & Safer Prods., Inc.*, 68 F.3d 525, 533-34 (1st Cir. 1995) (upholding compulsory high school sex education assembly program), *abrogated on other grounds by Martinez v. Cui*, 608 F.3d 54 (1st Cir. 2010); *Fleischfresser v. Dirs. of Sch. Dist. 200*, 15 F.3d 680, 690 (7th Cir. 1994) (parents lacked constitutional right to exempt child from reading program).

**B.     The Right Proposed by Plaintiffs-Appellants Would Extend Parental Control Over the School Day Beyond the Scope of Constitutional Protections.**

Courts have recognized the broad authority of schools to control the school day. "Whether it is the school curriculum, the hours of the school day, school discipline, the timing and content of examinations, the individuals hired to teach at the school, the extracurricular activities offered at the school or . . . a dress code, these issues of public education are generally committed to the control of state and local authorities." *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 395-96 (6th Cir. 2005) (internal quotation marks and citations omitted). The "right to control individual components of their [child's] education . . . is not constitutionally protected." *Bailey v. Va. High Sch. League, Inc.*, 488 F. App'x 714, 716 (4th Cir. 2012) (per curiam). Parental rights do not extend "to control[ling] every aspect of [their] child's education at a public school." *Thomas*, 258 F. App'x at 54 (no

violation of parental rights based on failure to inform parent of counselor's conversations with student, which were "academically oriented conversations when they occurred" about "difficulties functioning and performing at school," *id.* at 52). Simply casting school policies as non-curricular, as Plaintiffs-Appellants attempt to do here (Opening Br. at 14-15), does not create a parental right to interfere in how schools are run.

Parents cannot control every aspect of what transpires during the school day, nor dictate how their children are treated from moment to moment. This is true even when the school provides an educational environment inconsistent with the parents' own views about how their child should be raised. *See, e.g.*, *Barr*, 949 F.3d at 1233 (explaining that "accommodating the different personal, moral, or religious concerns of every parent would be impossible for public schools, because different parents would often likely, as in this case, prefer opposite and contradictory outcomes.") (internal quotations omitted). Although parents' desire to know about the name and pronouns their children have asked to use in public school may be understandable, it is not constitutionally required. *See, e.g.*, *Doe v. Irwin*, 615 F.2d 1162, 1169 (6th Cir. 1980) ("The desire of the parents to know of such activities by their children is understandable. However[,] the only issue before the district court and this court is whether there is a constitutional obligation on the Center to notify them" regarding contraceptive distribution); *see also*, *e.g.*, *Anspach ex rel. Anspach v. City of Phila.*,

*Dep't of Pub. Health*, 503 F.3d 256, 269 (3d Cir. 2007) (holding that there is "no constitutional right to parental notification of a minor child's exercise of reproductive privacy rights.").[3]

### C. The Guidelines Do Not Provide for Medical Treatment.

The fact that social transition may be medically indicated for some transgender youth diagnosed with gender dysphoria does not transform the Guidelines into a form of medical treatment. Social transition may be medically indicated for transgender youth who receive a diagnosis of gender dysphoria;[4] however, individuals who use gender-affirming names and pronouns for transgender students are not themselves prescribing or providing medical care. *See, e.g.*, Order on Defendants' Motion to Dismiss, *Foote v. Town of Ludlow*, Case No. 3:22-cv-30041-MGM (D. Mass. Dec. 14, 2022), Dkt. No. 51, at 9 (explaining that "referring

---

[3] Moreover, "minors are individuals who enjoy constitutional rights of privacy under substantive due process." *Anspach*, 503 F.3d at 271; *accord Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52, 74 (1976) ("Constitutional rights do not mature and come into being magically only when one attains the state-defined age of majority. Minors, as well as adults, are protected by the Constitution and possess constitutional rights.").

[4] According to the American Psychiatric Association's Diagnostic & Statistical Manual of Mental Disorders, "gender dysphoria" is the diagnostic term for the condition experienced by some transgender people of clinically significant distress resulting from the lack of congruence between their gender identity and the sex assigned to them at birth. *See, e.g.*, *Grimm*, 972 F.3d at 594-95.

to a person by their preferred name and pronouns . . . requires no special training or skill").[5]

"Treatment, as commonly understood, occurs when a *health care provider* takes steps to remedy or improve a malady that caused the patient to seek [the provider's] help." *Shanks v. Blue Cross & Blue Shield United of Wis.*, 979 F.2d 1232, 1233 (7th Cir. 1992) (emphasis added). Calling people by names that match who they are and how they feel (whether a given name, nickname, or honorific) and using their pronouns (whether corresponding with a sex assigned at birth or not) is part of "the basic level of respect expected in a civil society generally." Order on Defendants' Motion to Dismiss, *Foote v. Town of Ludlow*, Case No. 3:22-cv-30041-MGM (D. Mass. Dec. 14, 2022), Dkt. No. 51, at 10. But that respect is not itself the provision of medical care—even if it may be medically indicated for some transgender youth—nor does using the chosen name and pronouns for transgender or gender nonconforming students assume a constitutional dimension merely because the students' parents may not be aware of their children's request to the school administration.

School personnel perform any number of tasks during the school day that may relate to a medical condition—for example, reminding a child to use their reading

---

[5] Decision available at https://www.glad.org/wp-content/uploads/2022/10/20221214-Foote-v-Ludlow_Memo-on-MTD.pdf.

glasses, or providing noise-cancelling headphones or a fidget device to a student with sensory accommodations—but a teacher does not become a medical provider by facilitating learning with tools that can help students focus. Using a student's name and pronouns is that kind of facilitation: transgender and gender nonconforming students cannot focus during school if they are persistently addressed using a name and pronouns that undermine their sense of self.[6] Schools are charged with helping students focus and thrive, and the Guidelines do precisely that: create an opportunity for transgender and gender nonconforming students to learn from their teachers and peers by eliminating the distress and distraction of persistent misgendering.

## II. Schools Have a Compelling Interest in Fostering an Environment Conducive to Learning, Which Requires Preventing Discrimination.

The state has a compelling interest in fostering an environment conducive to learning, which includes preventing discrimination against and ensuring the safety and well-being of transgender and gender nonconforming students. The state's compelling interest in protecting children is well-established. *See, e.g.*, *New York v. Ferber*, 458 U.S. 747, 756-57 (1982) ("It is evident beyond the need for elaboration that a State's interest in 'safeguarding the physical and psychological well-being of a minor' is 'compelling.'"). When the state provides public education, "perhaps the

---

[6] *See* Brenda Alvarez, *Why Pronouns Matter*, neaToday (Oct. 5, 2022), https://www.nea.org/advocating-for-change/new-from-nea/why-pronouns-matter.

most important function of state and local governments," it "is a right which must be made available to all on equal terms." *Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954), *supplemented*, 349 U.S. 294 (1955). A school board's "responsibility includes the well-being of the students," *Lee v. York Cnty. Sch. Div.*, 484 F.3d 687, 700 (4th Cir. 2007), and school administrators are charged with "provid[ing] a safe school environment conducive to learning," *Kowalski v. Berkeley Cnty. Schs.*, 652 F.3d 565, 572 (4th Cir. 2011). That "compelling interest in protecting the physical and psychological well-being of minors" extends to "a compelling state interest in not discriminating against transgender students" and "in protecting transgender students from discrimination." *Boyertown*, 897 F.3d at 525, 528-29.

## A. An Environment Conducive to Learning Requires Affirming Transgender Students' Gender Identity.

The government's compelling interest in preventing discrimination and fostering an environment conducive to learning includes ensuring the safety and well-being of transgender and gender nonconforming students. That, in turn, requires affirming their gender identity. As this Court has recognized, "[t]ransgender students face unique challenges in the school setting." *Grimm*, 972 F.3d at 597. "When transgender students face discrimination in schools, the risk to their wellbeing cannot be overstated—indeed, it can be life threatening." *Boyertown*, 897 F.3d at 529. Transgender and gender nonconforming youth "encounter deeply-rooted social stigmas and hostility that often lead to disturbingly high rates of

violence, harassment, and other forms of cruelty and discrimination." *See* Dist. Dkt. 46-1 at 1-2 (Brief of Amici Curiae PFLAG Metro DC et al.). And transgender and gender nonconforming students are harassed at alarming rates in schools. *See Grimm*, 972 F.3d at 612 (explaining that 78% of transgender students are harassed in schools).

Affirming transgender students' gender identity fosters a school environment conducive to learning: transgender students perform as well as their cisgender[7] peers when their gender identity is affirmed with appropriate pronouns and names. *See Boyertown*, 897 F.3d at 523 ("[W]hen transgender students are addressed with gender appropriate pronouns and permitted to use facilities that conform to their gender identity, those students reflect the same, healthy psychological profile as their peers.") (internal quotation marks and footnote omitted). While harassment at school is correlated with negative mental health outcomes, the "opposite is also true []: transgender students have better mental health outcomes when their gender identity is affirmed." *Grimm*, 972 F.3d at 597. Affirming students in this way correlates with lower rates of discrimination, psychological distress, and attempted suicide. *See* Dist. Dkt. 46-1 at 7-9 (Brief of Amici Curiae PFLAG Metro DC et al.) (collecting studies).

---

[7] For cisgender people, "their gender identity—or their 'deeply felt, inherent sense' of their gender—aligns with their sex-assigned-at-birth." *Grimm*, 972 F.3d at 594. "Just like being cisgender, being transgender is natural and is not a choice." *Id.*

That affirmation—including the use of names and pronouns consistent with a student's gender identity—is an essential component to transgender and gender nonconforming students' success in schools.

### B. Respecting Transgender Students' Privacy Is Essential to Their Safety and Personal Autonomy.

Given the undeniable and well-documented discrimination that transgender people experience, there is a compelling interest in allowing students, in the first instance, to determine whether and to what extent to reveal their gender identity in different settings. *See Grimm*, 972 F.3d at 611-12 (explaining the historical discrimination against transgender people, the current challenges facing transgender people in housing and employment, the prevalence of harassment in schools, and transgender people's lack of political power); *Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267, 288 (W.D. Pa. 2017) (finding that "transgender people as a class have historically been subject to discrimination or differentiation"). Transgender and gender nonconforming individuals frequently experience rejection or abuse by their families based on their gender identity, and 40% of those rejected by their families go on to experience homelessness. *See* Dist. Dkt. 46-1 at 11-12 (Brief of Amici Curiae PFLAG Metro DC et al.). Transgender and gender nonconforming students should not be forced to communicate their gender identity to people they are not ready to have it disclosed to in order to have their identity

affirmed at school, *see Boyertown*, 897 F.3d at 530, especially when keeping that information private may be essential to their safety.

In addition to those very real safety concerns, there is a compelling state interest in affording transgender and gender nonconforming students the same kind of informational privacy afforded to others, and not requiring its forfeiture—with respect to their parents, or anyone else—in exchange for being affirmed in their gender identity in school. *See, e.g.*, *Boyertown*, 897 F.3d at 530 (rejecting position that would "very publicly brand all transgender students with a scarlet "T," because transgender students "should not have to endure that as the price of attending their public school."). There is "constitutional significance" to the "right not to have intimate facts concerning one's life disclosed without one's consent." *C.N.*, 430 F.3d at 179. Respecting students' autonomy to decide when and to whom they disclose their gender identity or transgender status is a compelling interest that schools can exercise their judgment to protect. *See, e.g.*, *Arroyo Gonzalez v. Rossello Nevares*, 305 F. Supp. 3d 327, 333 (D.P.R. 2018) (holding that forced disclosure of plaintiffs' transgender status violated their constitutional rights to decisional privacy); *see also*, *e.g.*, *Sterling v. Borough of Minersville*, 232 F.3d 190, 196 n.4 (3d Cir. 2000) (agreeing with the proposition that information about sexual orientation "is intrinsically private"); *Doe v. Town of Plymouth*, 825 F. Supp. 1102, 1107 (D. Mass. 1993) (acknowledging in light of the constitutional right to privacy "implicated by

the disclosure of a broad range of personal information" that the right "encompasses nondisclosure of [] HIV status.").

### C.    Inclusivity Benefits Schools at Large.

The benefits of affirming every student's gender identity extend to the school environment at large. Policies that protect transgender and gender nonconforming students may also "foster[] an environment of inclusivity, acceptance, and tolerance," which "not only serves the compelling interest of protecting transgender students, but it benefits all students by promoting acceptance." *Boyertown*, 897 F.3d at 529.

Those principles of inclusivity, acceptance, and tolerance are not idiosyncratic: they are consistent with an ever-growing body of caselaw regarding transgender and gender nonconforming individuals' constitutional and statutory rights. *See Bostock v. Clayton County*, 140 S. Ct. 1731, 1753 (2020) (holding that Title VII prohibits discrimination on the basis of, *inter alia*, transgender status); *Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1050 (7th Cir. 2017) (same under Equal Protection Clause and Title IX); *see also Soule by Stanescu v. Conn. Ass'n of Schs., Inc.*, No. 3:20-CV-00201 (RNC), 2021 WL 1617206, at *10 (D. Conn. Apr. 25, 2021), *aff'd*, No. 21-1365-CV, 2022 WL 17724715 (2d Cir. Dec. 16, 2022) ("Courts across the country have consistently held that Title IX requires schools to treat transgender students consistent with their

gender identity."); *Grimm v. Gloucester Cnty. Sch. Bd.*, 400 F. Supp. 3d 444, 458-62 (E.D. Va. 2019), *aff'd*, 972 F.3d 586 (4th Cir. 2020, *as amended* Aug. 28, 2020) (discrimination against transgender student violated Equal Protection Clause and Title IX); *Doe by & through Doe v. Boyertown Area Sch. Dist.*, 276 F. Supp. 3d 324, 390 (E.D. Pa. 2017), *aff'd*, 897 F.3d 518 (3d Cir. 2018) (collecting cases for the proposition that school districts violate the Equal Protection Clause and Title IX by precluding transgender students from using the restrooms); *Evancho*, 237 F. Supp. 3d at 294 (discrimination against transgender students violated Equal Protection Clause).

Given the "importance of education to our democratic society" as "the very foundation of good citizenship," including "awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment," *Brown*, 347 U.S. at 493, it is well within schools' purview to foster an environment of inclusivity, acceptance, and tolerance for transgender and gender nonconforming students, not only for the benefit of those particular students, but for all students.

**III.    The Guidelines Are Narrowly Tailored To Further Compelling State Interests.**

The Guidelines are narrowly tailored to ensure that schools can provide for the safety and well-being of students. Parents are not excluded from that process, but neither can they control it. As the district court noted, the Guidelines "explicitly

anticipate parental involvement," while also advising personnel "to avoid disclosing a student's gender identity to their parents without the student's consent, particularly if the student has not yet disclosed their gender identity to their parents, or if the student either expects or knows their parents to be unsupportive." (JA84.)

As this Court has held in other contexts, narrow tailoring requires "serious, good faith consideration of workable race-neutral alternatives," even if the state need not "exhaust . . . every conceivable race-neutral alternative." *H.B. Rowe Co., Inc. v. Tippett*, 615 F.3d 233, 252 (4th Cir. 2010). The Guidelines are narrowly tailored because allowing students to use their chosen name and pronouns without requiring parental notification is the only workable option to protect the state's interest in fostering an environment conducive to learning while preventing discrimination and preserving the safety and well-being of transgender and gender nonconforming students. Transgender students perform as well as their cisgender peers when their gender identity is affirmed with appropriate pronouns and names. *See Boyertown*, 897 F.3d at 523 ("[W]hen transgender students are addressed with gender appropriate pronouns and permitted to use facilities that conform to their gender identity, those students reflect the same, healthy psychological profile as their peers.") (internal quotation marks and footnote omitted). "[T]ransgender students have better mental health outcomes when their gender identity is affirmed." *Grimm*, 972 F.3d at 597. Affirming students in this way correlates with lower rates of

discrimination, psychological distress, and attempted suicide. *See* Dist. Dkt. 46-1 at 7-9 (Brief of Amici Curiae PFLAG Metro DC et al.) (collecting studies).

Schools' other two options are to either force students to use their birth names and pronouns, or to require parental notification or consent before allowing students to use the name and pronouns that reflect who they know themselves to be. Neither furthers the state's interest in fostering an environment conducive to learning, supporting students' well-being and safety, or preventing discrimination. Forcing transgender students to use their birth name and pronouns exposes them to the "life threatening" risks of discrimination, *see Boyertown*, 897 F.3d at 529, when they are already harassed at alarming rates in schools. *See Grimm*, 972 F.3d at 612. And forcing transgender students to notify their parents exposes them to inordinately high risks of familial rejection, which frequently leads to homelessness, among other negative outcomes. *See* Dist. Dkt. 46-1 at 11-12 (Brief of Amici Curiae PFLAG Metro DC et al.). Transgender and gender nonconforming students most effectively learn when they are referred to by the name and pronoun that match who they are, and for many children, school is a place where they can safely explore and affirm their identity before doing so with their parents at home.

The Guidelines, by their own account, are limited in scope: they extend no further than the schoolhouse door. If a student wishes to be called by a certain name and pronouns in the school environment alone, but not at home, then the Guidelines

provide sufficient flexibility on a case-by-case basis to enable school personnel only to use that name and pronouns in school, but nowhere else. (*See* JA68-75.) The Guidelines do not require that parents address their child in any particular way or prevent parents from inculcating their child with their own views about gender identity generally or their child's gender identity specifically. The Guidelines are written such that students, in school, can be addressed in a manner that is conducive to their focus and learning, and are not written with the aim of excluding parents categorically. (*See* JA103-104.) And in any event, schools have wide latitude—even in the face of parental disagreement—to shape and regulate the learning environment.

*      *      *

The Guidelines do not interfere with parents' rights to raise their children as they see fit: they do not provide any medical treatment to students or require parents to adopt any particular views on gender identity generally or their child's gender identity specifically. But even if the Guidelines infringed on some parental right— which they do not—such rights are not absolute, even in their most robust form. Schools have a compelling interest not only in keeping transgender and gender nonconforming students safe, but also in ensuring that they can learn and succeed, which includes honoring students' requests to use gender-affirming names and pronouns in school.

20

## CONCLUSION

Whatever views parents may hold about gender identity generally or their child's gender identity specifically, a parent's fundamental rights do not require a public school to disclose to parents any time their child uses a name or pronoun that is not typically associated with the child's assigned sex at birth. But even if this Court were to find that the Guidelines at issue here did implicate the fundamental rights of parents, they survive strict scrutiny. The government has a compelling interest in fostering an environment conductive to learning and ensuring the health, well-being, and a safe learning environment for all students. No student can succeed when they are persistently undermined and discriminated against because of who they are, and that includes failing to affirm the gender identity of transgender and gender nonconforming students. The Guidelines at issue here are narrowly tailored to advance that compelling interest.

Dated: January 4, 2023              Respectfully submitted,

                                    */s/ Jon W. Davidson*
                                    Jon W. Davidson (admitted only in California)
                                    Harper S. Seldin (admitted only in Pennsylvania)
                                    Chase B. Strangio
                                    AMERICAN CIVIL LIBERTIES
                                      UNION FOUNDATION
                                    125 Broad Street, 18th Floor
                                    New York, NY 10004
                                    (323) 536-9880
                                    jondavidson@aclu.org

                                    *Counsel for Amicus Curiae*

21

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(g), I certify that this brief complies with the type-volume limitation, typeface requirements, and type style requirements of Fed. R. App. P. 32(a) because it contains 4,839 words and has been prepared in a proportionally spaced typeface, 14-point Times New Roman, using the word-processing system Microsoft Word.

Dated: January 4, 2023          By: */s/ Jon W. Davidson*          .
                                              Jon W. Davidson

                                              *Counsel for Amicus Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 4, 2023, I electronically filed the foregoing with the Clerk of Court using the ECF System, which will send notification of such filing to all counsel of record.

Dated: January 4, 2023          By: */s/ Jon W. Davidson*          .
                                              Jon W. Davidson

                                              *Counsel for Amicus Curiae*