No. 22-2034

_____

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

_____

JOHN AND JANE PARENTS 1, *et al.*,
Plaintiff-Appellants,

vs.

MONTGOMERY COUNTY BOARD
OF EDUCATION, *et al.*,
Defendant-Appellees.

_____

On Appeal from Order of the United States District Court
For the District of Maryland
Case No. 8:20-3552-PWG

_____

## BRIEF OF *AMICUS CURIAE* PROFESSORS OF PSYCHOLOGY & HUMAN DEVELOPMENT IN SUPPORT OF DEFENDANT-APPELLEES
_____

Shannon Minter (CA Bar: 168907)
Asaf Orr (CA Bar: 261650)
NATIONAL CENTER FOR
LESBIAN RIGHTS
870 Market Street, Suite 370
San Francisco, CA 94102
T: (415) 392-6257
E: aorr@nclrights.org
   sminter@nclrights.org


*Attorneys for Amicus Curiae*

**TABLE OF CONTENTS**

TABLE OF CONTENTS................................................................................i

TABLE OF AUTHORITIES ...................................................................... ii

INTEREST OF AMICI CURIAE .................................................................1

ARGUMENT ...............................................................................................1

      I.     STATE LAW AND RESEARCH-BASED PUBLIC
             POLICY DEMONSTRATE THAT NOT
             AUTOMATICALLY DISCLOSING CONFIDENTIAL
             INFORMATION TO A STUDENT'S PARENT IN
             LIMITED CIRCUMSTANCES TO PROTECT
             STUDENT SAFETY AND WELLBEING IS A
             COMPELLING GOVERNMENTAL INTEREST..............................4

      II.    REQUIRING SCHOOL PERSONNEL TO
             AUTOMATICALLY DISCLOSE A STUDENT'S
             REQUEST TO USE A DIFFERENT NAME OR
             PRONOUN WHILE IN SCHOOL TO THEIR PARENT
             CAN UNDERMINE A SCHOOL DISTRICT'S
             COMPELLING INTEREST IN THE STUDENT'S
             SAFETY AND WELLBEING.............................................................10

CONCLUSION ..........................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**STATE STATUTES**

105 Ill. Comp. Stat. Ann. 10/5 ................................................................5

Conn. Gen. Stat. Ann. § 10-154a ...........................................................5

Md. Code Ann., Educ. § 7-412 ...........................................................5, 7

N.D. Cent. Code Ann. § 31-01-06.1 .......................................................5

N.J. Stat. Ann. § 18A:40A-7.1 ..............................................................5

N.Y. Educ. Law § 3038 ..........................................................................5

Wisc. Stat. Ann. § 118.126(1)............................................................5, 7

**OTHER AUTHORITIES**

Alida Bouris & Brandon Hill, *Exploring the mother-adolescent relationship as a promote resource for sexual and gender minority youth*, 73 J. of Soc. Issues 618 (2017) ............................................................................14

Am. Acad. of Pediatrics, *Bright Futures: Guidelines for Health Supervision of Infants, Children, and Adolescents* (Hagan et al., eds., 3d ed. 2008) ........................8

Am. Acad. of Pediatrics, Comm. on Adolescence, *The Adolescent Right to Confidential Care When Considering Abortion*, 97 Pediatrics 746 (1996) ..........................9

Am. Coll. of Obstetricians & Gynecologists, *ACOG Committee Opinion 803: Confidentiality in adolescent care* (2020)..................................8

Am. Med. Ass'n, *Opinion 5.055 Confidential care for minors*, 16 AMA J. of Ethics 901 (2014)..........................................................8

Am. Sch. Counselors Ass'n, *The School Counselor and Confidentiality* (2018) ...........................8

Caitlyn Ryan, et al., *Family Rejection as a Predictor of Negative Health Outcomes in White and Latino Lesbian, Gay, and Bisexual Young Adults*, 123 Pediatrics 346 (2009) ................................................11

Caitlyn Ryan, et al., *Parent-Initiated Sexual Orientation Change Efforts With LGBT Adolescents: Implications for Young Adult Mental Health and Adjustment*, 67 J. of Homosexuality 159 (2018).....................................11

Carol A. Ford et al., *Foregone Health Care Among Adolescents*, 282 JAMA 2227 (1999)..................................................6

Carol Ford, et al., *Confidential health care for adolescents: position paper of the Society for Adolescent Medicine*, 35 J. of Adolescent Health 160 (2004) ................................ 8

D.C. Pub. Schs., Transgender & Gender Nonconforming Policy Guidance (Jun. 2015) ........................................................................................................................ 2

Durham Pub. Schs., LGBTQIA+ (Lesbian, Gay, Bisexual, Transgender, Queer, Intersex, Allied/Asexual+) and Gender Supports Policy (Dec. 2022) ...................................... 2

Human Rts. Campaign & Gender Spectrum, *Supporting and Caring for Our Gender Expansive Youth: Lessons from the Human Rights Campaign's Youth Survey* (2014) ........................................................................................................... 12

Joseph G. Kosciw, et al., *2019 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in Our Nation's Schools* 16 (2021) ........................................................................................ 11, 12, 13

Kristina Olson, et al., *Mental health of transgender children who are supported in their identities*, 137 Pediatrics 1 (2016) ...................................................................... 14

Laura E. Durso & Gary J. Gates, *Serving Our Youth: Findings from a National Survey of Services Providers Working with Lesbian, Gay, Bisexual and Transgender Youth Who Are Homeless or At Risk of Becoming Homeless* (2012) ........................................................................................................................ 10

Laurie S. Zabin & Samuel D. Clark, Jr., *Institutional Factors Affecting Teenagers' Choice and Reasons for Delay in Attending a Family Planning Clinic*, 15 Fam. Plan. Persp. 25 (1983) .................................................................... 5

Laurie Zabin et al., *To Whom Do Inner-City Minors Talk About Their Pregnancies? Adolescents' Communications with Parents and Parent Surrogates*, 23 Fam. Plan. Persp. 148 (1992) ...................................................... 9

Lisa Simons, et al., *Parental support and mental health among transgender adolescents*, 53 J. of Adolescent Health 791 (2013) .............................................. 14

Mavis Sanders & Steven Sheldon, *Principals Matter: A Guide to School, Family, and Community Partnerships* (2009) ...................................................................... 4

Melissa Prober, *Please Don't Tell My Parents: The Validity of School Policies Mandating Parental Notification of a Student's Pregnancy*, 71 Brook. L. Rev. 557 (2005) ........................................................................................................ 6

Michelle M. Johns, et al., *Transgender Identity and Experiences of Violence Victimization, Substance Use, Suicide Risk, and Sexual Risk Behaviors Among High School Students - 19 States and Large Urban School Districts, 2017*, 68 MMWR 67 (2019) ........................................................................................ 12

N.J. Dep't of Educ., *Transgender Student Guidance for School Districts* .....................................2

Nat'l Cmte. for Citizens in Educ., *A New Generation of Evidence: The Family is Critical to Student Achievement* (Henderson & Berla, Eds., 1994).............................4

Rhonda Williams & Joseph Wehrman, *Collaboration and Confidentiality: Not a Paradox but an Understanding Between Principals and School Counselors*, 94 NAASP Bull. 107 (2010).........................................................................6

Russell Toomey, et al., *Heteronormativity, school climates, and perceived safety for gender nonconforming peers*, 35 J. of Adolescence 187 (2012).......................................13

Sabra Katz-Wise, et al., *Family functioning and mental health of transgender and gender nonconforming youth in the Trans Teen and Family Narratives project*, 55 J. of Sex Research 582 (2018).................................................14

Sabra Katz-Wise, et al., *LGBT Youth and Family Acceptance*, 63 Pediatric Clinics of N. Am. 1011 (2016)...........................................................................10

Sharon Levy & Miriam Schnizer, *AAP Technical Report: Adolescent Drug Testing Policies in Schools*, 135 Pediatrics e1107 (2015) ........................................7

Stanley K. Henshaw & Kathryn Kost, *Parental Involvement in Minors' Abortion Decisions*, 24 Fam. Plan. Persp. 196 (1992) .........................................9

Stephanie Budge, et al., *A grounded theory study of the development of trans youths' awareness of coping with gender identity*, 27 J. of Child Family Studies 3048 (2018) ........................................................................14

Stephen Russell, et al., *Chosen Name Use Is Linked to Reduced Depressive Symptoms, Suicidal Ideation, and Suicidal Behavior Among Transgender Youth*, 63 J. of Adolescent Health 503 (2018) .........................................13

Tina Cheng, et al., *Confidentiality in health care: a survey of knowledge, perceptions, and attitudes among high school students*, 269 JAMA 1404 (1993).................................................................................6

## INTEREST OF AMICI CURIAE

Dr. Stephanie Budge, Dr. Mollie McQuillan, Dr. Stephen Russell, Dr. Kristina Olson, Dr. Sabra Katz-Wise, Dr. Russell Toomey, and Dr. Katherine Kuvalanka join as *amici* because of their collective understanding that requiring school personnel automatically to disclose information related to a student's sexual orientation, gender identity, gender exploration, or gender expression to the student's parents or guardians—regardless of a student's individual circumstances or potential vulnerability to harm—would contradict best practices regarding the disclosure of potentially sensitive personal information and undermine the school's ability to create a school environment that supports student development and success. *Amici* have extensive experience studying the effects of home and school environments on the development and wellbeing of young people, including LGBTQ+ young people. Drawing from that research, *amici* urge this Court to affirm the district court's dismissal of Plaintiff-Appellants' complaint.[1]

## ARGUMENT

School administrators, counselors, and teachers work every day to meet the myriad needs of students and foster an environment that supports each student's

---

[1] All parties have consented to the filing of this brief. No counsel for a party authored any portion of this brief and no party and no other entity, except *amici* and their counsel, made any monetary contribution toward the preparation or submission of this brief.

academic, social, and emotional growth. Because of the care and support they show students, students often look to school personnel as a resource to help them address issues such as substance misuse, problems with peers, unplanned pregnancy, and problems with family members. School personnel are entrusted to rely on their expertise and professional judgment to provide that guidance; in fact, numerous states protect those conversations from disclosure to encourage students to seek the confidences of school personnel.

Consistent with their legal obligations under federal and state laws and evidence-based best practices, state education agencies and school districts adopted policies to ensure that transgender students—like all other students—feel safe at school and can learn and grow. *See, e.g.*, Durham Pub. Schs., LGBTQIA+ (Lesbian, Gay, Bisexual, Transgender, Queer, Intersex, Allied/Asexual+) and Gender Supports Policy (Dec. 2022), *available at*, https://go.boarddocs.com/nc/dpsnc/Board.nsf/goto?open&id=CLXMFD58A27C (last visited Jan. 2, 2023); D.C. Pub. Schs., Transgender & Gender Nonconforming Policy Guidance (Jun. 2015), *available at*, https://dcps.dc.gov/sites/default/files/dc/sites/dcps/publication/attachments/DCPS%20Transgender%20Gender%20Non%20Conforming%20Policy%20Guidance.pdf (last visited Jan. 2, 2023); N.J. Dep't of Educ., *Transgender Student Guidance for School Districts*, available at, https://nj.gov/education/students/safety/sandp/transgender/Guidance.pdf (last

visited Jan. 2, 2023). Those policies also help guide school personnel in exercising their professional judgment to address the needs of transgender students, including around the disclosure of a student's transgender status. The disclosure of that sensitive information can have a significant effect on the social and emotional wellbeing of a transgender student and, as such, needs to be approached with care. The guidelines at issue in this appeal do precisely that. By encouraging school personnel to engage the student in a discussion about the disclosure of this information, the guidelines appropriately protect sensitive and confidential information and ensure that school personnel assess the supports a student may need, including supports for building family acceptance.

The district court correctly concluded that the Montgomery County Board of Education's Guidelines do not infringe on Plaintiff-Appellants' constitutional rights. The guidelines adopted by Defendant-Appellees are consistent with evidence-based best practices regarding the disclosure of confidential student information and the health and wellbeing of transgender students, significantly furthering the district's educational mission. Therefore, the guidelines satisfy any level of constitutional scrutiny and this Court should affirm the district court's dismissal of Plaintiff-Appellants' complaint.

I.    **State law and research-based public policy demonstrate that not automatically disclosing confidential information to a student's parent in limited circumstances to protect student safety and wellbeing is a compelling governmental interest.**

Schools are often referred to as a student's home away from home. Like parents, schools are invested in their students. Administrators and school personnel strive to build an environment that is welcoming and inclusive of all students so that students can thrive socially, emotionally, and academically. Because of that common interest, school personnel and parents are natural collaborators. Schools strive to maintain open lines of communication with a student's parents and to encourage open communication between students and parents. Doing so is important for many reasons, including that it may provide school personnel with an opportunity to share information and resources that will help parents support their child in navigating difficult circumstances. Unsurprisingly, research demonstrates the benefits of such partnerships. *See generally*, Mavis Sanders & Steven Sheldon, *Principals Matter: A Guide to School, Family, and Community Partnerships* (2009); Nat'l Cmte. for Citizens in Educ., *A New Generation of Evidence: The Family is Critical to Student Achievement* (Henderson & Berla, Eds., 1994).

Maintaining open communication with parents is the ideal method for supporting student development and growth; however, as numerous state laws have long recognized, there are limited circumstances where schools must—consistent with their obligations to protect students—respect students' confidentiality when

failing to do so may deter them from seeking support or put them at risk of harm. *See, e.g.*, Md. Code Ann., Educ. § 7-412 (designating information provided by students to school mental health professionals regarding substance abuse as confidential and not subject to disclosure absent consent of the student); Conn. Gen. Stat. Ann. § 10-154a (same); N.J. Stat. Ann. § 18A:40A-7.1 (same); N.Y. Educ. Law § 3038; Wisc. Stat. Ann. § 118.126(1) (same); 105 Ill. Comp. Stat. Ann. 10/5 (protecting information provided to school-based mental health providers as confidential and not subject to disclosure to parents); N.D. Cent. Code Ann. § 31-01-06.1 (same).

Importantly, research has documented that for many students, being able to confide confidentially in school personnel is critical to students' willingness to seek adult support. School employees are a likely source for that support because of the convenience of talking with them since doing so generally does not require obtaining parental permission or assistance to go somewhere such as a therapist's office. Laurie S. Zabin & Samuel D. Clark, Jr., *Institutional Factors Affecting Teenagers' Choice and Reasons for Delay in Attending a Family Planning Clinic*, 15 Fam. Plan. Persp. 25 (1983). Research repeatedly shows that without confidentiality protections many young people would rather forgo seeking help than risk their parents finding

out.[2] *See, e.g.*, Carol A. Ford et al., *Foregone Health Care Among Adolescents*, 282 JAMA 2227 (1999); Rhonda Williams & Joseph Wehrman, *Collaboration and Confidentiality: Not a Paradox but an Understanding Between Principals and School Counselors*, 94 NAASP Bull. 107, 110 (2010) ("99% of participants identified confidentiality as essential (53%) or important (46%) in their decision to seek help from a school counselor"); Tina Cheng, et al., *Confidentiality in health care: a survey of knowledge, perceptions, and attitudes among high school students*, 269 JAMA 1404 (1993). In those limited circumstances, state laws and research-based best practices prohibit automatic disclosure of sensitive information to a student's parent or guardian, opting instead for a flexible and individualized assessment of the student and situation that focuses on family support. Guided by the best interests of the students, those policies—including the guidelines at issue here—safeguard the ability of students to obtain support from trusted adults in navigating difficult—if not, crisis—situations.

As noted above, many states have enacted confidentiality provisions related to students in school. The most common examples are statutes and policies governing the confidentiality of reports of substance abuse and access to

---

[2] Melissa Prober, *Please Don't Tell My Parents: The Validity of School Policies Mandating Parental Notification of a Student's Pregnancy*, 71 Brook. L. Rev. 557, 575 n.108 (2005) (breaching student confidentiality can have a chilling effect, causing students to forgo seeking other health-related services from the school).

reproductive healthcare, including pregnancy-related services. For example, Maryland law has long recognized a privileged relationship between school personnel and student "who seek[] information to overcome any form of drug abuse." Md. Code Ann., Educ. § 7-412(a). Those communications are safeguarded from disclosure without exception. *Id.* at § 7-412(b). Some states permit disclosure, but only in very limited circumstances, including the student provides written consent for the disclosure or that the disclosure is required to prevent "serious and imminent danger to the health, safety or life of any person and . . . . [n]o more information than is required to alleviate the serious and imminent danger may be disclosed." *See, e.g.*, Wisc. Stat. Ann. § 118.126(1)(a)–(c). In contrast, policies that mandate automatic disclosure of sensitive information to parents, such as random drug testing of students, can undermine the school environment by sowing distrust between school personnel and students, and encouraging students to engage in more dangerous behavior to evade detection—for example, by using drugs that are not typically tested for, even though those drugs have a higher morbidity and mortality rates. *See* Sharon Levy & Miriam Schnizer, *AAP Technical Report: Adolescent Drug Testing Policies in Schools*, 135 Pediatrics e1107 (2015). As a result, the American Academy of Pediatrics does not support school-based drug testing programs. *Id.*

Likewise, research-based best practices regarding the confidentiality of a student's pregnancy strongly support confidentiality and respect for the student's

decision regarding if, and when, to disclose that information to their parent or guardian. Those best practices have been adopted by many major associations of professionals working with young people in the United States. Am. Sch. Counselors Ass'n, *The School Counselor and Confidentiality* (2018), *available at*, https://www.schoolcounselor.org/Standards-Positions/Position-Statements/ASCA-Position-Statements/The-School-Counselor-and-Confidentiality (last visited Jan. 2, 2023); Am. Coll. of Obstetricians & Gynecologists, *ACOG Committee Opinion 803: Confidentiality in adolescent care* (2020), *available at*, https://www.acog.org/clinical/clinical-guidance/committee-opinion/articles/2020/04/confidentiality-in-adolescent-health-care (last visited Jan. 2, 2023); Am. Med. Ass'n, *Opinion 5.055 Confidential care for minors*, 16 AMA J. of Ethics 901 (2014); Am. Acad. of Pediatrics, *Bright Futures: Guidelines for Health Supervision of Infants, Children, and Adolescents* (Hagan et al., eds., 3d ed. 2008); Carol Ford, et al., *Confidential health care for adolescents: position paper of the Society for Adolescent Medicine*, 35 J. of Adolescent Health 160 (2004).

In practice, this confidentiality is most often time limited: long enough to support the student in coping with the immediate situation while providing the student the tools and support they need to disclose this information to their parent or guardian. For example, one study found that around ninety percent of students who become pregnant eventually disclose that information to at least one parent. Laurie

Zabin et al., *To Whom Do Inner-City Minors Talk About Their Pregnancies? Adolescents' Communications with Parents and Parent Surrogates*, 23 Fam. Plan. Persp. 148, 151 (1992). At the same time, there is no evidence that forcing school personnel to disclose confidential information is correlated with positive familial communication or outcomes. Am. Acad. of Pediatrics, Comm. on Adolescence, *The Adolescent Right to Confidential Care When Considering Abortion*, 97 Pediatrics 746 (1996). In fact, research strongly indicates the opposite is true; minors whose parents found out about the minor's pregnancy from a third party were two to four times more likely to face adverse consequences. Stanley K. Henshaw & Kathryn Kost, *Parental Involvement in Minors' Abortion Decisions*, 24 Fam. Plan. Persp. 196 (1992).

Longstanding public policy in states across the country and well-established evidence-based best practices demonstrate that, in limited circumstances, there are significant benefits to protecting student confidentiality, including fostering a supportive school environment that promotes student development and success, protecting students from harm, and maximizing the likelihood that students will share sensitive information with parents while avoiding the negative consequences that often result from compelled third-party disclosures. Protecting student confidentiality provides school personnel with the flexibility to work with students and support them to disclose private information to their parents. It may also help

parents make more informed parenting decisions by learning from the expertise and experience of school personnel who have worked with numerous students facing these similar difficult circumstances. Mandating disclosure, however, may put students at risk of serious harms by deterring them from seeking any adult support and undermining their relationship with their parents.

## II. Requiring school personnel to automatically disclose a student's request to use a different name or pronoun while in school to their parent can undermine a school district's compelling interest in the student's safety and wellbeing.

For many of the same reasons that schools are required to maintain student confidentiality in the context of pregnancy and substance abuse (which principally are issues some older students may face), it is critical that schools also safeguard the confidentiality of students of any age who are exploring their gender identity, some of whom may be transgender. Transgender young people experience high levels of family rejection. Approximately one third of transgender youth are rejected by family after disclosing their transgender status. Sabra Katz-Wise, et al., *LGBT Youth and Family Acceptance*, 63 Pediatric Clinics of N. Am. 1011 (2016). The fear of rejection causes another third of transgender young people to keep that information from their families. *Id.*

The negative effects of family rejection are serious and well-documented. In the short-term, family rejection can result in verbal or physical abuse, homelessness, and attempts to change the child's sexual orientation or gender identity. Caitlyn

Ryan, et al., *Parent-Initiated Sexual Orientation Change Efforts With LGBT Adolescents: Implications for Young Adult Mental Health and Adjustment*, 67 J. of Homosexuality 159 (2018); Laura E. Durso & Gary J. Gates, *Serving Our Youth: Findings from a National Survey of Services Providers Working with Lesbian, Gay, Bisexual and Transgender Youth Who Are Homeless or At Risk of Becoming Homeless* (2012), *available at*, https://williamsinstitute.law.ucla.edu/wp-content/uploads/Serving-Our-Youth-July-2012.pdf (last visited Jan. 2, 2023). Family rejection also has significant long-term effects. For example, those who experience high levels of family rejection were over eight times more likely to have attempted suicide as compared to twice as likely among families who were moderately rejecting (*i.e.* responded to their child's gender identity with both supportive and rejecting behaviors). Caitlyn Ryan, et al., *Family Rejection as a Predictor of Negative Health Outcomes in White and Latino Lesbian, Gay, and Bisexual Young Adults*, 123 Pediatrics 346 (2009). Those who had a highly rejecting family were also six times more likely to experience severe depression. *Id.*

Transgender people experience pervasive discrimination by employers, healthcare providers, and places of public accommodation. For many transgender young people, school is not a safe place. Joseph G. Kosciw, et al., *2019 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in Our Nation's Schools* 16 (2021) (finding over forty percent of

LGBTQ students did not feel safe at school felt unsafe because of how they expressed their gender); *see also* Michelle M. Johns, et al., *Transgender Identity and Experiences of Violence Victimization, Substance Use, Suicide Risk, and Sexual Risk Behaviors Among High School Students — 19 States and Large Urban School Districts, 2017*, 68 MMWR 67 (2019), *available at*, http://dx.doi.org/10.15585/mmwr.mm6803a3 (last visited Jan. 2, 2023); Human Rts. Campaign & Gender Spectrum, *Supporting and Caring for Our Gender Expansive Youth: Lessons from the Human Rights Campaign's Youth Survey* 10 (2014). More than forty percent of students surveyed for the National School Climate Survey reported hearing anti-transgender epithets or remarks by either frequently or often, and more than half reported the same about negative remarks regarding gender expression. Kosciw, *2019 National School Climate Survey* at 22. Transgender students are often the targets of multiple forms of bullying and harassment, such as verbal harassment, relational aggression, and physical assault.

In contrast, research has shown that transgender youth benefit greatly from supportive school environments. For example, transgender students in schools or districts with policies that addressed the specific needs of transgender students were less likely to hear negative remarks about transgender people, less likely to miss school because they felt unsafe or uncomfortable, and reported experiencing less bullying and harassment. *Id.* at 69–79. Those students also reported feeling a greater

sense of belonging to the school community, which is correlated with improvements in academic motivation and achievement. *Id.* Students who reported being taught curriculum that was inclusive of LGBTQ people, or that had support from school personnel, also felt safer in school, had higher grades, and higher educational aspirations. *Id.*; *see also* Russell Toomey, et al., *Heteronormativity, school climates, and perceived safety for gender nonconforming peers*, 35 J. of Adolescence 187 (2012) (finding schools with LGBTQ-inclusive curriculum and presence of GSA were perceived by students to be safer).

The benefits of a positive and supportive school environment are not just academic. Being bullied and harassed less frequently at school is associated with better self-esteem and lower levels of depression. Kosciw, *2019 National School Climate Survey*, at 52–53. Even something as simple as referring to a transgender student by their chosen name and correct pronouns significantly decreases symptoms of severe depression. Stephen Russell, et al., *Chosen Name Use Is Linked to Reduced Depressive Symptoms, Suicidal Ideation, and Suicidal Behavior Among Transgender Youth*, 63 J. of Adolescent Health 503 (2018). Policies that safeguard the confidentiality of a student's transgender identity or gender exploration and promote family involvement, like the guidelines adopted by the Montgomery County Board of Education, help foster a welcoming learning environment in schools throughout the district.

Supportive policies also provide schools an opportunity to facilitate positive communication between students and their parents. This includes being a resource for building family acceptance and support, which is a strong protective factor as a child moves into adolescence and adulthood. *See, e.g.*, Stephanie Budge, et al., *A grounded theory study of the development of trans youths' awareness of coping with gender identity*, 27 J. of Child Family Studies 3048 (2018); Sabra Katz-Wise, et al., *Family functioning and mental health of transgender and gender nonconforming youth in the Trans Teen and Family Narratives project*, 55 J. of Sex Research 582 (2018); Alida Bouris & Brandon Hill, *Exploring the mother-adolescent relationship as a promotive resource for sexual and gender minority youth*, 73 J. of Soc. Issues 618 (2017); Kristina Olson, et al., *Mental health of transgender children who are supported in their identities*, 137 Pediatrics 1 (2016); Lisa Simons, et al., *Parental support and mental health among transgender adolescents*, 53 J. of Adolescent Health 791 (2013).

In sum, the guidelines adopted by Defendant-Appellees are consistent with laws and policies addressing other sensitive issues, such as disclosures relating to substance abuse and pregnancy. The guidelines further compelling governmental interests in promoting student wellbeing and protecting students from potentially serious harms. And they are firmly grounded in research and evidence-based best practices, including evidence that compelled disclosure of sensitive information is

likely to undermine rather than support students' relationships with their parents.

## CONCLUSION

The district court correctly concluded Plaintiff-Appellants failed to allege a violation of their constitutional right to parent their children and, even if such a right applied in this circumstance, that the guidelines adopted by Defendant-Appellees furthers significant governmental interests. *Amici* respectfully urge this Court to affirm the dismissal Plaintiff-Appellants' complaint.


Dated: January 4, 2023.

Respectfully submitted,

/s/ Asaf Orr
NATIONAL CENTER FOR
LESBIAN RIGHTS
Shannon Minter (CA Bar: 168907)
Asaf Orr (CA Bar: 261650)
870 Market Street, Suite 370
San Francisco, CA 94102
Telephone:  (415) 392-6257
Facsimile:  (415) 392-8442
Email:        aorr@nclrights.org
                  sminter@nclrights.org



*Attorneys for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

I hereby certify:

1.     This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 29(a)(5) because it contains 3,113 words, as determined by the word-count function of Microsoft Word, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.     This brief complies with the type-face requirements and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.


Dated: January 4, 2023

/s/ Asaf Orr                              
Attorney for Amicus Curiae

-16-

## CERTIFICATE OF SERVICE

I certify that on January 4, 2023, I caused a true and accurate copy of the

foregoing document to be electronically filed with the Clerk of the Court for the

United States Court of Appeals for the Fourth Circuit through the CM/ECF system.

I further certify that the participants in this case are registered CM/ECF

users and that service will be accomplished by the CM/ECF system.


/s/ Asaf Orr
Attorney for Amicus Curiae

-17-