No. 22-2034

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

---

JOHN and JANE PARENTS 1 and JOHN PARENT 2,

*Plaintiffs-Appellants,*

v.

MONTGOMERY COUNTY BOARD OF EDUCATION, *et al.*,

*Defendants-Appellees.*

---

On Appeal from a Judgment of the United States District Court
for the District of Maryland (before the Hon. Paul W. Grimm)
Case No. 8:20-cv-3552-PWG

---

**BRIEF OF AMICI CURIAE MASSACHUSETTS, CALIFORNIA, COLORADO, CONNECTICUT, THE DISTRICT OF COLUMBIA, HAWAI'I, ILLINOIS, MARYLAND, MINNESOTA, NEW JERSEY, NEW YORK, OREGON, RHODE ISLAND, VERMONT, AND WASHINGTON IN SUPPORT OF DEFENDANTS-APPELLEES**

---

MAURA HEALEY
  *Attorney General*
  *Commonwealth of Massachusetts*
David C. Kravitz*
  *Deputy State Solicitor*
Adam M. Cambier
Cassandra J. Thomson
  *Assistant Attorneys General*
One Ashburton Place
Boston, MA 02108
david.kravitz@mass.gov
(617) 963-2427
  *Counsel of Record*
*Additional counsel listed on signature page*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................... ii

INTERESTS OF AMICI.............................................................1

ARGUMENT ...........................................................................3

    I.    The States Have Broad Discretion To Shape The School
        Environment To Ensure That Students Succeed..................................3

        A.    States use the public school system to educate the next
             generation of citizens. .................................................3

        B.    States are vested with meaningful discretion to shape
             school policies..........................................................6

        C.    Plaintiffs' proposed framework creates significant
             burdens on State and local governments' ability to fulfill
             the mission of their schools.........................................10

    II.    States Have An Interest In Making Schools A Safe And
        Supportive Environment For All Youth, Including Transgender
        Youth. ....................................................................15

        A.    All students benefit from safe and supportive schools. ............15

        B.    Transgender youth face unique struggles that are
             addressed through a safe and supportive school
             environment. ..........................................................22

CONCLUSION ......................................................................29

CERTIFICATE OF COMPLIANCE.....................................................32

i

# TABLE OF AUTHORITIES

**Cases**

*Ambach v. Norwick*,
    441 U.S. 68 (1979) ............................................................ 3-6, 9

*Bailey v. Va. High Sch. League, Inc.*,
    488 F. App'x 714 (4th Cir. 2012) ..................................... 9

*Bethel Sch. Dist. No. 403 v. Fraser*,
    478 U.S. 675 (1986) .......................................................... 4

*Bd. of Ed., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
    457 U.S. 853 (1982) ......................................................... 6-7

*Blau v. Ft. Thomas Pub. Sch. Dist.*,
    401 F.3d 381 (6th Cir. 2005) ............................................ 9

*Brown v. Bd. of Education*,
    347 U.S. 483 (1954) ......................................................... 3, 5

*Curtis v. Sch. Comm. of Falmouth*,
    652 N.E.2d 580 (Mass. 1995) .......................................... 10

*Earls ex rel. Earls v. Bd. of Ed. of Tecumseh Pub. Sch. Dist.*,
    242 F.3d 1264 (10th Cir. 2001) ....................................... 11-12

*Edwards v. Aguillard*,
    482 U.S. 578 (1987) .......................................................... 6

*Epperson v. Arkansas*,
    393 U.S. 97 (1968) ............................................................ 6

*Fields v. Palmdale Sch. Dist.*,
    427 F.3d 1197 (9th Cir. 2005) .......................................... 13

*Grimm v. Gloucester Cnty. Sch. Bd.*,
    972 F.3d 586 (4th Cir. 2020) ............................................ 7

*Herndon v. Chapel Hill-Carrboro City Bd. of Ed.*,
    89 F.3d 174 (4th Cir. 1996) .......................................................8, 9

*Howe v. Aytes*,
    No. 2:14-cv-00077, 2016 WL 3262600 (M.D. Tenn. June
    10, 2016) .......................................................................................10

*Hugger v. Rutherford Inst.*,
    94 F. App'x 162 (4th Cir. 2004) ...................................................5

*Immediato v. Rye Neck Sch. Dist.*,
    73 F.3d 454 (2d Cir. 1996) ...........................................................9

*John and Jane Parents 1 v. Montgomery Cnty. Bd. of Ed.*,
    No. 8:20-cv-3552-PWG, 2022 WL 3544256 (D. Md. Aug.
    18, 2022) ............................................................................ 7-8, 13

*Kahn v. East Side Union High Sch. Dist.*,
    75 P.3d 30 (Cal. 2003) ................................................................12

*Kite v. Marshall*,
    661 F.2d 1027 (5th Cir. 1981) ....................................................10

*Littlefield v. Forney Indep. Sch. Dist.*,
    268 F.3d 275 (5th Cir. 2001) ......................................................10

*Mahanoy Area Sch. Dist. v. B.L.*,
    141 S. Ct. 2038 (2021)................................................................15

*McCollum v. Bd. of Ed. of Sch. Dist. No. 71*,
    333 U.S. 203 (1948)............................................................. 4-5, 9

*San Antonio Indep. Sch. Dist. v. Rodriguez*,
    411 U.S. 1 (1973)..........................................................................3

*Sch. Dist. of Abington Twshp. v. Schempp*,
    374 U.S. 203 (1963)......................................................................5

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
    393 U.S. 503 (1969)............................................................6, 7

*Vernonia Sch. Dist. 47J v. Acton*,
    515 U.S. 646 (1995)..............................................................11

*Wisconsin v. Yoder*,
    406 U.S. 205 (1972)........................................................5, 6, 7

**Constitutional Provisions, Statutes, and Rules**

Cal. Educ. Code § 220 ...........................................................28

Mass. Gen. Laws ch. 69, § 1P.............................................17, 21

Mass. Gen. Laws ch. 76, § 5 ..................................................28

Md. Code Regs. §§ 13A.01.06.03(B)(5)(d), 13A.01.06.04 ...................28

**Miscellaneous**

*2022 National Survey on LGBTQ Youth Mental Health*, The Trevor
    Project (2022) ...........................................................22, 24-25

*About*, Nat'l Ctr. on Safe Supportive Learning Environments (2022) ...................16

Ashley Austin et al., *Suicidality Among Transgender Youth:*
    *Elucidating the Role of Interpersonal Risk Factors*, 37 J.
    Interpersonal Violence 2696 (2022).............................................24

Isabel Brito et al., *Do You Trust Me? A Systematic Literature Review*
    *on Student-teacher Trust and School Identification*, The
    European Conference on Ed. 2021 (Sept. 2021) .........................................19

Linda Darling-Hammond et al., *Implications for educational*
    *practice of the science of learning and development*, 24
    Applied Developmental Sci. 97 (Feb. 17, 2019)............................. 17, 19-20

*Equality Maps: Safe Schools Laws*, Movement Advancement Project
(2022) ........................................................................................... 28

Marina Feijo et al., *Improving School Outcomes for Transgender
and Gender-Diverse Youth: A Rapid Review*, 9(1) Policy
Insights from the Behavioral and Brain Sciences 27 (2022) ................... 20, 22

*Frequently Asked Questions*, Cal. Dep't of Educ. (2021) ....................................... 29

*Guidance for Massachusetts Public Schools Creating a Safe and
Supportive School Environment*, Mass. Dep't of Elementary
and Secondary Ed. (2022) ............................................................. 28

Ann P. Haas et al., *Suicide Attempts Among Transgender and
Gender Non-Conforming Adults: Findings of the National
Transgender Discrimination Survey*, Am. Found. for Suicide
Prevention & Williams Inst. (2014) .............................................. 24

Sandy E. James et al., *The Report of the 2015 U.S. Transgender
Survey*, Nat'l Ctr. for Transgender Equal. 131 (2016) .................................. 24

Michelle M. Johns et al., *Transgender Identity and Experiences of
Violence Victimization, Substance Use, Suicide Risk, and
Sexual Risk Behaviors Among High School Students — 19
States and Large Urban School Districts, 2017*, 68 Morbidity
& Mortality Weekly Report 67 (2019) .......................................... 23

Michelle Marie Johns et al., *Protective factors among transgender
and gender variant youth: A systematic review by
socioecological level*, 39(3) J. Primary Prevention 263 (2018) ................... 27

Michelle Marie Johns et al., *Trends in violence victimization and
suicide risk by sexual identity among high school students —
Youth Risk Behavior Survey, United States, 2015-2019*,
69(Suppl-1) Morbidity and Mortality Weekly Report Suppl.
(Aug. 21, 2020) ............................................................................. 26

Laurie Kincade et al., *Meta-Analysis and Common Practice Elements of Universal Approaches to Improving Student-Teacher Relationships*, 90(5) Review of Ed. Rsch. 711 (Aug. 4, 2020) ................................................................................19

Joseph G. Kosciw et al., *The 2019 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in Our Nation's Schools*, GLSEN (2019) ...............................26

Joseph G. Kosciw et al., *The 2021 National School Climate Survey: The Experiences of LGBTQ+ Youth in Our Nation's Schools*, GLSEN (2022)................................................................ 22-23, 25

Benjamin Kutsyuruba et al., *Relationships among school climate, school safety, and student achievement and well-being: a review of the literature*, 3 British Ed. Rsch. Ass'n 103 (June 30, 2015) ................................................................................17

*Legal Advisory*, Cal. Dep't of Educ. (2021) .........................................29

Nicole Legate et al., *Is Coming Out Always a "Good Thing"? Exploring the Relations of Autonomy Support, Outness, and Wellness for Lesbian, Gay, and Bisexual Individuals*, 3 Social Psychological & Personality Sci. 145 (2012)......................................... 13-14

Jenifer K. McGuire et al., *School Climate for Transgender Youth: A Mixed Method Investigation of Student Experiences and School Responses*, J. Youth & Adolescence 1187 (April 2010) ............. 26-27

Roxanne Mitchell et al., *Student trust in teachers and student perceptions of safety: positive predictors of student identification with school*, 21 Int'l J. Leadership Ed. 135 (May 2016) ........................................................................ 17-20

Kristina R. Olson et al., *Mental Health of Transgender Children Who Are Supported in Their Identities*, 137(3) Pediatrics (2016)................................................................................27

Monika Platz, *Trust Between Teacher and Student in Academic Education at School*, 55 J. Phil. Ed. 688 (2021) ...........................................11

M D Resnick et al., *Protecting adolescents from harm. Findings from the National Longitudinal Study on Adolescent Health*, 278 J. Am. Med. Ass'n 823 (Sept. 10, 1997).........................................20-21

Sara Rimm-Kaufman & Lia Sandilos, *Improving Students' Relationships with Teachers to Provide Essential Supports for Learning*, Am. Psychological Ass'n (2015)....................................................11

*Safe & Supportive Schools*, Office of Elementary and Secondary Ed. (2022)...............................................................................................16

*Safe and Supportive Schools Project*, Am. Psychological Ass'n (2014)...............................................................................................16

*Safe and Supportive Schools Self-Reflection Tool*, Mass. Dep't of Elementary and Secondary Ed. (2022)...........................................21

*School Connectedness Helps Students Thrive*, Ctrs. for Disease Control and Prevention (Sept. 28, 2022)......................................17

*Separation and Stigma: Transgender Youth and School Facilities*, Movement Advancement Project & GLSEN (2017) .................22-23, 25, 27

Riley J. Steiner et al., *Adolescent Connectedness and Adult Health Outcomes*, 144(1) Pediatrics 1 (Jul. 1, 2019) ................................21

*The Trevor Project Research Brief: LGBTQ & Gender-Affirming Spaces*, The Trevor Project (December 2020) .............................27

Jenna Howard Terrell et al., *Conceptualizing and Measuring Safe and Supportive Schools*, 24 Contemporary Sch. Psychology 327 (Aug. 2020)..............................................................................16

Nhan L. Truong et al., *Erasure and Resilience: The Experiences of LGBTQ Students of Color—Black LGBTQ Youth in U.S. Schools*, GLSEN (2020) ...............................................................23

Megan Tschannen-Moran et al., *Student Academic Optimism: A confirmatory factor analysis*, 51 J. Educ. Admin. 151 (Mar. 2013) ................................................................................. 18-19

Russell M. Viner et al., *Adolescence and the social determinants of health*, 379(9826) Adolescent Health 1641 (Apr. 28, 2012) ........................20

## INTERESTS OF AMICI

The *Amici* States—Massachusetts, California, Colorado, Connecticut, the District of Columbia, Hawai'i, Illinois, Maryland, Minnesota, New Jersey, New York, Oregon, Rhode Island, Vermont, and Washington—file this brief pursuant to Fed. R. App. P. 29(a)(2) because we share sovereign and compelling interests in making schools safe places for all students. Defendants-Appellees Montgomery County Board of Education ("MCBE") and its members, like other school authorities around the country, are charged with one of the most important functions of government—nurturing successive generations of children into capable citizens of a diverse and unified nation. In recognition of the paramount importance of this responsibility, courts (including this Court) have long afforded State and local governments significant discretion to shape school policies in order to best serve this goal, so long as they act within the constraints of federal law, including both the Constitution and federal antidiscrimination law.

The *Amici* States respectfully submit this brief to underscore the breadth of this policy discretion invested in our local schools, the problems posed by Plaintiffs' proposed judicial intervention in school policymaking, and the reasons why MCBE's chosen policy here serves important governmental purposes. MCBE has exercised its discretion to craft a policy to support transgender or gender-nonconforming students. The policy prefers including families in developing

gender support plans and works towards that outcome, but recognizes that not all families are supportive, and not all students are open about their gender identity at home. Where a student does not want the school to disclose their status to others, including parents, information on the student's gender identity is not shared with their family. This policy endeavors to keep transgender students supported and safe while at school. Conversely, the rule urged by Plaintiffs—one in which the school is constitutionally bound to share information about students' gender identity with parents against students' wishes—undermines trust between students and teachers, creates significant administrative burdens for schools, and improperly inserts school officials into private conversations that should happen between children and their parents at the time and in the manner chosen by the family. By contrast, policies like MCBE's are supported by social science research indicating that safe and supportive school environments are critically important for all students—and for transgender and gender-nonconforming students in particular. Schools and educators that build trust and are supportive of students' identities set these students up for higher academic achievement, improved mental health outcomes, and bigger and better plans for the future.

We therefore join MCBE and its members in supporting affirmance of the decision below dismissing Plaintiffs' complaint.

2

## ARGUMENT

I.   **The States Have Broad Discretion To Shape The School Environment To Ensure That Students Succeed.**

A.   **States use the public school system to educate the next generation of citizens.**

Public schools play a foundational role in society.  For decades, courts have recognized that these institutions serve as States' primary tool in raising successive generations of citizens, providing them with the tools they need to lead fulfilled lives and creating the buildings blocks of broader societal cohesion.  In *Brown v. Board of Education*, for instance, the Supreme Court observed that public schools are "a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment," such that "it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education."  347 U.S. 483, 493 (1954).  Indeed, the *Brown* Court noted, the public school system is "the very foundation of good citizenship" and of key "importance to our democratic society."  *Id.*

Since *Brown*, the Court has repeatedly "express[ed] an abiding respect for the vital role of education in a free society" and recognized "the grave significance of education both to the individual and to our society."  *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 30 (1973) (collecting cases; cleaned up).  In *Ambach v. Norwick*, for example, the Court upheld a state statute limiting

3

employment as a teacher to American citizens because of "[t]he importance of public schools in the preparation of individuals for participation as citizens, and in the preservation of the values on which our society rests."  441 U.S. 68, 76 (1979). In doing so, the Court explained how a robust public school system creates benefits not just for individuals, but for the States and for society as a whole:  Common education serves as an "'assimilative force' by which diverse and conflicting elements in our society are brought together on a broad but common ground" and "inculcat[es] fundamental values necessary to the maintenance of a democratic political system."  *Id.* at 77; *see also id.* at 79 ("[A] teacher has an opportunity to influence the attitudes of students toward government, the political process, and a citizen's social responsibilities.  This influence is crucial to the continued good health of a democracy.").

The Court has also described the dual nature of education as benefiting both individuals and the fabric of our society at large.  In *Bethel School District No. 403 v. Fraser*, the Court observed that public schools "prepare pupils for citizenship in the Republic" by "inculcat[ing] the habits and manners of civility as values in themselves conducive to happiness" while also recognizing that such values are "indispensable to the practice of self-government in the community and the nation."  478 U.S. 675, 681 (1986).  This same principle has been emphasized in oft-cited concurrences as well.  *See, e.g.*, *McCollum v. Bd. of Ed. of Sch. Dist. No.*

*71*, 333 U.S. 203, 216, 231 (1948) (Frankfurter, J., concurring) (observing that public schools are "perhaps the most powerful agency for promoting cohesion among a heterogenous democratic people" and are "at once the symbol of our democracy and the most pervasive means for promoting our common destiny"); *School Dist. of Abington Township v. Schempp*, 374 U.S. 203, 241-42 (1963) (Brennan, J., concurring) (stating that "public schools serve a uniquely public function: the training of American citizens" and observing that a "public secular education" serves "uniquely democratic values"). So too has this Court recognized the "obvious importance of … schools in shaping the character of our future citizens." *Hugger v. Rutherford Inst.*, 94 F. App'x 162, 167 (4th Cir. 2004).

In light of the indispensable benefits public schools provide, the Court observed in *Brown* that "education is perhaps the most important function of state and local governments." 347 U.S. at 493. And the Court has echoed this observation in the ensuing decades. *See, e.g.*, *Ambach*, 441 U.S. at 75-76 (observing that the provision of education "goes to the heart of representative government" and "fulfills a most fundamental obligation of government to its constituency" (cleaned up)); *Wisconsin v. Yoder*, 406 U.S. 205, 213 (1972) ("Providing public schools ranks at the very apex of the function of a State.").

Public schools thus lie at the heart of both an obligation and an opportunity for States—an obligation to provide people with the skills they need as citizens, and an opportunity to forge a unified society that will stand the test of time.

### B.    States are vested with meaningful discretion to shape school policies.

In order to fulfill our critical educational mission, States are given latitude to shape the school environment.  The Supreme Court has repeatedly underscored that "States and local school boards are generally afforded considerable discretion in operating public schools."  *Edwards v. Aguillard*, 482 U.S. 578, 583 (1987); *see also, e.g.*, *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 507 (1969) ("[T]he Court has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials … to prescribe and control conduct in the schools."); *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968) ("By and large, public education in our Nation is committed to the control of state and local authorities.").  And the Court has directly grounded this discretion in the States' paramount interest in providing our citizenry with an education.  *See, e.g.*, *Yoder*, 406 U.S. at 213 ("There is no doubt as to the power of a State, having a high responsibility for education of its citizens, to impose reasonable regulations for the control and duration of basic education."); *Ambach*, 441 U.S. at 78 ("In shaping the students' experience to achieve educational goals, teachers by necessity have wide discretion over the way course material is communicated to students."); *Bd. of*

*Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 863-64 (1982) (noting that "local school boards have broad discretion in the management of school affairs" and that "local school boards must be permitted to establish and apply their curriculum in such a way as to transmit community values" (cleaned up)).

Of course, States' latitude to control the school environment is subject to certain restraints imposed by federal law, including prohibitions against discrimination contained in the Equal Protection Clause and Title IX of the Education Amendments of 1972. *See Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 606-19 (4th Cir. 2020). States' discretion is also "not totally free from a balancing process when it impinges on fundamental rights and interests." *Yoder*, 406 U.S. at 214; *see also, e.g.*, *Tinker*, 393 U.S. at 507 (stating that States' "comprehensive authority" must be exercised "consistent with fundamental constitutional safeguards").

For constitutional claims, this Court has already decided the level of scrutiny appropriate for MCBE's exercise of discretion, where, as the district court found here, Plaintiffs' claim hinged on a school policy of seeking students' consent before advising their parents of their gender identity. *John and Jane Parents 1 v. Montgomery Cnty. Bd. of Ed.*, No. 8:20-cv-3552-PWG, 2022 WL 3544256, at *7

(D. Md. Aug. 18, 2022).[1]  In *Herndon v. Chapel Hill-Carrboro City Board of Education*, 89 F.3d 174, 177-79 (4th Cir. 1996), this Court reviewed Supreme Court jurisprudence stretching back to the 1920s concerning school policies that allegedly bore on parents' fundamental right to direct their children's education. Synthesizing this precedent, the Court held:

> [T]he Supreme Court has stated consistently that parents have a liberty interest, protected by the Fourteenth Amendment, in directing their children's schooling.  Except when the parents' interest includes a religious element, however, the Court has declared with equal consistency that *reasonable* regulation by the state is permissible even if it conflicts with that interest.  That is the language of rational basis scrutiny.

*Id.* at 179.  Plaintiffs here do not suggest that MCBE or its policy infringe on any particular religious interest.  *See generally* Pls.' Br.  Accordingly, under the rational basis review dictated by this Court's own precedent, MCBE has discretion to determine how to operate its schools to best serve its students.

The discretion vested in schools is not limited solely to issues of curriculum. Although Plaintiffs suggest otherwise, attempting to limit the States' authority to a supposed "curricular exception" to parents' right to control their children's

---

[1]    While Plaintiffs contend that MCBE's policy abridges "their right to remove their child from public school by not telling them that the school is fostering their child's gender transition" and infringes on parental rights by "allowing school personnel to decide whether and when their children should gender transition or how they should do so," Pls.' Br 5-6, as the district court discerned, this view of Plaintiffs' claims bears no real resemblance to the MCBE policy's aims or the way it operates. *John and Jane Parents 1*, 2022 WL 3544256, at *5-7.

education, Pls.' Br. 14-23, the Supreme Court has linked the discretion given to teachers and schools to schools' educational operations beyond just the curriculum itself, including teachers' "direct, day-to-day contact with students both in the classrooms and in the other varied activities of a modern school," *Ambach*, 441 U.S. at 78. As the Court has noted, "a teacher's function as an example for students … exists independently of particular classroom subjects." *Id.* at 80; *cf., e.g.*, *McCollum*, 333 U.S. at 224 (Frankfurter, J., concurring) (noting in a discussion of "released time" for religious instruction that "education was more than instruction in a classroom").

Again, this Court's own precedent demonstrates that schools have discretion over policy that goes beyond questions of instruction or subject matter. *Herndon*, for example, upheld a school district's requirement that students complete fifty hours of community service in order to graduate. 89 F.3d at 176. This Court has also rejected a claim by parents that a school rule concerning eligibility for interscholastic athletics interfered with their fundamental right to control their child's education. *Bailey v. Va. High Sch. League, Inc.*, 488 F. App'x 714, 716 (4th Cir. 2012). Other courts have similarly rejected parental liberty claims touching on a wide array of non-curricular issues. *See, e.g.*, *Immediato v. Rye Neck Sch. Dist.*, 73 F.3d 454, 462 (2d Cir. 1996) (community service requirement); *Blau v. Ft. Thomas Pub. Sch. Dist.*, 401 F.3d 381, 395-96 (6th Cir. 2005) (dress

9

code); *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 291 (5th Cir. 2001)

(dress code); *Kite v. Marshall*, 661 F.2d 1027, 1029-30 (5th Cir. 1981) (attendance

at summer athletic training camps); *Curtis v. Sch. Comm. of Falmouth*, 652 N.E.2d

580, 584-87 (Mass. 1995) (voluntary condom distribution program); *Howe v.

Aytes*, No. 2:14-cv-00077, 2016 WL 3262600, at *1-4 (M.D. Tenn. June 10, 2016)

(student pickup procedures requiring parents to wait inside vehicles).  The breadth

and variety of these holdings underscore the importance of schools being given

leeway to guide students in the manner the schools themselves deem best suited to

achieve their critical educational goals.

### C.    Plaintiffs' proposed framework creates significant burdens on State and local governments' ability to fulfill the mission of their schools.

The rule suggested by Plaintiffs here—that the Constitution requires schools

to inform parents of conversations with students about gender identity regardless of

circumstances against those same students' wills—would interfere with critical

functions of public education.

Perhaps most important, this rule would chill open communication and

damage the trust between students and their teachers, coaches, and guidance

counselors.  Trusting relationships with school staff aid students in manifold ways:

Students who trust their teachers are more engaged in learning, have improved

academic achievement, are less likely to avoid school, are more self-directed, and

have greater confidence in their own ability to process information even after

leaving school.[2]  These kinds of benefits lie at the very heart of the civic purpose

of public education.

But these benefits would be undermined by a rule requiring school officials

to provide parents with information about a student's gender identity against the

student's will—particularly where the student's request is based on fears of

negative reactions, or even for their own safety.  A student not wanting information

about their gender identity shared with their family would not share that

information with their teachers either, creating distance that otherwise might not

exist and preventing the student from reaping the benefits that can result from close

relationships with school staff.  Indeed, in other contexts, courts and others have

decried legal rules that destroy trust between students and their teachers and

coaches.  *See, e.g.*, *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 664 (1995);

*Earls ex rel. Earls v. Bd. of Ed. of Tecumseh Pub. Sch. Dist.*, 242 F.3d 1264, 1280

(10th Cir. 2001) (Ebel, J., dissenting) (noting that *Vernonia* stated that "any

suspicion-based [drug] testing changes the relationship between students and

---

[2]     *See* Monika Platz, *Trust Between Teacher and Student in Academic Education at School*, 55 J. Phil. Ed. 688-697 (2021), https://doi.org/10.1111/1467-9752.12560; Sara Rimm-Kaufman & Lia Sandilos, *Improving Students' Relationships with Teachers to Provide Essential Supports for Learning*, Am. Psychological Ass'n (2015), https://www.apa.org/education-career/k12/relationships.

teachers from one of trust and cooperation to one of distrust and adversarial interactions"); *see also Kahn v. East Side Union High Sch. Dist.*, 75 P.3d 30, 52 (Cal. 2003) (Kennard, J., concurring in part) (arguing that failure to assign coaches a duty to ensure school sports are conducted safely "puts an end to [students'] trust" in coaches "not to carelessly and needlessly expose them to injury" that arises from coaches' roles as "a mentor or role model").

Plaintiffs' proposed constitutional rule would impose significant administrative burdens on schools as well. Plaintiffs claim they require information on "the school's 'philosophy'" and also its specific "application to their own child" in order to determine whether to keep their child in public schools, Pls.' Br. 13, but this notion is unaccompanied by any coherent limiting principle. These particular Plaintiffs object to a policy regarding students' gender identity, but other parents may have wholly different objections to a school's operations as applied to their own child that might inspire them to withdraw their children from the public education system. If school officials were constitutionally required to share *any* school-related information with parents—beyond information, of course, that is necessary to ensure a student's health and safety—schools could be required to make time-consuming and burdensome case-by-case determinations of what kinds of information to disclose to parents. Further, officials would be required to create systems to ensure that such disclosures were made, adding another layer of

complication to the daily operation of the schools. "Schools cannot be expected to accommodate the personal, moral or religious concerns of every parent. Such an obligation would not only contravene the educational mission of the public schools, but also would be impossible to satisfy." *Fields v. Palmdale Sch. Dist.*, 427 F.3d 1197, 1206 (9th Cir. 2005), *opinion reaff'd and amended on denial of reh'g sub nom. Fields v. Palmdale Sch. Dist.*, 447 F.3d 1187 (9th Cir. 2006).

Finally, Plaintiffs' rule requiring disclosure of information on students' gender identity would force school officials to interfere with sensitive familial relationships. The question of whether and how to share information on one's gender identity is deeply personal, and as the district court and the MCBE policy both recognized, for youth in particular these issues "can be complex and may involve familial conflict." *John and Jane Parents 1*, 2022 WL 3544256, at *6. Were Plaintiffs to prevail, school officials would be *required* to insert themselves into these highly sensitive discussions and to share information that should come from the child in the context of family conversations. This kind of forced disclosure would have obvious negative repercussions for a child who is not yet ready to have this discussion with their parents or who perceives their parents as unsupportive of their identity[3]—and if anything, this represents *more* of an

---

[3]     *Cf.* Nicole Legate et al., *Is Coming Out Always a "Good Thing"? Exploring the Relations of Autonomy Support, Outness, and Wellness for Lesbian, Gay, and*
(footnote continued)

intrusion on the parent-child relationship than the restraint from such communications about which Plaintiffs complain.  Conversely, the current MCBE policy encourages participation of families:  Where the student is not open about gender status at home, including "because of safety concerns or lack of acceptance," school staff will work with the student "toward inclusion of the family, if possible, taking safety concerns into consideration, as well as student privacy."  JA69; *see also* JA89-90, JA104 (stating that school officials should take case-by-case approaches based on student privacy and safety).  This allows children or parents to initiate these conversations about students' identity within their own families, leaving school officials free to focus on creating a positive and supportive environment for education.[4]

---

*Bisexual Individuals*, 3 Social Psychological & Personality Sci. 145-52 (2012), https://journals.sagepub.com/doi/10.1177/1948550611411929 (LGB individuals who disclose sexual identity in environments less supportive of authentic expressions of the self are less likely to reap mental well-being benefits of coming out).

[4]      Plaintiffs are wrong that policies like MCBE's "regulate what happens at home" or "regulate [the] parent-children relationship."  Pls.' Br. 21.  Nothing about the policy dictates whether or how a student discusses gender identity with their family, or vice versa.  If anything, the policy keeps schools *out* of the home by leaving familial discussion of a student's gender identity in the hands of family members themselves.  In any event, the clear benefits a policy like MCBE's has on the academic environment, *see infra* Part II.B, place it well within the scope of the school's discretion.

## II.    States Have An Interest In Making Schools A Safe And Supportive Environment For All Youth, Including Transgender Youth.

States have a strong interest in fostering safe and supportive schools for all children to learn, thrive, and grow into contributing members of our society. Safe and supportive school environments that nurture the whole student, foster trusting relationships, and promote a sense of belonging are a crucial component of student success, in terms of both academic outcomes and student well-being. Safe and supportive school environments are particularly important for transgender and gender-nonconforming youth. Transgender youth often experience discrimination, harassment, and stigma, causing tangible mental and physical harm and restricting their ability to realize their potential. Conversely, robust data confirm that transgender students who feel safe expressing their gender identity at school are happier, healthier, and more academically successful. The experiences of *Amici* States and other jurisdictions show that policies and practices that support all facets of students' identities and facilitate trusting relationships between adults and students are beneficial for all students, including and especially transgender and gender-nonconforming youth.

### A.    All students benefit from safe and supportive schools.

Courts have recognized that the States' responsibility to provide public education encompasses the duty to "protect" students from harm. *Mahanoy Area Sch. Dist. v. B.L.*, 141 S. Ct. 2038, 2046 (2021). Considering the vast influence

that education has over the trajectory of an individual's life, it is essential that States provide students with a safe educational environment that allows them to succeed and thrive to the best of their abilities.

*Amici* States and other governmental institutions,[5] as well as medical and educational organizations,[6] have recognized that physically and psychologically safe schools are indispensable to obtaining optimal health and educational outcomes for all students. While there is no exhaustive list of what constitutes a safe and supportive educational environment, research has emphasized both physical safety and security alongside emotional well-being, connectedness of staff and students, and norms and policies.[7] This framework is heavily supported by extensive developmental science and neuroscience research affirming that educational environment and school culture influence many facets of a child's

---

[5]     *See, e.g.*, *Safe & Supportive Schools*, Office of Elementary and Secondary Ed. (2022), https://oese.ed.gov/offices/office-of-formula-grants/safe-supportive-schools/; *About*, Nat'l Ctr. on Safe Supportive Learning Environments (2022), https://safesupportivelearning.ed.gov/about.

[6]     *See, e.g.*, *Safe and Supportive Schools Project*, Am. Psychological Ass'n (2014), https://www.apa.org/pi/lgbt/programs/safe-supportive.

[7]     Jenna Howard Terrell et al., *Conceptualizing and Measuring Safe and Supportive Schools*, 24 Contemporary Sch. Psychology 327-29 (Aug. 2020), https://www.researchgate.net/publication/343619376_Conceptualizing_ and_Measuring_Safe_and_Supportive_Schools.

development, including social-emotional and academic learning.[8]  In contrast, the

experience of fear or anxiety weakens a child's cognitive capacity and disrupts the

learning process:  In essence, without physical and psychological safety, students

are biologically unable to learn effectively.[9]  Accordingly, safe and supportive

school environments allow students to develop positive relationships, regulate their

emotions and behavior, and maintain physical and psychological well-being—

which, in turn, contribute to academic and non-academic success.[10]

In particular, safe and supportive educational environments foster a student's

belief that both adults and peers in the school care about their education and about

them as individuals.[11]  Schools depend on interpersonal relationships that set

students up to succeed emotionally, socially, and academically.[12]  Trust in an

educational space depends on a student's willingness to be vulnerable, which

---

[8]      *See* Linda Darling-Hammond et al., *Implications for educational practice of the science of learning and development*, 24 Applied Developmental Sci. 97-98 (Feb. 17, 2019), https://doi.org/10.1080/10888691.2018.1537791.

[9]      *Id.* at 102.

[10]      Mass. Gen. Laws ch. 69, § 1P.

[11]      *School Connectedness Helps Students Thrive*, Ctrs. for Disease Control and Prevention (Sept. 28, 2022), https://www.cdc.gov/healthyyouth/protective/school_connectedness.htm.

[12]      *See* Benjamin Kutsyuruba et al., *Relationships among school climate, school safety, and student achievement and well-being: a review of the literature*, 3 British Ed. Rsch. Ass'n 103-35 (June 30, 2015), https://doi.org/10.1002/rev3.3043; Roxanne Mitchell et al., *Student trust in teachers and student perceptions of safety: positive predictors of student identification with school*, 21 Int'l J. Leadership Ed. 135-54 (May 2016), https://doi.org/10.1080/13603124.2016.1157211.

requires confidence that the other party is benevolent, honest, open, reliable, and competent.[13]  There is a thoroughly documented link between student trust and healthy school climates, academic optimism, student identification with school, and academic performance.[14]

Because the student-teacher relationship in particular holds enormous importance in the school environment, the degree and quality of trust between student and teacher significantly impacts a student's educational experience.  Yet trust does not arise in all student-teacher relationships:  Research indicates that teachers must first demonstrate caring and goodwill in order to cultivate the trust of their students.[15]  Students have been shown to believe that a teacher cares about them if the teacher showed concern about them as a person outside of the school context and communicated openly.[16]  Conversely, after student-teacher trust is developed, subsequent violations of that trust are difficult to repair.[17]

When students believe a teacher cares such that there is trust in that relationship, there is a positive effect on that student's academic outcomes and the

---

[13]    Megan Tschannen-Moran et al., *Student Academic Optimism: A confirmatory factor analysis*, 51 J. Educ. Admin. 151-52 (Mar. 2013), https://doi.org/10.1108/09578231311304689.

[14]    Mitchell et al., *supra* note 12, at 138.

[15]    Tschannen-Moran et al., *supra* note 13, at 168.

[16]    *Id.* at 153-54.

[17]    Mitchell et al., *supra* note 12, at 138.

degree to which a student identifies with their school.[18]  Indeed, a substantial body of research indicates that students benefit from student-teacher relationships that are trusting and warm, where the student and teacher are independent and generally not in conflict.[19]  These positive student-teacher relationships—at all stages, from early childhood to adolescence and young adulthood—have been shown to have a beneficial effect on student engagement, academic achievement, students' self-esteem, and social skills, while reducing a student's likelihood of being suspended or of dropping out of school.[20]  Such benefits are not limited to the student-teacher relationship:  The presence of a strong, trusting, and supportive connection to any adult in the school setting (e.g., mentors, advisors) is also connected to a greater likelihood that a student will attend, graduate, and succeed academically.[21]  In addition, strong student-school staff relationships have impacts on students beyond

---

[18]    Tschannen-Moran et al., *supra* note 13, at 153-54, 168-70; Mitchell et al., *supra* note 12, at 148-49.

[19]    Laurie Kincade et al., *Meta-Analysis and Common Practice Elements of Universal Approaches to Improving Student-Teacher Relationships*, 90(5) Review of Ed. Rsch. 711-12 (Aug. 4, 2020), https://journals.sagepub.com/doi/abs/10.3102/0034654320946836.

[20]    *Id*. at 712; Tschannen-Moran et al., *supra* note 13, at 150-54, 157-58, 167-71; Isabel Brito et al., *Do You Trust Me? A Systematic Literature Review on Student-teacher Trust and School Identification*, The European Conference on Ed. 2021 (Sept. 2021), https://papers.iafor.org/wp-content/uploads/papers/ece2021/ECE2021_60608.pdf.

[21]    Darling-Hammond et al., *supra* note 8, at 103.

the individuals involved in the relationship, as students who trust their teachers and administrators are more likely to report unsafe situations and lead to intervention.[22]

Of note, students have been shown to learn most effectively when in an environment with positive adult-student relationships that are culturally sensitive and recognize a student's identity as one that belongs and is deserving of value.[23] Furthermore, students experiencing the effects of poverty, trauma, and discrimination are particularly susceptible to interference with their learning and opportunities to succeed.[24] However, these consequences are mitigated by the presence of strong relationships and support systems in the school setting.[25]

Ultimately, a student's sense of connectedness to their school affects much more than just academic achievement.[26] Over two decades of research has demonstrated that school connectedness directly promotes positive outcomes and

---

[22]     Mitchell et al., *supra* note 12, at 136.

[23]     Darling-Hammond et al., *supra* note 8, at 102.

[24]     *Id.* at 103.

[25]     *Id.*

[26]     Russell M. Viner et al., *Adolescence and the social determinants of health*, 379(9826) Adolescent Health 1641-52 (Apr. 28, 2012), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(12)60149-4/fulltext; M D Resnick et al., *Protecting adolescents from harm. Findings from the National Longitudinal Study on Adolescent Health*, 278 J. Am. Med. Ass'n 823-32 (Sept. 10, 1997), https://pubmed.ncbi.nlm.nih.gov/9293990/; Marina Feijo et al., *Improving School Outcomes for Transgender and Gender-Diverse Youth: A Rapid Review*, 9(1) Policy Insights from the Behavioral and Brain Sciences 27-34 (2022), https://journals.sagepub.com/doi/abs/10.1177/23727322211068021.

buffers the negative effects of risk factors related to mental health, violence, sexual behavior, and substance use.[27]  Recent work has demonstrated that the influence of school connectedness experienced as an adolescent continues to impact students as they become adults, resulting in reduced emotional distress and suicidal ideation, a lower likelihood of physical violence victimization and perpetration, and less prescription or illicit drug use in adulthood.[28]  Accordingly, schools that value safety and trusting relationships benefit all students in that educational environment—academically and otherwise.

Recognizing the paramount importance of fostering these safe and trusting relationships, *Amici* States and their localities have created a number of policies to ensure a positive school culture.  For example, Massachusetts has codified a Safe and Supportive Schools framework, and released detailed implementation guidance to help school staff gauge where progress needs to be made and identify available methods for improving conditions and outcomes within their specific school community based on local context, resources, and capacity.[29]

---

[27]    Riley J. Steiner et al., *Adolescent Connectedness and Adult Health Outcomes*, 144(1) Pediatrics 1-11 (Jul. 1, 2019), https://doi.org/10.1542/peds.2018-3766; M D Resnick et al., *supra* note 26, at 831-32.

[28]    *Id.*

[29]    Mass. Gen. Laws ch. 69, § 1P; *Safe and Supportive Schools Self-Reflection Tool*, Mass. Dep't of Elementary and Secondary Ed. (2022), http://www.sassma.org/.

**B.     Transgender youth face unique struggles that are addressed through a safe and supportive school environment.**

Providing a safe and supportive school environment is especially important to transgender and gender-nonconforming youth, who experience levels of discrimination and violence higher than their cisgender peers.[30]

According to a 2022 mental health survey, 71% of transgender and nonbinary youth respondents reported being discriminated against because of their gender identity.[31]  A 2017 study suggested that as many as 75% of transgender students surveyed felt unsafe at school as a result of their gender identity or gender expression,[32] which corresponds with recent data suggesting that youth questioning their gender identity similarly faced a risk of a hostile school climate.[33] Transgender students are more likely than cisgender students to report that they feel unsafe at or traveling to and from school, have experienced bullying at school,

---

[30]     Joseph G. Kosciw et al., *The 2021 National School Climate Survey: The Experiences of LGBTQ+ Youth in Our Nation's Schools*, GLSEN xxvii, 93 (2022) https://www.glsen.org/sites/default/files/2022-10/NSCS-2021-Full-Report.pdf.

[31]     *2022 National Survey on LGBTQ Youth Mental Health*, The Trevor Project 17 (2022), https://www.thetrevorproject.org/survey-2022/; *see also* Feijo et al., *supra* note 26, at 27-28.

[32]     *Separation and Stigma: Transgender Youth and School Facilities*, Movement Advancement Project & GLSEN 4 (2017), https://www.glsen.org/ research/separation-and-stigma-transgender-youth-and-school-facilities.

[33]     Kosciw et al., *supra* note 30, at 94.

and have been threatened or injured with a weapon at school.[34]  Additionally, transgender and gender-nonconforming students of color and students with disabilities face compounded levels of discrimination based on their intersecting identities.[35]  This discrimination, violence, and harassment has been shown to reduce transgender and gender-nonconforming students' sense of connection to their schools and their own sense of belonging as compared to other students.[36]

Discrimination based on gender identity and expression in educational settings can result in severe health consequences for transgender and gender-nonconforming youth.  In the 2015 U.S. Transgender Survey, 77% of respondents—including students out as transgender and those who believed they were perceived as transgender or questioning—reported negative experiences at

---

[34]    Michelle M. Johns et al., *Transgender Identity and Experiences of Violence Victimization, Substance Use, Suicide Risk, and Sexual Risk Behaviors Among High School Students — 19 States and Large Urban School Districts, 2017*, 68 Morbidity & Mortality Weekly Report 67, 69 (2019), https://www.cdc.gov/mmwr/volumes/68/wr/mm6803a3.htm; *see also* Movement Advancement Project & GLSEN, *supra* note 32, at 3 (finding that transgender students were more likely to report having experienced verbal harassment, physical harassment, and physical assault as compared to their peers).

[35]    *See, e.g.,* Nhan L. Truong et al., *Erasure and Resilience: The Experiences of LGBTQ Students of Color—Black LGBTQ Youth in U.S. Schools*, GLSEN (2020), https://www.glsen.org/research/black-lgbtq-students.

[36]    Kosciw et al., *supra* note 30, at xix-xx.

school in grades K–12, such as harassment or having been attacked.[37]  Among

those same respondents, the youth who reported negative experiences were more

likely to be under serious psychological distress, to have experienced

homelessness, and to have attempted suicide.[38]  Furthermore, transgender and

gender nonconforming youth experience significantly higher rates of suicidal

thoughts and attempts than in the overall U.S. population.[39]  A 2022 mental health

survey found that over half of transgender and nonbinary youth reported having

seriously considered suicide in the past year, and nearly one in five attempted

suicide in that timeframe.[40]  One study found that a lack of school belonging,

familial emotional neglect, and internalized self-stigma contributed to suicidal

thoughts among transgender youth.[41]  The COVID-19 pandemic has only

exacerbated the mental health crisis among this group of students:  More than three

---

[37]    Sandy E. James et al., *The Report of the 2015 U.S. Transgender Survey*, Nat'l Ctr. for Transgender Equal. 131-35 (2016), https://transequality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf.

[38]    *Id*.

[39]    *See, e.g.,* Ann P. Haas et al., *Suicide Attempts Among Transgender and Gender Non-Conforming Adults: Findings of the National Transgender Discrimination Survey*, Am. Found. for Suicide Prevention & Williams Inst. 2 (2014), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-GNC-Suicide-Attempts-Jan-2014.pdf.

[40]    The Trevor Project, *supra* note 31, at 4.

[41]    Ashley Austin et al., *Suicidality Among Transgender Youth: Elucidating the Role of Interpersonal Risk Factors*, 37 J. Interpersonal Violence 2696 (2022), https://doi.org/10.1177/0886260520915554.

in five transgender and nonbinary youth reported in 2022 that their mental health was poor most of the time or always due to the pandemic.[42]

Discrimination, harassment, and stigma based on gender identity also detrimentally impact transgender and gender-nonconforming students' academic outcomes. Transgender students who experienced higher levels of victimization in school as a result of their gender expression are less likely to plan to graduate high school, twice as likely to report that they did not plan to pursue post-secondary education, have lower grade point averages (GPAs), and are three times more likely to have missed school in a given month.[43] Questioning students are also more likely than cisgender students to miss school because they feel unsafe.[44] In the absence of safe and supportive school environments, transgender and gender-nonconforming students also frequently avoid attending school functions and participating in extracurricular activities.[45]

Because the harm commonly experienced by transgender students and gender-nonconforming students is related to the way they are treated at school, increased acceptance and affirmation like that fostered by safe and supportive

---

[42]    The Trevor Project, *supra* note 31, at 13.

[43]    Movement Advancement Project & GLSEN, *supra* note 32, at 4; Kosciw et al., *supra* note 30, at xix, 35.

[44]    Kosciw et al., *supra* note 30, at 84.

[45]    *Id*. at xv, 11, 84.

school environments are effective means of counteracting such harm.[46]  Supportive

educators have been shown to have an immensely positive influence on

transgender and gender-nonconforming students' academic success and mental

health.  LGBTQ+ students with support from many (11 or more) supportive staff at

their school were less likely to feel unsafe because of their gender expression and

sexual orientation, were less likely to miss school because they felt unsafe or

uncomfortable, had higher GPAs, were less likely to say they might not graduate

high school, and felt greater belonging to their school community.[47]  These

students at schools with more supportive staff also reported higher levels of self-

esteem and lower levels of depression.[48]

Trust of school personnel has been found to be an important factor in the

academic success of transgender and gender-nonconforming youth specifically, in

---

[46]    *See, e.g.,* Michelle Marie Johns et al., *Trends in violence victimization and suicide risk by sexual identity among high school students — Youth Risk Behavior Survey, United States, 2015-2019*, 69(Suppl-1) Morbidity and Mortality Weekly Report Suppl. (Aug. 21, 2020), https://www.cdc.gov/mmwr/volumes/69/su/su6901a3.htm.

[47]    Joseph G. Kosciw et al., *The 2019 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in Our Nation's Schools*, GLSEN (2019), https://www.glsen.org/sites/default/files/2021-04/NSCS19-FullReport-032421-Web_0.pdf.

[48]    *Id.*

part because trusting adult relationships were associated with feelings of safety.[49]

Transgender and gender-nonconforming youth who had a relationship with a

supportive educator were less likely to miss school and less likely to drop out, even

if they experienced victimization and harassment from others in the school

environment.[50]  Transgender students who reported being supported in their

transition (e.g., addressed by their chosen name and pronouns) also reported

mental health outcomes analogous to their cisgender peers.[51]  Indeed, gender-

affirming environments generally are associated with reduced suicide risk among

transgender and gender-nonconforming youth, and gender-affirming school

environments were specifically found to have the strongest association with

---

[49]     Jenifer K. McGuire et al., *School Climate for Transgender Youth: A Mixed Method Investigation of Student Experiences and School Responses*, J. Youth & Adolescence 1187 (April 2010), https://link.springer.com/article/10.1007/s10964-010-9540-7.

[50]     Michelle Marie Johns et al., *Protective factors among transgender and gender variant youth: A systematic review by socioecological level*, 39(3) J. Primary Prevention 263-301 (2018), https://link.springer.com/article/10.1007/s10935-018-0508-9.

[51]     *See* Movement Advancement Project & GLSEN, *supra* note 32, at 4*; see also* Kristina R. Olson et al., *Mental Health of Transgender Children Who Are Supported in Their Identities*, 137(3) Pediatrics (2016), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4771131/ (finding similar results for transgender children based on parental reports).

reduced odds of reporting a suicide attempt within the past year of all the spaces studied.[52]

Cognizant of the importance of education to all our communities' youth, as well as the broad negative effects of discrimination specifically for transgender and gender nonconforming students, many *Amici* States and other jurisdictions protect transgender and gender-nonconforming students by codifying prohibitions against discrimination in schools on the basis of gender identity,[53] similar to Maryland's protections.[54]  We also recognize that ensuring safe and supportive school environments is an important part of fulfilling those anti-discrimination obligations.  For example, the Massachusetts Board of Elementary and Secondary Education provides guidance to school districts regarding anti-discrimination compliance vis-à-vis gender identity in the context of a safe and supportive school, recognizing the deeply personal nature of decisions related to sharing gender

---

[52]  *The Trevor Project Research Brief: LGBTQ & Gender-Affirming Spaces*, The Trevor Project (December 2020), https://www.thetrevorproject.org/wp-content/uploads/2021/07/LGBTQ-Affirming-Spaces_-December-2020.pdf.

[53]  *See, e.g.*, Mass. Gen. Laws ch. 76, § 5; Cal. Educ. Code § 220; *Equality Maps: Safe Schools Laws*, Movement Advancement Project (2022), https://www.lgbtmap.org/equality-maps/safe_school_laws ("nondiscrimination" tab) (compiling laws of all states).

[54]  *See* Md. Code Regs. §§ 13A.01.06.03(B)(5)(d), 13A.01.06.04.

identity and explaining best practices.[55]  These guidelines often indicate that the best practice is to engage the student in discussion regarding aspects of the school experience such as name and pronoun usage, and that such discussions should occur before discussing a student's gender nonconformity with that student's parent or guardian.[56]  Similarly, California's Department of Education guidelines "support[] healthy communication between educators, students, and parents" where possible, but also recommend districts consult with a student and respect their wishes to limit disclosure of their transgender status, including to the student's family.[57]  Policies like that of the MCBE thus reflect common practices within *Amici* States and other jurisdictions to foster an inclusive, supportive educational environment that benefits all students, including and especially transgender and gender nonconforming youth.

## **CONCLUSION**

For the foregoing reasons, this Court should affirm the judgment below.

---

[55]     *See Guidance for Massachusetts Public Schools Creating a Safe and Supportive School Environment*, Mass. Dep't of Elementary and Secondary Ed. (2022), https://www.doe.mass.edu/sfs/lgbtq/GenderIdentity.html.

[56]     *See, e.g.*, *id.*

[57]     *See Frequently Asked Questions*, Cal. Dep't of Educ. (2021), https://www.cde.ca.gov/re/di/eo/faqs.asp; *Legal Advisory*, Cal. Dep't of Educ. (2021), https://www.cde.ca.gov/re/di/eo/legaladvisory.asp.

Respectfully submitted,

MAURA HEALEY
  *Attorney General*
  *Commonwealth of Massachusetts*
David C. Kravitz*
  *Deputy State Solicitor*
Adam M. Cambier
Cassandra J. Thomson
  *Assistant Attorneys General*
One Ashburton Place
Boston, MA 02108
david.kravitz@mass.gov
(617) 963-2427
    *Counsel of Record*

Dated: January 4, 2023

ROBERT BONTA
*Attorney General of California*
1300 I Street
Sacramento, CA 95814

PHILIP J. WEISER
*Attorney General of Colorado*
1300 Broadway, 10th Floor
Denver, CO 80203

WILLIAM TONG
*Attorney General of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

BRIAN L. SCHWALB
*Attorney General for the District of Columbia*
400 6th Street NW, Suite 8100
Washington, D.C. 20001

ANNE E. LOPEZ
*Attorney General of Hawaiʻi*
425 Queen Street
Honolulu, HI 96813

KWAME RAOUL
*Attorney General of Illinois*
100 West Randolph Street, 12th Floor
Chicago, IL 60601

ANTHONY G. BROWN
*Attorney General of Maryland*
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202

KEITH ELLISON
*Attorney General of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther King Jr. Boulevard
St. Paul, MN 55155

MATTHEW J. PLATKIN
*Attorney General of New Jersey*
25 Market Street
Trenton, NJ 08625

LETITIA JAMES
*Attorney General of New York*
28 Liberty Street
New York, NY 10005

ELLEN F. ROSENBLUM
*Attorney General of Oregon*
1162 Court Street N.E.
Salem, OR 97301

PETER F. NERONHA
*Attorney General of Rhode Island*
150 South Main Street
Providence, RI 02903

SUSANNE R. YOUNG
*Attorney General of Vermont*
109 State Street
Montpelier, VT 05609

ROBERT W. FERGUSON
*Attorney General of Washington*
P.O. Box 40100
Olympia, WA 98504

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B), because it contains 6,487 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman style, 14-point font.

/s/ David C. Kravitz
*Counsel of Record*
