UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 22-2034**

JOHN AND JANE PARENTS 1; JOHN PARENT 2,

Plaintiffs - Appellants,

v.

MONTGOMERY COUNTY BOARD OF EDUCATION; SHEBRA L. EVANS, individually and in their official capacity as Member of the Montgomery County Board of Education; BRENDA WOLFF, individually and in their official capacity as Member of the Montgomery County Board of Education; JUDITH DOCCA, individually and in their official capacity as Member of the Montgomery County Board of Education; KARLA SILVESTRE, individually and in their official capacity as Member of the Montgomery County Board of Education; REBECCA SMONDROWSKI, individually and in their official capacity as Member of the Montgomery County Board of Education; LYNNE HARRIS, DR. SCOTT JOFTUS AND DR. MONIFA B. MCKNIGHT,

Defendants - Appellees.

----------------------------------

PACIFIC JUSTICE INSTITUTE; DR. ERICA E. ANDERSON; JEWISH COALITION FOR RELIGIOUS LIBERTY; COALITION FOR JEWISH VALUES; AMERICAN HINDU COALITION; ISLAM AND RELIGIOUS FREEDOM ACTION TEAM; ALLIANCE DEFENDING FREEDOM,

Amici Supporting Appellant.

AMERICAN CIVIL LIBERTIES UNION; PFLAG; PFLAG REGIONAL CHAPTERS; CHASE BREXTON HEALTH CARE; FCPS PRIDE; FREESTATE JUSTICE; HUMAN RIGHTS CAMPAIGN; THE TREVOR PROJECT; TIME OUT YOUTH CENTER; WHITEMAN-WALKER HEALTH; WHITMAN WALKER INSTITUTE; PROFESSORS OF PSYCHOLOGY & HUMAN DEVELOPMENT; MASSACHUSETTS; CALIFORNIA; COLORADO;

CONNECTICUT; DISTRICT OF COLUMBIA; HAWAII; ILLINOIS; MARYLAND; MINNESOTA; NEW JERSEY; NEW YORK; OREGON; RHODE ISLAND; VERMONT; WASHINGTON,

Amici Supporting Appellee.

———————————

Appeal from the United States District Court for the District of Maryland, at Greenbelt. Paul W. Grimm, Senior District Judge. (8:20-cv-03552-PWG)

———————————

Argued: March 9, 2023                    Decided: August 14, 2023

———————————

Before NIEMEYER, QUATTLEBAUM, and RUSHING, Circuit Judges.

———————————

Vacated and remanded by published opinion. Judge Quattlebaum wrote the majority opinion, in which Judge Rushing joined. Judge Niemeyer wrote a dissenting opinion.

———————————

**ARGUED:** Frederick W. Claybrook, Jr., CLAYBROOK LLC, Washington, D.C., for Appellants. Alan E. Schoenfeld, WILMERHALE LLP, New York, New York, for Appellees. **ON BRIEF:** Steven W. Fitschen, NATIONAL LEGAL FOUNDATION, Chesapeake, Virginia, for Appellants. Bruce M. Berman, Washington, D.C., Simon B. Kress, Boston, Massachusetts, Thomas K. Bredar, WILMER CUTLER PICKERING HALE AND DORR LLP, New York, New York, for Appellees. Kevin T. Snider, PACIFIC JUSTICE INSTITUTE, Sacramento, California; Sorin A. Leahu, PACIFIC JUSTICE INSTITUTE – IL, Park Ridge, Illinois, for Amicus Pacific Justice Institute. Luke N. Berg, WISCONSIN INSTITUTE FOR LAW & LIBERTY, Milwaukee, Wisconsin, for Amicus Dr. Erica E. Anderson, PhD. Sue Ghosh Stricklett, AMERICAN HINDU COALITION, Sterling, Virginia, for Amicus American Hindu Coalition. Jeffrey C. Mateer, Keisha T. Russell, Plano, Texas, Kayla A. Toney, FIRST LIBERTY INSTITUTE, Washington, D.C., for Amici Jewish Coalition for Religious Liberty, Coalition for Jewish Values, American Hindu Coalition, and Islam and Religious Freedom Action Team. Katherine L. Anderson, Scottsdale, Arizona, Christopher P. Schandevel, John J. Bursch, Tyson C. Langhofer, ALLIANCE DEFENDING FREEDOM, Lansdowne, Virginia, for Amicus Alliance Defending Freedom. Jon W. Davidson, Harper S. Seldin, Chase B. Strangio, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York, for Amicus American Civil Liberties Union. Karen L. Loewy, Washington, D.C., Paul D. Castillo, LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC., Dallas, Texas; Maureen P. Alger, Palo Alto, California, Jeffrey M. Gutkin, Reece Trevor,

Hamaseh Sorooshian, COOLEY LLP, San Francisco, California, for Amici PFLAG and PFLAG Regional Chapters, Chase Brexton Health Care, FCPS Pride, Freestate Justice, Human Rights Campaign, The Trevor Project, Time Out Youth Center, Whitman-Walker Health, and Whitman-Walker Institute. Shannon Minter, Asaf Orr, NATIONAL CENTER FOR LESBIAN RIGHTS, San Francisco, California, for Amici Professors of Psychology & Human Development. Maura Healey, Attorney General, David C. Kravitz, Deputy State Solicitor, Adam M. Cambier, Assistant Attorney General, Cassandra J. Thomson, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MASSACHUSETTS, Boston, Massachusetts, for Amicus Commonwealth of Massachusetts. Robert Bonta, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF CALIFORNIA, Sacramento, California, for Amicus State of California. Philip J. Weiser, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF COLORADO, Denver, Colorado, for Amicus State of Colorado. William Tong, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF CONNECTICUT, Hartford, Connecticut, for Amicus State of Connecticut. Brian L. Schwalb, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF THE DISTRICT OF COLUMBIA, Washington, D.C., for Amicus District of Columbia. Anne E. Lopez, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF HAWAI'I, Honolulu, Hawai'i, for Amicus State of Hawai'i. Kwame Raoul, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ILLINOIS, Chicago, Illinois, for Amicus State of Illinois. Anthony G. Brown, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Amicus State of Maryland. Keith Ellison, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MINNESOTA, St. Paul, Minnesota, for Amicus State of Minnesota. Matthew J. Platkin, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEW JERSEY, Trenton, New Jersey, for Amicus State of New Jersey. Letitia James, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEW YORK, New York, New York, for Amicus State of New York. Ellen F. Rosenblum, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF OREGON, Salem, Oregon, for Amicus State of Oregon. Peter F. Neronha, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF RHODE ISLAND, Providence, Rhode Island, for Amicus State of Rhode Island. Susanne R. Young, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF VERMONT, Montpelier, Vermont, for Amicus State of Vermont. Robert W. Ferguson, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF WASHINGTON, Olympia, Washington, for Amicus State of Washington.

———————————

QUATTLEBAUM, Circuit Judge:

Frederick Douglass famously said that our freedoms as Americans rest in the ballot box and the jury box.[1] So true. But when may we open each box? This appeal illustrates that dilemma.

The Montgomery County Board of Education adopted Guidelines for Gender Identity for 2020–2021 that permit schools to develop gender support plans for students. The Guidelines allow implementation of these plans without the knowledge or consent of the students' parents. They even authorize the schools to withhold information about the plans from parents if the school deems the parents to be unsupportive.

In response, three parents with children attending Montgomery County public schools challenged the portion of the Guidelines that permit school officials to develop gender support plans and then withhold information about a child's gender support plan from their parents. Terming it the "Parental Preclusion Policy," the parents allege the policy unconstitutionally usurps the parents' fundamental right to raise their children under the Fourteenth Amendment.

But, before considering the merits of the parents' argument, we must decide whether the parents have alleged that the Parental Preclusion Policy caused an injury to them sufficient to give them access to the jury box—or, stated differently, to create what we call "standing." And this case begins and ends with standing.

---

[1] Frederick Douglass, *The Life and Times of Frederick Douglass: From 1817–1882*, at 333 (John Lobb ed., 1882). Douglass also said there is a third box on which our freedoms rest—the cartridge box. However, we need not open that box today.

The parents have not alleged that their children have gender support plans, are transgender or are even struggling with issues of gender identity. As a result, they have not alleged facts that the Montgomery County public schools have any information about their children that is currently being withheld or that there is a substantial risk information will be withheld in the future. Thus, under the Constitution, they have not alleged the type of injury required to show standing.

Absent an injury that creates standing, federal courts lack the power to address the parents' objections to the Guidelines. That does not mean their objections are invalid. In fact, they may be quite persuasive. But, by failing to allege any injury to themselves, the parents' opposition to the Parental Preclusion Policy reflects a policy disagreement. And policy disagreements should be addressed to elected policymakers at the ballot box, not to unelected judges in the courthouse. So, we remand to the district court to dismiss the case for lack of standing.

## I.

First, some background on the Guidelines. They provide that "all students should feel comfortable expressing their gender identity, including students who identify as transgender or gender nonconforming." J.A. 68. The goals of the Guidelines are to

> [s]upport students so they may participate in school life consistent with their asserted gender identity; [r]espect the right of students to keep their gender identity or transgender status private and confidential; [r]educe stigmatization and marginalization of transgender and gender nonconforming students; [and] [f]oster social integration and cultural inclusiveness of transgender and gender nonconforming students.

J.A. 68. To further these goals, the Guidelines call for "gender support plan[s]." J.A. 69.

The principal (or designee), in collaboration with the student and the student's family (if the family is supportive of the student), should develop a plan to ensure that the student has equal access and equal opportunity to participate in all programs and activities at school and is otherwise protected from gender-based discrimination at school.

J.A. 69. The specifics of a student's gender support plan depend on information provided by the student in consultation with school officials. But "each plan should address identified name; pronouns; athletics; extracurricular activities; locker rooms; bathrooms; safe spaces, safe zones, and other safety supports; and formal events such as graduation." J.A. 69.

The Guidelines also address communication with the student's parents. "Prior to contacting a student's parent/guardian, the principal or identified staff member should speak with the student to ascertain the level of support the student either receives or anticipates receiving from home." J.A. 69. Schools are to "support the development of a student-led plan that works toward inclusion of the family." J.A. 69. But the school may withhold information about a student's gender support plan "when the family is nonsupportive." J.A. 69.

## II.

Three parents of children attending Montgomery County Public Schools sued the Board and a number of individual defendants[2] in Maryland state court, challenging the Parental Preclusion Policy. Once again, this is the portion of the Guidelines that permit the

---

[2] For convenience, we refer to the defendants collectively as "the Board."

schools to both develop a gender support plan without parental involvement and withhold information about a student's gender support plan from the student's parents. The parents asserted that the Parental Preclusion Policy violates their fundamental right to raise their children under the Fourteenth Amendment of the Constitution as well as various state and federal statutes. After removing the case to the United States District Court for the District of Maryland, the Board moved to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state claims for which relief can be granted. The district court granted the motion and dismissed all the parents' claims. The parents timely appealed but only as to the dismissal of their federal constitutional claim.

## III.

On appeal, the parents' focus is narrow. They do not challenge the Guidelines as a whole. Using their own words, the parents "filed this action challenging the Parental Preclusion Policy." Op. Br. 4. To eliminate any uncertainty, the parents clarified that they

> are not attempting to dictate a curriculum about transgenderism or to change the [] bullying guidelines. They are only insisting that they be informed of their own, individual children's behavior when it deviates from the prior instruction about the naming and gender of their child—and not lied to about it by school personnel.[3]

---

[3] The parents' focus on the Parental Exclusion Policy seems strategic. The broader the challenge, the more likely the parents are to encounter what they describe as the "curricular exception" to fundamental parental rights. *See* Op. Br. 14; *Herndon v. Chapel Hill-Carrboro Bd. of Educ.*, 89 F.3d 174, 179 (4th Cir. 1996) (explaining that parents have a liberty interest, protected by substantive due process, in directing their children's schooling; but, unless coupled with a religious element, rational basis review applies to regulations made by public schools).

Op. Br. 15–16.

In addition to arguing that the district court did not err in dismissing the parents'
claim on the merits, the Board argues that the parents lacked Article III standing because
they did not allege facts that showed the Parental Preclusion Policy caused an "injury in
fact." Resp. Br. 18. The Board did not raise this issue below and the district court did not
address it. But because standing is jurisdictional, "it may be raised and addressed for the
first time on appeal." *Davison v. Randall*, 912 F.3d 666, 677 (4th Cir. 2019).

Since standing involves our jurisdiction to hear this appeal, we begin there. We must
determine whether the injury the parents complain of—a breach of their "rights to access
certain information generated and retained about their minor children"—conveys standing
based on the facts alleged. J.A. 36.

### A.

To answer this question, it is useful to review some basics. Article III of the
Constitution limits the jurisdiction of the federal courts to "Cases" and "Controversies."
U.S. Const. art. III, § 2. That federal courts' jurisdiction is limited to actual cases or
controversies is a "bedrock" principle fundamental to our judiciary's role in our system of
government. *Raines v. Byrd*, 521 U.S. 811, 818 (1997).

A dispute is not a case or controversy if the plaintiff lacks standing. *Id.* To establish
standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete,
particularized, and actual or imminent; (ii) that the injury was likely caused by the
defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion
LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (citing *Lujan v. Defenders of Wildlife*, 504

U.S. 555, 560–561 (1992)). In other words, a plaintiff must have a sufficient "personal stake in the alleged dispute" and have a particularized injury that a court can remedy. *Raines*, 521 U.S. at 819 (internal quotation marks and citation omitted).

Discussions about standing are inevitably wonky. But that should not obscure the importance of the underlying principles involved. "The requirement of standing furthers the separation of powers between the three branches of our government. Under the Constitution, a party's grievance without an injury in fact does not confer standing . . . ." *Menders v. Loudoun Cnty. Sch. Bd.*, 65 F.4th 157, 163 (4th Cir. 2023). That means disputes without an injury that confers standing should be addressed to elected officials, not the courts. Indeed, under Article III:

> [F]ederal courts do not adjudicate hypothetical or abstract disputes. Federal courts do not possess a roving commission to publicly opine on every legal question. Federal courts do not exercise general legal oversight of the Legislative and Executive Branches, or of private entities. And federal courts do not issue advisory opinions.

*Transunion LLC*, 141 S. Ct. at 2203. The limit on federal courts' jurisdiction is clear: "Article III grants federal courts the power to redress harms that defendants cause plaintiffs, not a freewheeling power to hold defendants accountable for legal infractions." *Id.* at 2205 (internal quotation marks and citations omitted). At bottom, we may only resolve real controversies with real impact on real people.

This appeal concerns the injury-in-fact requirement of standing.[4] That prong requires either a current injury, a certainly impending injury, or a substantial risk of a future injury. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) ("An injury sufficient to satisfy Article III must be concrete and particularized and actual or imminent, not conjectural or hypothetical. An allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." (cleaned up)); *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013). And for a future injury to support Article III standing, the claimed harm must not be so speculative as to lie "at the end of a 'highly attenuated chain of possibilities.'" *South Carolina v. United States*, 912 F.3d 720, 727 (4th Cir. 2019) (quoting *Clapper*, 568 U.S. at 410) (noting that "[t]he Supreme Court has repeatedly held" that harms lying at the end of a highly attenuated chain of possibilities are too speculative to support standing). The risk of a future injury must be substantial, not just conceivable.

## B.

With that background, we turn to the parents' allegations here. They allege that the Parental Preclusion Policy is currently in place. They claim it applies to all students, including their children. They claim that under that policy, the Montgomery County public schools have withheld information concerning over 300 gender support plans of students from parents. The parents claim they have a fundamental right in the rearing of their

---

[4] The Board also argued that the parents lack standing because their alleged injuries are not redressable by courts. But because of our injury-in-fact decision, we need not address the redressability argument.

children and that implementing a gender support plan and withholding information about such a plan from parents interferes with that right in violation of the Constitution's due process clause.

But those allegations are insufficient to create standing. To repeat, standing requires either a current injury, a certainly impending injury or substantial risk of a future injury. And the parents do not allege one.

As for a current injury, they have not alleged any of their children have gender support plans. Nor have they alleged that their children have had any discussions with school officials about gender-identity or gender-transition issues. So, according to their allegations, no information is being withheld from them under the Parental Preclusion Policy. In their briefs to us on appeal, the parents effectively concede a lack of current injury by arguing they should be able to challenge the policy before they are injured. Rep. Br. 8 ("[I]f they cannot preemptively challenge the policy, then they will be *required* to suffer the harm before they are capable of challenging the policy.") The closest the parents come to asserting a current injury is opining that "[f]or all [they] know, some of their own children *could be* part of the 300" students with a gender support plan. Rep. Br. 2 (emphasis added). This does not establish a current injury.

The parents likewise have not alleged any facts that indicate they have a certainly impending injury or a substantial risk of future harm from the Parental Preclusion Policy. For example, they have not alleged that they suspect their children might be considering gender transition or have a heightened risk of doing so. Again, the closest the parents come

to alleging such a possibility is stating that "[f]or all [they] know," their children "might soon be" subject to a gender support plan that is withheld from them. Rep. Br. 2.

Without more, any risk of future injury alleged by the parents is far more attenuated than what the Supreme Court has allowed. In *Clapper*, attorneys, human rights advocates and members of the media challenged provisions of the Foreign Intelligence Surveillance Act that permitted the government, with approval from a FISA court, to surveil non-citizens outside the United States' borders. 568 U.S. at 401. The plaintiffs alleged they were in contact with individuals they *believed* to be targets of government surveillance and thus *believed* their communications would be unconstitutionally captured. *Id.* at 406–07.

In analyzing standing, the Supreme Court reiterated that "no principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Id.* at 408 (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006)). And it explained that "allegations of *possible* future injury are not sufficient" to support standing. *Id.* at 409 (internal quotation marks omitted). The Court held that plaintiffs' "argument rests on their highly speculative fear that" the government would identify the individuals with whom the plaintiffs were in contact to be targets; then, the government would decide to use the particular type of surveillance being challenged and not other sources of information gathering; then, the FISA court had to approve the desired surveillance; and, finally, the government would intercept the communications. *Id.* at 410. According to the Supreme Court, this "speculative chain of possibilities" that "require[d] guesswork as to

how independent decisionmakers will exercise their judgment" was insufficient to establish Article III standing. *Id.* at 413–14.[5]

The parents' claims likewise depend on a speculative fear, the occurrence of which requires guesswork as to actions of others. Determining whether the parents will ever sustain an injury based on the Parental Preclusion Policy requires a chain of the following future events to occur: (1) their minor children must determine they identify as transgender or gender nonconforming, (2) their minor children must decide they want to approach the school about a gender support plan, (3) the school must deem the parents unsupportive and (4) it must then decide to keep the information about their children from them. And, on these allegations, any determination on the likelihood of these events occurring requires guesswork as to both their children's actions and actions of the Montgomery County public schools.

The parents also argue that we should find standing because they may never know they have been injured. Indeed, the Parental Preclusion Policy allows the Montgomery

___

[5] *Clapper* is no outlier. Nor is its test limited to claims involving national security. The Supreme Court has reiterated this concept multiple times since the *Clapper* decision in a variety of legal contexts. *See, e.g.*, *TransUnion LLC*, 141 S. Ct. at 2210 ("As this Court has recognized, a person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is *sufficiently imminent* and substantial." (emphasis added)); *California v. Texas*, 141 S. Ct. 2104, 2119 (2021) ("It would require far stronger evidence than the States have offered here to support their counterintuitive theory of standing, which rests on a 'highly attenuated chain of possibilities.'" (citation omitted)); *Susan B. Anthony List*, 573 U.S. at 158 ("An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk that the harm will occur.'" (cleaned up)). So while there may not be a Supreme Court case in the context of the type of claim the parents advance, we see no reason why the analysis from *Clapper* and these other decisions would not apply.

County public schools to hide the very information about the children that would establish the injury. And the Montgomery County Board of Education does not deny this. Perhaps because the Board of Education's position is so staggering from a policy standpoint, this argument has some appeal.

But the Supreme Court's *Clapper* decision and our *Wikimedia Foundation v. National Security Agency*, 857 F.3d 193 (4th Cir. 2017), decision tell us that we do not toss out the injury requirement because the government hides information. Those cases dealt with challenges to government surveillance, which the government keeps secret. Even though that hindered plaintiffs' ability to determine whether they had been injured, both *Clapper* and *Wikimedia* found no Article III standing for plaintiffs who could not allege an imminent or substantially likely harm. Thus, the fact that the Montgomery County Board of Education permits its schools to keep information about its students' gender support plans and related gender-identity issues from their parents, while perhaps repugnant as a matter of policy, does not create standing.

Simply put, the parents may think the Parental Preclusion Policy is a horrible idea. They may think it represents an overreach into areas that parents should handle. They may think that the Board's views on gender identity conflict with the values they wish to instill in their children. And in all those areas, they may be right. But even so, they have alleged neither a current injury, nor an impending injury or a substantial risk of a future injury. As such, these parents have failed to establish an injury that permits this Court to act. Or, to use Douglass' language, the jury box is not available to them. These parents must find their remedy at the ballot box.

## C.

Our good colleague in dissent reaches a different conclusion. He insists our determination that the parents challenge only the Parental Preclusion Policy reads the complaint too narrowly. According to the dissent, the parents have brought a broader challenge to the Guidelines on Gender Identity and have sufficiently alleged facts to support standing. But there are several problems with this argument.

### 1.

First, the parents disavow the dissent's interpretation of their claims. They could hardly have been clearer in telling us that they only challenge the Parental Preclusion Policy. In the very first sentence of the complaint, the parents state that they "have brought this action to enforce their rights to access certain information generated and retained about their minor children." J.A. 36. Right off the bat, they clarified that their case is about the Parental Preclusion Policy and that the injury they complain of is lack of access to information about their children. But that is not all. In their briefs to us, they repeated this framing of their challenge, emphasizing that they "are *only* insisting that they be informed of their own, individual children's behavior when it deviates from their prior instruction about the naming and gender of their child—and not lied to about it by school personnel." Op. Br. 15 (emphasis added). The dissent may wish the parents advanced a different theory. But in our system, we resolve the issues the parties press; not ones we'd prefer they had pressed.

2.

Second, the dissent misconstrues the allegations of the complaint that purportedly support its theory that the parents challenge to the Guidelines extends beyond the Parental Preclusion Policy. It cites paragraph two of the complaint:

> [The] Policy [is] expressly *designed to circumvent parental involvement* in a pivotal decision affecting the Plaintiffs Parents' minor children's care, health, education, and future. *The Policy enables [the Board] personnel to evaluate minor children about sexual matters* and *allows minor children, of any age, to transition* socially to a different gender identity at school without parental notice or consent. . . . *The Policy then prohibits personnel from communicating with Parents* about this potentially life-altering and dangerous choice, unless the minor child consents to parental disclosure.

Dissenting Op. at 32. But those allegations do not suggest a broader challenge. Instead, they immediately follow the paragraph where the parents expressly state that they brought this case to enforce their rights to information. So read in context, paragraph 2 merely elaborates on effects of the Parental Preclusion Policy. It is not any different or a broader challenge.

The dissent also cites paragraph 34 of the complaint:

> Pursuant to the [Montgomery County Public Schools] Policy, [Montgomery County Public Schools] *is taking over the rightful position of the Plaintiff Parents* and intentionally *hindering them from counseling their own minor children* concerning an important decision that will have life long repercussions and from providing additional professional assistance to their children that the parents may deem appropriate. *This decision directly relates to the Plaintiff Parents' primary responsibilities* to determine what is in their minor children's best interests with respect to their support, care, nurture, welfare, safety, and education.

Dissenting Op. at 32. These allegations likewise do not represent a broader challenge or describe an alternative injury. To the contrary, they explain the consequences the parents

contend result from the Parental Preclusion Policy. This is evident from the actual language of paragraph 34 itself. But it is even more clear when that paragraph is read in context. The immediately preceding paragraph describes the parents' alleged injury as stemming directly from potential withholding of information in the future. J.A. 46. ("Plaintiff Parents cannot wait to challenge the [Montgomery County Public School] Policy until they learn that one of their children experiences gender dysphoria."). Thus, paragraph 34 does not suggest a challenge that is broader than the Parental Preclusion Policy; it confirms that is the focus of their challenge. So, the allegations in the complaint are consistent with the clear statements from the parents on appeal that their challenge is narrowly focused on the Parental Preclusion Policy.

3.

Third, disagreements about the relative breadth of the complaint's language aside, none of the harms the dissent argues are described in the complaint occur until a child identifies as transgender or gender nonconforming and has approached the school for a gender support plan. And even after that, the school must also deem the parents unsupportive and decide to keep the information about their child from them. That leaves these parents at the end of a "hypothetical chain of events" that the Supreme Court has told us precludes standing.

4.

Fourth, the dissent repeats several times that the parents allege the Guidelines are mandatory and apply to all students. We agree. But we disagree that such allegations are enough to confer standing. In other words, just because a policy or practice exists and is

unconstitutional does not mean a particular plaintiff has been injured and has standing to challenge it. *See Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 489 (1982) (rejecting the view that "the business of the federal courts is correcting constitutional errors, and [] 'cases and controversies' are at best merely convenient vehicles for doing so and at worst nuisances that may be dispensed with when they become obstacles to that transcendent endeavor" as having "no place in our constitutional scheme").

*Susan B. Anthony List* illustrates this principle. There, two advocacy groups challenged the constitutionality of an Ohio statute prohibiting the use of false statements during political campaigns. 573 U.S. at 152. The Court identified the test for when "pre-enforcement review" of an allegedly unconstitutional law is allowed. *Id.* at 159. To establish standing in that context, the Court explained, it is not enough that plaintiffs be subject to a law they believe to be unconstitutional. Rather—to satisfy the injury-in-fact requirement of standing—they must show (1) "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute" and that (2) "there exists a credible threat of prosecution thereunder." *Id.* (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)).

This test would be meaningless if the Court's standing inquiry simply asked whether the plaintiff was the subject of an allegedly unconstitutional law. In *Susan B. Anthony List*, the law being challenged applied to the plaintiffs. Nevertheless, the plaintiffs were required to show more—that there was a credible threat of government *action* that would harm them. In other words, a plaintiff must show it is substantially likely she will actually be *injured*

by the law, not simply that she must operate under the realm of an unconstitutional law or policy. Likewise, in our case, the parents must show a substantial risk that they will be injured by the school's policy of nondisclosure—not merely that it applies to their children in the abstract.

5.

Fifth and finally, the dissent argues that *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701 (2007), supports its conclusion that the parents have standing. It highlights that the Court found standing there even though harm depended on a chain of future events. In *Parents Involved*, parents claimed a student-assignment plan that allocated slots in oversubscribed high schools based on race violated the Constitution's equal protection clause. The school district argued that the parents did not have standing because, unless they apply for a slot and do not receive it, none of the plaintiffs "can claim an imminent injury." *Parents Involved*, 551 U.S. at 718. The district court agreed with the school district. In dismissing their claim, it reasoned that "[plaintiffs] will only be affected if their children seek to enroll in a Seattle public high school and choose an oversubscribed school that is integration positive—too speculative a harm to maintain standing." *Id.* The Supreme Court rejected this argument, stating that "[t]he fact that it is possible that children of group members will not be denied admission to a school based on their race—because they choose an undersubscribed school or an oversubscribed school in which their race is an advantage—does not eliminate the injury claimed." *Id.* at 718–19. The Court then explained "[plaintiffs] also asserted an interest in not being 'forced to compete for seats at certain high schools in a system that uses race as a deciding factor in many of its admission

decisions.'" *Id.* at 719 (citation omitted). And because "one form of injury under the Equal Protection Clause is being forced to compete in a race-based system," the plaintiffs had asserted a valid injury. *Id.*

*Parents Involved* provides the parents' strongest argument for standing. As the parents note, the harm there depended on a chain of future events involving decisions of others. Even so, the Supreme Court held that standing existed. And it held the harm was being forced to participate in an unconstitutional system. So, applying *Parents Involved* in this situation might suggest that the parents have standing.

But nothing about *Parents Involved* nor subsequent Supreme Court decisions indicate the standing standard from *Parents Involved* applies beyond the context of equal protection claims. The Supreme Court has not applied that standard in other contexts. In fact, if *Parents Involved*'s standing analysis extended to other contexts, the Court's standing analyses in subsequent cases does not make sense.

Take *Clapper*. There, the plaintiffs alleged that to do their work, they were forced to risk the capture of their communications under an unconstitutional law. If the plaintiffs could show standing based on the presence of an alleged unconstitutional law or policy without also showing that it had caused concrete harm, why did the Court hold the plaintiffs lacked standing?

Nor is this interpretation compatible with our own recent jurisprudence. We have consistently held that parties must show either a certainly impending harm or a substantial risk of harm for a future injury to satisfy Article III standing. *See, e.g.*, *O'Leary v. TrustedID, Inc.*, 60 F.4th 240, 245 (4th Cir. 2023) (describing plaintiff's alleged future

injury as "the kind of daisy chain of speculation that can't pass muster under Article III"); *South Carolina*, 912 F.3d at 728 (rejecting standing where harm rested on a "highly attenuated chain of possibilities"); *Beck v. McDonald*, 848 F.3d 262, 272 (4th Cir. 2017) ("*Clapper*'s iteration of the well-established tenet that a threatened injury must be 'certainly impending' to constitute an injury-in-fact is hardly novel.").

In other words, we do not read *Parents Involved* as abrogating the certainly-impending-or-substantial-risk test that applies in cases involving standing for future injuries. Rather, it hinges on the fact that the Supreme Court has repeatedly held, in equal protection cases, that being "forced to compete in a race-based system" is sufficient for Article III standing. *Parents Involved*, 551 U.S. at 719; *see also Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 211 (1995) ("The injury in *cases of this kind* is that 'a discriminatory classification prevent[s] the plaintiff from competing on an equal footing.'" (emphasis added)); *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993) ("The 'injury in fact' *in an equal protection case* of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." (emphasis added)). To reach such a conclusion, we would have to, like racehorses wearing blinders, focus only on *Parents Involved* and ignore the rest of the Supreme Court's standing jurisprudence.

Not only would applying *Parents Involved*'s standing analysis beyond the equal protection context be incompatible with subsequent Supreme Court decisions; it also would substantially lower the bar for standing. Under the dissent's reasoning, Article III standing would now exist whenever a plaintiff alleges that he or she is being forced to be part of or

participate in any allegedly unconstitutional governmental policy, regardless of whether that policy causes an injury to the plaintiff. That approach would seem to open the doors of federal courthouses for disagreements that our Founders, in crafting Article III, intended to be resolved by the other branches of our government.[6]

---

[6] The dissent says our analysis "makes no sense and has no basis in constitutional law." Dissenting Op. at 37. While that comment might provide a nice soundbite, it ignores the fact that the Supreme Court has repeatedly established and acknowledged different standing requirements for different alleged constitutional violations. Consider three different types of claims all brought under the First Amendment. First Amendment free speech cases use a specifically delineated test for standing that does not apply to other constitutional claims. *See Am. Fed'n of Gov't Emps. v. Off. of Special Couns.*, 1 F.4th 180, 187 (4th Cir. 2021) ("In cases involving the First Amendment, injury-in-fact may be established either by 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder,' or a 'sufficient showing of self-censorship which occurs when a claimant is chilled from exercising his right to free expression[.]'" (internal citations omitted)). And First Amendment Free Exercise Clause cases involve a different standing standard from First Amendment Establishment Clause cases. *Sch. Dist. of Abington Twp., Pa. v. Schempp*, 374 U.S. 203, 224 n.9 (1963) ("[T]he requirements for standing to challenge state action under the Establishment Clause, unlike those relating to the Free Exercise Clause, do not include proof that particular religious freedoms are infringed."). These decisions show that our recognition that different standing analyses apply to different types of claims does not rank the Equal Protection Clause above the Due Process Clause. It simply means the Supreme Court has established different standing standards for different constitutional claims. Indeed, the Court's language, when discussing equal protection claims of the variety in *Parents Involved,* indicates that the standing rules for equal protection cases are based on the inherent nature of those claims. *Ne. Fla. Chapter of Associated Gen. Contractors of Am.*, 508 U.S. at 666 ("The 'injury in fact' *in an equal protection case of this variety* is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." (emphasis added)). Because injuries vary based on the constitutional claim involved, it does, in fact, make sense that standing principles would as well. Finally, the dissent offers no substantive response to our analysis of why *Parents Involved* does not support the parents' arguments for standing.

6.

In sum, the dissent points to no allegations from the parents that their children are transgender, are transitioning, are considering transitioning, are struggling with gender identity issues or are at a heightened risk for questioning their biological gender. Nor does it point to any allegations that the parents otherwise suspect their children's schools are currently withholding information from them or that there is a substantial risk the schools might do so in the future. The dissent's fundamental point—"The issue of whether and how grade school and high school students choose to pursue gender transition is a family matter, not one to be addressed initially and exclusively by public schools without the knowledge and consent of parents"—may be compelling. But because these parents have not alleged an injury that confers Article III standing, their remedy lies in the ballot box, not the jury box.

IV.

Like the dissent, the parents make compelling arguments about the Parental Preclusion Policy from the Montgomery County Board of Education's Guidelines for Gender Identity. But they do not allege a current injury, a certainly impending injury or a substantial risk of future injury. As a result, they have not alleged Article III standing. And without standing, we have no jurisdiction to hear the dispute. Thus, we vacate the district court's order and remand for the case to be dismissed without prejudice.

*VACATED AND REMANDED*

NIEMEYER, Circuit Judge, dissenting:

The issue of whether and how grade school and high school students choose to pursue gender transition is a family matter, not one to be addressed initially and exclusively by public schools without the knowledge and consent of parents. Yet, the Montgomery County Board of Education (the "Board") preempts the issue to the exclusion of parents with the adoption of its "Guidelines for Student Gender Identity," which invite all students in the Montgomery County public schools to engage in gender transition plans with school Principals *without the knowledge and consent of their parents*. This policy implicates the heartland of parental protection under the substantive Due Process Clause of the Fourteenth Amendment. *See, e.g.*, *Troxel v. Granville*, 530 U.S. 57, 65–66 (2000) (plurality opinion); *Jordan v. Jackson*, 15 F.3d 333, 343 (4th Cir. 1994). And parents whose children are subject to the policy must have access to the courts to challenge such a policy. *See, e.g.*, *Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S. 701, 719 (2007).

The majority reads the Parents' complaint in this case in an unfairly narrow way and thus denies the Parents the ability to obtain relief, concluding that the Parents have no standing to challenge the Guidelines until they learn that their own children are *actually considering* gender transition. In reaching that conclusion, the majority is, I submit, unnecessarily subjecting the Parents by default to a mandatory policy that pulls the discussion of gender issues from the family circle to the public schools without any avenue of redress by the Parents. In reaching such a conclusion, the majority totally overlooks

material allegations of the complaint about the Parents' injury, which are sufficient to give the Parents standing. For example, the Parents alleged:

> Pursuant to the MCPS [Montgomery County Public Schools] Policy, MCPS is *taking over the rightful position of the Plaintiff Parents* and *intentionally hindering them* from counseling their own minor children concerning an important decision that will have life long repercussions and from providing additional professional assistance to their children that the parents may deem appropriate. *This decision directly relates to the Plaintiff Parents' primary responsibilities* to determine what is in the minor children's best interests with respect to their support, care, nurture, welfare, safety, and education.

(Emphasis added). And in their complaint, they quoted Guidelines provisions to support these allegations. The majority's conclusion is, in the circumstances of this case, an unfortunate abdication of judicial duty with respect to a very important constitutional issue that is directly harming and will likely continue to harm the Parents in this case by usurping their constitutionally protected role.

I

As the Parents allege in their complaint, the Montgomery County Board of Education, in furtherance of its policy prohibiting discrimination in the Montgomery County, Maryland, public schools based on a range of classifications, including "sex, gender, gender identity, gender expression, and sexual orientation," adopted the "2020-2021 Guidelines for Student Gender Identity in Montgomery County Public Schools." The Guidelines are dedicated to making "all students . . . comfortable expressing their gender identity" by "recogniz[ing] and respect[ing] matters of gender identity; [by] mak[ing] all reasonable accommodations in response to student requests regarding gender identity; and [by] protect[ing] student privacy and confidentiality." And to this end, the Guidelines state

25

specific goals of (1) promoting students' participation "in school life consistent with their asserted gender identity"; (2) protecting students' right "to keep their gender identity or transgender status private and confidential"; (3) "reduc[ing] stigmatization and marginalization" of such students; (4) "foster[ing] social integration and cultural inclus[ion]" of such students; and (5) providing them with support to address their status. And in turn, the Guidelines direct the staff of Montgomery County public schools to "recognize and respect matters of gender identity; make all reasonable accommodations in response to student requests regarding gender identity; and protect student privacy and confidentiality."

As relevant to this appeal, the Guidelines include provisions that make promises to all students in the school system about privacy and confidentiality, and they offer students the ability to secretly develop and implement transition plans with the school Principal (or designee). The Guidelines define "transition" as "the process by which a person decides to live as the gender with which the person identifies, rather than the gender assigned at birth."

Under the Guidelines, a student wishing to develop and implement a transition plan fills out an intake form on which the student is asked to rate the level of parental support the student expects, on a scale from 1 to 10. If the support level is deemed inadequate and the student so desires, the student is assured that the student's parents will not be told about the development and implementation of the plan. The Guidelines do not indicate that any particular score suffices for a student's parents to be deemed "unsupportive" but instead direct staff members to make that determination by considering both the information in the

form and any other information gathered from consultation with the student. The Guidelines explain the reason for excluding parents as follows:

> In some cases, transgender and gender nonconforming students may not openly express their gender identity at home because of safety concerns or lack of acceptance. Matters of gender identity can be complex and may involve familial conflict.

Accordingly, the Guidelines explicitly prohibit disclosure of the student's status "to other students, *their parents/guardians*, or third persons." (Emphasis added).

Moreover, when parents are being excluded from the development and implementation of a transition plan, the Guidelines direct staff to engage in a form of coverup by providing that "[s]chools should seek to minimize the use of permission slips and other school-specific forms that require disclosure of a student's gender or use gendered terminology" and that "[u]nless the student or parent/guardian has specified otherwise, when contacting the parent/guardian of a transgender student, [Montgomery County] school staff members should use the student's legal name and pronoun that correspond to the student's sex assigned at birth."

The transition plans that are developed and implemented under the Guidelines include changing names and pronouns; requiring staff to comply with the use of such names and pronouns; changing school records; giving students the "right to dress in a manner consistent with their gender identity"; providing access to "gender-separated areas," *e.g.*, "bathrooms, locker rooms, and changing rooms"; providing access to classes and sports, in-school athletics, and clubs in accordance with the student's new gender identity; promising special arrangements for "outdoor education/overnight field trips,"

including sleeping arrangements; and providing safe places and other similar accommodations.

Finally, the Guidelines direct staff to "understand implicit bias, promote diversity awareness, and consider the risk of self-harm or the presence of suicidal ideation." And they encourage schools "to have age-appropriate student organizations develop and lead programs to address issues of bullying prevention for all students, with emphasis on LGBTQ+ students."

The Guidelines are not voluntary and instead apply mandatorily to all students in the school system, regardless of age, and all students are thus engaged with staff to help, as the Guidelines state, eliminate bullying, harassment, and discrimination based on gender, gender identity, gender expression, and sexual orientation.

## II

Parents of students attending Montgomery County public schools commenced this action against the Board to challenge the legality of the particular aspect of the Guidelines that provides for the design and implementation of plans for students' gender transition, which involve numerous steps and actions by the school and the student and which authorizes such action without the knowledge and consent of the student's parents, if that is the student's choice. This exclusion of the parents is based on the Board's stated understanding that "transgender and gender nonconforming students may not openly express their gender identity at home because of safety concerns or lack of acceptance. Matters of gender identity can be complex and may involve familial conflict." The Board's

Guidelines rest this exclusion on the stated principle that students "have a right to privacy" that includes "the right to keep private one's transgender status or gender nonconforming presentation at school" from the student's parents. The Parents alleged that this aspect of the Guidelines is both illegal under various statutes and, as relevant here, unconstitutional, denying them substantive due process under the Fourteenth Amendment, which gives them "the fundamental rights . . . to direct the care, custody, education, and control of their minor children." They also alleged that the transition plans are "life-altering" and involve "dangerous" choices, in which parents have a right to be involved. They seek both declaratory and injunctive relief, as well as one dollar in damages.

The district court granted the Board's motion to dismiss the Parents' complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a plausible claim for relief. In reaching its conclusion, the court determined that the Guidelines were best characterized as an aspect of the school district's *educational curriculum* and noted that parents' rights to contest curricular choices that public schools make are quite narrow and are subject to rational basis review, citing and mainly relying on *Herndon v. Chapel Hill-Carrboro City Board of Education*, 89 F.3d 174 (4th Cir. 1996). The court stated, "[P]arents have no due process or privacy right to override the determinations of public schools as to the information to which their children will be exposed while enrolled as students." (Quoting *Fields v. Palmdale Sch. Dist.*, 427 F.3d 1197, 1200 (9th Cir. 2005)). At bottom, the court concluded that the Board "easily meets" the rational basis standard of review, as it "certainly has a legitimate interest in providing a safe and supportive environment for all [Montgomery County Public Schools] students, including those who

are transgender and gender nonconforming. And the Guidelines are certainly rationally related to achieving that result." Addressing the aspect of the Guidelines that allows the exclusion of parents from the process of developing and implementing transition plans, the court stated:

> If the Guidelines mandated parental disclosure as the Plaintiff Parents urge, their primary purpose of providing transgender and gender nonconforming students with a safe and supportive school environment would be defeated. *A transgender child could hardly feel safe in an environment where expressing their gender identity resulted in the automatic disclosure to their parents*, regardless of their own wishes or the consequences of the disclosure.

(Emphasis added).

From the district court's order dated August 18, 2022, dismissing their complaint, the Parents filed this appeal. And, for the first time on appeal, the Board contends that the Parents lack Article III standing to challenge the Guidelines. While the Board did not raise this issue below and the district court did not address it, Article III standing may nonetheless be raised and addressed for the first time on appeal because it is a matter of jurisdiction. *See Davison v. Randall*, 912 F.3d 666, 677 (4th Cir. 2019). And the majority now dismisses this case for lack of Article III standing.

### III

In support of its standing argument, the Board contends that "Plaintiffs nowhere allege that they have actually been (or are likely to be) harmed in any way by the Guidelines." It argues that the Parents' claim "relies on a highly attenuated chain of possibilities that is far too speculative to establish standing." And the majority agrees, relying on the absence of any allegation that the Parents' children "might be considering

gender transition or have a heightened risk of doing so." *Ante* at 11. But, in order to reach that conclusion, the majority crimps the Parents' complaint, limiting it to the simple allegation that the Parents "are only insisting that they be informed of their own, individual children's behavior." *Ante* at 7. Taking this very restrictive view of the scope of the complaint, the majority denies the Parents any relief because their "focus is narrow" and they identify no information that has been wrongly withheld from them. *Ante* at 7, 11–12.

The Parents, however, assert that they are subject to a broader ongoing policy that violates their constitutional rights and that they therefore have standing to challenge it. They note that the Board "does not deny" that it has implemented the Policy by assisting "more than 300 students . . . exhibit as transgender at school without notice to their parents." The Parents argue further that the Guidelines explicitly target a group of which they are members — "parents of children attending [Montgomery County Public] schools" — and for that reason alone, they have standing, citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561–62 (1992). They note that in *Lujan*, the Court held that "[w]hen the suit is one challenging the legality of government action or inaction, . . . standing depends considerably upon *whether the plaintiff is himself an object of the action* (or forgone action) at issue. If he is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Id.* (emphasis added).

First, it is readily apparent that the Parents' complaint is far broader in scope than the narrow reading given it by the majority. To be sure, the Parents complain about not being informed about their children's gender identity issues, but such allegations are but

31

part of their repeated broader allegations that school personnel actively facilitate the adoption of gender transition plans without parents' involvement, knowledge, or consent, which they allege is the constitutional violation causing them constitutional injury. As the complaint states in ¶ 2:

> [The] Policy [is] expressly *designed to circumvent parental involvement* in a pivotal decision affecting the Plaintiffs Parents' minor children's care, health, education, and future. *The Policy enables [the Board] personnel to evaluate minor children about sexual matters* and *allows minor children, of any age, to transition* socially to a different gender identity at school without parental notice or consent. . . . *The Policy then prohibits personnel from communicating with Parents* about this potentially life-altering and dangerous choice, unless the minor child consents to parental disclosure.

(Emphasis added). Again, in ¶ 28, the complaint states, "The evaluation by [Montgomery County Public Schools] personnel of minor students as required by the . . . Policy and Form 560-80 is deliberately not performed with prior parental consent."

And rather than simply focusing on injury from *a lack of being given notice* — as the majority limits the complaint's request for relief — the complaint alleges a broader constitutional injury of *usurping parental roles*. As the complaint states in ¶ 34:

> Pursuant to the [Montgomery County Public Schools] Policy, [Montgomery County Public Schools] *is taking over the rightful position of the Plaintiff Parents* and intentionally *hindering them from counseling their own minor children* concerning an important decision that will have life long repercussions and from providing additional professional assistance to their children that the parents may deem appropriate. *This decision directly relates to the Plaintiff Parents' primary responsibilities* to determine what is in their minor children's best interests with respect to their support, care, nurture, welfare, safety, and education.

(Emphasis added). And to make clear this broader scope of the complaint, the Parents' requests for relief include a request for an injunction that prohibits the Board (1) "from

evaluating and then enabling" gender transition without Parents' consent; (2) from "preventing its personnel" from communicating with parents about gender identity issues; (3) from "actively deceiving parents" about their children's actions with respect to gender identity.

Thus, the Parents are challenging a mandatory policy that is forced upon their children and that governs them daily, having the potential to change or actually changing the dynamics between parents and children in the school system insofar as gender identity is being actively discussed, counseled, and addressed in the school setting. Moreover, in its most intrusive element, the Policy invites minor children to develop and implement a gender transition plan without the knowledge, consent, or participation of their parents. It follows that the Parents, as alleged, cannot know whether their children have acted on that invitation because of the Policy's provisions authorizing the exclusion of parents.

In these circumstances, the Parents are not merely unharmed bystanders who simply have "a keen interest in the issue," *Hollingsworth v. Perry*, 570 U.S. 693, 700 (2013), and they are not claiming an "abstract" injury, *see TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021). Rather, they have a "personal stake" in the dispute, *Raines v. Byrd*, 521 U.S. 811, 819 (1997), as the Board has implemented ongoing, interactive Guidelines that are directed at all students in the Montgomery County public schools in furtherance of its policy against bullying, harassment, and intimidation. Several aspects of the Guidelines reflect this. *First*, the Guidelines are not voluntary or optional, but are forced on the Parents without their consent. *Second*, the Guidelines are not merely threatened or prospective, but are indeed in operation, applying *to all students in the system*. *Third*, the Guidelines

*proscribe conduct* and *prescribe actions* in furtherance of making "*all students* feel comfortable expressing their gender identity." And *fourth*, the Guidelines actively encourage *all students* to identify and feel comfortable with their views and feelings about gender identity, including gender transition, and *they invite every student* who so desires to develop a transition plan with the Principal (or designee) that involves a lengthy list of lifestyle changes and arrangements and that promises to accomplish that without parental involvement if the child anticipates that the child's parents would not support such a plan. Thus, as a result of the entire program, the dynamics and dialogue between parent and child have been changed on an ongoing basis. Important decisions about gender, sex, care, and growth and related matters, including any potentially related medical issues, are pulled from the family circle to the exclusive purview of the State. Thus, in their interactions at home, the Parents must now contend with the worry that school officials might, for example, deem "unsupportive" the Parents' view that their child ought to transition only after professional psychological or psychiatric consultation. School officials might also deem "unsupportive" the Parents' positions regarding a variety of other widely held views concerning the appropriate care for children who question their gender identity, thus invoking the Guidelines' secrecy provisions. And the Board legally justifies its posture in the name of protecting the students' right to privacy, apparently assuming that that right trumps their parents' right to raise them and care for them.

Because all these aspects and consequences of the ongoing plan implicate, in a meaningful and, indeed, shocking way, the Parents' substantive due process rights under the Fourteenth Amendment, the Parents have plausibly alleged that they are, on an ongoing

basis, suffering constitutional injury or are facing "substantial risk" of suffering such injury. *Clapper v. Amnesty Int'l*, 568 U.S. 398, 414 n.5 (2013). While Article III standing requires a showing of "concrete harm," the Supreme Court has made clear that "[v]arious intangible harms can . . . be concrete," including the "disclosure of private information[] and intrusion upon seclusion." *TransUnion*, 141 S. Ct. at 2204. And it added that "those traditional harms may also include harms specified by the Constitution itself." *Id*. Those injuries, as well as a sufficient risk of those injuries, can thus give rise to standing.

The circumstances here are quite similar to those in another case in which the Supreme Court concluded that parents did indeed have standing to challenge a school policy. In *Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S. 701 (2007), the defendant school districts had adopted student assignment plans that relied upon race "to determine which public schools certain children may attend." *Id*. at 709–710. While the students could express interest in attending particular schools, the school districts relied upon "an individual student's race in assigning that student to a particular school, so that the racial balance at the school [would fall] within a predetermined range based on the racial composition of the school district as a whole." *Id*. at 710. The school districts contended that the plaintiff Parents Involved, which was challenging the practice, lacked standing "because none of [its] current members can claim an imminent injury," arguing that "Parents Involved members *will only be affected if their children seek to enroll* in a Seattle public high school and choose an oversubscribed school that is integration positive." *Id*. at 718 (emphasis added). Given those nested layers of contingency, the school districts argued that the alleged harm was too speculative. The

Supreme Court rejected the school districts' arguments and found that Parents Involved had standing. Of particular relevance, the Court observed:

> The fact that it is possible that children of group members will not be denied admission to a school based on their race — because they choose an undersubscribed school or an oversubscribed school in which their race is an advantage — does not eliminate the injury claimed.

*Id*. at 718–19. The Court held that it was a form of constitutional injury to the parents to be *forced to participate* in "a race-based *system* that *may* prejudice the plaintiff." *Id*. at 719 (emphasis added).

So it is here. As in *Parents Involved*, the Parents in this case have alleged (1) that the school has implemented a policy with systemic effects that reach *all* enrolled students and their families; (2) that the Parents are forced into this systemic policy; and (3) that the policy causes them constitutional injury. Thus, as in *Parents Involved*, the Parents here have alleged constitutional injury that is sufficient to give them standing. *See* 551 U.S. at 719. The injury here is not merely threatened but is also ongoing because the Parents and their children are subject to the Guidelines and related policies under which the Parents are deliberately being excluded from the discussion about gender and gender transition, which "*may* prejudice" them. *Id*. (emphasis added). Indeed, the Parents claim — and the School Board nowhere disputes — that the school system at present has roughly 300 secret transitions in place. Moreover, all students are addressed by the policy, being prohibited from certain conduct, being directed in their actions and response to gender issues, and being invited on a continuing basis to develop and transition their genders pursuant to a school-sponsored plan — *all without the knowledge and consent of their Parents*. And the

Parents have also alleged that eliminating the challenged portions of the Guidelines would redress their constitutional injury. These facts readily satisfy the established requirements of Article III standing. *See Lujan*, 504 U.S. at 560–61.

The majority dismisses the applicability of the Court's *Parents Involved* decision because that decision found standing for constitutional injury under the Equal Protection Clause, not the Due Process Clause, which is as at issue here. *See ante* at 20–21. But not only did the Court not so limit its holding, the majority's argument suggests that injury under the Due Process Clause yields rank to injury under the Equal Protection Clause. This argument makes no sense and has no basis in constitutional law.

The majority also attempts to undermine my analysis with various conclusory but unsupportable statements that are dismissive of clear allegations in the Parents' complaint. For example, the majority fails to account for the Parents' clear allegations that the Guidelines "*enable[]* [the Board's] personnel *to evaluate* minor children about sexual matters and allows minor children, of any age, *to transition* socially to a different gender . . . [and] *prohibits* personnel from communicating with parents." The Parents also allege that the Guidelines "*interfere*" with the rights of parents to be fully "*involved* in addressing issues relating to gender [transition]." These allegations describe, in the present tense, how the public schools are engaging with students regarding whether they want to transition their gender while prohibiting any disclosure of the discussions and actions with parents. Yet, the majority's response is merely to recite *other* allegations claiming a right to information, thereby construing the alleged interference and involvement with parental rights as something else quite different.

The majority further suggests that this case would be different if Parents were not challenging simply "the Parental Preclusion Policy" (which allows schools to withhold information about a student's gender identity) but also the "Guidelines as a whole." Yet again, the complaint reads broader. It defines, in ¶ 19, the "Policy" that it is challenging to include (1) the Guidelines; (2) the Form 560-80 (the intake form students fill out to explore gender transition); and (3) "related training" of staff "regarding gender identity." And with this definition of "Policy," it alleges that the Board violated the Parents' Fourteenth Amendment rights "by adopting a Policy (defined [in ¶ 19])." It then describes all aspects of the Policy, including the *exclusion* of Parents, the *evaluation* of students "about sexual matters," the *enabling* of gender transits by students, and the *prohibition* on school personnel communicating with parents. Finally, the complaint alleges, in ¶ 34, that with the "Policy," the Board "is *taking over the rightful position* of the Plaintiff Parents." (Emphasis added). And the relief that the Parents seek conforms to these broader allegations, not just the denial of notice.

In this case, there is no record to consider other than the complaint, which is subject to a motion to dismiss. Thus, in reviewing it, we must take its factual allegations as true — and all of them. We may not ignore or marginalize material allegations inconsistent with the decision we have reached. Taking the complaint fairly, I conclude that Parents have alleged a real, non-abstract issue in which they have a personal stake and are directly affected and constitutionally harmed. They are not complaining in the abstract about the ideology of the Board's Policy; they are complaining that the Policy is actually interfering with the parent-child relationship and that their own children are forcefully being subjected

to it.  They have an interest; they are harmed; and their grievance can be redressed by a favorable judicial decision.  I conclude that the Parents have standing to bring their action.

IV

Because I find standing, I turn to the legal sufficiency of the complaint.  The Parents' complaint alleged, among other things, a claim under 42 U.S.C. § 1983 based on a violation of the Due Process Clause of the Fourteenth Amendment.  Their complaint asserted that the Board deprived them "of their rights, privileges, or immunities secured by the United States . . . Constitution[] . . . by execution, adoption, enforcement, and application of the [Board's] Policy with respect to withholding and secreting from Plaintiff Parents information concerning transgender inclinations and behavior of their minor children."  The complaint defined "Policy" to be the Guidelines, the student intake form, related staff training, and official Board policy.  The Parents' complaint alleged that the Policy is "expressly designed to circumvent parental involvement in a pivotal decision affecting the Plaintiff Parents' minor children's care, health, education, and future"; it "enables [the Board's] personnel to evaluate minor children about sexual matters and allows minor children, of any age, to transition socially to a different gender identity at school without parental notice or consent."  To demonstrate the adverse potential consequence of the Board's Policy, the complaint asserted that transgender children have "significantly higher rates of suicide ideation, suicide attempts, and suicide, both with respect to the average population and to those of a homosexual sexual orientation."  It continued, "Multiple studies have found that the vast majority of children (roughly 80-90%) who experience

gender dysphoria ultimately find comfort with their biological sex and cease experiencing gender dysphoria as they mature (assuming they do not transition)."  Finally, it explained, "[t]here is significant consensus that children with gender dysphoria and their parents can substantially benefit from professional assistance and counseling 'as they work through the options and implications,'" quoting guidance from the World Professional Association for Transgender Health.

The complaint also alleged that the Board adopted the Policy "deliberately" to exclude parents, and pursuant to that intention, the Board would withhold gender-identity information "even if the Plaintiff Parents specifically request such information."

For relief, the Parents sought a declaratory judgment that the Policy "with respect to withholding from parents knowledge of and information about their minor children's transgender inclinations and behaviors and all records thereof violates the fundamental rights of parents to direct the care, custody, education, safety, and control of their minor children as guaranteed by the United States Constitution."  They also sought an injunction against the Board prohibiting it (1) "from evaluating and then enabling children to transition socially to a different gender at school . . . without prior parental notice and consent"; (2) "from preventing its personnel, without first obtaining the child's consent, from communicating with parents that their child may be dealing with gender dysphoria or that their child has or wants to change gender identity and from training its personnel to follow such policy"; and (3) "from actively deceiving parents by, among other things, using different names for their child(ren) around parents than they do in the school setting." Finally, the Parents sought nominal damages of one dollar.

The district court granted the Board's motion to dismiss for failure to state a claim, analyzing the Parents' complaint as a challenge to the Board's *curricular decisions*. In that vein, the court began its analysis by stating that the Parents do not have a fundamental right "to dictate the nature of their children's education" or "to override the determinations of public schools as to the information to which their children will be exposed while enrolled as students." It concluded that "it is clear in the case law that parents do not have a constitutional right *to dictate a public school's curriculum*." (Emphasis added). Applying rational basis review, the court held that the Guidelines easily met that standard by furthering the Board's interest "in providing a safe and supportive environment for all [Montgomery County Public Schools] students, including those who are transgender and gender nonconforming," which could not be accomplished with "the automatic disclosure to [students'] parents, regardless of the [students'] own wishes." Conditionally, the court also found that the Board's interests sufficed to satisfy strict scrutiny review on the grounds that the Guidelines are narrowly tailored in furtherance of the Board's compelling interests in "(1) protecting their students' safety and ensuring a safe, welcoming school environment where students feel accepted and valued; (2) not discriminating against transgender and gender nonconforming students; and (3) protecting student privacy." (Cleaned up). The court explained that these three interests were in actuality interlocking aspects of a student's well-being and right to privacy.

The Parents contend that the district court did not address the issue that their complaint raised, treating their argument as an assertion of the right to have a say in school curriculum and policy decisions rather than as an assertion of their substantive due process

41

parental rights, which could not be dismissed under rational basis review. As the Parents state, "This is not, as the district court would have it, a dispute about what is taught in the classroom to every child." While the Parents acknowledge that parents do indeed transfer to public schools some of their responsibilities with respect to educating their children, they contend that "they do not send them to public schools to supplant their primary right and responsibility to decide what is in the best interests of their children by allowing school personnel to decide whether and when their children should gender transition or how they should do so. Nor do they relinquish their right to provide professional assistance to their children who do want to transition."

I agree with the Parents that the district court erred in addressing the Guidelines' implementation as a curricular decision, effectively sidestepping their actual claim that the parental exclusion aspect of the Guidelines violates their substantive due process rights as parents. The Parents clearly asserted in their complaint that they were seeking to vindicate their fundamental liberty interest in the "care, custody, and control of their children," as guaranteed by the Fourteenth Amendment and as stated in *Troxel v. Granville*, 530 U.S. 57, 65–66 (2000) (plurality opinion); *see also Prince v. Massachusetts*, 321 U.S. 158, 166 (1944) ("It is cardinal with us that the custody, care and nurture of the child reside *first in the parents*, whose primary function and freedom include preparation for obligations *the state can neither supply nor hinder*" (emphasis added)). The Parents point out that these principles are "beyond debate," *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972), and that the relationship between parent and child in these contexts is "inviolable except for the most compelling reasons," *Jordan v. Jackson*, 15 F.3d 333, 343 (4th Cir. 1994), thus requiring

strict scrutiny of the State's significant interference with these rights, *see Bostic v. Schaefer*, 760 F.3d 352, 377 (4th Cir. 2014).

Moreover, I also agree that the district court erred in its strict scrutiny analysis by relying on the students' well-being and privacy interests to defeat the Parents' fundamental substantive due process right. Just as it is no defense to an alleged infringement of a plaintiff's First Amendment right to claim a compelling interest in not hearing disagreeable viewpoints, so also is it no defense to an alleged infringement of parental substantive due process rights to claim a compelling interest that is premised on a rejection of that right — in this case, the Board's claimed interest in having matters central to the child's well-being kept secret from and decided by a party other than the parents. In other words, the district court failed to recognize that its analysis was akin to holding there to be a *per se* interest in infringing on the Parents' rights by granting students a superior right to privacy and granting the school the prerogative to decide what kinds of attitudes are not sufficiently supportive for parents to be permitted to have a say in a matter of central importance in their child's upbringing. But that is effectively a nullification of the constitutionally protected parental rights.

While the district court's errors would require that we vacate its opinion, we would still have to determine whether the Parents have stated a claim sufficient to survive dismissal under Rule 12(b)(6). At this stage of the proceedings, we would, as is well established, have to accept the Parents' well-pleaded factual allegations as true and determine only whether they state a plausible claim for relief. *See Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 179–80 (4th Cir. 2009). I conclude that they do.

While the science and medicine related to gender identification, gender dysphoria, and gender transitioning are, these days, being actively debated, it is clear that developing and implementing a gender transition plan for minor children without their parents' knowledge and consent do not simply implicate a school's curricular decisions but go much further to implicate the very personal decisionmaking about children's health, nurture, welfare, and upbringing, which are fundamental rights of the Parents. *See Troxel*, 530 U.S. at 65; *Parham v. J.R.*, 442 U.S. 584, 602 (1979); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Ricard v. USD 475 Geary Cnty. Sch. Bd.*, No. 5:22-cv-4015, 2022 WL 1471372, *8 (D. Kan. May 9, 2022) ("It is difficult to envision why a school would even claim — much less how a school could establish — a generalized interest in withholding or concealing from the parents of minor children, information fundamental to a child's identity, personhood, and mental and emotional well-being such as their preferred name and pronouns"). Moreover, such "care and nurture of the child reside *first in the parents*, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Prince*, 321 U.S. at 166 (emphasis added). This means that *the parents* have, in the first instance, the fundamental constitutional right "*to make decisions*" regarding their children's care. *Troxel*, 530 U.S. at 66 (emphasis added). And "[s]imply because the decision of a parent is not agreeable to a child or because it involves risks does not automatically transfer the power to make that decision from the parents to some agency or officer of the state." *Parham*, 442 U.S. at 603; *see also Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 895 (1992) ("Those enactments [requiring parental notification or consent prior to a minor's obtaining an abortion], and our judgment

that they are constitutional, are based on the quite reasonable assumption that minors will benefit from consultation with their parents and that children will often not realize that their parents have their best interests at heart"), *overruled on other grounds by Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022). And significant state interference with such fundamental rights must be examined under the strict scrutiny standard. *See Bostic*, 760 F.3d at 377.

I would thus hold that the Parents' complaint challenging the Board's policy to the extent it excludes parents from their children's decisions to develop and implement gender transition plans, states a plausible claim for relief under the Due Process Clause.

Accordingly, I would vacate the district court's order of dismissal and remand for further proceedings.